PEITZMAN, WEG & KEMPINSKY LLP
David B. Shemano
Monsi Morales
Kathryn F. Russo
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 552-3100
Fax: (310) 552-3101

Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLUB VENTURES INVESTMENTS LLC, | ) | Case No. 11-10891 |
| | ) | |
| Debtor. | ) | |
| | ) | Joint Administration Pending |
| | ) | |

**DECLARATION OF STEPHEN SCHWARTZ, CHIEF FINANCIAL OFFICER**
**OF CLUB VENTURES INVESTMENTS LLC, PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF FIRST DAY MOTIONS**

I, Stephen Schwartz, declare as follows:

1.      I am the Chief Financial Officer of Club Ventures Investments LLC ("**Club Ventures**"), a limited liability company organized under the laws of the state of Delaware and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"). I am generally familiar with the Debtor's day-to-day operations, business affairs, books, and records.

2.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"). Also on the Petition Date, certain of the Debtor's subsidiaries filed voluntary petitions for relief in this Court. A list of Club Ventures' affiliated entities, including those that are debtors in pending chapter 11 cases (collectively and

with Club Ventures, the "**Debtors**"), is attached hereto as Exhibit A.  The Debtors are operating their business and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases (the "**Chapter 11 Cases**").

3.      Concurrently with the filing of the petitions, the Debtors have moved this Court for an order authorizing the joint administration of their Chapter 11 Cases.

4.      To minimize the adverse effects of filing for bankruptcy protection on their business, the Debtors have requested various types of "first-day" relief (collectively, the "**First Day Motions**").  The First Day Motions seek relief intended to allow the Debtors to continue to operate their business with minimal interruption and to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and creditors' interests.

5.      I submit this declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for this Court ("**Local Bankruptcy Rules**") and in support of the First Day Motions.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals or learned from my review of relevant documents, or upon my opinion based upon my experience with and knowledge of the Debtors' operations and financial condition.  If called, I could and would testify competently to the facts set forth herein.  I am authorized to submit this declaration.

6.      The first part of this declaration describes the nature of the Debtors' business, the capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases, as required by Local Bankruptcy Rule 1007-2(a)(1).  The second part of this declaration sets forth the relevant facts in support of each First Day Motion.

The third part of this declaration contains additional information about the Debtors required by Local Bankruptcy Rule 1007-2(a)(2)-(12) and (b)(1)-(3).

# I.

## THE DEBTORS' BUSINESS, CAPITAL STRUCTURE AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### The Company's Business Operations

7. Club Ventures and its twenty-one (21) subsidiaries (the "**Subsidiaries**"), listed on the chart attached hereto as Exhibit A (collectively, the "**Company**"), are a premiere boutique gym company operating stylish, upscale fitness clubs in four metropolitan areas in the United States. The Company primarily targets individuals in the 18-40 year age range. The fitness clubs operate under the name DavidBartonGym. As of December 31, 2010, the Company operated six fitness clubs in the following locations: (a) three fitness clubs in New York, New York; (b) one fitness club in Chicago, Illinois; (c) one fitness club in Miami Beach, Florida; and (d) one fitness club in Bellevue, Washington. Collectively, the clubs serve approximately 13,500 members (the "**Club Members**").

8. The majority of the Company's revenues derive from the commercial operation of the fitness centers. The Company's model is differentiated from other commercial fitness centers by its focus on personal training. As a result, the revenue collected per member is higher, on average, than competing fitness centers. Revenues from personal training account for approximately 44% of total revenues for the twelve months ending December 31, 2010.

9. The Company's consolidated net revenue for the twelve months ending December 31, 2010, was approximately $28.3 million. The Company has three principal sources of revenue:

- *Membership Services Revenue*. The Company's primary source of revenue is payments for membership services provided at each of its

fitness clubs (the "**Membership Services Revenue**").  Membership Services Revenue includes amounts paid by Club Members in the form of membership fees and dues, as well as revenue generated from initiation fees.  Membership services revenue comprised 51.7% of the Company's revenue for the twelve months ending December 31, 2010.  Total Membership Services Revenue for the twelve months ending December 31, 2010 was approximately $14.6 million, a 13.2% increase from approximately $12.9 million for the twelve months ending December 31, 2009.  The increase in Member Services Revenue was primarily due to the opening of New York and Bellevue fitness centers in the second half of 2009.

- *Personal Training Revenue*.  The second major source of revenue for the Company is payments received for personal training services provided at each of the fitness clubs (the "**Personal Training Revenue**").  Personal Training Revenue includes amounts paid by Club Members who receive personal training sessions.  Personal Training Revenue comprised approximately 43.8% of the Company's revenue for the twelve months ending December 31, 2010.  Total Personal Training Revenue for the twelve months ending December 31, 2010 was approximately $12.4 million, representing a 22% increase from approximately $10.2 million for the twelve months ending December 31, 2009.  The increase in Personal Training Revenue was primarily due to the opening of New York and Bellevue fitness centers in the second half of 2009.

- *Sale of Products and Other Service Revenue*.  The Company also generates revenue through the sale of products at its fitness center retail stores, including branded and third-party nutrition products, juice bar nutrition drinks and fitness-related convenience products, such as clothing.  The Company also offers spa services at one of its locations.  Revenue

from sale of products and other services comprised 4.5% of the Company's revenue for the twelve months ending December 31, 2010. Revenue from sale of products and other services for the twelve months ending December 31, 2010 was approximately $1.3 million, representing a 62.5% increase from approximately $0.8 million for the twelve months ending December 31, 2009.

Summary Of Assets

10.     The Company holds leasehold interests in (a) the six fitness clubs located in New York, Chicago, Miami, and Bellevue, and (b) its corporate office located in New York. The Debtors do not own any property from which they operate their business.

11.     Substantially all of the Company's physical assets are fitness and other miscellaneous equipment located at the fitness centers and its corporate office in New York. The Company's books and records are maintained at its corporate office located at 50 West 23rd Street, 5th Floor, New York, New York 10010. The Company does not have any assets held outside of the United States.

Debt Structure

12.     As of the Petition Date, the Company's total debt was approximately $65.5 million, which is summarized as follows:

- Bank of America. Pursuant to a Loan Agreement dated August 4, 2009, and a separate Amended and Restated Promissory Note dated as of December 31, 2010, Club Ventures is currently indebted to Bank of America, N.A. ("**BofA**") in the approximate amount of $11,115,000 (the "**BofA Indebtedness**"). The BofA Indebtedness is secured by substantially all of Club Ventures' assets. John D. Howard ("**JDH**") is a guarantor of the BofA Indebtedness.

- Praesidian. Pursuant to security and note purchase agreements executed in 2005, 2006, 2007, 2008 and 2009, Club Ventures executed a series of promissory notes in favor of Praesidian Capital Investors, LP

("**Investor**"), Praesidian II SPV 1 LP ("**SPV 1**") and Praesidian II SPV 2, LP ("**SPV 2**"), (together with Investor and SPV 1, "**Praesidian**" or the "**Praesidian Entities**"). Currently, the Company is indebted to Praesidian in the approximate amount of $30.6 million (the "**Praesidian Indebtedness**"). All of the Praesidian Indebtedness is guaranteed by each of the Debtor's subsidiaries listed on Exhibit A attached hereto. The Praesidian Indebtedness is secured by substantially all of the Company's assets. Pursuant to several subordination agreements executed by Praesidian in favor of BofA, Praesidian's claims and liens are subordinate to BofA's claims and liens. As set forth below, Praesidian holds membership interests in Club Ventures.

- LNB Holding LLC. Pursuant to agreements entered into between the Debtors and LNB Holding LLC ("**LNB**"), as successor to JDH, the Debtors are currently indebteded to LNB in the approximate amount of $22.4 million plus an additional $2 million related to collateral that LNB has posted in connection with two of the Debtors' leases (the "**LNB Indebtedness**"). The LNB Indebtedness is secured by substantially all of the Company's assets. Pursuant to several subordination agreements executed by LNB in favor of BofA, LNB's claims and liens are subordinate to BofA's claims and liens. As set forth below, LBN holds membership interests in Club Ventures.

- Capital Leases. The Company leases various equipment under capital leases that expire over a two year period from the Petition Date. As of the Petition Date, the Company is liable for approximately $860,000 in debt relating to the equipment leases.

- Unsecured Debt. As of the Petition Date, the Debtors' consolidated unsecured debt, consisting primarily of landlords, trade vendors and professionals, is approximately $6.1 million. Attached hereto

as Exhibit B is the Debtors' consolidated list of holders of the 30 largest unsecured claims.

- <u>Lawsuits</u>. In addition to the unsecured debt described above, certain of the Debtors are parties to pending lawsuits or proceedings. Attached hereto as Exhibit C is a list of such lawsuits and proceedings.

Equity Structure

13.     Club Ventures owns 100% of the membership or shareholder interest in the Subsidiaries. Club Ventures has five classes of membership interests: Class A, Class B, Class C, Series A Preferred, and Series B Preferred. Class A membership units are held by David Barton and LBN. Class B membership units are held by Mark Berkowitz. Class C membership units are held by Elan Ben-Avi. Series A Preferred membership interests are held by LBN. Series B Preferred membership interests are held by TRL Holdings Inc., an affiliated company of Praesidian through a subsidiary. In addition, LBN and Praesidian hold warrants to purchase Class A membership units. The respective rights and priorities of the different membership classes regarding distributions are set forth in the Amended and Restated Limited Liability Company Agreement dated March 24, 2009 (the "**Operating Agreement**"). The membership interests are non-voting. Instead, the Operating Agreement provides that Club Ventures will be managed by a Board of Managers consisting of (a) a designee of Praesidian, (b) a designee of David Barton, (c) a designee of John Howard, and (d) Elan Ben-Avi. On December 24, 2010, Elan Ben-Avi resigned as a Manager and has not yet been replaced.

Events Leading To The Chapter 11 Filings

14.     In 2005, the Company had fitness clubs in four locations: (a) two in New York, (b) one in Chicago, and (c) one in Miami Beach, totaling approximately 60,000 square feet of space. In the following years, the Company decided to embark on an ambitious expansion program. Over the next two years, the Company signed seven new real estate leases representing an additional 198,000 square feet of space. Six of the leases were for new fitness centers and one lease was for the corporate office. The real

estate leases for the fitness centers had more square footage than the average size of the Company's then existing facilities and the price per square foot was almost twice what the Company was paying for its then existing fitness centers.

15.     To fund the expansion plan, the Company needed to raise capital to provide for capital expenditures, construction build-outs and working capital.  In 2006, the Company hired Mark Berkowitz ("**Berkowitz**") to serve as Chief Financial Officer. Prior to joining the Company, Mr. Berkowitz acted as a consultant to the Company.  Mr. Berkowitz was responsible for negotiating the leases and the leases were executed prior to having committed funding for these projects.  The Company engaged an investment bank, Jefferies Group, Inc. ("**Jefferies Group**"), to represent the Company in its efforts to raise capital from parties other than the current shareholders.  Jefferies Group, however, was unable to raise any outside capital.

16.     In 2006 and 2007, the Company received approximately $20 million in funding from LBN and Praesidian.  In that period, the Company lost approximately $11 million from operations, spent $6.6 million to fund the building costs for its Miami Beach location and paid off approximately $2.4 million in tax liability.  The Miami Beach project fell behind schedule and ran over budget.

17.     By 2008, the Company was incurring substantial losses from operations and generating negative cash flow.  In 2008, the Company decided to hire an outside restructuring firm, Getzler Henrich & Associates LLC ("**Getzler Henrich**") to assess the financial viability of the Company.  Getzler Henrich determined that the primary causes for the Company's poor financial performance was its lack of an experienced management team, lack of internal controls and lack of policies and procedures.  In order to address these issues the Company decided to hire a Chief Operations Officer ("**COO**").  The Company also realized that it was financially necessary to terminate some of the newly signed real estate leases.

18.     Elan Ben-Avi was hired as the COO in 2008.  Corporate overhead increased from approximately $3.0 million to approximately $6.0 million annually over

the next two year period.  In addition, the Company opened three new locations during that period.  The Debtors' projections called for significant growth in revenue from the new locations, which would cover the increased costs of overhead.  For the period of 2008-2009, the Company's revenue grew less in line with projections and fell short to adequately cover expenses incurred over this same period.  Also in 2008, the former CFO, Mark Berkowitz, commenced litigation against the Company arising from his termination and claimed $3.5 million in damages.

19.     In 2008, while the Company lost approximately $13 million from operations, it received $17 million in additional financing from BofA, Praesidian and LBN.  The Miami Beach fitness center opened in October 2008, and the Company focused its financial resources on opening two new fitness centers in New York, New York and Bellevue, Washington.

20.     The Company opened the New York fitness center in July 2009 and the Bellevue center in September 2009.  That same year the Company had a net loss of $19 million and failed to comply with the minimum EBITDA and other financial covenants, resulting in a default on the Praesidian Indebtedness.  Notwithstanding the default, the Company received an additional $15.7 million in funding from BofA, Praesidian and LBN.

21.     In 2010, the Company's projections called for an approximately 20% increase in revenue with a similar expense structure as in 2009.  The Company, however, fell short of its revenue projections for 2010 and was required to borrow $7.5 million from LBN to continue to operate.

22.     By the fourth quarter of 2010, the Company determined to implement a significant change to its business plan.  On or about December 1, 2010, Club Ventures entered into a Management Agreement with Meridian Sports Club California, LLC (collectively with all affiliates, "**Meridian**").  Meridian owns and operates 12 fitness centers in California and Hawaii.  Pursuant to the Management Agreement, Charles

Grieve, the principal of Meridian, agreed to serve as the Manager of Club Ventures. Because of the change of direction, Mr. Ben-Avi, the then existing COO, resigned.

23. The Management Agreement contemplates a strategic alliance between the Company and Meridian that will be beneficial to both entities. For example, in the coming months, Meridian will be opening a fitness center in Las Vegas as a DavidBartonGym pursuant to a licensing agreement with the Company. The Company expects that in the coming weeks and months, in the ordinary course of its business, the Company and Meridian will enter into other joint ventures that will be mutually beneficial.

24. After the Management Agreement was entered into, the Company, under the leadership of Mr. Grieve, prepared a comprehensive plan to implement a restructuring of the Company, with the goal of improving the Debtors' financial position for 2011 and beyond. The comprehensive plan contemplated a financial restructuring of the balance sheet, an operational restructuring of the Company's fitness centers and significant reductions in certain corporate costs. The Company also began introducing new initiatives to enhance revenue and cash flow.

The Planned Restructuring

25. In order to effectuate a restructuring, the Company reached out to its secured lenders to discuss and negotiate a comprehensive restructuring of the Company's overleveraged balance sheet and outstanding obligations. Those discussions and negotiations were successful. Praesidian and LNB (together, the "**Consenting Secured Creditors**") have entered into a Plan Support Agreement ("**PSA**"), pursuant to which the Consenting Secured Creditor have agreed to terms of a reorganization plan that delevers the Company's balance sheet to enable the Company to continue as a going concern.

26. Under the PSA, the Consenting Secured Creditors have committed to convert debt to equity to implement such a restructuring. In connection therewith, LNB has agreed to provide the Company with debtor-in-possession financing (the "**Proposed DIP Financing**") so that the Company can continue operating during its Chapter 11

Cases.  The Proposed DIP Financing contains milestone dates by which the Company is to, among other things, file a disclosure statement and plan and to pursue and implement a restructuring in accordance with the PSA.  However, the restructuring can also be implemented through a 363 sale if the plan process becomes inordinately delayed and/or the Company and Consenting Secured Creditors determine the restructuring can better be effectuated through such a sale.

27.    While the PSA is not currently binding on the Company, it is contemplated that upon entry of a final order approving the Proposed DIP Financing, the restructuring deadlines contained in the Proposed DIP Financing will become binding on the Company.

## II.

## FACTS SUPPORTING THE FIRST DAY MOTIONS

28.    To minimize the adverse effects of the Chapter 11 Cases on their business, the Debtors have requested various types of relief in the First Day Motions, which have been filed concurrently with the chapter 11 petitions and this Declaration.  For the reasons discussed below, I believe that the relief requested in the First Day Motions is necessary and appropriate and in the best interest of the Debtors' estates (the "**Estates**"), creditors and other parties in interest.  Capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

Motion for Joint Administration.

29.    Club Ventures owns 100% of the membership or shareholder interests in, and is the managing member and operating company for all of the Subsidiaries.

30.    While the Debtors will continue to operate as separate and distinct entities during the pendency of the Chapter 11 Cases, the Debtors share many common creditors and business relationships, such as contractual relationships, with third parties.

31.    The Debtors do not propose to take any action that would constitute substantive consolidation of their Estates, but rather seek entry of an order directing joint

administration of their Chapter 11 Cases for procedural purposes only.  I believe that entry of an order directing joint administration of the Chapter 11 Cases substantially will reduce the administrative costs of the Chapter 11 Cases, ease the administrative burden on the Court and the parties, simplify the United States Trustee's supervision of the administrative aspects of these cases and have no adverse affect on creditors because it requests only administrative, and not substantive, consolidation of the Estates. Accordingly, I believe joint administration is in the best interest of the Estates.

<u>Motion to Authorize Use of Cash Collateral And Proposed DIP Financing.</u>

32.     The Debtors have an immediate need for the use of cash collateral and debtor-in-possession financing in light of the immediate and irreparable harm that will be suffered by the Debtors' Estates if they do not have access to the cash necessary to sustain their businesses as a going concern.  The Debtors have an urgent need to use cash for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers and customers, paying employees and satisfying other working capital and operational needs — all of which are vital to preserving and maintaining the Debtors' going-concern value and, ultimately, effectuating a successful reorganization for the benefit of all parties in interest.

33.     As of the Petition Date, the Debtors have approximately $430,000 of cash on hand which comprises the cash collateral of BofA, Praesidian and LNB (collectively, the "**<u>Prepetition Secured Creditors</u>**").  The Debtors forecast receipt of $2.9 million of additional cash over the next 30 days, which cash is proceeds of the Prepetition Secured Creditors' collateral.  During that period, the Debtors forecast aggregate expenditures of approximately $2.38 million.  The interim use of cash collateral proposed is intended to provide sufficient working capital while the Debtors operate in chapter 11.  The Debtors' use of cash collateral will be governed by the budget attached as Exhibit F (the "**<u>Budget</u>**") and will be used to operate in the ordinary course of business for the benefit of

the Debtors' Estates and creditors. The Budget shows the Debtors' cash flow forecasts for the next 13 weeks.

34. In addition to the use of cash collateral, the Debtors forecast that they will also require postpetition financing to pay all expenses incurred through confirmation of a reorganization plan. LNB, which is a Prepetition Secured Creditor and holder of membership units in Club Ventures, has agreed to advance up to $800,000 to the Debtors to the extent the Debtors require such funds during the Chapter 11 Cases.

35. The Proposed DIP Financing from LNB contains very favorable terms. Most significantly, (a) the advances will be secured by liens that are junior to existing liens, which existing liens encumber substantially all of the Debtors' assets and secure claims that are greater than the value of the collateral, (b) the Debtors will not be required to make any interest payments until the maturity date of the loan, and (c) LNB did not require any material financial covenants. Because of the Debtors' historical operating losses combined with the fact that the Debtors' assets are fully encumbered, I do not believe any third-party lender would be willing to advance on terms better than the terms proposed by LNB. In my experience, at minimum, any third-party lender would require a priming lien, interest payments and financial covenants.

36. The terms of the proposed Interim Order and Proposed DIP Financing were negotiated in good faith between the Debtors, BofA, Praesidian, and LNB (all parties being represented by competent and experienced counsel). I believe that such terms are fair and reasonable under the circumstances, are supported by reasonably equivalent value and fair consideration, are the best terms available under the circumstances, and will allow the Debtors sufficient capital to operate their business with the goal of effectuating a reorganization plan.

37. The Debtors are seeking entry of the Interim Order on an expedited basis because of the immediate and irreparable harm that would be suffered by the Debtors' Estates if the Debtors cannot obtain the financing needed to sustain their businesses as a going concern. The Debtors have an immediate need to obtain postpetition financing and

the use of cash collateral to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to meet payroll obligations, and to satisfy other working capital and operational needs, all of which are necessary to preserve and maintain the Debtors' going concern values. Without access to cash collateral and the Proposed DIP Financing, the Debtors would be forced to terminate their business operations to the material detriment of creditors, employees, members, and other parties in interest.

<u>Motion of the Debtors for an Order Establishing Notice Procedures.</u>

38.     The Debtors are presently preparing their Schedules of Assets and Liabilities, Statements of Financial Affairs and related documents.  The Debtors expect that their consolidated master mailing matrixes (the "**<u>Matrixes</u>**") will include over 350 entities, consisting of creditors, parties to contracts and leases, affiliates and insiders. The Matrixes currently do not include the names and addresses for the Debtors' nearly 13,500 customers (the "**<u>Club Members</u>**"), who almost certainly will not be impacted by the Chapter 11 Cases.

39.     I believe that the large number of creditors and other parties in interest involved in the Debtors' Chapter 11 Cases may impose heavy administrative and other burdens upon the Debtors, the Court and the Clerk's Office.

40.     The Debtors desire to cooperate with the Clerk's Office to help alleviate those burdens, to the fullest extent possible.  I believe that mailing notices of all pleadings and other documents in these Chapter 11 Cases to all creditors and customers, and mailing notice of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via certified mail, would be both impractical and unduly burdensome on the Debtors' Estates.

41.     Additionally, I believe that requiring separate notice to, and service upon, all such persons or entities would augment substantially the cost and administrative burden to the Debtors and the Estates and would diminish the assets ultimately available for reorganization without conferring any meaningful benefit on the Debtors' Estates.

<u>Motion to Extend Time to File Schedules and Statements of Financial Affairs.</u>

42.     Each of the Debtors requests the entry of an order extending the time for filing its respective lists, schedules and Statements of Financial Affairs (collectively, the "**<u>Schedules</u>**") for an additional 30 days (for a total of 44 days from the Petition Date).

43.     To prepare their Schedules, the Debtors must collect, review and assemble information from multiple locations across the country and compile such information from the Debtors' books, records and other documents relating to over 250 trade vendors, over 40 leases and contracts and assets of 18 separate Debtor entities.

44.     Given the number of Debtors, the size and complexity of the Debtors' operations and the critical matters that the Debtors' management, accounting staff and legal personnel must address in the initial days of these Chapter 11 Cases, I believe that an extension of time to file the Schedules is necessary and that sufficient cause for an extension exists.

<u>Motion to Pay and Continue Employee Wages and Other Benefit Programs.</u>

45.     The Debtors employ approximately 560 employees (the "**<u>Employees</u>**"), of whom approximately 260 are full-time salaried Employees and approximately 300 are part-time Employees.  The Employees perform a variety of critical functions, including operating the Debtors' facilities, maintaining equipment, monitoring Club Member use of equipment, recruiting new Club Members and providing training services to Club Members, as well as performing many administrative, accounting, supervisory, audit, consultant, management and other tasks.

46.     Employees are paid on the 7th and 22nd day of each month (or the prior business day if a weekend), with the payment on the 7th day covering wages earned from the 16th day of the previous month to the end of the month, and the payment on the 22nd day covering wages earned from the 1st day of the month to the 15th day of the month. The Debtors' next scheduled payroll is March 7, 2011.

47. I believe that the Employees' skills, knowledge and understanding of the Debtors' infrastructure, operations and Club Member relations are essential to effect a successful reorganization and to maintain the value of the Debtors' assets and business.

48. In 2010, the Debtors' average aggregate monthly payroll was approximately $1.4 million, and average aggregate monthly payroll tax was approximately $125,000 ("**Employee Wages**"). The Company offers incentive bonus programs for sales personnel, gym managers, assistant gym managers, training managers, sales managers and employees at the training schedule desk. The Debtors also reimburse eligible employees for certain out-of-pocket business expenses incurred in the ordinary course of business, such as travel expenses.

49. In the ordinary course of business, and as is customary with most companies, the Debtors offer a benefits package to some or all of its employees (the "**Employee Benefits**"), including coverage for 60% of medical insurance, 401(k) program funded 100% by the employees, workers' compensation benefits, short -term disability coverage, free membership to the gym and discounts on merchandise and training. The combined monthly cost of the Employee Benefits to the Debtors is approximately $43,000 per month.

50. As of the Petition Date, the Debtors collectively owe approximately $1.1 million in unpaid Employee Wages, which includes bonuses and commissions and approximately $44,000 in Employee Benefits. I am informed and believe that, as of the Petition Date, no single non-insider Employee is owed Employee Wages and Benefits in an amount in excess of $11,725.

51. To minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain morale and preserve their essential workforce during this critical time, the Debtors seek authority, in their discretion, to pay and honor certain prepetition claims for the Employee Wages and Employee Benefits, and to pay all fees and costs incident to the

foregoing as such amounts become due and payable, including amounts to third party administrators, temporary employment agencies and temporary Employees.

52.    With the exception of the Debtors' CEO, David Barton, and CFO, Stephen Schwartz, none of the Employees owed wages are insiders.

53.    I believe that failure to grant the relief requested in this Motion may have an immediate and irreparable adverse impact on both the reorganization efforts and day-to-day operations of the Debtors' business, as the Employees are essential to a quick, orderly and successful reorganization of the Debtors.

54.    I believe that, if the Debtors are unable to honor Employee Wages and Benefits for even a short time, Employee morale and loyalty will be compromised at a time when Employee support is most critical. It is likely that any deterioration in Employee morale and welfare during the critical time of reorganization would adversely impact the Debtors, the value of their assets and business, and ultimately their ability to reorganize in short order or even at all. Therefore, the Debtors believe that payment of the prepetition amounts of Employee Wages and Benefits requested in the Motion and the continuation of the Employee Wages and Benefits on a postpetition basis is in the best interest of all interested parties.

> Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue in the Ordinary Course of Business Their Customer Programs and Practices.

55.    As of the Petition Date, the Debtors have approximately 13,500 Club Members across the country. The vast majority of the Debtors' Club Members live in areas with competing health club facilities. The Debtors expect their competitors to use the filing of these Chapter 11 Cases as a tool to recruit new Club Members and lure current Club Members away from the Debtors. To combat this threat, the Debtors must clearly demonstrate to their Club Members that the filing of these Chapter 11 Cases will not impair their relationship with the Debtors. Accordingly, the Debtors have sought the authority to continue certain practices designed to develop and sustain their positive

reputation in the marketplace and to attract and retain Club Members (collectively, the "**Customer Programs**"). The Customer Programs include various programs, promotions, and refund opportunities, some of which are required by state law as more fully described in the motion related to Customer Programs. In addition, certain components of the Customer Programs are required by state statutes and must be maintained if the Debtors are to continue to operate health clubs in accordance with applicable law.

56.    The Debtors' Customer Programs primarily involve Club Member refund obligations (the "**Refund Obligations**"), which arise from several sources. Several of the states the Debtors do business in have statutes that require fitness service providers to provide new members with a "cooling off" period which provides a mechanism by which new members can cancel their membership contracts, usually within a few days of signing, and receive a full refund. Also, if a member sustains a medical injury while under contract with the Debtors, that member may terminate his or her membership contract and receive a pro rata refund for the remaining time available on the contract. Finally, several states where the Debtors maintain clubs also require health clubs to refund prepaid amounts if members move more than a proscribed distance from the health club or if a particular health club closes and the members live more than a proscribed distance from the nearest comparable health club.

57.    Additionally, if Club Members are dissatisfied with products purchased or services received, such as personal training services, the Debtors offer customers refunds on services and products on a case-by-case basis as part of the Debtors' customer service policy (the "**Customer Service Obligations**").

58.    Based on the Debtors' historical data for 2010, the Debtors estimate that the total amounts owed on account of the Customer Programs is less than approximately $20,000 as of the Petition Date.

59.    At this critical time, the Debtors cannot afford to lose their loyal Club Member base or to be placed at a competitive disadvantage with respect to prospective

Club Members.  To  maintain the loyalty of the Debtors' existing Club Members and the Debtors' ability to attract new Club Members, as well as to avoid providing the Debtors' competitors with a basis to compete with the Debtors for existing and new Club Members, it is critical that the Debtors' maintain the Customer Programs.

> Motion For Order Authorizing (1) Continued Use of Existing Cash Management System, (2) Maintenance of Prepetition Bank Accounts, and (3) Continued Use of Existing Forms.

60.     The Debtors' business and financial affairs are complex, requiring the collection, disbursement and movement of funds through numerous bank accounts.

61.     The Debtors' cash management system (the "**Cash Management System**") consists of numerous accounts and is funded by receipts from the Debtors' business operations, including membership fees, personal training fees, and sale of products and other services at the Debtors' fitness centers.

62.     On and before the Petition Date, in the ordinary course of the Debtors' business, the Debtors maintained 18 deposit accounts with BofA and 2 certificate of deposit account with Citibank (collectively, the "**Bank Accounts**").

63.     The Bank Accounts through which the Cash Management System is operated are part of the company-wide accounting and cash concentration and disbursement system employed by Debtors.  Generally, the Cash Management System can be described as a "hub and spoke" arrangement.  The hub is represented by a primary account (the "**Club Ventures Bank Account**"), with three groups of "spoke" accounts— the depository accounts ("**Depository Accounts**"), lease accounts ("**Lease Accounts**"), and disbursement accounts ("**Disbursement Accounts**").

- *Depository accounts.*  The Debtors maintain one depository account at BofA per individual club.  Each account is used for point of sale ("**POS**") cash accounts, POS credit card accounts and electronic fund transfer ("**EFT**") accounts.  The POS cash accounts are utilized for the purpose of depositing checks and cash from transactions made by Club Members and customers.  In addition to the POS Cash Account, the

Debtors maintain a POS collections account (the "**POS Credit Card Account**") for the purpose of processing credit cards payments. Also, the Debtors use these accounts for the purpose of holding deposits made by EFT or ACH transactions. Under their membership agreements, the majority of the Debtors' members have identified a credit card account or checking account from which their monthly dues are debited. The Debtors utilize a third party transaction processor (the "**Processor**") to assist them with these collections. Specifically, the Debtors use Global Payments, Inc. to charge credit cards account for the Debtors' Club Members who have opted to pay their dues with their credit card. The Debtors also use Connexions to debit appropriate amounts from checking accounts of the Debtors' Club Members who have opted to pay their dues through their checking account. After debiting appropriate amounts from the identified accounts, the Processor transfers the funds to the depository account. The processor subsequently deducts their fees through ACH withdrawal from these accounts. The Depository Accounts are swept daily into the Club Ventures Bank Account. To pay expenses, funds are transferred from the Club Ventures Bank Account to a specific Disbursement Account.

- *Lease Accounts*. The Lease Accounts are used to fund ACH withdrawals to pay capital lease accounts. This account is funded daily by the Club Ventures Bank Account through its sweep mechanism.

- *Restricted accounts.* Under terms of two agreements, the Debtors are required to maintain certain restricted use bank accounts. The Restricted Accounts are maintained at Citibank in the form of a CD for the purpose of collateralizing a letter of credit, which is used as security for two real estate leases.

64.     The principal components of the Cash Management System and the flow of funds among the Bank Accounts are illustrated in the chart attached hereto as Exhibit D.

65.     The Debtors have utilized their Cash Management System substantially in its current structure as part of their ordinary, usual and essential business practices.

66.     I believe that, given the corporate and financial structure of the Debtors and their businesses, it would be difficult for the Debtors to establish an entirely new system of accounts and a new cash management system for each debtor entity. If the Debtors had to open separate accounts as debtors-in-possession and rearrange their Cash Management System, it would necessitate opening at least 18 new accounts, one for each Debtor. I further believe that the delays that would result from opening new accounts, revising cash management procedures, modifying electronic payment systems and instructing customers and other third parties to redirect payments likely would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

67.     If the Debtors were required to close the Bank Accounts and open new bank accounts, the Debtors would have to contact each of the Debtors' numerous customers that make regular payments directly to the Bank Accounts via credit card or other electronic processing and ask such customers to redirect the payments. This effort, along with the administrative process that the Debtors must undertake with a bank to establish new accounts with substantially the same functionality, would, at a minimum, create the risk of significant delay in receiving payments from customers. Moreover, the inconvenience caused by such a procedure to the Debtors' customers might give rise to a harmful loss of customers and damage to the Debtors' reputation.

68.     The Debtors' businesses are dependant upon the regular stream of payments from customers, either by check or credit card; thus a change in the Debtors' Bank Accounts could seriously damage the Debtors' cash position. By allowing the Debtors to maintain the Bank Accounts, all parties in interest, including employees,

creditors, and the Estates, will benefit and the Debtors' rehabilitative efforts will be promoted.

69.     I believe under these circumstances, maintaining the Debtors' current Bank Accounts and Cash Management System is both essential and in the best interests of the Debtors' respective Estates and creditors. Furthermore, I believe that preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

70.     The Debtors will continue to maintain records with respect to transfers of cash, so that transactions can be ascertained, traced and recorded properly on applicable intercompany accounts.

71.     The Debtors represent that, to the best of their ability, no prepetition checks will be honored, unless authorized by separate order of the Court. Except as otherwise ordered by this Court, BofA will be advised by the Debtors not to honor checks issued prior to the Petition Date on any of the Bank Accounts.

72.     In the ordinary course of their businesses, the Debtors use many checks, invoices, contracts and other forms. The Debtors generate large numbers of checks and contracts per month. Most significantly, the Debtors enter into approximately 1,000 new membership and/or training contracts each month.

73.     It will be burdensome to the Debtors' Estates, as well as expensive and disruptive to the Debtors' business operations, if the Debtors are not permitted to continue using their existing checks and other business forms, such as membership contracts, without alteration or change.

74.     I believe that unless the Debtors are permitted to maintain and utilize the existing contracts and business forms, the Debtors and their Estates would be prejudiced. The Debtors' Estates would incur unnecessary and substantial cost if the Debtors are required to print new checks, contracts and business forms.

75.     In connection with the daily operations at each of the Debtors' seven facilities, the Debtors use electricity, water, gas, sewer, telephone and telecommunication, waste removal, and other utility services from approximately 35 utility companies through roughly 48 different accounts.  The Debtors incur an average of approximately $95,000 - $100,000 in utility fees and charges per month in the aggregate. A complete list of the companies that provide these utility services (the "**Utilities**") is attached hereto as Exhibit E.

## III.

## ADDITIONAL INFORMATION REQUIRED
## BY LOCAL BANKRUPTCY RULE 1007-2

76.     The Company currently employs approximately 560 employees, of whom approximately 260 are full-time employees, and approximately 300 are part-time employees.  The Company is not a party to a collective bargaining agreement with any of its employees.  The Debtors estimate that the bi-monthly payroll to non-insider employees for the first 30 days following the Petition Date will be approximately $1.6 million.

77.     The Debtors propose to pay to officers, stockholders and directors the aggregate estimated amount of $100,000 for the first 30 days following the Petition Date. This amount includes the salaries of the Debtors' CEO, David Barton, the CFO, Stephen Schwartz, and amounts owed to Meridian pursuant to the Management Agreement.

78.     Attached hereto as Exhibit F is a projected 13-week cash flow following the Petition Date.

79.     Attached hereto as Exhibit G is a list of the senior management team, including their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.  The senior management of the Debtors consists of

Charles Grieve, as Chairman and Manager, David Barton, as Chief Executive Officer and Manager, and Stephen Schwartz, as Chief Financial Officer.

80.    Attached hereto as Exhibit H is a list of the Debtors' leased premises.

81.    Attached hereto as Exhibit I is list of the holders of the 5 largest secured claims.

82.    Attached as Exhibit B is the Debtors' consolidated list of holders of the 30 largest unsecured claims.

83.    Attached as Schedule C is a list of the Debtors' existing lawsuits and proceedings.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of March 2011 at New York, New York.

Stephen Schwartz

# EXHIBIT A

# Exhibit A

## Club Ventures Investments LLC and its Subsidiaries



Club Ventures Investments LLC

- Club Ventures II, LLC
- CV 2, LLC
- CV II Gym, LLC
- Club Ventures III, L.L.C.
- CV 3, LLC
- CV III Gym, LLC
- Club Ventures IV, LLC
- CV 4 LEASING, LLC
- CV IV Gym, LLC
- Club Ventures V, LLC*
- Club Ventures VI, LLC
- CV VI, LLC
- CV VII GYM, LLC
- Club Ventures VIII, LLC
- CV VIII GYM, LLC
- Club Ventures IX, LLC*
- Club Ventures X, LLC
- CV X GYM, LLC
- Club Ventures XI, LLC*
- Club Ventures XII, LLC*
- DB 85 GYM CORP.

*Non-Debtor subsidiaries

# EXHIBIT B

**Exhibit B**

**Consolidated List of Holders of the 30 Largest Unsecured Claims**


  Attached hereto is the Debtors' Consolidated List of Holders of the 30 Largest Unsecured Claims (the "Top 30 List"), which is based on the Debtors' books and records as of approximately the Petition Date.  The Top 30 List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtors' Chapter 11 Cases. The Top 30 List does not include: (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101; or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.  The information presented in the Top 30 List shall not constitute an admission by the Debtors, nor is it binding on the Debtors.  The Debtors reserve all rights to challenge the priority, nature, amount and status of any claim or debt.

# CONSOLIDATED LIST OF TOP 30 UNSECURED CREDITORS

| Name of creditor | Complete mailing address | Name, telephone number and mailing address of employee, agent, or dept of creditor familiar with claim who may be contacted | Nature of claim (trade, debt, bank loan, gov't contract, etc) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|---|
| Gansevoort South Hotel Spa Residences | 2377 Collins Ave. Miami Beach, FL 33139 | 305-604-1000 | Real Property Lease | | $1,794,380.47 |
| The Bravern, LLC | C/O Schnitzer W 818 Stewart Street, Suite 700 Seattle, WA 98101 | Thomas Woodward 425-456-8780 | Real Property Lease | | $1,187,580.47 |
| Mark Berkowitz | 235 West 56th Street, Apt 24D New York, NY 10019 | c/o William Weinstein Sanford Wittels & Heisler, LLP 950 Third Avenue, 10th Floor New York, NY 10022 (646) 723-2947 | Employment agreement | Disputed | $670,000 (not including claim of $2,900,000 based on right to equity interests) |
| Elan Ben-Avi | 500 E. 77th Street Apt 1615 New York, NY 10162 | 917-515-9454 | Employment agreement | Disputed | $532,560.00 |
| Tannenbaum Helpern Syracuse & Hirschtri | 900 Third Avenue New York, NY 10022-4775 | 212-508-6700 | Professional fees | | $183,500.08 |
| 30 E 85th Street Company | c/o Manhattan Skyline 103 West 55th Street New York, NY 10019 | Thomas Eschmann 212-408-0600 | Real Property Lease | | $149,380.16 |
| Morrison Cohen | 909 Third Avenue 27th Floor New York, NY 10022-4784 | Stephen Budow 212-554-7847 | Professional fees | | $115,471.25 |
| Moses & Singer LLP | 405 Lexington Avenue New York, NY 10174-1299 | Howard Herman 212-554-7800 212-554-7847 | Professional fees | | $115,132.28 |
| TTMC as Nominee 50 W23 ST A&B LLC | 45 Main Street, Ste 602 Brooklyn, NY 11201 | George Paster 718-625-5505 | Real Property Lease | | $102,664.69 |
| 600 West Chicago Associates LLC | PO Box 51055 Newark, NJ 07101-5155 | Gilbert Lawton 312-923-2330 | Real Property Lease | | $81,272.59 |
| American Exp - Platinum | P.O. Box 360001 Fort Lauderdale,FL 33336-0001 | 1-800-492-3344 | Credit Card | | $77,978.73 |
| The Seattle Times | PO Box C34805 Seattle, WA 98124 | 206-464-3200 | Trade | | $73,965.63 |
| New Tech Mechanical Systems Incorp. | 129 5th Avenue Bay Shore, NY 11706 | Renee 631-666-6686 | Trade | | $73,717.88 |
| CBIZ MHM, LLC | 1065 Sixth Av New York, NY 10018 | Jeff Gluck 212-790-5700 | Professional fees | | $54,162.55 |
| Studio Sofield | 380 Lafayette Street New York, NY 10003 | 212-473-1300 | Trade | | $50,784.91 |
| CEMUSA NY, LLC | 420 Lexington Avenue Suite 2533 New York, NY 10170 | 646-312-8513 | Trade | | $35,325.00 |
| Grainger | DEPT. 864993175 Palatine, IL 60038-0001 | 518-869-1431 | Trade | | $32,078.15 |
| Shadow Public Relations | 1133 Broadway, Suite 1222 New York, NY 10010 | 212.972.0277 | Trade | | $27,991.91 |
| V Magazine LLC | 11 Mercer Street Ground FL New York, NY 10013 | 646-452-6033 | Trade | | $27,500.00 |

# CONSOLIDATED LIST OF TOP 30 UNSECURED CREDITORS

| Name of creditor | Complete mailing address | Name, telephone number and mailing address of employee, agent, or dept of creditor familiar with claim who may be contacted | Nature of claim (trade, debt, bank loan, gov't contract, etc) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|---|
| DailyCandy, Inc. | 584 Broadway Suite 510 New York, NY 10012 | 646-435-9199 | Trade | | $26,503.00 |
| Good Air Commercial & Service | 2217 SW 58th Way Hollywood, FL 33023 | 954-964-6355 | Trade | | $22,750.00 |
| Van Wagner | 800 Third Avenue 28th Floor New York, NY 10022 | 212-699-8400 | Trade | | $22,000.00 |
| New York Magazine | 75 Varick St. New York, NY 10022 | Jennifer Siniscalchi 212-508-0721 212-508-0633 | Trade | | $19,445.00 |
| Core Sports Nutrition | 154 Marine St. Farmingdale, NY 11735 | 631-393-2815 | Trade | | $14,344.47 |
| ConEdison | JAF Station P.O. Box 1701 New York, NY 10116 | 1-800-752-6633 | Trade | | $13,875.07 |
| Polar Air Conditioning, Inc. | 300 East 93rd St. Suite 37B New Yok, NY 10128 | 212-534-3300 | Trade | | $13,738.76 |
| Mojoware | 206 Trenton street West Monroe, LA 71291 | 318-387-7891 800-439-6656 | Trade | | $13,267.70 |
| N.T.I.Linen Inc. | PO Box 3786 OakBrook, IL 60522-3786 | 866-789-9915 630-789-9915 | Trade | | $13,256.51 |
| Americare Systems, Inc. | 136 Arlington Avenue Bloomfield, NJ 7003 | 973-748-2390 | Trade | | $13,145.72 |
| Ocean Drive Magazine | BankofAmerica Lockbox Services 15329 Collections Center Drive Chicago, IL 60693 | 305-532-2544 | Trade | | $13,000.00 |

# EXHIBIT C

## Exhibit C

### Lawsuits and Proceedings

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent. The following is a list of the pending lawsuits or proceedings in which one or more Debtor is a party.

| Name of Case | Court | Status |
|---|---|---|
| 1. Debroah R. Cooke and Christina M. Rodino v. DB85 Gym Corp., CV II Gym, LLC, CV VI, LLC, DB Broadway Gym Corp., Kevin Kavanaugh and Carl Helmle, III<br>Case Number: 11-CIV-0201 (AKH) | United States District Court for the Southern District of New York<br><br>Date Filed: February 14, 2011 | Pending |
| 2. Raphael Moeller v. DB 85 Gym Corp., a/k/a David Barton Gym<br>Case Number: 1500 12/10 | Supreme Court of the State of New York County of New York<br><br>Date Filed: January 11, 2010 | Pending |
| 3. Mark Berkowitz v. Club Ventures Investments, LLC, and David Barton<br>Case Number: 07-602824 | Supreme Court of the State of New York County of New York<br><br>Date Filed: May 7, 2008 | Pending |
| 4. Club Ventures VI, LLC and Two Trees Management, LLC<br>Case Number: 57175/11 | Civil Court of the City of New York County of New York: Part 52<br><br>Date Filed: February 17, 2011 | Pending |

Exhibit C - 30

# EXHIBIT D

# Exhibit D



# EXHIBIT E

# Exhibit E

## List of Utility Accounts

| Name of Company | Address | Account Number | Avg. One-Half Monthly Bill (past 12 months) |
|---|---|---|---|
| 30 E. 85th Street | 103 West 55th Street<br>New York, NY 10019 | 30/S6A | $3,893.83<br>$272.43 |
| 600 West Chicago Associates LLC | PO Box 51055<br>Newark, NJ 07101-5155 | 601-RW3-CU<br><br>Carting | $1,010.83<br>$2,082.00<br>$52.65 |
| AT Conference | P.O. Box 2939<br>Southhampton, NY 11969 | AT10015789 | Service Discontinued |
| AT&T | PO Box 8100<br>Aurora, IL 60507-8100 | 312 836-9127 121 9 | $353.64 |
| AT&T | PO Box 105262<br>Atlantic, GA 30348-5262 | 305 534-9777 001 0444<br>305 531-4337 862 0441 | $236.47 |
| AT&T Long Distance | PO Box 105068<br>Atlanta, GA 30348-5068 | 030 399 4119 001 | $55.14 |
| AT&T Mobility | PO Box 6463<br>Carol Stream, IL 60197-6463 | 387024043167 | $78.00 |
| Atlantic Broadband | PO Box 371801<br>Pittsburgh , PA 15250 | 9783 20 001 1939008 | $265.60 |
| Circale Carting | 111 Gardner Ave<br>Brooklyn, NY 11237 | CCST00454 | $1,396.82 |
| Comcast Internet | PO Box 34744<br>Seattle, WA 98124-1744 | 8498 33 008 1362074 | $35.21 |
| Comcast Other | PO Box 34744<br>Seattle, WA 98124-1744 | 8498 33 008 1369343 | $629.42 |
| Comed | PO Box 6111<br>Carol Steam, IL 60197-6111 | 3512125006 | $3,551.44 |
| Con Ed | JAF Station<br>PO Box 1701<br>New York, NY 10116 | 41-5105-7125-0002-0<br>49-4081-1570-0000-4<br>73-3037-3832-0302-2<br>42-3117-2194-0000-0 | $10,370.49<br>$7,552.20<br>$1,630.19<br>$277.29 |
| Covad | Department 33408<br>PO Box 39000<br>San Francisco, CA 94139-0001 | 485126 | $38.66 |
| Directv | P O Box 60036<br>Los Angeles, CA 90060-0036 | 80239440<br>82677069 | $51.88<br>$37.46 |
| FPL | General Mail Facility<br>Miami, FL 33188-0001 | 01846-13578 | $2,792.95 |
| IESI NY Corporation | 1099 Wall Street West<br>Lyndhurst, NJ 07071-3617 | 030248 | $256.38 |
| Intelliverse | 8130 Innovation Way<br>Chicago, IL 60682-0081 | 031-6927 | $32.52 |
| Mantana, LLC (now Two Trees, LLC) | 125 Park Ave, 11th floor<br>New York, NY 10017 | 00009685 1 | $1,291.58 |
| NewMark & Co. Real Estate Inc. | 125 Park Ave, 11th floor<br>New York, NY 10017 | 310-310 | $1,132.46 |
| NYC Water Board | PO Box 410<br>Church Street Station<br>New York, NY 10008-0410 | 7000115282001 | $8,544.30 |
| People's Gas | Peoples Gas<br>Chicago, IL 60687-0001 | 9 5000 4108 4594 | $1,054.43 |
| Quest | P. O. Box 91155<br>Seattle, WA 98111-9255 | 425-453-6120-355B | $137.38 |

| Name of Company | Address | Account Number | Avg. One-Half Monthly Bill (past 12 months) |
|---|---|---|---|
| RCN | PO Box 11816<br>Newark, NJ 07101 | 1001-0767421-02 | $27.97 |
| Royal Waste Services | 187-40 Hollis Avenue<br>Hollis, NY 11423 | 14741 | $154.92 |
| The Bravern | c/o Schnitzer West<br>818 Stewart Street, ste 700<br>Seattle, WA 98101 | 110791<br><br>Carting | $1,196.78<br>$3,657.57<br>$900.99<br>$856.50 |
| Tiffany Carting Corporation | 465 Johnson Ave.<br>Brooklyn, NY 11237 | 01- 15712 | $61.80 |
| Time Warner Cable of NYC | P.O. Box 9227<br>Uniondale, NY 11555-9227 | 8150 20 007 0290009 | $910.28 |
| Time Warner Internet | P.O. Box 9227<br>Uniondale, NY 11555-9227 | 8150 20 005 0046819<br>8150 20 005 0049649<br>212 505 2142 853 214 | $79.98<br>$79.98<br>$119.79 |
| TTMC as Nominee 50 W 23 St A&B LLC | 45 Main Street, Ste 602<br>Brooklyn, NY 11201 | 00005592 1 | See Mantana below |
| Verizon Phone | P.O. Box 15124<br>Albany, NY 12212-5124 | 212 X01 6287 039 21 6 | $253.75 |
| Verizon Fax | P.O. Box 15124<br>Albany, NY 12212-5124 | 212 414 2749 724 21 4<br>0006 3017 3156 54Y<br>212 524 2510 052 21 4 | $103.65<br>$21.55<br>$50.44 |
| Verizon Internet | P.O. Box 15124<br>Albany, NY 12212-5124 | 212 505 2142 853 214 | $119.79 |
| Verizon Internet Corp | P.O. Box 371355<br>Pittsburgh, PA 15250-7355 | Y2417890 | $297.73 |
| Verizon Wireless | PO Box 408<br>Newark, NJ 07101-0408 | 282659556-00001 | $1,215.90 |
| WebEx | 3979 Freedom Circle<br>Santa Clara, CA 95054 | 246004 | Service Discontinued |
| Wholesale Carrier Services | PO Box 934926<br>Atlanta, GA 31193-4926 | 132617 | $337.08 |
| XO Communications | 14239 Colletions Center Drive<br>Chicago, IL 60693 | 4000000187403<br>4000000197286<br>4000000072835<br>4000000154502<br>4000000175166 | $453.40<br>$240.33<br>$331.20<br>$261.95<br>$288.05 |

# EXHIBIT F

**DavidBartonGym**

**13 Week Cash Flow Forecast**
*Week of Mar-05-11 through May-28-11*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | 27-Feb-11 | 6-Mar-11 | 13-Mar-11 | 20-Mar-11 | 27-Mar-11 | 3-Apr-11 | 10-Apr-11 | 17-Apr-11 | 24-Apr-11 | 1-May-11 | 8-May-11 | 15-May-11 | 22-May-11 | |
| Saturday | 5-Mar-11 | 12-Mar-11 | 19-Mar-11 | 26-Mar-11 | 2-Apr-11 | 9-Apr-11 | 16-Apr-11 | 23-Apr-11 | 30-Apr-11 | 7-May-11 | 14-May-11 | 21-May-11 | 28-May-11 | TOTAL |
| **Beginning Cash** | 529,876 | 570,012 | 570,701 | 737,674 | 980,889 | 1,387,848 | 707,034 | 797,411 | 574,186 | 512,799 | 586,398 | 480,696 | 384,899 | 529,876 |
| | | | | | | | | | | | | | | |
| Collections From Operations | 363,853 | 884,859 | 263,515 | 805,015 | 588,939 | 170,056 | 958,241 | 283,426 | 824,926 | 279,655 | 959,219 | 278,712 | 820,212 | 7,480,626 |
| Proceeds From DIP Financing | - | - | - | 400,000 | - | - | - | - | - | - | - | - | - | 400,000 |
| **Total Cash Receipts** | 363,853 | 884,859 | 263,515 | 1,205,015 | 588,939 | 170,056 | 958,241 | 283,426 | 824,926 | 279,655 | 959,219 | 278,712 | 820,212 | 7,880,626 |
| **Operating Outflows** | | | | | | | | | | | | | | |
| Compensation | | | | | | | | | | | | | | |
| Salaries | - | (522,278) | - | (522,278) | - | (520,647) | - | - | (520,647) | - | (514,377) | - | (514,377) | (3,114,605) |
| Bonuses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Commissions | - | - | - | (196,870) | - | - | - | - | (111,316) | - | - | - | (105,202) | (413,388) |
| Total Compensation | - | (522,278) | - | (719,149) | - | (520,647) | - | - | (631,963) | - | (514,377) | - | (619,579) | (3,527,993) |
| Chelsea Rent | - | - | - | - | - | - | (113,899) | - | - | - | (56,949) | - | - | (170,848) |
| Uptown Rent | - | - | - | - | - | - | (399,126) | - | - | - | (133,042) | - | - | (532,168) |
| Chicago Rent | - | - | - | - | - | - | (208,764) | - | - | - | (69,588) | - | - | (278,352) |
| Gansevoort Rent | - | - | - | - | - | - | - | (80,420) | - | - | - | (80,420) | - | (160,841) |
| Astor Place Rent | (137,500) | - | - | - | - | - | - | (275,000) | - | - | - | (137,500) | - | (550,000) |
| Bellevue Rent | - | - | - | - | - | - | - | (44,036) | - | - | - | (45,677) | - | (89,713) |
| CAM and RE Taxes | - | - | - | (55,000) | - | - | (16,000) | (11,389) | - | - | (16,000) | (11,389) | - | (109,778) |
| Utilities | (89,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,696) | (327,267) |
| Cost of Sales | (6,443) | (6,443) | (6,443) | (6,443) | (6,470) | (6,470) | (6,470) | (6,470) | (6,470) | (6,610) | (6,610) | (6,610) | (6,610) | (84,558) |
| Supplies | (13,498) | (13,498) | (13,498) | (13,498) | (12,894) | (12,894) | (12,894) | (12,894) | (12,561) | (12,561) | (12,561) | (12,561) | (12,408) | (168,219) |
| Repairs/Maintenance | - | (6,600) | - | (6,600) | - | (5,240) | - | (5,240) | - | (5,240) | - | (5,240) | - | (34,160) |
| Spa | (9,213) | - | - | - | - | (9,161) | - | - | - | - | (9,161) | - | - | (27,535) |
| Capital Lease Payments | (5,000) | (17,863) | (17,863) | (17,863) | (17,863) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (219,361) |
| Capital Improvement | - | (2,000) | (4,000) | - | - | (4,000) | (2,000) | - | - | - | (2,000) | (4,000) | - | (18,000) |
| Miscellaneous | (14,500) | (14,500) | (14,500) | (14,500) | (46,500) | (14,500) | (14,500) | (14,500) | (46,500) | (14,500) | (14,500) | (14,500) | (46,500) | (284,500) |
| Credit Card Fees | (11,979) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,350) | (12,350) | (12,350) | (12,350) | (12,350) | (160,814) |
| **Total Operating Outflow** | (287,930) | (615,420) | (88,541) | (865,290) | (115,965) | (623,013) | (823,754) | (500,051) | (747,505) | (88,922) | (884,800) | (367,909) | (735,007) | (6,744,107) |
| **Corporate Outflows** | | | | | | | | | | | | | | |
| Corporate Compensation | - | (106,339) | - | (88,510) | - | (88,510) | - | - | (88,510) | - | (86,012) | - | (86,012) | (543,895) |
| Insurance | - | (73,399) | - | - | (30,228) | (51,734) | - | - | (43,698) | (51,734) | - | - | (31,458) | (282,250) |
| Rent and Utilities | - | - | - | - | - | - | (37,510) | - | - | - | (37,510) | - | - | (75,020) |
| Marketing | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (66,800) |
| Managerial Payments | - | (50,000) | - | - | - | (50,000) | - | - | - | - | (50,000) | - | - | (150,000) |
| Corporate Miscellaneous | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (119,035) |
| **Total Corporate Outflow** | (8,000) | (268,750) | (8,000) | (96,510) | (38,228) | (227,856) | (44,110) | (6,600) | (138,809) | (89,345) | (180,122) | (6,600) | (124,070) | (1,236,999) |
| | | | | | | | | | | | | | | |
| **Total Outflows** | (295,930) | (884,169) | (96,541) | (961,800) | (154,193) | (850,869) | (867,864) | (506,651) | (886,313) | (178,267) | (1,064,922) | (374,509) | (859,077) | (7,981,106) |
| | | | | | | | | | | | | | | |
| **Total Cash Flow from Operations** | 67,923 | 689 | 166,974 | 243,214 | 434,746 | (680,813) | 90,377 | (223,225) | (61,387) | 101,387 | (105,702) | (95,797) | (38,865) | (100,480) |
| | | | | | | | | | | | | | | |
| **Adequate Protection Payments** | | | | | | | | | | | | | | |
| Bank of America Interest | (27,787) | - | - | - | (27,787) | - | - | - | - | (27,787) | - | - | - | (83,362) |
| | | | | | | | | | | | | | | |
| **Change In Cash Before Professional Fees** | 40,135 | 689 | 166,974 | 243,214 | 406,959 | (680,813) | 90,377 | (223,225) | (61,387) | 73,600 | (105,702) | (95,797) | (38,865) | (183,842) |
| | | | | | | | | | | | | | | |
| **Ending Balance Before Professioanl Fees** | 570,012 | 570,701 | 737,674 | 980,889 | 1,387,848 | 707,034 | 797,411 | 574,186 | 512,799 | 586,398 | 480,696 | 384,899 | 346,034 | 346,034 |
| Professional Fees[1] | | | | | | | | | | | | | | (300,000) |
| **Ending Balance After Professional Fees** | | | | | | | | | | | | | | 46,034 |

[1] Professional fees will be accruing pursuant to Court order will be accruing and shall be payable in accordance with applicable order of the Bankruptcy Court.

# EXHIBIT G

**Senior Management**

| Name | Title | Experience/Responsibilities |
|---|---|---|
| Charles Grieve | Chairman | Mr. Grieve is the CEO & founder of Meridian Bodies in Motion ("MBIM"). MBIM is a successful chain of fitness clubs with twelve locations primarily located in southern California. Mr. Grieve began consulting with the Debtors in December 2010. Mr. Grieve brings both marketing and operational experience to the team. |
| David Barton | Chief Executive Officer | Mr. Barton founded the Company in 1992. His responsibilities lie in the promotion of the Debtors' brand and the gyms. |
| Stephen Schwartz | Chief Financial Officer | Mr. Schwartz has served as Chief Financial Officer for the Debtors since March 2009. His duties include the oversight of the accounting, finance, treasury, tax, payroll, purchasing, insurance, and IT departments. He has 27 years of professional experience in business and finance and, prior to joining the Debtors, he has been a CFO of public and private companies. |

# EXHIBIT H

# Exhibit H

## Premises Owned and/or Leased by the Debtors

| Premises Location | Nature of Debtors' Property Interest | Use of Premises |
|---|---|---|
| 50 West 23rd Street, 5th Floor New York, NY 10010 | Leased | Corporate Office |
| 215 West 23rd Street New York, NY 10010 | Leased | Club |
| 4 Astor Place New York, NY 10003 | Leased | Club |
| 30 East 85th Street New York, NY 10028 | Leased | Club |
| 600 West Chicago Avenue Chicago, IL 60654 | Leased | Club |
| 2323 Collins Avenue Miami Beach, FL 33139 | Leased | Club |
| 11111 NE 8th Street, ste 20 Bellevue, WA 98045 | Leased | Club |
| The Roosevelt Collection 150 West Roosevelt Road Chicago, IL 60605 | Leased | Not in use |

# EXHIBIT I

<u>**Exhibit I**</u>

**List of Holders of the 5 Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a schedule of the holders of the five largest secured claims for the Debtors, on a consolidated basis, prepared in accordance with the Debtors' books and records as of approximately the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, or that a claim amount exceeds the value of the collateral securing such claim. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name/Address of Secured Creditor | Claim Amount | Description of Collateral | Debtor |
|---|---|---|---|
| Bank of America 767 Fifth Avenue, Floor 12A, New York, NY 10153 | 11,114,999.00 | The obligations are secured by a cash collateral and personal guarantee of John Howard. | Club Ventures Investments, LLC |
| Praesidian Capital Investors, LLP 419 Park Avenue S., 8th Fl, New York, NY 10016 | 30,568,472.70 | The obligations are secured by a lien on all corporate assets of the company. | All Debtors |
| LNB Holding LLC 277 Park Avenue, 39th Fl, New York, NY 10172 | 24,402,416.08 | The obligations are secured by a lien on substantially all assets. | All Debtors |
| VGM Leasing PO Box 77077 Minneapolis, MN 55480-7777 | 275,853.45 | Capital leases on fitness equipment. | Club Ventures Investments, LLC |
| Key Equipment Finance Inc. 1000 S McCaslin Blvd Superior, CO 80027 | 211,639.44 | Capital leases on fitness equipment. | Club Ventures Investments, LLC |

Exhibit I - 37