PEITZMAN, WEG & KEMPINSKY LLP
David B. Shemano
Monsi Morales
Kathryn F. Russo
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone:  (310) 552-3100
Fax:  (310) 552-3101

Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CLUB VENTURES INVESTMENTS LLC, | Case No. 11-10891 |
| Debtor. | |
| | Joint Administration Pending |

**MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 361, 363 AND 364: (A) AUTHORIZING DEBTORS TO INCUR POSTPETITION INDEBTEDNESS, (B) GRANTING SECURITY INTERESTS, (C) AUTHORIZING USE OF CASH COLLATERAL, (D) AUTHORIZING ADEQUATE PROTECTION AND (E) GRANTING OTHER RELIEF**

Club Ventures Investments LLC ("**Club Ventures**") and certain of its subsidiaries, as debtors and debtors-in-possession (collectively, the "**Debtors**"), hereby move on an emergency basis for entry of an Interim Order (1) authorizing Debtors to incur postpetition indebtedness, (2) granting security interests, (3) authorizing the use of cash collateral, and (4) authorizing adequate protection, and (4) setting a final hearing on the motion (the "**Motion**").  In support of this Motion, the Debtors separately filed the Declaration of Stephen Schwartz pursuant to Local Bankruptcy Rule 1007-2 (the "**Schwartz Declaration**").

# I.

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtors' bankruptcy estates (the "**Estates**") and to obtaining credit and the use of property of the estate and is, accordingly, a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D) and (M)..  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 361, 363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure ("**FRBP**").

# II.

## GENERAL BACKGROUND

2.     On the date hereof (the "**Petition Date**"), the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     Club Ventures and its twenty-one (21) subsidiaries (the "**Subsidiaries**", together with Club Ventures, the "**Company**") are a premiere boutique gym company operating stylish, upscale fitness clubs in four metropolitan areas in the United States.  The Company primarily targets individuals in the 18-40 year age range.  As of the Petition Date, the Company operated six fitness clubs in the following locations: (a) three fitness clubs in New York, New York; (b) one fitness club in Chicago, Illinois; (c) one fitness club in Miami Beach, Florida; and (d) one fitness club in Bellevue, Washington.  Collectively, the clubs serve approximately 13,500 members (the "**Club Members**").

4.      The majority of the Company's revenues derive from the commercial operation of the fitness centers.  The Company's model is differentiated from other commercial fitness centers by its focus on personal training.  As a result, the revenue collected per member is higher, on average, than competing fitness centers.

5.      From 2005 through 2009, the Company embarked on an ambitious expansion plan.  During that period, the Company signed seven new real estate leases representing an additional 198,000 square feet of space, and opened six new fitness centers.  While the Company was able to raise capital to fund the expansion, by 2008 the Company was incurring substantial losses from operations and generating negative cash flow.  Various efforts to reverse the operating losses were unsuccessful.  Consequently, in the fourth quarter of 2010, the Company determined to implement a significant change to its business plan.  The Company replaced certain senior management and prepared a comprehensive plan to implement a restructuring of the Company.  The comprehensive plan contemplates a financial restructuring of the balance sheet, an operational restructuring of the Company's fitness centers, as well as significant reductions in certain corporate costs.  The Company also has begun introducing new initiatives to enhance revenue and cash flow.  After careful analysis, taking into consideration the existence of pending litigation, the need to modify and/or terminate existing leases, and the need to convert certain existing debt into equity, the Company concluded that its restructuring plan should be implemented through a chapter 11 proceeding.

## III.

## FACTS SPECIFIC TO THIS MOTION

6.      As set forth in the Schwartz Declaration, the Debtors historically financed their operations and growth through member equity contributions, the proceeds from operations of the gyms and sales of products and services, and the use of secured credit facilities provided by Bank of America (the "**BofA**"), Praesidian Capital Investors, LP,

Praesidian II SPV 1 LP and Praesidian II SPV 2, LP (collectively, "**Praesidian**"), and LNB Holding LLC ("**LNB**") (collectively, the "**Prepetition Secured Creditors**").

7.	Currently, the Company is indebted to: (a) BofA in the approximate amount of $11,115,000, which indebtedness is secured by substantially all of the Debtors' assets, (b) Praesidian in the approximate amount of $30.6 million, which indebtedness is secured by substantially all of the Debtors' assets, and (c) LNB in the approximate amount of $22.4 million, which indebtedness is secured by substantially all of the Debtors' assets.  Therefore, all of the Debtors' existing cash, and all of the Debtors' forecasted cash receipts, are the cash collateral of the Prepetition Secured Creditors and cannot be used without the consent of the Prepetition Secured Creditors or Order of the Court.

8.	In addition to the use of cash collateral, the Debtors forecast that they will also require postpetition financing to pay all expenses incurred through confirmation of a reorganization plan.  Without acquiring postpetition financing, the Debtors will not be able to continue their operations during the Chapter 11 Cases and will have little to no potential for a successful reorganization.

9.	The Debtors believe that they have the potential to be a profitable and growing enterprise with significant going concern value.  If given an opportunity during the Chapter 11 Cases to normalize and develop their business operations, the Debtors believe they can confirm a plan of reorganization that maximizes value for the Debtors' creditors and preserve the going concern value of the business.  To accomplish this goal, however, the Debtors must continue to operate.

10.	Attached to the Schwartz Declaration (and for the Court's convenience, also attached as Exhibit A hereto) is a consolidated cash budget prepared by the Debtors (the "**Budget**").  The Budget sets forth the Debtors' anticipated cash needs for 13 weeks immediately following the Petition Date, and may be amended or modified during the interim period until a final hearing on the Motion can be held.  As set forth in the Budget,

the Debtors require cash for primarily two purposes: (1) payroll, and (2) lease obligations.

## IV.

## **THE PROPOSED INTERIM ORDER AND DIP FINANCING**

11.     In preparation of the Debtors' chapter 11 filings, the Debtors entered into good faith negotiations with the Prepetition Secured Creditors concerning the use of cash collateral, the provision of adequate protection, and the provision of DIP financing by LNB.  Those negotiations resulted in agreement to the terms of a proposed Interim Order, a copy of which is attached as Exhibit A, and a proposed DIP credit agreement (the "DIP Agreement"), a copy of which is attached as Exhibit B.[1]

12.     The willingness of LNB to advance funds pursuant to the terms of the Interim Order and DIP Agreement, and the support of Praesidian for the proposed Interim Order and DIP Agreement, is directly related to agreement among the parties for the terms of a comprehensive restructuring of the Debtors' balance sheet.  Praesidian and LNB (together, the "**Consenting Secured Creditors**") have entered into a Plan Support Agreement ("**PSA**"), pursuant to which the Consenting Secured Creditor have agreed to terms of a reorganization plan that delevers the Company's balance sheet to enable the Company to continue as a going concern.

13.     Under the PSA, the Consenting Secured Creditors have committed to convert debt to equity to implement such a restructuring.  The Proposed DIP Agreement contains milestone dates by which the Company is to, among other things, file a disclosure statement and plan and to pursue and implement a restructuring in accordance with the PSA.  However, the restructuring can also be implemented through a 363 sale if the plan process becomes inordinately delayed and/or the Company and Consenting

---

[1] While the Interim Order and DIP Agreement are substantially complete, the parties are still working to finalize the documents and there is a possibility that the documents may change before the interim hearing on the Motion.

Secured Creditors determine the restructuring can better be effectuated through such a sale.

14.     While the PSA is not currently binding on the Company, it is contemplated that upon entry of a final order approving the DIP Agreement, the restructuring deadlines contained in the DIP Agreement will become binding on the Company.

15.     The proposed DIP Agreement, as authorized by the Interim Order, contains very favorable terms.  LNB has agreed to advance up to $800,000 to fund the Debtors' operations during the Chapter 11 Cases.  Most significantly, (a) the advances will be secured by liens that are junior to existing liens, which existing liens encumber substantially all of the Debtors' assets and secure claims that are greater than the value of the collateral, (b) the Debtors will not be required to make any interest payments until the maturity date of the loan, and (c) LNB did not require any material financial covenants. Because of the Debtors' historical operating losses combined with the fact that the Debtors' assets are fully encumbered, the Debtors do not believe any third-party lender would be willing to advance on terms better than the terms proposed by LNB.  At minimum, any third-party lender would require a priming lien, interest payments and financial covenants.

16.     In accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure and Local Rule 4001-2, the following are the material provisions of the Interim Order and DIP:

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| **Borrower** | Club Ventures Investments LLC | DIP Agreement Recitals; Interim Order, Recitals ¶ (i); Bankruptcy Rule 4001(c)(1)(B). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| **Guarantors** | Club Ventures II, LLC, CV 2, LLC, CV II Gym, LLC, Club Ventures III, L.L.C., CV 3, LLC, CV III Gym, LLC, Club Ventures IV, LLC, CV 4 Leasing, LLC, CV IV Gym, LLC, Club Ventures VI, LLC, CV VI, LLC, CV VII Gym, LLC, Club Ventures VIII, LLC, CV VIII Gym, LLC, Club Ventures X, LLC, CV X Gym, LLC, DB 85 Gym Corp. | DIP Agreement Recitals and Definitions; Interim Order Recitals ¶ (iii); Bankruptcy Rule 4001(c)(1)(B). |
| **DIP Lender** | LBN Holding LLC | DIP Agreement Recitals and Definitions; Interim Order, Recitals ¶ (i); Bankruptcy Rule 4001(c)(1)(B). |
| **Closing Date** | Means the date of the Promissory Note. | DIP Agreement Definitions; Bankruptcy Rule 4001(c)(1)(B). |
| **Borrowing Limits** | Interim: [    ]<br><br>Total: $800,000 | DIP Agreement § 2; Interim Order, ¶¶ Recitals (i) and 4; Bankruptcy Rule 4001(c)(1)(B). |
| **Interest Rate** | Applicable Federal Rate<br><br>Default Rate: Additional 2.0% per annum | DIP Agreement § 2(d); Bankruptcy Rule 4001(c)(1)(B). |
| **Fees and Reimbursement of Expenses** | DIP Lender and its counsel and advisors. | DIP Agreement § 12(j); Interim Order Recitals (vi) and ¶¶ 3, 5; Local Rule 4001-2(a)(3). |
| **Maturity Dates** | Earliest of (i) the date that is five (5) months after the Petition Date (the "**Initial Maturity Date**"), provided that this date may be extended for an additional period but in no event later than the date that is seven (7) months after the Initial Maturity Date if such extension is requested in writing by any of the Pre-Petition Lenders on or prior to the Initial Maturity Date, (ii) the date on which all the obligations under this Note have been indefeasibly repaid in full in cash and all of commitments under this Note have been permanently and irrevocably terminated, (iii) the date of the closing of a sale of all | DIP Agreement Definitions; Interim Order ¶ 5; Bankruptcy Rule 4001(c)(1)(B). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | or substantially all of Debtor's assets pursuant to Section 363 of the Bankruptcy Code, (iv) the date that a plan of reorganization for Debtors pursuant to chapter 11 of the Bankruptcy Code is declared effective, and (v) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit under this Note following the occurrence and during the continuance of an Event of Default. | |
| **Use of Cash Collateral** | Subject to the limitations set forth in the DIP Orders, the Debtors are authorized to use all cash collateral only in accordance with the Budget. | Interim Order, ¶¶ F and 12; Bankruptcy Rule 4001(b)(1)(B)(ii)- (iii). |
| **Use of DIP Facility** | The proceeds of the DIP Facility shall only be used, and for no other activities, (a) to pay all interest, charges, fees and expenses, (b) to fund post-petition operating expenses and other general corporate needs, including working capital needs, (c) to pay certain administrative expenses of the Cases, including reasonable fees and expenses of professionals, (d) to pay court-approved critical vendors and (e) to make such other court-approved payments, in each case, solely in the manner contemplated by and in amounts consistent with the Budget. | DIP Agreement § 6(g); Interim Order¶ 10; Bankruptcy Rule 4001(b)(1)(B), 4001(c)(1)(B)(iii), 4001(c)(1)(B); Local Rule 4001-2(a)(9). |
| **Events of Default** | • a default in the payment of any interest on any of the Notes as and when the same shall become due and payable or the failure to make any adequate protection payments when due;<br><br>• a default in the payment of all or any part of the principal of any of the Notes as and when the same shall become due and payable either at maturity, by declaration, acceleration or otherwise, whether or not prohibited by any provisions hereof;<br><br>• a failure on the part of any Debtor to duly observe or perform any of the covenants or agreements on the part of such Debtor contained in this Note (including the Guaranty); | DIP Agreement § 10(a); Interim Order ¶ 25; Bankruptcy Rule 4001(c)(1)(B). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | • any representation, warranty or statement made or deemed made by any Debtor herein shall prove to be false or misleading in any material respect when so made;<br><br>• there is entered against any Debtor a judgment or levy upon the Collateral;<br><br>• there is a taking of possession of a substantial part of the Collateral;<br><br>• any Lien being granted or placed upon the Collateral other than the lien of DIP Lender and Permitted Liens;<br><br>• a Material Adverse Effect in the financial condition of any Debtor, as determined by DIP Lender in its sole discretion;<br><br>• one or more judgments or orders as to any obligation arising after the Petition Date in excess of $50,000 (to the extent not covered by independent third-party insurance) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against any Debtor and shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of such Debtor to enforce any such judgment;<br><br>• there shall have occurred a Change of Control;<br><br>• the appointment of an examiner with expanded powers or a trustee in any Debtor's chapter 11 case, conversion of the chapter 11 case to a case or cases under chapter 7 of the Bankruptcy Code or dismissal of the chapter 11 case by order of the Bankruptcy Court;<br><br>• the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder of any security interest to permit foreclosure (including under Article 9 of the Uniform Commercial Code and/or applicable state law) on any of | |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | the assets of the Company; | |
| | • any order of the Bankruptcy Court shall be entered staying, reversing or vacating any of the Orders without the prior written consent of DIP Lender; | |
| | • the (A) (1) termination (whether in accordance with its terms or otherwise) by any Pre-Petition Lender of the PSA, or any material default or material breach (which material default or material breach is not cured by the deadline (if any) or waived) by any Pre-Petition Lender under the PSA; (2) subject to entry of the Final Order, termination (whether in accordance with its terms or otherwise) by any Debtor of the PSA, or any material default or material breach (which material default or material breach is not cured by the deadline (if any) or waived) by any Debtor under the PSA or (B) any modification, amendment or supplement with respect to the Restructuring or any modification, amendment or supplement affecting the rights or obligations of any Pre-Petition Lender or DIP Lender absent such parties written consent; | |
| | • the failure by Debtors to achieve any of the Milestones (except to the extent that DIP Lender has agreed, in its sole discretion, to extend the applicable timing in connection with any of the Milestone), and such failure shall continue unremedied for a period of forty-five (45) days after written notice thereof from DIP Lender to Debtors; | |
| | • the making of any material cash payment by the Debtors other than payments authorized by the Orders; | |
| | • the termination by the Bankruptcy Court of the Debtors' exclusive period to file the Plan under Section 1121 of the Bankruptcy Code, or the lapsing of such exclusive period; | |
| | • the Debtors withdraw the Plan or publicly announce their intention not to pursue or support the Plan; | |
| | • the failure of any Debtor to perform | |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | Bankruptcy Court orders in any material respect; | |
| | • any breach by any Debtor of any material term or condition of the Interim Order or the Final Order, as applicable; | |
| | • the payment of, or filing of a motion or other pleading any Debtor for authority to pay, any pre-petition claim or administrative expense arising under Section 503(b)(9) of the Bankruptcy Code except as may be provided for in the Interim Order or the Final Order, as applicable, or this Note or as may be approved by the Bankruptcy Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to DIP Lender; | |
| | • the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against DIP Lender or any of the Collateral; | |
| | • the filing of any plan that does not conform to the terms and conditions of the PSA; | |
| | • the filing of any motion or application or the commencement of any litigation (or the joinder by any of the Debtors in, or support by the Debtors of, any such action commenced by any other party) by the Debtors that is inconsistent in any material respect with the PSA or seeks to effectuate a Material Adverse Change (as defined in the PSA); or | |
| | • the entry of an order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of any Debtor to which DIP Lender does not consent. | |
| **Change of Control** | Shall be deemed to have occurred if (a) there is a material change in Company's management or the board of directors of Company (except as directed by Holder or its affiliates); (b) any "person" or "group" (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the date hereof), other than the existing equity holders of Company, shall own, directly or indirectly, | DIP Agreement, Definitions; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001- 2(a)(11). |

| TERM | DESCRIPTION | CITATION |
|------|-------------|----------|
| | beneficially or of record, shares representing more than 25% of the aggregate issued and outstanding equity interests of Company; (c) any change in control (or similar event, however denominated) with respect to Company shall occur under and as defined in any material agreement in respect of which Company is a party; or (d) all or substantially all of the assets of Company shall be sold, or a chapter 11 plan of reorganization shall be confirmed, without the consent of DIP Lender. | |
| **DIP Liens** | The DIP Lender will receive perfected liens and security interests pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the Credit Parties' respective existing and after-acquired property and assets (including, subject to the Final Order, any claims or causes action arising under chapter 5 of the Bankruptcy Code). The liens will be junior to the Carve Out, all of the BofA Prepetition Liens and adequate protection liens granted to BofA, but otherwise prime the liens existing on the Collateral. | Interim Order ¶¶ 6, 7, 20; DIP Agreement § 5(e); Bankruptcy Rule 4001(1)(B)(i) and (xi). |
| **Superpriority Claims** | All of the DIP Obligations shall constitute administrative expense claims against each of the Debtors subordinate to the Carve Out and the adequate protection claims granted to BofA, but shall have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, section 506(c)), and at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law. | DIP Agreement § 5(e); Interim Order ¶¶ 8; Bankruptcy Rule 4001(c)(1) (B)(i). |
| **Validity, Enforceability, Priority and Amount of Pre-** | The Debtors' stipulation to the validity, enforceability, priority and amount of the DIP Lender's pre-petition claims and liens securing such claims, which is subject to any party in interest | Interim Order ¶¶ E(iii)-(vi); 29; Bankruptcy Rule 4001(c)(1)(B)(iii) |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| **Petition Liens** | granted standing to assert a Challenge (as defined in the Interim Order) within seventy-five (75) calendar days following the date of entry of the Interim Order. | |
| **Waiver of the Automatic Stay** | As necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claim, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Lender or the Prepetition Lenders each may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Lender and Prepetition Lenders under the DIP Documents, the DIP Facility and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Lender and Prepetition Lenders to retain and apply, payments made in accordance with the terms of the Interim Order. Further modified to terminate the DIP Agreement and use of Cash Collateral upon the occurrence of a Termination Declaration and subject to seven (7) Court days notice. | DIP Agreement § 10(b); Interim Order, ¶ 19,26; Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001- 2(c). |
| **Milestones Related to Chapter 11 Cases** | The "***Milestones***" include (1) on or prior to the date that is twenty (20) Business Days after the commencement of the Chapter 11 Cases, provide Holder with a final draft of the Disclosure Statement and any motions to be filed with the Bankruptcy Court in connection therewith, in each case, consistent in all material respects with the PSA; (2) no later than twenty-five (25) Business Days following the Petition Date, to file a plan of reorganization and disclosure statement with the Bankruptcy Court containing terms and conditions consistent with this Note and the PSA and, in each case, otherwise in form and substance satisfactory to Holder; (3)file the Debtors' schedules and statements of affairs with the Bankruptcy Court no later than sixty (60) days after the Petition Date; (4) obtain entry of the (x) Interim Order by the Bankruptcy Court within three (3) Business Days following the Petition Date and (y) Final Order by the Bankruptcy Court no later than thirty (30) calendar days following the date of the Interim Order, in each case | DIP Agreement § 8(b); Bankruptcy Rule 4001(c)(1)(B)(vi). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | on terms that are consistent with the PSA in all material respects and in all other respects satisfactory to DIP Lender; (5) to obtain entry of an order approving the Disclosure Statement by the Bankruptcy Court within 70 calendar days from the Petition Date; (6)to obtain entry of an order by the Bankruptcy Court confirming the Plan in form and substance satisfactory to DIP Lender within 135 calendar days from the Petition Date; and (7) to cause the "Effective Date" of the Plan to occur no later than 155 days after the Petition Date, on which date there shall be no appeals pending with respect to the Confirmation Order other than such appeals over which the Consenting Lenders (as defined in the PSA) have determined to substantially consummate the Plan. | |
| **Waiver of Section 552(b) "equities of the case"** | The "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or any Prepetition Lender with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | Interim Order ¶ 35; Local Rule 4001-2(a)(8). |
| **Waiver of Section 506(c)** | Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Lender or the Prepetition Lenders or any of their respective claims, the DIP Collateral or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the affected DIP Lender or Prepetition Lender. | Interim Order ¶ 34; Bankruptcy Rule 4001(c)(1)(B)(x). |
| **Right to Credit Bid** | Each of the DIP Lender and Prepetition Lenders retain unqualified right to credit bid up to the full amount of (i) with respect to the DIP Lender, such lender advanced under the DIP Facility that is outstanding at the time of the sale, and (ii) with respect to the Prepetition Lenders, such lender's portion of the Prepetition Obligations. | DIP Agreement § 10(b)(iii)Interim Order ¶ 23; Bankruptcy Rule 4001(c)(1)(B). |
| **Adequate Protection** | § _Adequate Protection Liens_: The Prepetition Lenders are granted Adequate Protection Lien to cover any Diminution in Value of their interests in the Prepetition Collateral. <br><br> § _Adequate Protection Superpriority Claims_: The Prepetition Lenders are granted | Interim Order¶¶ G, 13, 14, 15, 16 21; Bankruptcy Rule 4001(c)(1) (B)(ii). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | Adequate Protection Superiority Claims to cover any Diminution in Value of their interests in the Prepetition Collateral. | |
| | § Adequate Protection Payments: The Debtors are authorized to provide adequate protection to shall make current cash payments of all (i) (i) the Prepetition Lenders in the form of ongoing payment of the reasonable legal fees and expenses (subject to the review) incurred after the Petition Date, and (ii) BofA in the form of payment of accrued interest at the rate provided for in and pursuant to the terms of the BofA Note and the BofA Loan Agreement. | |
| **Material Conditions to Closing and Borrowing** | Customary borrowing conditions, including but not limited to, all DIP Loan Documents shall be in form and substance satisfactory to the DIP Lender, payment of all fees and expenses that are required to be paid on or before the Closing Date pursuant to the DIP Agreement, all first day orders satisfactory in form and substance to the DIP Lender, delivery and approval of the Budget, and all the requisite consents and internal corporate approvals and Bankruptcy Court approvals in connection with the filing of these chapter 11 cases have been obtained. | DIP Agreement § 7, 2.2; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2). |
| **Budget** | The Credit Parties will submit a 13 week rolling budget proposed Budget in form and substance acceptable to the DIP Lender. | DIP Agreement Definitions and § 8(k); Interim Order ¶ F; Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2). |
| **Carve Out Expenses** | The Carve-Out Expenses are: (i) statutory fees payable to the UST pursuant to 28 U.S.C. § 1930(a)(6); (ii) all professional fees and disbursements by counsel to the Debtors retained by order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to sections 327 or 1103(a) of the Bankruptcy Code (the "Case Professionals") to the extent allowed or later allowed by order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the | DIP Agreement Definitions; Interim Order ¶¶ 28; Local Rule 4001- 2(a)(5). |

| TERM | DESCRIPTION | CITATION |
|---|---|---|
| | "Allowed Professional Fees"), but solely to the extent such Allowed Professional Fees are within the corresponding amounts set forth in the Budget; provided, however, that, upon an Event of Default under the DIP Documents, the amount of the Carve Out shall not exceed $50,000 plus the amount of the professional fees and expenses incurred in accordance with the Budget prior to such Event of Default. | |
| **Plan Support Agreement** | Subject to entry of Final Order, the Debtors will be obligated to pursue a Restructuring in accordance with the Plan Support Agreement. | DIP Agreement Definitions and ¶ 10(a)(xiv); Local Rule 4001-2(a)(8) |
| **Limitation of Sale of Debtors' Business or Property** | Other than ordinary course sales and transactions, the Credit Parties are prohibited from the sale of assets. | DIP Agreement § 9(c) and (e); Bankruptcy Rule 4001(c)(17)(B); Local Rule 4001- 2(a)(8). |

## V.

## THE INTERIM ORDER SHOULD BE ENTERED

### The Court Should Authorize The Use Of Cash Collateral Pursuant To The Terms Of The Interim Order And DIP Agreement

19.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions and to use property of the estate in the ordinary course of business.  Section 363(c)(2), however, prohibits a debtor-in-possession's use of cash collateral under subsection (c)(1) unless each entity that has an interest in such cash collateral consents or the Bankruptcy Court authorizes such use, sale, or lease after notice and a hearing.

20.     Pursuant to the terms of the Interim Order and DIP Agreement, the Debtors have obtained the consent of the Prepetition Secured Creditors to the use of cash collateral pursuant to the Budget.  In addition, understanding that the value of the Company can only be preserved through its continued operations, supported by adequate

capital, as provided through the DIP Agreement, BofA and Praesidian support the Debtors' entry into the DIP Agreement.

21.     Because the secured creditors have consented to the Debtors' use of the Cash Collateral in the ordinary course of business, such use is allowed and should be approved pursuant to section 363(c)(2).

22.     The Interim Order and DIP Agreement provide the Prepetition Secured Creditors adequate protection of their interest in the cash collateral in the form of replacement liens and other rights as set forth above. Section 363(e) provides that a court may condition the debtor-in-possession's use of cash collateral on the debtor-in-possession providing "adequate protection" of the secured party's interest in the collateral being used. Section 361 states that, when adequate protection is required under section 363, such adequate protection may be satisfied by providing the lender with an additional or replacement lien to the extent that the proposed use of the estate's property results in a decrease in the value of the lender's interest in such property. The type of adequate protection that is appropriate in a particular case will depend on the nature of the case. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987) ("Adequate protection [is] a concept which is to be decided flexibly on the proverbial case-by-case basis.").

23.     Under the circumstances, the proposed adequate protection – replacement liens and other rights as described above – are what is required under section 361 of the Bankruptcy Code and are reasonable under the circumstances. Therefore, the Debtors request that the Court enter the Interim Order granting the Prepetition Secured Creditors adequate protection.

### The Court May Authorize Use Of Cash Collateral On An Interim And Emergency Basis

24.     The Court may authorize the Debtors' interim use of cash collateral to avoid immediate and irreparable harm to the Debtors' business and estates. Pursuant to FRBP 4001(b)(2), the Court may commence a final hearing on a motion for

authorization to use cash collateral no earlier than 15 days after service of the motion, and may authorize the use of cash collateral only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing. *See generally, In re Center Wholesale, Inc.*, 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (discussion of importance of emergency relief granting use of cash collateral at the commencement of a case).

25.     As set forth above, it is critical that the Debtors be authorized to pay their expenses pursuant to the Budget immediately and uninterrupted in the ordinary course of its business.  Most significantly, the Debtors have a payroll due on March 7, 2011 and again on March 22, 2011.  Furthermore, the Debtors must continue to pay postpetition amounts due under their leases for equipment and gym locations to continue to maintain operations at their club locations.

26.     If the Debtors are not permitted to pay their employees and the other critical expenses immediately and in the ordinary course of its business, the Debtors likely will be required to cease operations temporarily, which will be extremely damaging, if not fatal, to the Debtors' business. Therefore, the Debtors' interim use of cash collateral is necessary to avoid immediate and irreparable harm to the Debtors and their bankruptcy estates.

27.     Under the circumstances, the Debtors request that the Court set a final hearing as soon as the Court's calendar permits on a date approximately thirty (30) days from the date of the initial hearing on the Motion, and authorize the Debtors to use cash collateral in accordance with the Budget on an interim basis pending such final hearing. The Debtors propose to serve notice of entry of the Interim Order and the final hearing by regular mail or electronic service, no later than two days after entry of the Interim Order upon (i) the parties indentified in the "Notice" paragraph below, and (ii) any other party which prior thereto filed a notice of appearance in these cases.

<u>The DIP Agreement Should Be Approved On An Interim Basis.</u>

17.     The DIP Agreement should be approved because the terms thereof satisfy the requirements of section 364(c) of the Bankruptcy Code.  If a debtor in possession is unable to obtain credit on an unsecured priority basis, it may seek approval to obtain credit or incur debt with an administrative expense "superpriority," secured by a first priority lien on property of the estate that is not otherwise subject to a lien, or secured by a junior lien on property of the estate that is subject to an existing lien.  11 U.S.C. § 364(c); *see, e.g., Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001).  It is well-established that the "statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *See, e.g., Bray v. Shenandoah Savings and Loan Association (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Rather, in determining whether to approve a postpetition financing transaction, the Court should give broad deference to the business decision of a chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds.  *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties").

18.     Further, FRBP Rule 4001(c)(2) provides that the court may conduct an interim hearing on less than 15 days' notice, and, at such hearing, "may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."

19.     The Debtors have demonstrated the immediate need and the benefits of the proposed postpetition financing under the circumstances of this case.  Postpetition financing is necessary to allow the Debtors to continue their business operations uninterrupted, which will enable the Debtors to maximize the value of the business as a going concern with the goal of a successful reorganization.

20.     In addition, the Debtors do not believe that postpetition financing is available from any source other than LNB upon the favorable terms agreed to by LNB. LNB is unwilling to extend credit to the Debtors except on the terms set forth in the Interim Order and DIP Agreement.

21.     Therefore, having satisfied the requirements of section 364(c), and having exercised reasonable business judgment in negotiating the terms of the DIP Agreement, the Debtors should be authorized to enter into the DIP Agreement on an interim basis pending a final hearing.  As with cash collateral, the Debtors request that the Court schedule a final hearing to consider proposed postpetition financing on a final basis.


## VI.
## NOTICE

30.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York, (b) the Debtors' secured creditors, and (c) the holders of the thirty (30) largest unsecured claims.

31.     No previous request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order in the form attached hereto as Exhibit B: (i) authorizing Debtors to incur postpetition indebtedness, (ii) granting security interests, (iii) authorizing the use of cash collateral, and (iv) authorizing adequate protection, (v) setting a final hearing, and (vi) granting the Debtors such other and further relief as is just.

Dated: Los Angeles, California
       March 2, 2011

## PEITZMAN, WEG & KEMPINSKY LLP


By:/s/  David B. Shemano
       David B. Shemano
       Monsi Morales
       Kathryn F. Russo
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone:  (310) 552-3100

Proposed Counsel for Debtors and Debtors-in-Possession

# EXHIBIT A

**DavidBartonGym**

**13 Week Cash Flow Forecast**

*Week of Mar-05-11 through May-28-11*

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | 27-Feb-11 | 6-Mar-11 | 13-Mar-11 | 20-Mar-11 | 27-Mar-11 | 3-Apr-11 | 10-Apr-11 | 17-Apr-11 | 24-Apr-11 | 1-May-11 | 8-May-11 | 15-May-11 | 22-May-11 | |
| Saturday | | 5-Mar-11 | 12-Mar-11 | 19-Mar-11 | 26-Mar-11 | 2-Apr-11 | 9-Apr-11 | 16-Apr-11 | 23-Apr-11 | 30-Apr-11 | 7-May-11 | 14-May-11 | 21-May-11 | 28-May-11 | TOTAL |
| **Beginning Cash** | | 529,876 | 570,012 | 570,701 | 737,674 | 980,889 | 1,387,848 | 707,034 | 797,411 | 574,186 | 512,799 | 586,398 | 480,696 | 384,899 | 529,876 |
| | | | | | | | | | | | | | | | |
| Collections From Operations | $ | 363,853 | 884,859 | 263,515 | 805,015 | 588,939 | 170,056 | 958,241 | 283,426 | 824,926 | 279,655 | 959,219 | 278,712 | 820,212 | $ 7,480,626 |
| Proceeds From DIP Financing | | - | - | - | 400,000 | - | - | - | - | - | - | - | - | - | 400,000 |
| **Total Cash Receipts** | $ | 363,853 | 884,859 | 263,515 | 1,205,015 | 588,939 | 170,056 | 958,241 | 283,426 | 824,926 | 279,655 | 959,219 | 278,712 | 820,212 | $ 7,880,626 |
| **Operating Outflows** | | | | | | | | | | | | | | | |
| Compensation | | | | | | | | | | | | | | | |
| Salaries | $ | - | (522,278) | - | (522,278) | - | (520,647) | - | - | (520,647) | - | (514,377) | - | (514,377) | $ (3,114,605) |
| Bonuses | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Commissions | | - | - | - | (196,870) | - | - | - | - | (111,316) | - | - | - | (105,202) | (413,388) |
| Total Compensation | | - | (522,278) | - | (719,149) | - | (520,647) | - | - | (631,963) | - | (514,377) | - | (619,579) | (3,527,993) |
| Chelsea Rent | | - | - | - | - | - | - | (113,899) | - | - | - | (56,949) | - | - | (170,848) |
| Uptown Rent | | - | - | - | - | - | - | (399,126) | - | - | - | (133,042) | - | - | (532,168) |
| Chicago Rent | | - | - | - | - | - | - | (208,764) | - | - | - | (69,588) | - | - | (278,352) |
| Gansevoort Rent | | - | - | - | - | - | - | - | (80,420) | - | - | - | (80,420) | - | (160,841) |
| Astor Place Rent | | (137,500) | - | - | - | - | - | - | (275,000) | - | - | - | (137,500) | - | (550,000) |
| Bellevue Rent | | - | - | - | - | - | - | - | (44,036) | - | - | - | (45,677) | - | (89,713) |
| CAM and RE Taxes | | - | - | - | (55,000) | - | - | (16,000) | (11,389) | - | - | (16,000) | (11,389) | - | (109,778) |
| Utilities | | (89,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,798) | (19,696) | (327,267) |
| Cost of Sales | | (6,443) | (6,443) | (6,443) | (6,443) | (6,470) | (6,470) | (6,470) | (6,470) | (6,470) | (6,610) | (6,610) | (6,610) | (6,610) | (84,558) |
| Supplies | | (13,498) | (13,498) | (13,498) | (13,498) | (12,894) | (12,894) | (12,894) | (12,894) | (12,561) | (12,561) | (12,561) | (12,561) | (12,408) | (168,219) |
| Repairs/Maintenance | | - | (6,600) | - | (6,600) | - | (5,240) | - | (5,240) | - | (5,240) | - | (5,240) | - | (34,160) |
| Spa | | (9,213) | - | - | - | - | (9,161) | - | - | - | - | (9,161) | - | - | (27,535) |
| Capital Lease Payments | | (5,000) | (17,863) | (17,863) | (17,863) | (17,863) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (17,864) | (219,361) |
| Capital Improvement | | - | (2,000) | (4,000) | - | - | (4,000) | (2,000) | - | - | - | (2,000) | (4,000) | - | (18,000) |
| Miscellaneous | | (14,500) | (14,500) | (14,500) | (14,500) | (46,500) | (14,500) | (14,500) | (14,500) | (46,500) | (14,500) | (14,500) | (14,500) | (46,500) | (284,500) |
| Credit Card Fees | | (11,979) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,440) | (12,350) | (12,350) | (12,350) | (12,350) | (12,350) | (160,814) |
| **Total Operating Outflow** | | (287,930) | (615,420) | (88,541) | (865,290) | (115,965) | (623,013) | (823,754) | (500,051) | (747,505) | (88,922) | (884,800) | (367,909) | (735,007) | (6,744,107) |
| **Corporate Outflows** | | | | | | | | | | | | | | | |
| Corporate Compensation | | - | (106,339) | - | (88,510) | - | (88,510) | - | - | (88,510) | - | (86,012) | - | (86,012) | (543,895) |
| Insurance | | - | (73,399) | - | - | (30,228) | (51,734) | - | - | (43,698) | (51,734) | - | - | (31,458) | (282,250) |
| Rent and Utilities | | - | - | - | - | - | - | (37,510) | - | - | - | (37,510) | - | - | (75,020) |
| Marketing | | (6,000) | (6,000) | (6,000) | (6,000) | (6,000) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (4,600) | (66,800) |
| Managerial Payments | | - | (50,000) | - | - | - | (50,000) | - | - | - | - | (50,000) | - | - | (150,000) |
| Corporate Miscellaneous | | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (33,012) | (2,000) | (2,000) | (2,000) | (119,035) |
| **Total Corporate Outflow** | | (8,000) | (268,750) | (8,000) | (96,510) | (38,228) | (227,856) | (44,110) | (6,600) | (138,809) | (89,345) | (180,122) | (6,600) | (124,070) | (1,236,999) |
| | | | | | | | | | | | | | | | |
| **Total Outflows** | | (295,930) | (884,169) | (96,541) | (961,800) | (154,193) | (850,869) | (867,864) | (506,651) | (886,313) | (178,267) | (1,064,922) | (374,509) | (859,077) | (7,981,106) |
| | | | | | | | | | | | | | | | |
| **Total Cash Flow from Operations** | | 67,923 | 689 | 166,974 | 243,214 | 434,746 | (680,813) | 90,377 | (223,225) | (61,387) | 101,387 | (105,702) | (95,797) | (38,865) | (100,480) |
| | | | | | | | | | | | | | | | |
| **Adequate Protection Payments** | | | | | | | | | | | | | | | |
| Bank of America Interest | | (27,787) | - | - | - | (27,787) | - | - | - | - | (27,787) | - | - | - | (83,362) |
| | | | | | | | | | | | | | | | |
| **Change in Cash Before Professional Fees** | $ | 40,135 | 689 | 166,974 | 243,214 | 406,959 | (680,813) | 90,377 | (223,225) | (61,387) | 73,600 | (105,702) | (95,797) | (38,865) | $ (183,842) |
| | | | | | | | | | | | | | | | |
| **Ending Balance Before Professioanl Fees** | $ | 570,012 | 570,701 | 737,674 | 980,889 | 1,387,848 | 707,034 | 797,411 | 574,186 | 512,799 | 586,398 | 480,696 | 384,899 | 346,034 | $ 346,034 |
| Professional Fees[1] | | | | | | | | | | | | | | | (300,000) |
| **Ending Balance After Professional Fees** | | | | | | | | | | | | | | | $ 46,034 |

[1] Professional fees will be accruing pursuant to Court order will be accruing and shall be payable in accordance with applicable order of the Bankruptcy Court.

# EXHIBIT B

PEITZMAN, WEG & KEMPINSKY LLP
David B. Shemano
Monsi Morales
Kathryn F. Russo
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone:  (310) 552-3100
Fax:  (310) 552-3101

Proposed Counsel for Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| CLUB VENTURES INVESTMENTS LLC, *et al*., | : | Case No. 11-10891 |
| | : | |
| Debtors. | : | [Jointly Administered] |
| | : | |

----------------------------------------------------------------X

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN JUNIOR SECURED SUPERPRIORITY POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED LENDERS, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Club Ventures Investments LLC ("CV") and its

subsidiaries Club Ventures II, LLC, CV 2, LLC, CV II Gym, LLC, Club Ventures III, L.L.C.,

CV 3, LLC, CV III Gym, LLC, Club Ventures IV, LLC, CV 4 Leasing, LLC, CV IV Gym, LLC,

Club Ventures VI, LLC, CV VI, LLC, CV VII Gym, LLC, Club Ventures VIII, LLC, CV VIII

Gym, LLC, Club Ventures X, LLC, CV X Gym, LLC, DB 85 Gym Corp., as debtors and debtors

in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively,

with any Successor Cases (as defined below), the "Cases") pursuant to sections 105, 361, 362,

363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) and 507 of title 11 of the United States Code,

11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and S.D.N.Y. LBR 4001-2,

seeking entry of an interim order (this "Interim Order") *inter alia*:

(i)        authorizing the Debtors to obtain an aggregate amount not to exceed $800,000 of secured, superpriority post-petition financing, junior in priority to certain prepetition secured claims and adequate protection claims and liens granted to certain  Prepetition Lenders (as defined below), and with administrative priority (the "<u>DIP Facility</u>") pursuant to the terms and conditions of that certain Junior Secured Super Priority Debtor-in-Possession Promissory Note, Security Agreement and Guaranty (as it may be amended, supplemented, restated, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>") by and among the Debtors and LNB Holding LLC ("<u>Holding</u>" or the "<u>DIP Lender</u>"), substantially in the form of <u>Exhibit A</u> attached to the Motion;

(ii)       authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related loan documents (collectively, the "<u>DIP Documents</u>") by and among the Debtors and the DIP Lender and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)      authorizing the Debtors (other than CV) to jointly and severally guaranty (the "<u>DIP Guarantors</u>")  the DIP Credit Agreement the obligations under the DIP Facility (the "<u>DIP Guarantees</u>") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iv)      granting to the DIP Lender allowed superpriority administrative expense claims in the Cases and any Successor Cases for the DIP Facility and all obligations owing thereunder and under the DIP Documents, including all indemnification obligations of the Debtors thereunder (collectively, and including all "Obligations" as described in the DIP Credit Agreement and in paragraph 5 of this Interim Order, the "<u>DIP Obligations</u>"), subject to the priorities set forth in paragraph 7 of this Interim Order;

(v)     granting to the DIP Lender, automatically perfected, valid and enforceable junior security interests in and liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>"), which liens shall be subject to the priorities set forth in paragraph 7 of this Interim Order;

(vi)     authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, the fees and disbursements of the DIP Lender's counsel and other professionals, all to the extent provided by and in accordance with the terms of the DIP Documents;

(vii)     authorizing the Debtors' use of Cash Collateral of the Prepetition Lenders;

(viii)     providing adequate protection to the Prepetition Lenders for any diminution in value of their interests in the Prepetition Collateral (as defined below), including the Cash Collateral;

(ix)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(x)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") having considered the Motion, Declaration of Steven Schwartz, Chief Financial Officer for the Debtors, in Support of First Day Pleadings, the exhibits attached thereto, the DIP Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on March __, 2011 (the "<u>Interim Hearing</u>"); notice of the Interim Hearing having been

3

given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014, and S.D.N.Y. LBR 4001-2; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; it appearing to the Court that granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON DEBTORS' STIPULATIONS AND THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      _Petition Date_:  On March 2, 2011 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court commencing these Cases.

B.      _Debtors in Possession_.  The Debtors are continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      _Jurisdiction and Venue_.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the property affected hereby.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceeding on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4

D.     *Creditors' Committee*.  No official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code.

E.     *Stipulations and Findings Regarding Prepetition Liens and Obligations.*

(i)     *BofA Prepetition Liens and Obligations*.  Pursuant to that certain Promissory Note (the "BofA Note"), dated June 29, 2004, as amended, between CV, as borrower, and Bank of America, N.A. ("BofA"), as lender, as heretofore amended from time to time, and that certain Loan Agreement (the "BofA Loan Agreement"), dated as of August 4, 2009, between CV and BofA, as heretofore amended from time to time, BofA agreed to make loans to CV (the "BofA Loans").  BofA also has outstanding a $1.5 million letter of credit for the account of Debtors (all amounts owing thereunder, together with all amounts owing under the BofA Note and the BofA Loan Agreement, the "BofA Obligations").  To induce BofA to extend the BofA Loans and as security for the repayment of all amounts due under the BofA Obligations, (i) pursuant to that certain Pledge Agreement (the "BofA Pledge Agreement", and together with the BofA Note, the "BofA Agreement"), dated June 29, 2004, between BofA and CV, CV granted to BofA a lien and security interest (the "BofA Liens") in substantially all of its assets, as more fully described in the BofA Pledge Agreement (the "BofA Collateral"), and (ii) John D. Howard ("JDH", and together with Holding, "LBN") issued a Continuing and Unconditional Guaranty, dated June 29, 2004, and a Continuing and Unconditional Guaranty, dated March 27, 2009 (together, the "JDH Guaranty"), guaranteeing all amounts owed under the BofA Note.  As of the date of filing approximately $11,115,000 was owed to BofA in respect of the BofA Loans.

5

(ii)  *Praesidian Prepetition Liens and Obligations.*  Pursuant to agreements entered into between the Debtors and Praesidian Capital Investors, LP ("Investors"), Praesidian II SPV 1 LP ("SPV 1") and Praesidian II SPV 2, LP ("SPV 2", and together with Investors and SPV 1, "Praesidian," and together with BofA and LNB, the "Prepetition Lenders" and each a "Prepetition Lender"), from time to time (collectively, the "Praesidian Agreements"), Praesidian has loaned amounts to the Debtors from time to time (the "Praesidian Loans") and the obligations under such agreements (the "Praesidian Obligations") are secured by a lien and security interest (the "Praesidian Liens") in substantially all of the assets of Debtors (the "Praesidian Collateral").  As of the date of filing, approximately $30,626,715.70 was owed to Praesidian in respect of the Praesidian Loans.

(iii)  *LBN Prepetition Liens and Obligations.*  Pursuant to agreements entered into between the Debtors and LBN (as successor in interest to JDH) from time to time (collectively, the "LBN Agreements", and together with the BofA Agreement and the Praesidian Agreements, the "Prepetition Credit Agreements"), LBN has loaned amounts to or for the benefit of the Debtors from time to time (the "LBN Loans") and the obligations under such agreements (the "LBN Obligations", and together with the BofA Obligations and the Praesidian Obligations, the "Prepetition Obligations") are secured by a lien and security interest (the "LBN Liens", and together with the BofA Liens and the Praesidian Liens, the "Prepetition Liens") in substantially all of the assets of Debtors and by a pledge of the equity interests in all or substantially all of the Debtors ( the "LBN Collateral", and together with the BofA Collateral and the Praesidian Collateral, the

6

"<u>Prepetition Collateral</u>").[1]  As of the date of filing, not less than $22,400,000 was owed to LBN in respect of the LBN Loans.  In addition, pursuant to a Reimbursement Agreement between JDH and the Debtors dated June 27, 2004, if JDH is obliged to make any payment under the JDH Guaranty, the Debtors must reimburse LBN, and such reimbursement obligation is similarly secured.

(iv)     Except as provided for in this Interim Order, the Prepetition Liens are (i) valid, binding, perfected, enforceable liens on the Prepetition Collateral and, subject to section 552 of the Bankruptcy Code, all postpetition proceeds, products, offspring, rents and profits thereof, (ii) not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination under the Bankruptcy Code or applicable non-bankruptcy law, and (iii) subject and subordinate only to (A) Carve Out (as defined below), (B) DIP Liens (as defined below), and (C) adequate protection liens.

(v)     Except as provided for in this Interim Order, the Prepetition Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms, and no objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Obligations exists.  The Prepetition Obligations, and any amounts previously paid to the Prepetition Lenders on account thereof or with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, causes of action, defenses, or setoff rights,

---

[1] The LBN Obligations and the Praesidian Obligations are subordinated to the BofA Obligations pursuant to that certain Subordination Agreement, dated on or about March 5, 2009, by Praesidian Capital Investors, L.P. and LBN, in favor of BofA and that certain Subordination Agreement, dated on or about March 5, 2009, by Praesidian II SPV 1, LP and Praesidian II SPV 2, LP, in favor of BofA.

whether arising under the Bankruptcy Code or otherwise, with respect to the Prepetition

Obligations or against any of the Prepetition Lenders and their respective predecessors in

interest, affiliates, subsidiaries, agents, officers, directors, employees, and attorneys, with

respect to the Prepetition Obligations and any related guarantees.

(vi)     The Prepetition Lenders perfected their security interests and

Prepetition Liens in and on the Prepetition Collateral by, among other methods, the filing

of UCC-1 financing statements, instruments filed in federal, state, and county offices,

mortgages, and other required documents against the applicable Debtors and such

collateral with the proper federal, state, and county offices for the perfection of such

security interests and Prepetition Liens, as applicable.

F.       *Prepetition Lenders' Consent*.  Each of the Prepetition Lenders consents to the

Debtors' use of the Prepetition Lenders' Cash Collateral and the priming of the Prepetition Liens

to the extent and solely on the terms and conditions provided for in this Interim Order, and in

accordance with the budget attached hereto as Exhibit A (the "Budget").  The adequate

protection provided herein and other benefits and privileges contained herein are consistent with

and authorized by the Bankruptcy Code and are necessary in order to obtain such consent.

G.       *Adequate Protection*.  The Prepetition Lenders are entitled to receive adequate

protection on account of their respective interests in the Prepetition Collateral pursuant to

sections 361, 362, 363 and 364 of the Bankruptcy Code to the extent of any diminution in the

value of their interests in the Prepetition Collateral (including Cash Collateral) resulting from the

subordination to the Carve Out and the DIP Obligations to the extent provided for in this Interim

Order, the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the

automatic stay (collectively, and to the extent of any such diminution in value, the "Diminution

8

in Value"). Pursuant to sections 361, 363, and 507(b) of the Bankruptcy Code, as adequate

protection, the Prepetition Lenders will receive (i) adequate protection liens and superpriority

claims, as more fully set forth in paragraphs 13 and 14 herein, (ii) interest payments to BofA as

set forth more fully in paragraph 15 herein, and (iii) payment of the reasonable fees and

disbursements (solely to the extent that such fees and disbursements are incurred in connection

with protecting the rights of the Prepetition Lenders under the Prepetition Credit Documents, as

applicable) of (A) Shearman & Sterling LLP, counsel to BofA, (B) Morrison Cohen LLP,

counsel to Praesidian, and (c) Moses & Singer LLP, counsel to LBN. The Debtors expressly

reserve all rights to object to the reasonableness of the fees and disbursements of the Prepetition

Lenders and to argue that to the extent such fees and disbursements are paid in excess of the

amounts determined reasonable by the Court, such excess payments should be applied in

reduction of principal amounts owed to the Prepetition Lenders, as applicable.

H.    *Stipulations and Findings Regarding the Postpetition Financing*.

(i)    *Need for Post-petition Financing and Use of Cash Collateral*. The DIP

Facility is superior to the Debtors' other alternatives, if any, including the use of Cash Collateral

alone. The Debtors' need to obtain credit pursuant to the DIP Facility and to use Cash Collateral

is immediate and critical in order to enable the Debtors to continue operations and to administer

and preserve the value of their estates. The ability of the Debtors to maintain business

relationships with their vendors, suppliers and customers, to pay their employees, to make utility

deposits and to otherwise finance their operations requires the availability of working capital

from the DIP Facility and the use of Cash Collateral, the absence of either of which would

immediately and irreparably harm the Debtors, their estates, their creditors and equity holders,

and the possibility for a successful reorganization. The Debtors do not have sufficient available

sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and use of Cash Collateral.

(ii)    *No Credit Available on More Favorable Terms*.  Given their financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors have been unable to obtain sufficient unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain credit:  (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; or (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Lender (i) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 7 hereof, (ii) superpriority claims with the priorities set forth in paragraph 8, and (iii) the other protections set forth in this Interim Order.

(iii)    *Use of Proceeds of the DIP Facility.*  As a condition to the entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the agreement for the use of Cash Collateral, the DIP Lender and Prepetition Lenders require, and the Debtors have agreed that, proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Documents and in accordance with and to the extent set forth in the Budget (as the same may be modified from time to time with the consent of the DIP Lender), consistent with the terms of the DIP Documents and subject to such variances as permitted by the DIP Credit Agreement, solely for (a) working capital and other general corporate purposes to fund the Debtors' operations, (b) permitted payment of costs of administration of the Cases, and (c)

payment of such prepetition and postpetition expenses as have been or hereafter are consented to

by the DIP Lender, in writing in its sole discretion, and are approved by the Court.

I.  *Good Faith of the DIP Lender.*

(i)  *Willingness to Provide Financing.*  The DIP Lender is willing to provide

financing to the Debtors subject to:  (a) the entry of this Interim Order and the Final Order (as

defined below); (b) the DIP Lender's approval of the terms and conditions of the DIP Facility

and the DIP Documents and satisfaction of all conditions precedent in the DIP Documents; and

(c) entry of findings by this Court that such financing is essential to the Debtors' estates, that the

DIP Lender is extending credit to the Debtors pursuant to the DIP Documents in good faith, and

that the DIP Lender's claims, superpriority claims, security interests, liens, rights, and other

protections granted pursuant to this Interim Order and the DIP Documents will have the

protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any

subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this

Interim Order or any other order, or by the filing or pendency of any motion or appeal seeking to

reverse, modify, vacate, amend, reargue, or reconsider this Interim Order or any other order.

(ii)  *Business Judgment and Good Faith Pursuant to Section 364(e).*  The

terms and conditions of the DIP Facility and the DIP Documents, and the fees paid and to be

paid thereunder, are fair, reasonable, and the best available to the Debtors under the

circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP

Facility was negotiated in good faith and at arms' length.  The credit to be extended under the

DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good

faith, and for valid business purposes and uses, within the meaning of section 364(e) of the

11

Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

J.      *Sections 506(c) and 552(b)*.  In light of (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve Out and certain of the adequate protections liens and claims granted herein; and (ii) the agreement of the Prepetition Lenders to subordinate their adequate protection liens and superpriority claims to the Carve Out and the DIP Lender's liens and superpriority claims solely to the extent provided for herein, and to permit the use of their Cash Collateral for payments made in accordance with the Budget and this Interim Order, each of the DIP Lender and the Prepetition Lenders are entitled, upon entry of a Final Order (as defined below) granting such relief, to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

K.      *Final Hearing*.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing arrangements and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order"), which shall be in form and substance satisfactory to (i) the DIP Lender in its sole discretion with respect to the postpetition financing arrangements and (ii) the Prepetition Lenders in their sole discretion with respect to the use of Cash Collateral arrangements, approving such postpetition financing arrangements and use of Cash Collateral arrangements and consistent with the DIP Documents, notice of which Final Hearing and Final Order will be provided in accordance with this Interim Order.

L.      *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the Office of the United States Trustee for

12

the Southern District of New York (the "UST"); (ii) all secured creditors, and (iii) the Debtors'

consolidated list of 20 largest unsecured creditors, which constitutes due and sufficient notice

thereof pursuant to Rules 2002 and 4001(b) and (c) of the Bankruptcy Rules and S.D.N.Y. LBR

4001-2, and that no other or further notice is necessary for purposes of this Interim Order.

Based upon the foregoing stipulations, findings and conclusions, the Motion and the

record before the Court with respect to the Motion, and good and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT:**

1.      <u>Interim Financing and Use of Cash Collateral Approved</u>.  The Motion is granted,

the postpetition financing on an interim basis is authorized and approved, and the use of Cash

Collateral on an interim basis is authorized and approved, subject to the terms and conditions set

forth in this Interim Order.

2.      [<u>Objections Overruled</u>.  All objections to the Motion and to the entry of the

Interim Order, if any, to the extent not withdrawn or resolved are hereby overruled.]

**DIP Facility Authorization**

3.      <u>Authorization of the DIP Financing and DIP Documents</u>.  The DIP Documents

are hereby approved.  The Debtors are expressly and immediately authorized and empowered to

execute and deliver the DIP Documents (including authorizing and causing the execution of

appropriate documents by the DIP Guarantors) and to incur and to perform the DIP Obligations

in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and

to deliver all instruments and documents which may be required or necessary for the

performance by the Debtors under the DIP Facility and the creation and perfection of the DIP

Liens described in and provided for by this Interim Order and the DIP Documents.  The Debtors

are hereby authorized to pay the principal, interest, fees, expenses and other amounts described

in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, including, without limitation, the fees and disbursements of the DIP Lender (including the reasonable fees and expenses of the DIP Lender's attorneys and other professionals, indemnification obligations, and any other reimbursement of fees and expenses, all of which fees and expenses shall constitute DIP Obligations; provided, however, that such fees and expenses shall only be paid ten (10) business days after reasonably detailed invoices for such fees shall have been submitted to the Debtors, and the Debtors shall promptly provide copies of such invoices to the UST), all to the extent provided in the DIP Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with the terms of the DIP Documents.

4. <u>Authorization to Borrow</u>. Subject to the terms and conditions set forth in the DIP Documents, the DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtors' estate, the Debtors are hereby authorized to borrow up to an aggregate principal amount of $800,000, which may be repaid but not reborrowed. Such funds shall only be used for purposes permitted and prescribed under the DIP Documents (including, without limitation, as circumscribed by the Budget) and this Interim Order.

5. <u>DIP Obligations</u>. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including

without limitation, any trustee or other estate representative appointed or elected in the Cases, or

any case under chapter 7 of the Bankruptcy Code upon the conversion of a Case, or in any other

proceedings or Cases superseding or related to any of the foregoing (each a "<u>Successor Case</u>").

Upon entry of this Interim Order, the DIP Obligations will include all loans and any other

indebtedness or obligations, contingent or absolute, which may now or from time to time be

owing by the Debtors to the DIP Lender under the DIP Documents or this Interim Order,

including, without limitation, all principal, accrued interest, costs, fees, expenses and other

amounts owed pursuant to the DIP Documents.  The DIP Obligations shall be due and payable,

without notice or demand on the earliest to occur of (a) August 2, 2011 (provided, however, that

the DIP Obligations will be extended for an additional seven (7) months unless the Prepetition

Lenders each agree otherwise); (b) the effective date of any plan of reorganization or liquidation

in these Cases; (c) the date on which any of the Cases are converted to a case under chapter 7 of

the Bankruptcy Code; (d) the date on which the acceleration of the DIP Facility and the

termination of the commitments with respect to the DIP Facility occurs in accordance with the

DIP Documents; (e) the date of the closing of the sale of all or substantially all of the Debtors'

assets; (f) the date on which all obligations outstanding under the DIP Facility are paid in full

and the commitments under the DIP Facility have terminated; or (g) the dismissal of any of the

Cases (the earliest of such dates, the "<u>Maturity Date</u>").

      6.      <u>DIP Liens and DIP Collateral</u>.  Effective immediately upon the execution of this

Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the

Bankruptcy Code:  (a) the DIP Lender is hereby granted continuing, valid, binding, enforceable,

non-avoidable and automatically and properly perfected postpetition security interests in and

liens (the "<u>DIP Liens</u>") on all existing and after acquired real and personal property, and other

assets of the Debtors, tangible and intangible, whether now owned by or owing to, or arising in favor of the Debtors, whether owned or consigned by or to, or leased from or to the Debtors (to the full extent of the Debtors' interest therein), and regardless of where located, including, without limitation, the following (collectively, the "<u>DIP Collateral</u>"):[2] (A) all Collateral (as defined in the DIP Documents) and the proceeds thereof, (B) all avoidance power claims and actions under section 549 of the Bankruptcy Code relating to any post-petition transfer of DIP Collateral and any proceeds thereof, (C) subject to entry of a Final Order, all avoidance claims or actions under chapter 5 of the Bankruptcy Code and any proceeds thereof, (D) any previously unencumbered assets of any Debtor, and (E) proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting form the sale, exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein.

7. <u>DIP Lien Priority</u>.  The DIP Liens securing the DIP Obligations shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected security interests and liens junior only to (a) the Carve Out, (b) all of the BofA Prepetition Liens, and (c) all adequate protection claims and liens granted to BofA pursuant to this Interim Order.  Other than as specifically set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Case. The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Cases or any Successor Cases, including, without limitation, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of the Cases or Successor Cases.  The DIP Liens

---

[2]  All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents.  All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such

shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or, upon entry of the Final Order, section 506(c) of the Bankruptcy Code.

8.      DIP Superpriority Claim.  Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Cases and any Successor Cases (collectively, the "DIP Superpriority Claim") for all DIP Obligations.  The DIP Superpriority Claim shall be subordinate only to the Carve Out and the adequate protection claims granted to BofA, and otherwise the DIP Superpriority Claims shall have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code (including, subject to entry of the Final Order, section 506(c)), and at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

9.      No Obligation to Extend Credit.  The DIP Lender shall not have any obligation to make any loan under the DIP Documents, unless all of the conditions precedent to the making of such loan under the applicable DIP Documents and this Interim Order have been satisfied in full or waived in writing by the DIP Lender.

10.     Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtors shall use loans under the DIP Facility only for the purposes specifically set forth in this Interim Order,

---

terms in Article 8 or 9 of the Uniform Commercial Code.

the DIP Documents and in substantial compliance with the Budget, which sets forth on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures on a rolling weekly basis and all necessary and required cumulative expenses which the Debtors expect to incur during each week of the Budget; provided, however, that for any week in the Budget, the amounts for each line item may vary 20% up to a 15% aggregate variance of the total amount provided for any week in the Budget, but as provided for in the DIP Credit Agreement, the failure to comply with such variances shall not constitute an Event of Default under the DIP Credit Agreement.

11.    Rights of Access and Information. Without limiting the rights of access and information afforded the DIP Lender under the DIP Documents, the Debtors are authorized and directed to afford representatives, agents and/or employees of the DIP Lender reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents, and are authorized and directed to reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.

**Authorization to Use Cash Collateral and for Adequate Protection**

12.    Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order and the DIP Documents (including, without limitation, paragraph 10 of this Interim Order), the Debtors are authorized to use Cash Collateral in accordance with the Budget until the earliest to occur of a Maturity Date or entry of the Final Order; provided, however, that during the Remedies Notice Period (as defined below) the Debtors may use Cash Collateral in accordance with the terms and provisions of the Budget solely to meet payroll obligations and to pay expenses critical to the preservation of the Debtors and their estates as agreed to by the DIP Lender and the Prepetition Lenders in their sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course

18

of business, or the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, the DIP Documents and in accordance with the Budget or otherwise as approved by the Court.

13.     Adequate Protection Liens.

(a)     *Adequate Protection Liens*.  Pursuant to sections 361 and  363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests, the Debtors hereby grant to the Prepetition Lenders, continuing valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests in and liens on the DIP Collateral (the "Adequate Protection Liens").

(b)     *Priority of Adequate Protection Liens.*  The Adequate Protection Liens shall be subordinate to the Carve Out and junior to the BofA Prepetition Liens.  The Adequate Protection Liens granted to the Prepetition Lenders other than BofA shall be junior to the DIP Liens.  The Adequate Protection Liens shall otherwise be senior to all other security interests, mortgages, collateral interests, liens or claims on or to any of the DIP Collateral.  Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Case, or upon the dismissal of the Cases or any Successor Case.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

19

14. <u>Adequate Protection Superpriority Claims</u>.

(a) *Adequate Protection Superpriority Claims*.  As further adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Lenders are each hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Cases and any Successor Case (the "<u>Adequate Protection Superpriority Claims</u>").

(b) *Priority of Adequate Protection Superpriority Claims.*  The Adequate Protection Superpriority Claims shall be subordinate to the Carve Out.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Adequate Protection Superpriority Claims granted to the Prepetition Lenders other than BofA shall be subordinate to the DIP Superpriority Claim.

15. <u>Adequate Protection Payments and Protections</u>.  As further adequate protection, the Debtors are authorized to and shall provide adequate protection to (i) the Prepetition Lenders in the form of ongoing payment of the reasonable legal fees and expenses (subject to the review period set forth in Paragraph 3 of this Interim Order) incurred after the Petition Date, and (ii) BofA in the form of payment of accrued interest at the rate provided for in and pursuant to the terms of the BofA Note and the BofA Loan Agreement.

16.     _Section 507(b) Reservation_.  Nothing herein shall impair, limit or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to any of the Prepetition Lenders pursuant to this Interim Order is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Cases or any Successor Case.

17.     _Amendment of the DIP Documents_.  The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto in accordance with the provisions thereof without notice or a hearing if:  (a) the amendment, modification, or supplement is in accordance with the DIP Documents; (b) a copy (which may be provided through electronic mail or facsimile) of the amendment, modification or supplement is provided to counsel for the Prepetition Lenders and the UST and consented to by the Prepetition Lenders; and (c) the amendment, modification or supplement is filed with the Court; _provided_, _however_, that consent of the UST, and approval of the Court is not necessary to effectuate any such amendment, modification or supplement.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

18.     _Budget Maintenance_.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance acceptable to and approved by the DIP Lender (in consultation with the Prepetition Lenders) in its sole discretion.

19.     _Modification of Automatic Stay_.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claim, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Lender or the Prepetition Lenders each may request in their reasonable discretion to assure the perfection and

priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Lender and Prepetition Lenders under the DIP Documents, the DIP Facility and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Lender and Prepetition Lenders to retain and apply, payments made in accordance with the terms of this Interim Order.

20.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Lender and the Prepetition Lenders to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Lender and the Prepetition Lenders is authorized to file, as it deems necessary or advisable, such financing statements, mortgages, notices and other instrument or documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens and/or Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; <u>provided</u>, <u>however</u>, that no such filing or recordation shall be necessary or required in order to create, evidence or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized to and shall execute and deliver promptly upon demand to the DIP Lender and the Prepetition Lender all such financing statements, mortgages, title insurance policies, notices, instruments, and other documents as the DIP Lender or the

22

Prepetition Lenders may request. The DIP Lender and the Prepetition Lender may file a photocopy of this Interim Order as a financing statement or notice with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, mortgages, notices of lien, instrument, or similar document.

21.    <u>Maintenance of DIP Collateral and Cash Management System</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, the Debtors are authorized and directed to:  (a) insure the DIP Collateral as required under the DIP Documents; and (b) maintain the cash management system in effect as of the Petition Date, as modified by any order that may be entered by the Court which has first been agreed to by the DIP Lender and the Prepetition Lenders, or as otherwise agreed to by the DIP Lender, in its sole discretion, or as otherwise required by the DIP Documents.

22.    <u>Disposition of DIP Collateral; Rights of DIP Lender and the Prepetition Lenders</u>. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender and the Prepetition Lenders or otherwise ordered by the Court.

23.    <u>Right to Credit Bid</u>.  Each of the DIP Lender and the Prepetition Lenders shall have the right to credit bid with respect to any sale of assets or equity under either section 363 of the Bankruptcy Code or a plan of reorganization, the amount, (i) with respect to the DIP Lender, such lender advanced under the DIP Facility that is outstanding at the time of the sale, and (ii) with respect to the Prepetition Lenders, such lender's portion of the Prepetition Obligations, which credit bid rights under section 363(k) of the Bankruptcy Code or otherwise shall not be impaired in any manner, and each such lender, as the case may be.  For the avoidance of

ambiguity, no future order or plan of reorganization may impair the credit bid rights of the DIP Lender or the Prepetition Lenders.

24.     Postpetition Financing Termination. On the Maturity Date, (a) all DIP Obligations shall be immediately due and payable, (b) all commitments to extend credit under the DIP Facility will terminate, and (c) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period, the Debtors may use Cash Collateral solely as set forth in paragraph 12 hereof.

25.     Events of Default.  The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein, including, but not limited to, the failure to comply with any of the terms of this Interim Order, shall constitute an event of default (an "Event of Default") under this Interim Order, unless waived in writing by the DIP Lender.

26.     Rights and Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender, in accordance with the terms of the DIP Credit Agreement, shall be entitled to declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, (c) the termination of the DIP Credit Agreement and any other DIP Document as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations; and/or (d) and, in consultation with the Prepetition Lenders, may declare a termination, reduction or restriction on the ability of the Debtors to use Cash Collateral, except as provided in paragraph 12 hereof during the Remedies Notice Period defined below (any such declaration shall be referred to herein as a "Termination Declaration").  The Termination Declaration shall be given by email, facsimile (or other electronic means) to counsel to the

24

Debtors, counsel to the Prepetition Lenders, and the UST (the earliest date any such Termination Declaration is received by counsel to the Debtors prior to 5:00 p.m. prevailing eastern time shall be referred to herein as the "Termination Declaration Date").  The DIP Obligations shall be due and payable, without notice or demand, and the ability of the Debtors to use Cash Collateral shall automatically terminate or be reduced or restricted on the Termination Declaration Date, as provided in the applicable Termination Declaration except as provided in paragraph 12 during the Remedies Notice Period.  For the period that is seven (7) Court days after the Termination Declaration Date (the "Remedies Notice Period"), the Debtors shall be entitled to seek an emergency hearing with the Court.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred or enters an order precluding the exercise of remedies, and subject to the prior rights, remedies, claims and liens of the Prepetition Lenders as provided for in this Interim Order, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Lender shall be permitted to exercise all remedies set forth in the DIP Credit Agreement and the DIP Documents, as applicable, and as otherwise available at law or in equity against the DIP Collateral, as the case may be, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interests in the DIP Collateral or any other rights and remedies granted to the DIP Lender with respect thereto pursuant to the DIP Credit Agreement, the DIP Documents, this Interim Order or applicable law.

27.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Lender has acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith.  Based on the findings set

forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the extent, validity, perfection, priority, allowability, enforceability or non-avoidability of any advances previously made or made hereunder, or lien, claim or priority granted, perfected, authorized or created hereby. Any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

28. <u>Carve Out</u>.

(a) *Carve Out*. As used in this Interim Order, "<u>Carve Out</u>" means the following expenses: (i) statutory fees payable to the UST pursuant to 28 U.S.C. § 1930(a)(6); (ii) subject to the terms and conditions of this Interim Order, all professional fees and disbursements by counsel to the Debtors retained by order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) pursuant to sections 327 or 1103(a) of the Bankruptcy Code (the "<u>Case Professionals</u>") to the extent allowed or later allowed by order of the Court (which order has not been reversed, vacated, or stayed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the "<u>Allowed Professional Fees</u>"), <u>but</u> <u>solely</u> to the extent such Allowed Professional Fees are within the corresponding amounts set forth in the Budget; <u>provided</u>, <u>however</u>, that, upon an Event of Default under the DIP Documents, the amount of the

Carve Out shall not exceed $50,000 plus the amount of the professional fees and expenses incurred in accordance with the Budget prior to such Event of Default.

(b)     *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees*.  The DIP Lender and the Prepetition Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate the DIP Lender or the Prepetition Lenders in any way to pay compensation to or to reimburse expenses of any Case Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if actual Allowed Professional Fees are higher in fact than reflected in the Budget or estimated fees and disbursements of Case Professional reflected in the Budget; or (iii) as consent to the allowance of any professional fees or expenses of any Case Professionals.  Any funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.  The DIP Lender's and the Prepetition Lenders' liens and claims granted pursuant to this Interim Order shall, however, be subject and subordinate to the Carve Out as set forth in this Interim Order.

29.     Reservation of Certain Third Party Rights and Bar of Challenges and Claims.
Any party in interest granted standing (other than the Debtors and their successors, with the exception of a chapter 7 or 11 trustee appointed during the Challenge Period (as defined below)) by the Court, may seek to avoid, object to or otherwise challenge the findings or Debtors' stipulations in this  Interim Order regarding (a) the validity, extent, priority, or perfection of the

27

mortgages, security interests, and liens of any of the Prepetition Lenders or (b) the validity, allowability, priority, fully secured status or amount of the Prepetition Obligations. A party must commence, as appropriate, a contested matter or adversary proceeding raising such claim, objection, defense, or other challenge, including, without limitation, any claim against any of the Prepetition Lenders in the nature of a setoff, counterclaim or defense to the applicable Prepetition Obligations or the Prepetition Liens (each, a "Challenge") within seventy-five (75) calendar days following the date of entry of the Interim Order (the "Challenge Period"). The Challenge Period may only be extended with the written consent of the applicable Prepetition Lender. Upon the expiration of the Challenge Period (the "Challenge Period Termination Date"), without the filing of a Challenge (or if any such Challenge is filed and overruled): (A) any and all such Challenges by any party (including, without limitation, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Cases), shall be deemed to be forever waived and barred, and (B) all of the Debtors' stipulations, waivers, releases, affirmations and other stipulations as to the priority, extent, and validity as to each of the Prepetition Lender's, claims, liens, and interests as set forth herein shall be of full force and effect and forever binding upon all the Debtors' estate and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. To the extent that a Challenge is timely filed but does not expressly challenge all of the Debtors' stipulations, or to the extent any creditor, interest holder and other party interest does not file any timely Challenge, all such unchallenged Debtors' stipulations shall be of full force and effect and forever binding upon all the Debtors' estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases, notwithstanding any timely-filed Challenge.

30.     No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

31.     Allowed Secured Claims.  Without the requirement or need to file any proof of claim with respect thereto, (i) the Prepetition Obligations shall constitute allowed secured claims for all purposes in the Chapter 11 Cases and any Successor Case, (ii) the Prepetition Liens shall be deemed legal, valid, binding, enforceable, perfected liens not subject to (except as expressly set forth in this Interim Order) recharacterization, subordination or avoidance for all purposes in the Chapter 11 Cases and any Successor Case, and (iii) the Prepetition Obligations, the Prepetition Liens, and prior payments on account of or with respect to the Prepetition Obligations shall not be subject to any other or further claims, cause of action, recharacterization, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor.

32.     No Proof of Claim.  For the avoidance of doubt, the Prepetition Lenders are hereby relieved of the requirements to file a proof of claim in the Chapter 11 Cases or any other proceeding with respect to any Prepetition Obligations.

33.     Rights of Recoupment or Setoff.  Notwithstanding anything to the contrary in this Interim Order, nothing in this Interim Order shall (a) compromise, modify or affect the ability of any party in interest to assert a right of recoupment or setoff with respect to amounts allegedly owed to the Debtors, or (b) create any right of recoupment or setoff with respect to amounts allegedly owed to the Debtors.

34.     Section 506(c) Claims.  Upon entry of the Final Order granting such relief, no costs or expenses of administration which have been or may be incurred in the Cases at any time

29

shall be charged against the DIP Lender or the Prepetition Lenders or any of their respective claims, the DIP Collateral or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior express written consent of the affected DIP Lender or Prepetition Lender, and no such consent shall be implied, directly or indirectly, from any action, inaction, or acquiescence by any such agents or lenders.

35.     No Marshaling/Applications of Proceeds.  The DIP Lender and the Prepetition Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.

36.     Section 552(b).  The DIP Lender and the Prepetition Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or any Prepetition Lender with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

37.     Discharge Waiver.  The Debtors expressly stipulate, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of sections 524 and/or 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  The Debtors shall not propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of reorganization or such sale, of all DIP Obligations.

38.     Rights Preserved.

(a)     Notwithstanding anything herein to the contrary, in the case of an Event of Default under the DIP Credit Agreement, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the DIP Lender's or the Prepetition Lenders' right under the Bankruptcy Code or under non-bankruptcy law including, but not limited to, the right (i) to seek any other or supplemental relief in respect of any Debtors; (ii) to request modification of the automatic stay of section 362 of the Bankruptcy Code; (iii) to request dismissal of any of the Cases or any Successor Cases, conversion of any of the Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers; or (iv) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans.

(b)     Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender and the Prepetition Lenders are preserved.

39.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender or the Prepetition Lenders to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable DIP Lender or any Prepetition Lender.

40.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Lenders, all other creditors of the Debtors, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary

31

hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any of the Cases or any Successor Cases.

41.     No Modification of Interim Order.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms) (with full cash collateral provided for any contingent obligation (other than any indemnification obligations) that have not yet matured) and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the DIP Lender: (i) any modification, stay, vacatur or amendment to this Interim Order (and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender); (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Cases or any Successor Cases equal or superior to the DIP Superpriority Claim or Adequate Protection Superpriority Claims, other than the Carve Out; or (iii) any lien on any of the DIP Collateral with priority equal, superior or junior to the DIP Liens, except as specifically provided in the DIP Documents.

42.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall govern and control.

43.     Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of

reorganization in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; (d) discharging the Debtors; or (e) pursuant to which this Court abstains from hearing any of the Cases or any Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender and the Prepetition Lenders pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in any of the Cases, in any Successor Cases, or following dismissal of any of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations and Prepetition Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility are terminated. The terms and provisions of the DIP Credit Agreement concerning the indemnification of the DIP Lender shall continue in any of the Cases, in any Successor Cases, following dismissal of any of the Cases or any Successor Cases, and following termination of the DIP Documents and/or the repayment of the DIP Obligations.

44. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [                    ] 2011 at [        ] [   ].m. (Eastern Time) before the Honorable _____, United States Bankruptcy Judge, Courtroom __ on the ___ floor of the United States Bankruptcy Court for the Southern District of New York. On or before [        ], 2011, the Debtors shall serve, by United States mail, first-class postage prepaid, or by electronic delivery, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with a copy of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; and (b) any party which has filed prior to such date a request for notices with this Court. The Final Hearing Notice shall state that any

party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on [          ] at 4:00 p.m. (Eastern Time), which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, attn: David B. Shemano, Esq., Peitzman Weg & Kempinsky, LLP, 2029 Century Part East, Suite 3100, Los Angeles, CA 90067; (ii) counsel to DIP Lender, attn: Alan E. Gamza, Esq., Moses & Singer LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-1299; (iii) counsel to BofA, attn:  William E. Hirschberg, Esq and Susan A. Fennessey, Esq.., Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022; (iv) counsel to Praesidian, Stephen I. Budow, Esq., Morrison Cohen LLP, 909 Third Avenue, New York, NY 1002-4784, and (v) the UST, 33 Whitehall Street, 21st Floor, New York, NY 10004.

45.     Effect of this Interim Order.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

46.     Retention of Jurisdiction.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: March ____, 2011
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

## JUNIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
## PROMISSORY NOTE, SECURITY AGREEMENT AND GUARANTY

THE OFFER AND SALE OF THIS NOTE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**") OR ANY STATE SECURITIES LAWS, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS COMPANY HAS RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO COMPANY AND ITS COUNSEL THAT SUCH REGISTRATION IS NOT REQUIRED.

$800,000.00                                        Dated: March [   ], 2011

For value received and intending to be legally bound, Club Ventures Investments LLC., a Delaware limited liability company ("**Company**"), hereby promises to pay to the order of LBN Holding LLC, a Delaware limited liability company ("**Holder**"), in lawful money of the United States and in immediately available funds, the aggregate principal sum of Eight Hundred Thousand Dollars ($800,000.00) (the "**Maximum Note Amount**"), or such lesser amount as Company shall borrow from Holder from time to time as set forth in the column entitled "Unpaid Principal Balance of Note" on **Schedule 1**, together with interest thereon, all payable under the terms and subject to the conditions set forth in this promissory note (this "**Note**").

## RECITALS

A.      Company and certain of its subsidiaries (collectively, the "**Subsidiary Debtors**" and, together with Company, the "**Debtors**") filed on March 2, 2011 (the "**Petition Date**") petitions for relief under chapter 11 of the United States Bankruptcy Code (collectively, the "**Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

B.      The Company has retained possession of its assets and is authorized to continue the operation of its businesses as debtor-in-possession;

C.      Subject to entry of the Interim Order by the Bankruptcy Court, the Company shall be authorized to execute and deliver this Note and to incur indebtedness and other obligations to the Holder, provided herein and secured on a senior secured basis with respect to all unencumbered assets and properties of Company and on a junior secured basis with respect to all other assets and properties of the Company subject to an existing and validly perfected Lien, including the Pre-Petition Senior Liens;

D.      Company has requested Holder to make postpetition loans to Holder on the terms set forth herein, and the Company and Holder have negotiated in good faith for the extension of such credit; and

E.      In consideration of the credit being extended by Holder to Company pursuant to this Note, the Subsidiary Debtors have agreed to guaranty the obligations of Company hereunder and to grant to Holder a security interest in their respective assets (on the same priority basis as the security interest granted by Company) to secure such guaranty.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Note, and for good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, each of the parties hereto agree as follows:

1.      Definitions.  As used in this Note, the following terms shall have the meanings specified below:

"**Act**" shall have the meaning assigned to such term in the legend.

"**Advance**" shall have the meaning assigned to such term in Section 2(a).

"**Affiliates**" shall have the meaning assigned to such term in the Bankruptcy Code and, when used with respect to a specified Person, shall mean another Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

"**Avoidance Actions**" shall mean claims and causes of action under chapter 5 of the Bankruptcy Code, including without limitation sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, or any proceeds thereform; provided, that, in accordance with the Orders, any proceeds of any Avoidance Actions on account of the Pre-Petition Senior Liens shall be used to first pay down the Pre-Petition Senior Debt until such time such Pre-Petition Senior Debt has been fully satisfied or discharged.

"**Bankruptcy Code**" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as enacted in 1978, as the same has heretofore been amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals or any other court having jurisdiction over the Cases from time to time.

"**BofA Adequate Protection Claims**" shall mean the adequate protection claims and liens granted to Bank of America, N.A., in respect of the Pre-Petition Senior Debt, in accordance with the Orders.

"**Budget**" shall mean the weekly budget prepared and delivered by Debtors reflecting projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements and cash balances for Debtors from the Closing Date through [   ], 2011 and, each subsequent rolling 13-week budget delivered by Debtors after the Closing Date, in each case, in form and substance acceptable to Holder and as may be updated from time to time pursuant to amendments thereto as approved by Holder in its sole discretion.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which commercial banks in New York City, are authorized or required by law to close.

**"Carve-Out"** shall mean a carve-out for (i) allowed, accrued, but unpaid professional fees and expenses of Debtors as set forth in the Budget (on a cumulative basis) incurred prior to an Event of Default not otherwise cured or waived by Holder, (ii) allowed, accrued, but unpaid professional fees and expenses of Debtors incurred in the Cases after an Event of Default (that is not waived or cured) not to exceed an amount equal to $50,000 and (iii) the payment of fees pursuant to 28 U.S.C. § 1930; provided that this Carve-Out, any cash collateral and any proceeds of this Note may not be used to investigate or prosecute the validity, perfection, priority, extent, or enforceability of this Note, or the Liens securing this facility, or any claims against Holder.

**"Cases"** shall have the meaning assigned to such term in the recitals.

**"Cash Collateral"** shall mean "cash collateral" (as defined in section 363(a) of the Bankruptcy Code.

A **"Change in Control"** shall be deemed to have occurred if (a) there is a material change in Company's management or the board of directors of Company (except as directed by Holder or its affiliates); (b) any "person" or "group" (within the meaning of Rule 13d-5 of the Securities Exchange Act of 1934 as in effect on the date hereof), other than the existing equity holders of Company, shall own, directly or indirectly, beneficially or of record, shares representing more than 25% of the aggregate issued and outstanding equity interests of Company; (c) any change in control (or similar event, however denominated) with respect to Company shall occur under and as defined in any material agreement in respect of which Company is a party; or (d) all or substantially all of the assets of Company shall be sold, or a chapter 11 plan of reorganization shall be confirmed, without the consent of Holder.

**"Closing Date"** shall mean the date of this Note.

**"Collateral Support"** shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

**"Company"** shall have the meaning assigned to such term in the preamble.

**"Confirmation Order"** shall have the meaning assigned to such term in Section 8(m).

**"Control Account"** shall have the meaning assigned to such term in Section 2(a)(iii).

**"Consolidated EBITDA"** shall mean, with respect to any fiscal period, Company's and its Subsidiaries' consolidated net earnings (or loss), minus (a) without duplication and to the extent included in determining Company's and its Subsidiaries' consolidated net earnings (or loss) for such period, the sum for such period of (i) extraordinary gains and (ii) interest income, in the case of each of clauses (a)(i) and (a)(ii) above determined on a consolidated basis in accordance with GAAP, plus (b) without duplication and to the extent deducted in determining Company's and its Subsidiaries' consolidated net earnings (or loss) for such period, the sum for such period of (i) interest expenses, (ii) income taxes and (iii) depreciation and amortization, in the case of each of clauses (b)(i) through and including (b)(iii) above, determined on a consolidated basis in accordance with GAAP.

"**Court Day**" shall mean any day other than a day on which the Bankruptcy Court is authorized or required by law to close.

"**Debtors**" shall have the meaning assigned to such term in the recitals.

"**DIP Administrative Claims**" shall have the meaning assigned to such term in Section 5(e).

"**Disclosure Statement**" shall have the meaning assigned to such term in Section 8(m).

"**Final Order**" shall mean an order of the Bankruptcy Court consistent with the terms and conditions of the PSA, in form and substance satisfactory to Holder, authorizing, on a permanent basis, the Debtors to enter into this Note and the use of the Cash Collateral, and as to which no stay on its execution or enforcement is in effect and which has not been reversed, modified, vacated or overturned.

"**GAAP**" shall mean generally accepted accounting principles in the United States.

"**Governmental Authority**" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 11(a).

"**Guarantors**" shall mean each of the Subsidiary Debtors.

"**Guaranty**" shall mean the guaranty by each of the Guarantors in favor of Holder set forth in Section 11.

"**Holder**" shall have the meaning assigned to such term in the preamble.

"**Indebtedness**" shall mean, without duplication, (a) all obligations of Debtors for borrowed money, (b) all obligations of Debtors evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of Debtors under conditional sale or other title retention agreements relating to property or assets acquired by Debtors, (d) all obligations of Debtors in respect of the deferred purchase price of property or services (other than (i) trade accounts payable incurred in the ordinary course of business and not past due for more than 60 days after the date on which such trade account was created and (ii) any earn-out obligation until such obligation appears on the liability section of the balance sheet of Debtors), (e) all obligations of Debtors, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any equity interests in Debtors, (f) all Indebtedness of others secured by (or for which holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by Debtors, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by Debtors of Indebtedness of others, (h) all capital lease obligations or synthetic lease obligations of Debtors, (i) all obligations, contingent or otherwise, of Debtors as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of Debtors in respect of bankers' acceptances. The

Indebtedness of a Debtor include the Indebtedness of any other Person to the extent such Debtor is liable therefor as a result of such Debtor's ownership interest in such other Person.

"**Interim Order**" shall mean an order of the Bankruptcy Court consistent with the terms of the PSA, in form and substance satisfactory to Holder, authorizing, on an interim basis, the Debtors to enter into this Note and the use of Cash Collateral.

"**Investments**" shall have the meaning assigned to such term in Section 9(d).

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Material Adverse Effect**" shall mean a material adverse condition or material adverse change in or affecting (a) the validity or enforceability of this Note or the rights and remedies of Holder thereunder, (b) the condition (financial or otherwise), assets, operations, prospects or business of Debtors, not contemplated by the Budget, (c) the ability of Debtors to comply with its obligations under this Note and (d) the validity, legality, priority or enforceability of any Lien created by this Note; <u>provided</u> that, for purposes of all representations and warranties made in connection with this Note, none of the following shall be deemed in itself, or in any combination, to constitute a "Material Adverse Effect": (i) the filing of the Cases and (ii) the conditions, events and changes that ordinarily occur in connection with a filing under chapter 11 of the Bankruptcy Code.

"**Maturity Date**" shall mean the earliest of (i) the date that is five (5) months after the Petition Date (the "**Initial Maturity Date**"), provided that this date may be extended for an additional period but in no event later than the date that is seven (7) months after the Initial Maturity Date if such extension is requested in writing by any of the Pre-Petition Lenders on or prior to the Initial Maturity Date, (ii) the date on which all the obligations under this Note have been indefeasibly repaid in full in cash and all of commitments under this Note have been permanently and irrevocably terminated, (iii) the date of the closing of a sale of all or substantially all of Debtor's assets pursuant to Section 363 of the Bankruptcy Code, (iv) the date that a plan of reorganization for Debtors pursuant to chapter 11 of the Bankruptcy Code is declared effective, and (v) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit under this Note following the occurrence and during the continuance of an Event of Default.

"**Maximum Note Amount**" shall have the meaning assigned to such term in the preamble.

"**Milestone**" shall have the meaning assigned to such term in Section 8(m).

"**Note**" shall have the meaning assigned to such term in the preamble.

"**Orders**" shall mean the Interim Order and the Final Order.

"**Other Taxes**" means all present or future stamp, court or documentary taxes and any other excise, property, intangible, recording, filing or similar levies or charges which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to this Note.

"**Participation Agreement**" shall mean that certain Participation Agreement dated as of March [ ], 2011, by and among the Praesidian Entities and Holder, as the same may be amended, supplemented or otherwise modified from time to time.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 9(b).

"**Person**" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall have the meaning assigned to such term in the recitals.

"**Plan**" shall have the meaning assigned to such term in Section 8(m).

"**Praesidian Debt**" shall mean the indebtedness incurred pursuant to security and note purchase agreements, as amended, executed by one or more Debtors in favor of the Praesidian Entities in 2005, 2006, 2007, 2008 and 2009.

"**Praesidian Entities**" shall mean, collectively, Praesidian Capital Investors, LP, Praesidian II SPV 1 LP and Praesidian II SPV 2, LP.

"**Pre-Petition Collateral**" shall mean all Liens securing the Pre-Petition Debt.

"**Pre-Petition Debt**" shall mean, collectively, the Pre-Petition Senior Debt and the Praesidian Debt.

"**Pre-Petition Lenders**" shall mean Bank of America, N.A. and the Praesidian Entities.

"**Pre-Petition Liens**" shall mean the Liens securing the Pre-Petition Debt.

"**Pre-Petition Payment**" shall mean a payment made by a Debtor (by way of adequate protection or otherwise) on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against such Debtor.

"**Pre-Petition Senior Debt**" shall mean the indebtedness incurred by Debtors in favor of Bank of America, N.A. pursuant to a Loan Agreement dated August 4, 2009, and a separate Amended and Restated Promissory Note dated as of December 31, 2010, each as amended.

"**Pre-Petition Senior Liens**" shall mean the Liens securing the Pre-Petition Senior Debt.

"**Pro Forma Consolidated EBITDA**" shall mean, with respect to any fiscal period, Consolidated EBITDA calculated on a pro forma run rate basis consistent with Debtors' past practices.

"**PSA**" means that certain Plan Support Agreement dated as of March 1, 2011, by and among the Praesidian Entities and Holder, as the same may be amended, supplemented or otherwise modified from time to time (it being expected that the PSA shall also be executed by the Debtors upon entry of the Final Order).

"**Real Property**" shall mean all mortgaged property and all other real property owned or leased from time to time by a Debtor.

"**Restructuring**" shall mean a restructuring of the Debtors' indebtedness and other obligations on the terms and conditions set forth in the PSA.

"**Subsidiary**" shall mean, with respect to any Person, any corporation, partnership, limited liability company, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, controlled or held by such Person or (b) that is, at the time any determination is made, otherwise controlled by the parent or one or more subsidiaries of such Person or by such Person and one or more subsidiaries of such Person.

"**Subsidiary Debtors**" shall have the meaning assigned to such term in the recitals.

"**Superpriority Claim**" shall mean a claim against a Debtor in the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

"**Taxes**" shall have the meaning assigned to such term in Section 4(b).

"**UCC**" shall mean the Uniform Commercial Code in effect in the State of New York.

     2.    <u>Payment of Interest and Principal</u>.

     (a)    <u>Term Note</u>.  Until the Maturity Date, and prior to an Event of Default, Company may borrow up to the Maximum Note Amount in one or more drawings by borrowing in accordance with the terms and conditions hereof, including the Budget. Once any portion of this Note has been paid or prepaid, it may not be reborrowed.  Borrowings under this Note (each such event being called an "**Advance**") will be available to Company as follows:

     (i)    upon entry of the Interim Order (in form and substance satisfactory to Holder), but prior to entry of the Final Order, $[  ] of the Maximum Note Amount.

     (ii)    upon entry of the Final Order (in form and substance satisfactory to Holder), the balance of the Maximum Note Amount, reduced by amounts drawn under Section 2(a)(i).

(iii)     Each Advance under this Note shall be made by wire transfer of immediately available funds to [Account #    ] (the "**Control Account**").

(b)     [reserved].

(c)     <u>Making of Advances</u>.  In order to request an Advance under this Note, Company shall provide Holder with a borrowing request, which shall (1) be irrevocable, (2) be in writing and signed by Company, (3) be in compliance with the Budget and Section 6(g), (4) include the amount requested to be borrowed and the requested timing of such borrowing, and (5) state that no Event of Default has occurred or is reasonably likely to occur with the passage of time.  The making of any advance hereunder (including the timing thereof and the amount so advanced) shall be subject to Holder's sole determination that the conditions to borrowing hereunder have been satisfied.  Holder is authorized to endorse on **Schedule 1** the date and amount of each borrowing, payment or prepayment of principal.  Each such endorsement shall constitute prima facie evidence of the accuracy of the information endorsed and shall be binding and enforceable against Company, absent manifest error.   The failure to make any such endorsement or any error in any such endorsement shall not affect the obligations of Company in respect of this Note.

(d)     <u>Rate of Interest</u>.

(i)     On the Maturity Date, Company shall pay interest on the unpaid principal amount of this Note outstanding, accrued at a daily rate from the date of this Note through and including the Maturity Date, at a rate equal to the Applicable Federal Rate as in effect for each month.  The term "Applicable Federal Rate" shall mean, with respect to any month, the interest rate in effect for such month which would avoid imputation of interest or other items under Section 7872 of the Internal Revenue Code of 1986, as amended from time to time.

(ii)     During the occurrence and continuance of an Event of Default additional interest shall accrue on the unpaid principal and interest of this Note at a rate equal to 2% per annum or the maximum amount of interest allowable by applicable law (the "**Default Rate**").  Any judgments obtained for sums due hereunder shall accrue interest at the Default Rate until paid.

(e)     <u>Payment; Maturity</u>.  Payment of the outstanding principal amount under this Note, together with accrued but unpaid interest due in accordance with Section 2 (d) above, plus any accrued, due or outstanding fees and expenses of Holder, shall be due and payable on the Maturity Date and on demand therefor as provided for herein; provided that such payment shall be made subject to the Participation Agreement.  Company shall have the right to prepay at any time, in whole and not in part, without penalty or premium, all of the outstanding principal of this Note, together with accrued and unpaid interest thereon.

(f)     <u>Place of Payment</u>.  Company shall make all payments to Holder at the address of Holder as set forth in Section 11(d) hereof or to such other place as Holder, from time to time, shall designate in writing to Company not later than 1:00 p.m., New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim. Any payment received by Holder after 1:00 p.m., New York City time, may be considered

received on the next Business Day in Holder's sole discretion.  All payments under this Note shall be made in U.S. dollars.  Except as otherwise expressly provided herein, whenever any payment (including principal of or interest or other amounts) or performance under this Note shall become due, or otherwise would occur, on a day that is not a Business Day, such payment or performance may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

(g)     Obligations Absolute.  No provision of this Note shall alter or impair the obligations of Company, which are absolute and unconditional, to pay the principal of and interest on this Note (and any other amounts due hereunder) at the place, times, rate, and in the currency, herein prescribed.  Subject to the provisions of Section 10, upon the maturity (whether by acceleration or otherwise) of any of the obligations under this Note of Company, Holder shall be entitled to immediate payment of such obligations without further application to or order of the Bankruptcy Court.

(h)     Mutilated, Defaced, Destroyed, Lost and Stolen Notes.  In case any Note shall become mutilated, defaced or be apparently destroyed, lost or stolen, Company shall execute and deliver a new Note, in exchange and substitution for the mutilated or defaced Note or in substitution for the apparently destroyed, lost or stolen Note.

(i)     Cancellation of Notes; Destruction Thereof.  All Notes surrendered for payment, transfer or exchange shall be delivered to Company for cancellation.  Company shall destroy canceled Notes held by it unless otherwise required hereunder.

3.     No Commitment Fees.  Company shall not be required to pay any commitment fees to Holder in respect of this Note.

4.     Taxes Generally.

(a)     All payments by or on account of any obligation of any Debtor under this Note shall be made free and clear of and without deduction for any present or future excise, stamp or other taxes, fees, duties, levies, imposts, charges, deductions, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding (A) any taxes imposed on or measured by Holder's net income or franchise taxes imposed in lieu of net income taxes, that would not be imposed but for a present or former connection between the Holder and the jurisdiction imposing such taxes (other than a connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, this Note), and (B) any United States withholding tax that is imposed on amounts payable to Holder on the date hereof (or at the time Holder designates a new lending office) or is attributable to Holder's failure (other than as a result of a change in applicable law) to comply with Section 4(b) (to the extent legally able to be provided and requested by a Debtor), except to the extent that Holder (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from such Debtor with respect to such withholding tax pursuant to Section 4(b) (such non excluded items being collectively called "**Taxes**").  If any withholding or deduction from any payment to be made by any Debtor hereunder is required in respect of any Taxes pursuant to any applicable law, then such Debtor will:

(i)     make (or cause to be made) such deductions and pay directly to the relevant Governmental Authority the full amount so deducted in accordance with applicable law; and

(ii)     promptly forward to the Holder an official receipt or other documentation satisfactory to the Holder evidencing such payment to such Governmental Authority;

In addition, each Debtor hereunder shall pay (or cause to be paid) any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)     <u>Tax Forms</u>.  Prior to the first payment of interest under this Note, the Holder shall deliver to the Debtors such certificates, documents or other evidence, as required by the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**") or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W 8ECI and W 8BEN, as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by Holder establishing that payments to it under the Note are (A) not subject to United States Federal backup withholding tax and, if applicable (B) not subject to United States Federal withholding tax under the Internal Revenue Code.  Holder shall obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by any Debtor.

5.     <u>Security</u>.

(a)     <u>Grant of Security</u>.  Subject to the terms of the Order and Section 5(e) herein, each of the Debtors hereby pledges, assigns, transfers and grants to and creates in favor of Holder a continuing security interest and lien under the UCC and all other applicable laws in all of the personal property of such Debtor, including the following property and including Avoidance Actions (and any proceeds from any such property and Avoidance Actions), in each case, wherever located and now owned or at any time hereafter acquired by such Debtor or in which such Debtor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**") as security for the full and timely payment, observance and performance of this Note and the Guaranty, as applicable (defined terms used in this Section 5 but not otherwise defined in this Note have the meanings assigned to such terms in the UCC):

(i)     all Accounts;

(ii)     all Chattel Paper;

(iii)     all Collateral Accounts and all Collateral Account Funds;

(iv)     all Commercial Tort Claims from time to time specifically described in writing from Company to Holder;

(v)     all Contracts;

(vi)     all Deposit Accounts;

(vii)    all Documents;

(viii)   all Equipment;

(ix)     all Fixtures;

(x)      all General Intangibles;

(xi)     all Goods;

(xii)    all Instruments;

(xiii)   all Insurance;

(xiv)    all Intellectual Property;

(xv)     all Inventory;

(xvi)    all Investment Property;

(xvii)   all Letters of Credit and Letter of Credit Rights;

(xviii)  all Money;

(xix)    all Receivables and Receivables Records;

(xx)     all Securities Accounts;

(xxi)    all books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time pertain to or evidence or contain information relating to any of the Collateral or are otherwise reasonably necessary in the collection thereof or realization thereupon;

(xxii)   to the extent not otherwise included, all other property, whether tangible or intangible, of Company and all proceeds, products, accessions, rents and profits of any and all of the foregoing and all Collateral Support and guarantees given by any Person with respect to any of the foregoing; and

(xxiii)  upon entry of the Final Order, any Avoidance Actions.

(b)      Rights in Collateral.  Each Debtor represents, warrants and covenants that it has and shall have at all times good and valid title to all of the Collateral, free and clear of all liens, claims, charges and encumbrances other than Permitted Liens, and such Debtor shall defend such title against the claims and demands of all other Persons.  Each Debtor represents and warrants that this Note creates a valid security interest in the Collateral and, upon entry of the Interim Order, such security interest shall constitute a perfected lien on and security interest

in all Collateral, subject only to Permitted Liens.  Each Debtor assumes full responsibility for taking any and all steps to preserve its rights with respect to the Collateral.

(c)    <u>Preservation of Security Interest</u>.  Each Debtor shall diligently preserve and protect Holder's security interest in the Collateral and shall, at its expense, cause such security interest to be and remain perfected so long as this Note or any portion thereof or obligation hereunder remains outstanding and unpaid and, for such purposes, such Debtor shall, from time to time at Holder's reasonable request and at Company's expense, file or record, or cause to be filed or recorded, such instruments, documents and notices (including, without limitation, financing statements and continuation statements) as may be necessary to perfect and continue such security interests.  Each Debtor shall do all such other acts and things and shall execute and deliver all such other instruments, security agreements and documents as Holder may reasonably request from time to time to protect and preserve the priority of Holder's security interest in the Collateral, as a perfected security interest in the Collateral subject only to Permitted Liens.

(d)    <u>Remedies on Default</u>.  Subject to the Orders and the Participation Agreement, but without limitation to any and all remedies on default provided therein, if any Event of Default shall occur and be continuing, Holder may (i) to the full extent permitted by law take possession and control of all or any part of the Collateral and any proceeds thereof and the books and records pertaining thereto, with or without judicial process, and (ii) without demand or notice (and if notice is required by law, after ten days prior written notice), proceed to exercise one or more of the rights and remedies accorded to a secured party by the UCC and otherwise by law or by the terms hereof.  Holder's rights and remedies shall include without limitation the power to sell all or any portion of the Collateral at public or private sale at such place and time and on such terms as Holder may see fit (subject to the requirements of applicable law).  Without precluding any other methods of sale, the sale of Collateral shall be deemed to have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of secured parties disposing of similar property, but in any event, Holder may sell the Collateral on such terms as Holder may choose without assuming any credit risk and without any obligation to advertise or give notice of any kind not expressly required under this Note, by the UCC or otherwise.  All of the rights and remedies of Holder under this Note shall be cumulative and not exclusive of other rights and remedies which it otherwise would have, whether under the Notes, the Bankruptcy Code, the UCC or otherwise.  Holder shall not be under any obligation to marshal any assets in favor of any Debtor or any other Person or against or in payment of this Note or under the Guaranty.

(e)    <u>Priority</u>.

(i)    Subject to the Carve-Out and the BofA Adequate Protection Claims (in the case of subparagraphs (1)-(4) below), each of the Debtors hereby covenants, represents and warrants that, upon entry of the Interim Order and the Final Order, the obligations of the Debtors under this Note and the Guaranty, as applicable:

(1) pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed super-priority administrative expenses claims in the Cases (the "**DIP Administrative Claims**") and a Superpriority Claim having superpriority over any and all

administrative expenses, diminution claims and all other claims against Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code or otherwise which superpriority claims shall be payable in accordance with the terms of the Orders.

(2) pursuant to section 364(d)(1) of the Bankruptcy Code, are secured by a valid, binding, continuing, enforceable, fully-perfected, Lien on, and security interest in, the Collateral. The Liens granted under this clause (3) shall be junior in all respects to the security interests in, and Liens on, the Pre-Petition Senior Liens.

(3) pursuant to section 364(c)(3) of the Bankruptcy Code, are secured by a valid, binding, continuing, enforceable, fully-perfected junior Lien on, and security interest in all tangible and intangible prepetition and postpetition property of Debtors, whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable Liens in existence immediately prior to the Petition Date or to valid and unavoidable Liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and Liens in favor of Holder shall be junior to such valid, perfected and unavoidable Liens.

(4) (I) shall not be subject or subordinate to (A) any Lien or security interest that is avoided and preserved for the benefit of a Debtor and its estates under section 551 of the Bankruptcy Code or (B) any Liens arising after the Petition Date or (II) subordinated to or made pari passu with any other Lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

6.    <u>Representations and Warranties</u>.  Each Debtor represents and warrants to Holder as follows:

(a)    <u>Organization</u>.  Such Debtor is duly organized and validly existing and, to the extent legally applicable, in good standing under the laws of the State of Delaware, and has the requisite power and authorization to own its properties and to carry on its business as now being conducted.  Such Debtor is duly qualified as a foreign entity to do business and, to the extent legally applicable, is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it make such qualification necessary.

(b)    <u>Authorization, Execution, Delivery</u>.    Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), such Debtor has the requisite power and authority to enter into and perform its obligations under this Note and Guaranty, as applicable, and to issue this Note in accordance with the terms hereof.  Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), the execution and delivery of this Note by such Debtor and the consummation of the transactions contemplated hereby have been duly authorized by the board of directors of such Debtor and no further filing, consent, or authorization is required by such Debtor, the board of directors of such Debtor or such Debtor's stockholders.  This Note has been duly executed and delivered by such Debtor, and constitutes the legal, valid and binding obligation of such Debtor, enforceable

against such Debtor in accordance with its terms, except as such enforceability may be limited by the Bankruptcy Code.

(c)     Noncontravention.  The execution, delivery and performance of this Note by such Debtor and the consummation by such Debtor of the transactions contemplated hereby will not result in a violation of any certificate of incorporation, certificate of formation, any certificate of designation or other constituent documents of such Debtor, any capital stock of such Debtor or bylaws of such Debtor.

(d)     Governmental Approvals.  Other than the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), no action, consent or approval of, registration or filing with, permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with this Note, except for such as have been made or obtained and are in full force and effect.

(e)     No Material Adverse Change.  No event, change or condition has occurred since December 31, 2010 that has caused, or could reasonably be expected to cause, a Material Adverse Effect other than events, changes or conditions that ordinarily would occur in connection with a filing under chapter 11 of the Bankruptcy Code.

(f)     Subsidiaries.     Company has the following Subsidiaries: the Debtor Subsidiaries, Club Ventures V, LLC, Club Ventures IX, LLC, Club Ventures XI, LLC and Club Ventures XII, LLC.  No Debtor Subsidiary has any Subsidiaries.

(g)     Use of Proceeds.  The proceeds of this Note shall be used (a) to pay all interest, charges, fees and expenses (including attorneys' fees for counsel to Holder), (b) to fund post-petition operating expenses and other general corporate needs, including working capital needs, (c) to pay certain administrative expenses of the Cases, including reasonable fees and expenses of professionals, (d) to pay court-approved critical vendors and (e) to make such other court-approved payments, in each case, solely in the manner contemplated by and in amounts consistent with the Budget.

(h)     Tax Returns.  Such Debtor has timely filed or timely caused to be filed all federal and state income tax returns and other material tax returns required to have been filed by it and all such tax returns are correct and complete in all material respects.  Such Debtor has timely paid or caused to be timely paid all income and franchise taxes and all other material taxes due and payable by it and all assessments received by it, except taxes that are being contested in good faith by appropriate proceedings and for which such Debtor shall have set aside on its books adequate reserves in accordance with GAAP.  Such Debtor has made adequate provision in accordance with GAAP for all taxes not yet due and payable.  Such Debtor (a) does not intend to treat the proceeds of this Note or any of the transactions contemplated by this Note as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4) (b) is aware of any facts or events that would result in such treatment, and (c) has never "participated" in a "listed transaction" (within the meaning of Treasury Regulation Section 1.6011-4).  Such Debtor is not party to any tax sharing agreement with any Person.

(i)    No Material Misstatements.  None of the information, reports, financial statements, exhibits or schedules furnished by or on behalf of such Debtor for use in connection with this Note or in connection with the negotiation of this Note or included therein or delivered pursuant thereto (as modified or supplemented by other information so furnished), taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, reports, financial statements, exhibits or schedules were based upon or constitute a forecast or projection, such Debtor represents only that it acted in good faith and utilized reasonable assumptions in light of the conditions existing at the time of preparation.  The forecasts and projections that have been or will be made available to Holder by such Debtor have been or will be prepared in good faith based upon reasonable assumptions at the time of delivery.

(j)    Liens.  There are no Liens of any nature whatsoever on any of the properties or assets of such Debtor other than Permitted Liens or Liens otherwise permitted by this Note.

(k)    Foreign Corrupt Practices Act.  Such Debtor and its respective directors and officers or, to the knowledge of such Debtor, any agent, employee or other Person acting on behalf of such Debtor, have not, in the course of their actions for, or on behalf of, such Debtor (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or are in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C. §§ 78dd-1, et seq.); or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

7.    Conditions Precedent.  The making of borrowings under this Note by Holder is subject to the satisfaction of the following conditions:

(a)    All Advances.  On the date of each Advance:

(i)    The representations and warranties set forth herein shall be true and correct in all material respects on and as of the date of such Advance with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date (except that such materiality qualifiers shall not be applicable to any representation and warranty that is already qualified by materiality).

(ii)    At the time of and immediately after giving effect to such Advance, no Event of Default shall have occurred and be continuing (unless otherwise waived in writing by Holder).

(iii)    At the time of such Advance, either (i) the Interim Order shall be in full force and effect or (ii) if the date of such requested extension of credit is more than 30 calendar days after the Petition Date, the Final Order shall have been entered.

(iv)     The making of such Advance shall not violate any requirement of applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(v)     Each Advance shall be deemed to constitute a representation and warranty by the Debtors on the date of such Advance as to the matters specified in this Section 7(a).

(b)     <u>Deliverables</u>.  On or prior to the Closing Date:

(i)     Holder shall have received this Note, executed and delivered by a duly authorized officer of each Debtor, and any deliverables required thereunder.

(ii)     Holder shall have been granted perfected Liens on the Collateral and shall have received, if applicable, any certificates or instruments representing and certificated equity interests or instruments accompanied by instruments of transfer, endorsed in blank.

(iii)     There shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose burdensome conditions on any Debtor, this Note, or the other transactions contemplated hereby, including the repayment hereof and the Guaranty.

(iv)     Holder shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(v)     Moses & Singer LLP, counsel to Holder, shall have received payment of all fees, disbursements and other charges invoiced, due, and payable on or prior to the Closing Date.

(vi)     Holder shall have received payment of all other amounts due and payable on the Closing Date.

(vii)     Holder shall have received, with respect to each Debtor, (a) customary evidence of authority, (b) customary officer's certificates and other evidence of corporate authorization (including applicable constituent documents), (c) good standing certificates in jurisdiction of formation and (d) a notice of borrowing.

(viii)     Holder shall have received, and Holder (together with the Pre-Petition Lenders) shall have approved the Budget in their sole discretion.

(ix)     Holder shall have received evidence satisfactory to Holder in its reasonable discretion of the entry of the Interim Order (i) approving this Note and (ii) granting the Superpriority Claim status and senior priming and other Liens described herein and in the Interim Order.

(x)     All "first day orders" will be in form and substances reasonably satisfactory to Holder.

8. _Affirmative Covenants_.  Each Debtor covenants and agrees with Holder that so long as this Note shall remain in effect and until this Note has been terminated and the principal of and interest hereunder, all fees and all other expenses or amounts payable hereunder shall have been paid in full, such Debtor will:

(a)     _Existence; Businesses and Properties_.

(i)     Except as occasioned by the Cases, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence.

(ii)     Except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect or would violate the Orders, (i) do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names used in the conduct of its business; (ii) comply with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted; (iii) comply with the terms of, and enforce its rights under, each lease of Real Property and each other agreement so as not to permit any uncured default on its part to exist thereunder; and (iv) at all times maintain and preserve all of its property and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

(b)     _Insurance_.  Keep its insurable properties adequately insured at all times by financially sound and reputable insurers to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is reasonable and customary for companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the this Note (and comply with all covenants in the this Note with respect thereto).

(c)     _Obligations and Taxes_.  Except to the extent otherwise required by the Orders, (a) pay its material Indebtedness and other material obligations arising after the Petition Date that are approved by the Bankruptcy Court and provided in the Budget promptly and in accordance with their terms; (b) timely file (after giving effect to any valid extensions of time in which to file such filings) all of its tax returns and (c) pay and discharge promptly when due all material taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, arising after the Petition Date before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, would reasonably be expected to give rise to a Lien upon such properties or any part thereof; provided, however, that such payment and discharge shall not be required with respect to any such material tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and such Debtor shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP.

(d)    <u>Financial Statements, Reports, Etc.</u>  Furnish to Holder:

(i)    as soon as possible after preparation, copies of financial statements prepared in the ordinary course of business;

(ii)    the Budget and updates as requested by Holder;

(iii)    if applicable, promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by such Debtor with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to its public shareholders, as the case may be;

(iv)    promptly after the receipt thereof by such Debtor, a copy of any "management letter" received by any such Person from its certified public accountants in connection with any audit and the management's response thereto;

(v)    as soon as possible, and in any event when such Debtor's statement of financial affairs and schedules of assets and liabilities are required to be filed with the Bankruptcy Court (but no later than 30 days after the Petition Date or such later date as approved by the Bankruptcy Court), a pro forma balance sheet of such Debtor's financial condition as of the Petition Date;

(vi)    copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of with the Bankruptcy Court in the Cases, or distributed by or on behalf of such Debtor to any official committee appointed in the Cases;

(vii)    no later than 30 days after the end of each calendar month, a list of all professional fees and related expenses incurred by such Debtor during the preceding month;

(viii)    prompt notice of any of the following; (A) changes to any material customer contracts, and (B) any event that has or could reasonably be expected to result in a Material Adverse Effect or Change in Control;

(ix)    promptly provide any other information regarding (A) the operations, business affairs, or financial condition of such Debtor, (B) compliance with the terms of any material contract entered into or assumed after the Petition Date and (C) information and updates regarding the achievement or progress towards the Milestones as Holder may reasonably request; and

(x)    cooperate with Holder's legal and financial advisors and promptly provide all information reasonably requested by Holder' legal and financial advisors with respect to such Debtor.

(e)    <u>Litigation and Other Notices</u>.  Furnish to Holder prompt written notice of the following:

(i)     any Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto; and

(ii)     the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against such Debtor that could reasonably be expected to result in a Material Adverse Effect.

(f)     <u>Information Regarding Collateral</u>.  Furnish to each of Holder prompt written notice of any change in such Debtor's (i) corporate name, (ii) jurisdiction of organization or any office in which it maintains books or records relating to the Collateral owned by it, (iii) identity or corporate structure. or (iv) organizational identification number.  Such Debtor agrees to promptly to notify Holder if any material portion of the Collateral is damaged or destroyed.

(g)     <u>Maintaining Records; Access to Finances</u>.  Keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP are made of all material dealings and transactions in relation to its business and activities.  Such Debtor will permit any representatives designated by Holder to visit and inspect its respective financial records and properties at reasonable times during normal business hours on reasonable notice and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by Holder to discuss the affairs, finances and condition of such Debtor with the officers thereof and independent accountants therefor provided that (i) any such visit or inspection shall be coordinated through Holder and (ii) in respect of any such discussions with any independent accountants, such Debtor, as the case may be, shall have received reasonable advance notice thereof and a reasonable opportunity to participate therein.

(h)     <u>Use of Proceeds</u>.  The proceeds of this Note shall only be used for the purposes set for in Section 6(g).

(i)     <u>Additional Collateral, Etc.</u>

(i)     With respect to any Collateral acquired after the Closing Date or, in the case of inventory or equipment (other than inventory or equipment in transit), any material Collateral moved after the Closing Date by such Debtor (other than any Collateral described in paragraphs (ii) or (iii) of this Section) which is not subject to the Liens created by this Note or the Orders, promptly (and, in any event, within 10 days following the date of such acquisition or move or such longer period as agreed by Holder) (i) execute and deliver to Holder such additional documents and amendments to this Note as are necessary or that Holder may deem advisable in its sole discretion to grant to Holder a Lien in such Collateral and (ii) take all actions necessary or that Holder may deem advisable to grant to, or continue on behalf of Holder a Lien.

(ii)     Subject to Section 9(k), with respect to any Subsidiary created or acquired after the Closing Date by Company, promptly (and, in any event, within 30 days following such creation or the date of such acquisition or such longer period as agreed by Holder) (i) execute and deliver to Holder such additional documents as Holder deems necessary or advisable in its discretion to grant to Holder a valid, perfected first priority security interest in the equity interests in such new Subsidiary that are owned by Company, (ii) deliver to Holder the

certificates, if any, representing such equity interests, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of Company, as the case may be, (iii) cause such new subsidiary (A) to become a party to this Note and/or enter into such other documents as determined by Holder in its sole discretion to be required to provide a guaranty of this Note and (B) to take such actions necessary or that Holder may deem advisable to grant to Holder a Lien having the priority set forth in this Note, and (iv) if requested by Holder, deliver to Holder legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel reasonably satisfactory to Holder.

(j)     Further Assurances.   From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such instruments, certificates, financing statements, agreements or documents, and take all such actions (including filing UCC and other financing statements), as Holder may reasonably request, for the purposes of implementing or effectuating the provisions of this Note, or documenting (other than the Orders), perfecting or renewing the rights of Holder with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by such Debtor which may be deemed to be part of the Collateral), and the Orders.   Upon the exercise by Holder of any power, right, privilege or remedy pursuant to this Note or the Orders which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, such Debtor will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that Holder may be required to obtain from such Debtor for such governmental consent, approval, recording, qualification or authorization.

(k)     Budget.

(i)     Make all payments, incur expenses and all cash receipts received shall be in accordance with the Budget and such Budget will take into account all funds received by such Debtor.

(ii)     In the event that management of such Debtor determines it necessary to take any action or make any payment in an emergency situation, management will obtain the consent of the Holder.

(l)     Milestones.   Such Debtor shall consult with Holder in connection with carrying out the following Milestones (as defined below), including providing Holder with copies of the material documents prepared to achieve such Milestones in advance of their submission to the Bankruptcy Court:

(i)     (A) on or prior to the date that is twenty (20) Business Days after the commencement of the Chapter 11 Cases, provide Holder with a final draft of the Disclosure Statement and any motions to be filed with the Bankruptcy Court in connection therewith, in each case, consistent in all material respects with the PSA;

(B)     no later than twenty-five (25) Business Days following the Petition Date, to file a plan of reorganization (the "**Plan**") and disclosure statement (the "**Disclosure Statement**") with the Bankruptcy Court containing terms and conditions consistent

with this Note and the PSA and, in each case, otherwise in form and substance satisfactory to Holder;

(C)     file the Debtors' schedules and statements of affairs with the Bankruptcy Court no later than sixty (60) days after the Petition Date;

(D)     obtain entry of the (x) Interim Order by the Bankruptcy Court within three (3) Business Days following the Petition Date and (y) Final Order by the Bankruptcy Court no later than thirty (30) calendar days following the date of the Interim Order, in each case on terms that are consistent with the PSA in all material respects and in all other respects satisfactory to Holder;

(E)     to obtain entry of an order approving the Disclosure Statement by the Bankruptcy Court within 70 calendar days from the Petition Date;

(F)     to obtain entry of an order by the Bankruptcy Court confirming the Plan in form and substance satisfactory to Holder (the "**Confirmation Order**") within 135 calendar days from the Petition Date; and

(G)     to cause the "Effective Date" of the Plan to occur no later than 155 days after the Petition Date, on which date there shall be no appeals pending with respect to the Confirmation Order other than such appeals over which the Consenting Lenders (as defined in the PSA) have determined to substantially consummate the Plan;

(each of the actions or events set forth in subsections (A) through (G), a "**Milestone**", and collectively, the "**Milestones**"); provided that, Holder may agree, in its sole discretion, to extend the applicable timing in connection with any of the Milestone, and

(ii)     not to seek to implement any transaction or series of transactions that would effect a restructuring on terms that differ in any material respect from those set forth in this Note and the PSA unless otherwise agreed by Holder.

9.     <u>Negative Covenants</u>.  Each Debtor covenants and agrees that, so long as this Note shall remain in effect and until this Note has been terminated and the principal of and interest hereunder, all fees and all other expenses or amounts payable hereunder have been indefeasibly paid in full, such Debtor will not:

(a)     <u>Indebtedness</u>.  Incur, create, assume or permit to exist any Indebtedness, except:

(i)     Indebtedness that exists as of the date hereof and listed on Company's "Schedule of Assets and Liabilities" filed in connection with the Cases;

(ii)     Indebtedness approved by Holder;

(iii)     Indebtedness specified in the Budget (to the extent such Budget has been approved by Holder);

(iv)     Indebtedness created hereunder, under this Note and the Orders;

(v)     Pre-Petition Debt;

(vi)     Indebtedness existing on the Petition Date that has not been assumed and the enforcement of which is stayed; and

(vii)     Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business.

(b)     <u>Liens</u>.   Create, incur, assume or permit to exist any Lien on any property or assets (including equity interests or other securities of any Person) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(i)     Liens on property or assets of Company existing on the date hereof and listed on Company's "Schedule of Assets and Liabilities" filed in connection with the Cases; provided that such Liens shall secure only those obligations which they secure on the date hereof and extensions, renewals and replacements thereof permitted hereunder;

(ii)     Liens approved by Holder;

(iii)     any Lien in favor of Holder created under this Note and the Orders;

(iv)     Pre-Petition Liens;

(v)     valid, unavoidable, and perfected Liens in existence immediately prior to the Petition Date including, without limitation, Liens set forth on **Schedule 9(b)(vii)**;

(vi)     valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code;

(vii)     Liens for taxes (i) not yet due, (ii) which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the books of such Debtor in accordance with GAAP, or (iii) that are not, either individually or in the aggregate, material;

(viii)     statutory Liens of landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not overdue for a period of more than 30 days or which are being contested;

(ix)     zoning restrictions, easements, rights-of-way, restrictions on such Debtor's use of Real Property and other similar encumbrances and minor title defects affecting Real Property which, in the aggregate, do not interfere with the ordinary conduct of the business of such Debtor;

(x)   any interest or title of a lessor or sublessor under any lease entered into by such Debtor in the ordinary course of business and covering only the assets so leased;

(xi)   Liens on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens; provided that (i) the applicable deposit account is not a dedicated cash collateral account or the Control Account and is not subject to restrictions against access by such Debtor in excess of those set forth in regulations promulgated by the board of directors of such Debtor and (ii) the applicable deposit account is not intended by such Debtor to provide collateral or security to the applicable depositary institution or any other Person;

(xii)   leases, licenses, subleases or sublicenses in each case, granted to others in the ordinary course of business which do not interfere in any material respect with the business of such Debtor or secure any Indebtedness (clauses 9(b)(i) to 9(b)(xii), the "**Permitted Liens**").

(c)   <u>Sale and Lease-Back Transactions</u>.  Enter into any arrangement, directly or indirectly, with any Person whereby such Debtor shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

(d)   <u>Investments, Loans and Advances</u>.  Purchase, hold or acquire any equity interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other Person (all of the foregoing, "**Investments**"), except (i) Investments existing on the date hereof and listed on such Debtor 's "Schedule of Assets and Liabilities" filed in connection with the Cases; (ii) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case, in the ordinary course of business; (iii) extensions of trade credit in the ordinary course of business; and (iv) investments in the ordinary course of business that are consistent with the terms in the Budget.

(e)   <u>Mergers, Consolidations, Sales of Assets and Acquisitions</u>.  Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or sell, transfer, lease, issue or otherwise dispose of (in one transaction or in a series of transactions) all or any substantial part of the assets (whether now owned or hereafter acquired) or the equity interests of such Debtor, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, except for (i) the purchase and sale by such Debtor of inventory in the ordinary course of business, or (ii) the sale or discount by such Debtor, in each case without recourse and in the ordinary course of business of overdue accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing transaction).

(f)    Restricted Payments; Restrictive Agreements.

(i)    Pay directly or indirectly any dividends or make any distributions on capital stock or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to Affiliates of such Debtor or to holders of their capital stock; or sell, lease or transfer any of Company's properties or assets to Affiliates of such Debtor or to holders of their capital stock (i) without the approval of Holder or (ii) that are not contemplated by the Budget.

(ii)    Enter into, incur or assume any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Company to create, incur or permit to exist any Lien upon any of its property or assets; provided that the foregoing shall not apply to restrictions and conditions imposed by law, by this Note, by the Orders or in effect as of the date hereof.

(g)    Transactions with Affiliates.  Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any Affiliates of such Debtor, except that (a) such Debtor may engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to such Debtor than could be obtained on an arm's-length basis from unrelated third parties and (b) transactions consented to by Holder and approved by the Bankruptcy Court pursuant to orders that are acceptable to Holder.

(h)    Business of Debtors.  With respect to such Debtor, engage at any time in any business or business activity other than the business conducted by it as of the date hereof and business activities reasonably incidental or related thereto.

(i)    Pre-Petition Payments.

(i)    Make Pre-Petition Payments, other than Pre-Petition Payments which are authorized by the Bankruptcy Court pursuant to authority granted by the Orders, the "first-day orders" or other orders in form and substance satisfactory to Holder in its sole discretion.

(ii)    Pay any management, consulting or similar fees to or any salary expense for executives, directors, officers or shareholders of such Debtor, in any case by direct payment or otherwise or enter into any employment or consulting agreements with current management, shareholders or directors of such Debtor, in any case, unless (a) contemplated by the Budget or (b) made with the prior written consent of Holder.

(iii)    Permit any waiver, supplement, modification, amendment or termination of any organizational document or any material agreement of such Debtor in a manner adverse to Holder in any material respect.

(iv)    Without the prior written consent of Holder, enter into any contract, term sheet, letter of intent or similar agreement for the actual or proposed sale, lease or disposition of any or all assets except in the ordinary course of business and consistent with past practices.

        (j)    <u>Bankruptcy Case Matters</u>.  In each case subject to the availability of available funds in the Budget:

        (i)    Seek, consent to or fail to oppose any modification, stay, vacatur or amendment of the Orders without the prior written consent of Holder.

        (ii)    Seek, consent to or fail to oppose (i) any grant or imposition, or request that the Bankruptcy Court grant or impose, under Section 364 of the Bankruptcy Code or otherwise, Liens on the property of such Debtor, whether equal, superior, or subordinate, to the Liens created under this Note and the Orders on that property, except as expressly permitted by this Note, or (ii) any request of the Bankruptcy Court to seek authority for such Debtor to use cash collateral as defined in Section 363 of the Bankruptcy Code, except as set forth as provided in the Orders or the first day motions, amounts for which have been approved by Holder.

        (iii)    Seek, consent to or fail to oppose the assertion of any claims against or defenses (including, without limitation, offsets and counterclaims of any nature or kind) to the validity, perfection, enforceability or non-avoidability (under Sections 105, 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or otherwise) of the Indebtedness (other than the priming thereof pursuant to the Orders) or the Liens created under this Note and the Orders.

        (iv)    Seek, consent to or fail to oppose the assertion of any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek (or the result of which would be to obtain) any order, judgment, determination, declaration or similar relief invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness (other than the priming thereof pursuant to the Orders) or the Liens created under this Note and the Orders.

        (v)    Seek, consent to or fail to oppose the modification, alteration or impairment in any manner of the Liens, security interests, rights or remedies granted to Holder pursuant to the Orders and this Note (including, without limitation, Holder' right to demand payment of this Note and to enforce its Liens in the Collateral), whether by plan of reorganization or liquidation order of confirmation, or any financings of, extensions of credit to, or incurring of debt by such Debtor, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

        (vi)    Seek, consent to or fail to oppose any order (i) dismissing the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; or (ii) converting the Cases under Sections 105 or 1112 of the Bankruptcy Code or otherwise;

        (vii)    Seek, consent to or fail to oppose a priority for any administrative expense, secured claim or unsecured claim against such Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 of the Bankruptcy Code or otherwise) which are equal or superior to the priority of the Liens created under this Note and the Orders, except for the Carve-Out, the Pre-Petition Senior Liens and the BofA Adequate Protection Claims;

(viii)    Except pursuant to an order of the Bankruptcy Court after an actual hearing and sufficient notice thereof to Holder with an opportunity to object, prior to the date on which this Note have been paid in full in cash, pay or incur any administrative expenses, except for such expenses which are administrative expense claims incurred in the ordinary course of the business of such Debtor;

(ix)    Make any payments or transfer any property on account of claims asserted by the vendors of such Debtor for reclamation in accordance with Section 2-702 of any applicable Uniform Commercial Code and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to Holder;

(x)    Seek to return any property to any party pursuant to Section 546(g) of the Bankruptcy Code;

(xi)    Seek, consent to or fail to oppose any Avoidance Action against Holder; and

(xii)    Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is *pari passu* with or senior to the claims of Holder against Company hereunder, except for the Pre-Petition Senior Liens, the Carve-Out and the BofA Adequate Protection Claims.

(k)    Subsidiaries.  Form or create a Subsidiary of the Company or any other Debtor without the consent of Holder

(l)    Pro Forma Consolidated EBITDA.  Permit Pro Forma Consolidated EBITDA as of and for the period ending December 31, 2011 to be less than $0.

10.    Events of Default; Remedies.

(a)    Events of Default.  The following shall constitute events of default ("**Events of Default**") under this Note:

(i)    a default in the payment of any interest on any of the Notes as and when the same shall become due and payable or the failure to make any adequate protection payments when due;

(ii)    a default in the payment of all or any part of the principal of any of the Notes as and when the same shall become due and payable either at maturity, by declaration, acceleration or otherwise, whether or not prohibited by any provisions hereof;

(iii)    a failure on the part of any Debtor to duly observe or perform any of the covenants or agreements on the part of such Debtor contained in this Note (including the Guaranty);

(iv)    any representation, warranty or statement made or deemed made by any Debtor herein shall prove to be false or misleading in any material respect when so made;

(v)     there is entered against any Debtor a judgment or levy upon the Collateral;

(vi)     there is a taking of possession of a substantial part of the Collateral;

(vii)     any Lien being granted or placed upon the Collateral other than the lien of Holder and Permitted Liens;

(viii)     a Material Adverse Effect in the financial condition of any Debtor, as determined by Holder in its sole discretion;

(ix)     one or more judgments or orders as to any obligation arising after the Petition Date in excess of $50,000 (to the extent not covered by independent third-party insurance) or that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against any Debtor and shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed by reason of appeal or otherwise, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of such Debtor to enforce any such judgment;

(x)     there shall have occurred a Change of Control;

(xi)     the appointment of an examiner with expanded powers or a trustee in any Debtor's chapter 11 case, conversion of the chapter 11 case to a case or cases under chapter 7 of the Bankruptcy Code or dismissal of the chapter 11 case by order of the Bankruptcy Court;

(xii)     the Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder of any security interest to permit foreclosure (including under Article 9 of the Uniform Commercial Code and/or applicable state law) on any of the assets of the Company;

(xiii)     any order of the Bankruptcy Court shall be entered staying, reversing or vacating any of the Orders without the prior written consent of Holder;

(xiv)     the (A) (1) termination (whether in accordance with its terms or otherwise) by any Pre-Petition Lender of the PSA, or any material default or material breach (which material default or material breach is not cured by the deadline (if any) or waived) by any Pre-Petition Lender under the PSA; (2) subject to entry of the Final Order, termination (whether in accordance with its terms or otherwise) by any Debtor of the PSA, or any material default or material breach (which material default or material breach is not cured by the deadline (if any) or waived) by any Debtor under the PSA or (B) any modification, amendment or supplement with respect to the Restructuring or any modification, amendment or supplement affecting the rights or obligations of any Pre-Petition Lender or Holder absent such parties written consent;

(xv)     the failure by Debtors to achieve any of the Milestones described in Section 8(m) (except to the extent that Holder has agreed, in its sole discretion, to extend the applicable timing in connection with any of the Milestone), and such failure shall continue

unremedied for a period of forty-five (45) days after written notice thereof from Holder to Debtors;

(xvi)   the making of any material cash payment by the Debtors other than payments authorized by the Orders;

(xvii)   the termination by the Bankruptcy Court of the Debtors' exclusive period to file the Plan under Section 1121 of the Bankruptcy Code, or the lapsing of such exclusive period;

(xviii)  the Debtors withdraw the Plan or publicly announce their intention not to pursue or support the Plan;

(xix)   the failure of any Debtor to perform Bankruptcy Court orders in any material respect;

(xx)   any breach by any Debtor of any material term or condition of the Interim Order or the Final Order, as applicable;

(xxi)   the payment of, or filing of a motion or other pleading any Debtor for authority to pay, any pre-petition claim or administrative expense arising under Section 503(b)(9) of the Bankruptcy Code except as may be provided for in the Interim Order or the Final Order, as applicable, or this Note or as may be approved by the Bankruptcy Court for payments to critical vendors, such critical vendor order to be reasonably acceptable to Holder;

(xxii)   the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against Holder or any of the Collateral;

(xxiii)  the filing of any plan that does not conform to the terms and conditions of the PSA;

(xxiv)  the filing of any motion or application or the commencement of any litigation (or the joinder by any of the Debtors in, or support by the Debtors of, any such action commenced by any other party) by the Debtors that is inconsistent in any material respect with the PSA or seeks to effectuate a Material Adverse Change (as defined in the PSA); or

(xxv)   the entry of an order by the Bankruptcy Court authorizing the sale of all or substantially all of the assets of any Debtor to which Holder does not consent.

(b)   Remedies.

(i)   Subject to the Orders (but without prejudice to any rights granted therein) and the Participation Agreement, after the occurrence and continuance of an Event of Default and upon seven (7) Court Days' written notice of such Event of Default from Holder to Debtors, Holder shall have the right to declare the entire unpaid principal amount of this Note together with all accrued but unpaid interest and any unpaid fees and expenses incurred by Holder immediately due and payable. Each Debtor hereby waives presentment, protest, demand, notice of dishonor and all other requirements of any kind. Holder's failure to exercise any right

or remedy under this Note or acceptance of partial or delinquent payments, shall not be a waiver of any obligation of Debtors or right of Holder, or constitute Holder's waiver of any other default subsequently occurring.

(ii)     The remedies set forth herein shall be in addition to, and not in lieu of, any other additional rights or remedies to which Holder may be entitled, whether at law, in equity or otherwise. After the occurrence and continuance of an Event of Default and upon written notice of such Event of Default from Holder to Debtors, Holder shall have the right to take all or any actions and exercise any remedies available to a secured party under this Note (and the Guaranty) or applicable law or in equity subject to any requirements set forth in the Orders and the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated and Holder shall have the right to exercise any of the remedies under this Note (and the Guaranty), including any rights and remedies provided in the Orders and the right to realize on all of the Collateral without relief or order of the Bankruptcy Court except as provided in the Orders and subject to the Participation Agreement.

(iii)     Subject to the Participation Agreement, Holder shall have the right to credit bid this Note under section 363 of the Bankruptcy Code or pursuant to the Plan or any other plan of reorganization in the Debtor's case.

11.     <u>Guaranty</u>.

(a)     In order to induce Holder to extend credit hereunder, each Guarantor hereby irrevocably, unconditionally and absolutely, jointly and severally, guarantees to Holder, as a primary obligor and not merely as a surety, the due and punctual payment and performance of all obligations of Company under this Note (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding in respect of Company, regardless of whether allowed or allowable in such proceeding) (collectively, the "**Guaranteed Obligations**"). Each Guarantor agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension or renewal of any Guaranteed Obligation. Each and every default in payment or performance of any Guaranteed Obligation shall give rise to a separate cause of action hereunder, and separate suits may be brought hereunder as each cause of action arises.

(b)     To the fullest extent permitted by applicable law, each Guarantor waives presentment to, demand of payment from and protest to Company or to any other guarantor of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment. To the fullest extent permitted by applicable law, the obligations of each Guarantor hereunder shall not be affected by (a) the failure of Holder to assert any claim or demand or to enforce or exercise any right or remedy against Company or any other Debtor under the provisions of this Note or otherwise; (b) any rescission, waiver, amendment or modification of, or any release from, any of the terms or provisions of this Note or any other agreement; (c) the release of (or the failure to perfect a security interest in) any security held by Holder for the performance of any of the Guaranteed Obligations; (d) the failure or delay of Holder for any reason whatsoever to exercise any right or remedy against any other guarantor of any of the Guaranteed Obligations or any obligor in respect of any Collateral, (e) the failure of

Holder to assert any claim or demand or to enforce any remedy under this Note, any guarantee or any other agreement or instrument, (f) any default, failure or delay, willful or otherwise, in the performance of any of the Guaranteed Obligations; or (g) any other act, omission or delay to do any other act which may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity or which would impair or eliminate any right of any Guarantor to subrogation.

(c)      Each Guarantor agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, that such guarantee may be enforced at any time and from time to time during the continuance of any Event of Default, without any prior demand or enforcement in respect of any Guaranteed Obligations, and that such Guarantor waives any right to require that any resort be had by Holder to any other guarantee, or to any security held for the payment of any Guaranteed Obligations. The solicitation of, or the delivery by any Guarantor of, any confirmation or reaffirmation of this guarantee under any circumstance shall not give rise to any inference as to the continued effectiveness of this guarantee in any other circumstance in which the confirmation or reaffirmation hereof has not been solicited or has not been delivered, and the obligations of each Guarantor hereunder shall continue in effect as herein provided notwithstanding any solicitation or delivery of any confirmation or reaffirmation hereof, or any failure to solicit or to deliver any such confirmation or reaffirmation, under any circumstances.

(d)      The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Guaranteed Obligations), including any claim of waiver, release, surrender, amendment, modification, alteration or compromise of any of the Guaranteed Obligations or of any collateral security or guarantee or other accommodation in respect thereof, and shall not be subject to any defense, setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or this Note or any provision thereof or otherwise. Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by any change of location, form or jurisdiction of Company or any other Person, any merger, consolidation or amalgamation of Company or any other Person into or with any other Person, any sale, lease or transfer of any of the assets of Company or any other Person to any other Person, any insolvency, bankruptcy, reorganization or dissolution of Company or any other Person, any other change of form, structure, or status under any law in respect of Company or any other Person, or any other occurrence, circumstance, happening or event whatsoever, whether similar or dissimilar to the foregoing, whether foreseen or unforeseen, that might otherwise constitute a legal or equitable defense, release, exoneration, or discharge or that might otherwise limit recourse against Company or the Guarantors or any other Person.

(e)      To the fullest extent permitted by applicable law, each Guarantor waives all defenses based upon suretyship laws and principles and all defenses based on or arising out of any defense of Company or any other guarantor or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of Company, other than the final payment in full in cash of the Guaranteed Obligations. Holder may, at its election, foreclose on any security held for the Guaranteed Obligations by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other

accommodation with Company or any other Person or exercise any other right or remedy available to them against Company or any other Person, without affecting or impairing in any way the liability of the Guarantors hereunder except to the extent the Guaranteed Obligations have been fully, finally and indefeasibly paid in full in cash. Pursuant to applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantors against Company or any other Person, as the case may be, or any security. Each Guarantor agrees that, as between the Guarantors, on the one hand, and Holder, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated during the continuance of any Event of Default for the purposes of the Guarantors' guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration as to Company in respect of the Guaranteed Obligations guaranteed hereby (other than any notices and cure periods expressly granted to Company in this Note) and (ii) in the event of any such acceleration of such Guaranteed Obligations, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable in full by the Guarantors for purposes of this Note.

(f)     In furtherance of the foregoing and not in limitation of any other right that Holder has at law or in equity against the Guarantors by virtue hereof, upon the failure of Company to pay (after the giving of any required notice and the expiration of any cure period expressly granted to Company in this Note) any Guaranteed Obligation when and as the same shall become due, whether at maturity, upon mandatory prepayment, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to Holder, in cash the amount of such unpaid Guaranteed Obligation. Upon payment by any Guarantor of any sums as provided above (including by way of realization upon any collateral provided by any such Guarantor), all rights of such Guarantor against Company or any other Person arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Guaranteed Obligations. In addition, upon the occurrence and during the continuance of any Event of Default, any indebtedness of Company now or hereafter held by any Guarantor is hereby subordinated in right of payment to the prior payment in full in cash of the Guaranteed Obligations. If any amount shall erroneously be paid to any Guarantor on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of Company, such amount shall be held in trust for the benefit of Holder and shall forthwith be paid to Holder be credited against the payment of the Guaranteed Obligations, whether matured or unmatured.

(g)     If any claim is ever made upon Holder for repayment or recovery of any amount received by Holder in payment or on account of any Guaranteed Obligations, including claims in connection with any insolvency, bankruptcy or reorganization of Company, and claims of invalid, fraudulent or preferential transfers, and Holder repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body, or (b) any settlement or compromise of any such claim effected by Holder with any such claimant, each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon Guarantor, notwithstanding any termination hereof or the cancellation of any instrument or agreement evidencing any of the Guaranteed Obligations, and such Guarantor shall

remain liable to Holder hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Holder.

(h)     Each Guarantor assumes all responsibility for being and keeping itself informed of Company's financial condition and assets, and of all other circumstances bearing upon the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that Holder will not have any duty to advise such Guarantor of information now or hereafter known to it or any of them regarding any of the foregoing.

(i)     Each Guarantor represents and warrants that, to its actual knowledge, all representations and warranties relating to it (in any capacity) contained in this Note are true and correct in all material respects.

12.     Miscellaneous.

(a)     Rights Cumulative.  The remedies of Holder as provided in this Note shall be cumulative and concurrent; may be pursued singly, successively or together at the sole discretion of Holder, and may be exercised as often as occasion for their exercise shall occur.

(b)     GOVERNING LAW.   THIS NOTE SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH, AND ENFORCED UNDER, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW OF SUCH STATE (INCLUDING GIVING EFFECT TO GENERAL OBLIGATIONS LAW SECTION 5-1401).

(c)     JURISDICTION, JURY TRIAL WAIVER, ETC.

(i)     EACH PARTY TO THIS NOTE HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR ANY AGREEMENTS OR TRANSACTIONS CONTEMPLATED HEREBY MAY BE BROUGHT IN THE BANKRUPTCY COURT OR THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM.  EACH PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SET FORTH IN SECTION 11(d) OF THIS NOTE, SUCH SERVICE TO BECOME EFFECTIVE 5 AFTER SUCH MAILING.

(ii)     EACH PARTY TO THIS NOTE HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS NOTE, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS. COMPANY (I) CERTIFIES THAT NEITHER HOLDER NOR ANY REPRESENTATIVE OR

ATTORNEY OF HOLDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT HOLDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (II) ACKNOWLEDGES THAT HOLDER HAS BEEN INDUCED TO PURCHASE THIS NOTE BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

(d)     <u>Notices</u>.  All notices, requests, demands, waivers, consents, approvals, payments or other communications which are required by or permitted hereunder shall be in writing and be deemed delivered (a) upon receipt, if by hand delivery, (b) upon transmission, if sent by facsimile with confirmation of receipt during normal business hours for the recipient or on the next Business Day if sent after normal business hours for the recipient, (c) the next business day, if sent by a reputable overnight courier service such as FedEx or DHL, or (d) on the fifth calendar day following deposit in the United States mail, certified, postage prepaid, return receipt requested, addressed in the case of (c) and (d) as follows:

If to any Debtor:

> c/o Club Ventures Investments LLC
> David Barton Gym
> 50 West 23rd Street
> New York, New York 10010

With a copy to:

> Peitzman Weg & Kempinsky, LLP
> 10100 Santa Monica Blvd
> Suite 1450
> Los Angeles, CA  90067
> Attention: David B. Shemano, Esq.
> Telephone: (310) 552-3100 / (310) 712-0051
> Facsimile: (310) 552-3101

If to Holder:

> c/o Moses & Singer LLP
> 405 Lexington Avenue
> New York, NY 10174
> Tel.: (212) 554-7847
> Fax: (212) 554-7700
> Attn: Howard Herman, Esq.

With a copy to:

> Moses & Singer LLP
> 405 Lexington Avenue
> New York, NY 10174
> Tel.: (212) 554-7847

Fax: (212) 554-7700
Attn: Howard Herman, Esq.

Any party may alter the address to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section for the giving of notice.

(e)     Assignment.  This Note may be assigned by Holder in whole or in part, and will inure to the benefit of its successors and assigns.  This Note may not be assigned by Company or any other Debtor.  Company agrees to issue from time to time replacement Notes in the form hereof to facilitate any permitted assignments.

(f)     Binding Nature of Note.  This Note shall be binding upon each Debtor and their respective successors and assigns, and shall inure to the benefit of Holder and its successors and assigns.

(g)     Modification.  This Note may not be modified or amended other than by an agreement in writing signed by each Debtor and Holder.

(h)     Headings.  Article and Section headings used herein are for convenience of reference only, are not part of this Note and are not to affect the construction of, or to be taken into consideration in interpreting, this Note.

(i)     Severability.  If any provision of this Note is held illegal or unenforceable, the validity of the remaining provisions shall not be affected.

(j)     Fees and Expenses.  Subject to the Budget, Company agrees to promptly pay all costs, charges and expenses incurred by Holder and its assigns (including, without limitation, costs of collection, court costs and reasonable and documented attorneys' fees and disbursements) in connection with the enforcement of Holder's rights under this Note.  Subject to the Budget, Company agrees to pay, on a monthly basis, the reasonable fees and expenses of Holder's legal counsel arising from or related to the Note and the Cases.  Company agrees to pay the fees and expenses of the financial advisor, appraisers and other third-party consultants of Holder in connection with this Note and the Cases.

[signature pages follow]

(k)    <u>USA PATRIOT Act Notice</u>.  Holder hereby notifies each Debtor that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies a Debtor which information includes the name and address of such Debtor and other information that will allow the Holder to identify such Debtor in accordance with the USA PATRIOT Act.

IN WITNESS WHEREOF, each Debtor, intending to be legally bound, has duly executed and delivered this Note on the date first written above.

CLUB VENTURES INVESTMENTS LLC


By:_____
Name:
Title:


CLUB VENTURES II, LLC


By:_____
Name:
Title:


CV 2, LLC


By:_____
Name:
Title:


CV II GYM, LLC


By:_____
Name:
Title:

[SIGNATURE PAGE OF JUNIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION PROMISSORY NOTE]

CLUB VENTURES III, L.L.C.

By:_____
Name:
Title:


CV 3, LLC

By:_____
Name:
Title:


CV III GYM, LLC

By:_____
Name:
Title:


CLUB VENTURES IV, LLC

By:_____
Name:
Title:


CV 4 LEASING, LLC

By:_____
Name:
Title:


CV IV GYM, LLC

By:_____
Name:
Title:


[SIGNATURE PAGE OF JUNIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION PROMISSORY NOTE]

CLUB VENTURES VI, LLC


By:_____
Name:
Title:


CV VI, LLC


By:_____
Name:
Title:


CV VII GYM, LLC


By:_____
Name:
Title:


CLUB VENTURES VIII, LLC


By:_____
Name:
Title:


CV VIII GYM, LLC


By:_____
Name:
Title:


CLUB VENTURES X, LLC


By:_____
Name:
Title:

[SIGNATURE PAGE OF JUNIOR SECURED SUPER-PRIORITY
DEBTOR-IN-POSSESSION PROMISSORY NOTE]

CV X GYM, LLC


By:_____
Name:
Title:


DB 85 GYM CORP.


By:_____
Name:
Title:



**AGREED AND ACKNOWLEDGED:**



LBN HOLDING LLC


By:_____
Name:  John D. Howard,
           Authorized Signatory

**Schedule 1**

**PRINCIPAL AMOUNT OF NOTE AND PAYMENTS OF PRINCIPAL**

| Date | Original Principal Amount of Note | Amount of Principal Borrowed | Amount of Principal Repaid | Unpaid Principal Balance of Note | Notation Made By |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**The Budget**