**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLUB VENTURES INVESTMENTS LLC, *et al.*,[1] | ) | Case No. 11-10891 (ALG) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT PLAN OF**
**REORGANIZATION OF THE DEBTORS UNDER CHAPTER 11**
**OF THE BANKRUPTCY CODE**

Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

David B. Shemano, Esq.
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

Counsel for Debtors and Debtors-in-Possession

Dated: Los Angeles, California
        August __, 2011

---

[1] Jointly Administered with Case Nos.: 11-10892; 11-10894; 11-10893; 11-10896; 11-10895; 11-10897; 11-10900; 11-10898; 11-10899; 11-10901; 11-10902; 11-10903; 11-10905; 11-10904; 11-10906; 11-10907; 11-10908.

# TABLE OF CONTENTS

*Page No.*

**I. INTRODUCTION** ........................................................................................................ 2

    *A. Purpose of This Document* ..................................................................................... 2

        1. **WHO CAN VOTE OR OBJECT** ....................................................... 2

        2. **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION** ......................................

        3. **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY** ........................................................................................... 3

        4. **WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN** ........................................... 3

        5. **WHAT IS THE EFFECT OF CONFIRMATION, AND** ...................... 3

        6. **WHETHER THIS PLAN IS FEASIBLE** ........................................ 3

    *B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing* ................... 3

        1. Time and Place of the Confirmation Hearing ................................................. 3

        2. Deadline For Voting For or Against the Plan ................................................. 3

        3. Deadline For Objecting to the Confirmation of the Plan ................................. 4

        4. Identity of Person to Contact for More Information Regarding the Plan ........... 4

    *C. Disclaimer* ............................................................................................................ 4

**II. BACKGROUND** ....................................................................................................... 4

    *A. Description and History of the Debtors' Businesses* ................................................ 4

    *B. Debtors' Capital Structure and Significant Claims* ................................................. 6

        1. Bank of America ........................................................................................ 6

        2. LBN Holding LLC ..................................................................................... 6

        3. Praesidian ................................................................................................. 7

        4. Capital Leases ........................................................................................... 7

        5. Unsecured Debt .......................................................................................... 7

        6. Berkowitz Claims ....................................................................................... 8

    *C. Principals/Affiliates of Debtors' Businesses* ......................................................... 8

    *D. Management of the Debtors Before and After the Bankruptcy* ................................. 8

        1. Prepetition Management of the Debtors ....................................................... 8

        2. Management of the Debtors After The Chapter 11 Filing ............................... 8

    *E. Events Leading to Chapter 11 Filing* .................................................................... 8

    *F. Significant Events During the Bankruptcy* ............................................................ 10

        1. Bankruptcy Proceedings ............................................................................ 10

            a. Administrative Matters ........................................................................ 10

            b. Appointment of Creditors' Committee .................................................. 11

            c. Debtor in Possession Financing and Cash Collateral Motion .................. 11

            d. Motion to Pay Prepetition Employee Wages and Benefits ...................... 11

            e. Motion for Order Authorizing (1) Continued Use of Existing Cash Management System, (2) Maintenance of Prepetition Bank Accounts, and (3) Continued Use of Existing Forms ...................................................................................... 11

            f. Motion Regarding Adequate Assurance of Utilities ............................... 12

            g. Motion Regarding Customer-Related Programs and Practices ................. 12

            h. Motion to Extend Time to Assume or Reject Non-Residential Real Property

      Leases .................................................................................................................... 12

      i. Motion to Assume Certain Fitness Center Leases ........................................ 12

      j.Prepetition Payment of Priority Tax Claim ................................................. 12

      k. Bar Dates for Claims ................................................................................. 13

      l. Objections to Claims .................................................................................. 13

      m. Professionals ............................................................................................ 13

      n. Pending Adversary Proceedings ............................................................... 14

  2.    Other Legal Proceedings ................................................................................ 14

      a. Cooke/Rodino ........................................................................................... 14

      b. Berkowitz ................................................................................................. 14

      c. Two Trees Management ............................................................................ 15

      d. Raphael Moeller ....................................................................................... 15

  3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers ...................... 15

  4.    Procedures Implemented to Resolve Financial Problems ................................ 15

  5.    Current and Historical Financial Conditions .................................................. 16

**III.  SUMMARY OF THE PLAN OF REORGANIZATION** ............................................. 16

  **A.**    *Joint Consolidated Plan* ................................................................................ 16

  **B.**    *What Creditors and Interest Holders Will Receive Under The Proposed Plan* ............ 17

  **C.**    *Unclassified Claims* ...................................................................................... 17

  1.    Statutory Fees ................................................................................................. 17

  2.    Priority Tax Claims ........................................................................................ 18

  3.    Administrative Claims, Including Professional Administrative Claims ...................... 18

  4.    Deadlines For Filing Administrative Claims .................................................. 20

      a. Pre-Effective Date Claims and Expenses .................................................. 20

      b. Post-petition Tax Claims ........................................................................... 20

      c. Professional Fees ....................................................................................... 21

  **D.**    *Classified Claims and Interests* .................................................................... 21

  1.    Classes of Priority Unsecured Claims ............................................................ 22

  2.    Classes of Secured Claims .............................................................................. 23

      a. BofA Secured Claim .................................................................................. 23

      b. LBN Secured Claim .................................................................................. 23

      c. Praesidian Secured Claim .......................................................................... 24

      d. Other Secured Claims ................................................................................ 24

  3.    Classes of Unsecured Claims .......................................................................... 25

      a. Member Claims ......................................................................................... 25

      b. Convenience Claims .................................................................................. 26

      c. General Unsecured Claims ......................................................................... 26

      d. Insured Claims ........................................................................................... 26

      e. Subordinated Claims .................................................................................. 27

  4.    Class of Interest .............................................................................................. 27

      a. Interests in the Subsidiary Debtors ........................................................... 27

      b. Series B Preferred Interests in CVI ........................................................... 27

      c. Series A Preferred Interests in CVI ........................................................... 28

      d. Class C. Interests in CVI ............................................................................ 28

      e. Class B Interests in CVI ............................................................................ 28

      f. Class A Interests in CVI ............................................................................ 28

5. Intercompany Claims ................................................................................................. 29
6. Alternative Treatment ............................................................................................... 29
7. Special Provision Regarding Unimpaired Classes of Claims ..................................... 29
E. **Means of Performing the Plan** ....................................................................................... 29
1. Continued Legal Existence and Revesting of Assets .................................................. 29
2. Sources of Cash for Distribution. .............................................................................. 29
3. Amended CVI Operating Agreement. ......................................................................... 30
4. Section 1145 Exemptions. .......................................................................................... 30
5. Corporate Action. ...................................................................................................... 30
6. Preservation of Causes of Action. .............................................................................. 30
7. Effectuating Documents; Further Transactions. ......................................................... 30
8. Exemption From Certain Transfer Taxes and Recording Fees. ................................... 31
9. Further Authorization. ................................................................................................ 31
10. Dissolutiono of Creditors' Committee. ...................................................................... 31
3. Officers and Directors of Reorganized Debtors .......................................................... 31
F. **ProvisionsGoverning Distributions** ................................................................................ 32
1. Allowed Claims and Interests .................................................................................... 32
2. Distributions for Claims Allowed as of the Effective Date ......................................... 32
3. Undeliverable Distributions. ...................................................................................... 32
4. Interest and Penalties on Claims. ............................................................................... 33
5. Means on Cash Payment. ........................................................................................... 33
6. Withholding and Reporting Requirements. ................................................................. 33
7. Setoffs. ...................................................................................................................... 33
G. **Procedures for Resolving Disputed, Contingent, and Unliquidated Claims** ................. 34
1. Authority and Deadline .............................................................................................. 34
2. Creation of Reserves for Disputed Claim ................................................................... 34
3. Estimation of Claims. ................................................................................................. 34
4. Distribution Related to Disputed Claims. ................................................................... 34
5. Disallowed Claims. .................................................................................................... 35
H. **Risk Factors** ................................................................................................................... 35
I. **Other Provisions of the Plan** ......................................................................................... 35
1. Assumption/Rejection of Executory Contracts and Unexpired Leases ....................... 35
2. Changes in Rates Subject to Regulatory Commission Approval .................................. 37
3. Retention of Jurisdiction. ........................................................................................... 37
J. **Tax Consequences of Plan** ............................................................................................. 39
IV. **CONFIRMATION REQUIREMENTS AND PROCEDURES** ............................................ 39
A. **Who May Vote or Object** ............................................................................................... 39
1. Who May Object to Confirmation of the Plan ............................................................ 39
2. Who May Vote to Accept/Reject the Plan .................................................................. 40
   a. What Is an Allowed Claim/Interest ....................................................................... 40
   b. What Is an Impaired Claim/Interest ...................................................................... 40
3. Who is <u>Not</u> Entitled to Vote ................................................................................... 40
4. Who Can Vote in More Than One Class ..................................................................... 41
5. Votes Necessary to Confirm the Plan ......................................................................... 41
6. Votes Necessary for a Class to Accept the Plan .......................................................... 41
7. Treatment of Nonaccepting Classes ............................................................................ 41

    8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es)................... 41
*B.*    *Liquidation Analysis* ................................................................................................ 42
*C.*    *Feasibility* ................................................................................................................. 42
**V.  CONDITION TO CONFIRMATION OF THE PLAN**....................................................... 43
*A.*    *Condition to Entry of the Confirmation Order* ....................................................... 43
*B.*    *Conditions to Effective Date* ................................................................................... 43
*C.*    *Waiver of Condition* ................................................................................................. 44
**VI. EFFECT OF CONFIRMATION OF PLAN** ..................................................................... 44
*A.*    *Binding Effect* .......................................................................................................... 44
*B.*    *Revesting of Assets* .................................................................................................. 44
*C.*    *Releases by the Debtors, their Estates and the Reorganized Debtors* ........................... 45
*D.*    *Discharge of the Debtors* ......................................................................................... 45
*E.*    *Injunction* ................................................................................................................. 46
*F.*    *Exculpation and Limitation of Liability* .................................................................. 46
*G.*    *Term of Bankruptcy Injunction or Stays* ................................................................ 47
*H.*    *Post-Effective Date Retention of Professionals* ..................................................... 47
*I.*    *Effect of Release, Discharge and Injunction on Unimpaired Claims* ........................... 47
*J.*    *Amendment Or Modification of This Plan* ............................................................... 47
*K.*    *Post-Confirmation Status Report* ............................................................................ 48
*L.*    *Post-Confirmation Conversion/Dismissal* .............................................................. 48
*M.*   *Final Decree and Closing The Chapter 11 Cases* .................................................... 48

EXHIBIT A - CVI OPERATING AGREEMENT
EXHIBIT B - MERIDIAN MANAGEMENT AGREEMENT
EXHIBIT C - LIST OF CLAIMS
EXHIBIT D - LIQUIDATION ANALYSIS.
EXHIBIT E - FINANCIAL STATEMENT ENDING DECEMBER 31, 2009
EXHIBIT F - FINANCIAL STATEMENT ENDING DECEMBER 31, 2010
EXHIBIT G - FINANCIAL STATEMENT FOR MAY 2011
EXHIBIT H - SECURITIES PURCHASE AGREEMENT
EXHIBIT I - AMENDED CVI OPERATING AGREEMENT.
EXHIBIT J - CASH FLOW PROJECTION THROUGH OCTOBER 2012
EXHIBIT K - LIST OF EXECUTORY CONTRACTS
EXHIBIT L - TAX CONSEQUENCES

# I.

## INTRODUCTION

Club Ventures Investments LLC ("***CVI***") and certain of its subsidiaries, Club Ventures II, LLC, CV 2, LLC, CV II Gym, LLC, Club Ventures III, L.L.C., CV 3, LLC, CV III Gym, LLC, Club Ventures IV, LLC, CV 4 Leasing, LLC, CV IV Gym, LLC, Club Ventures VI, LLC, CV VI, LLC, CV VII Gym, LLC, Club Ventures VIII, LLC, CV VIII GYM, LLC, Club Ventures X, LLC, CV X Gym, LLC, and DB 85 Gym Corp. (collectively, the "***Debtors***"), are debtors and debtors in possession in jointly-administered chapter 11 bankruptcy cases (the "***Chapter 11 Cases***").  The Debtors commenced voluntary bankruptcy cases by filing chapter 11 petitions under the United States Bankruptcy Code ("***Bankruptcy Code***"), 11 U.S.C. § 101 *et. seq.*, on March 2, 2011 (the "***Petition Date***").  The Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") authorized the joint administration of the Debtors' cases by Order entered on March 4, 2011.

Chapter 11 allows the Debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  The plan may provide for the Debtors to reorganize by continuing to operate, to liquidate by selling assets of the estates, or a combination of both.  The Debtors (collectively, the "***Plan Proponents***") are the parties proposing the consolidated chapter 11 plan (the "***Plan***") sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.  The Disclosure Statement has been approved by the Bankruptcy Court, and is provided to help you understand the Plan.  Any capitalized terms used in this Disclosure Statement and not defined shall have the meaning ascribed in the Plan.

The Plan is a reorganizing Plan.  In other words, subject to the provisions of the Plan, the Debtors will emerge from bankruptcy as an operating entity and continue to operate their business.   The Debtors will make payments to creditors from Cash on hand, Cash generated from the operation of the business, and the Exit Facility, which is described below.  The Effective Date of the proposed Plan is expected to be _____ __, 2011.

### A.    Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

### READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

**1.    WHO CAN VOTE OR OBJECT,**

**2.    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

3.      THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

4.      WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

5.      WHAT IS THE EFFECT OF CONFIRMATION, AND

6.      WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

**1.      Time and Place of the Confirmation Hearing**

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on _____ __, 2011, at _____ _.m., in Courtroom 617, U.S. Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.

**2.      Deadline for Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: Kathryn F. Russo, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067.

Your ballot must be received by 4:00 p.m., Pacific Time, on _____ or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon: (1) counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: David B. Shemano, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067; (2) counsel for the Official Committee of Unsecured Creditors (the "*Creditors' Committee*"), Klestadt & Winters, LLP, Attention: Tracy L. Klestadt, Esq., 570 Seventh Avenue, 17th Floor, New York, NY 10018; (3) counsel for LBN, Moses & Singer LLP, Attention: Howard R. Herman, Esq., Alan E. Gamza, Esq. and Kent C. Kolbig, Esq., The Chrysler Building, 405 Lexington Avenue, New York, New York 10174; (4) counsel for Praesidian, Morrison Cohen LLP, Attention: Stephen Budow, Esq., and Joe Moldovan, Esq., 909 Third Avenue, New York, New York 10022; and (5) the Office of the United States Trustee for the Southern District of New York, attention: Nazar Khodorovsky, Esq., 33 Whitehall Street, 21st Floor, New York, New York 10004, by _____.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: Kathryn F. Russo, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067, krusso@pwkllp.com.

### C. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtors' books and records, financial statements, valuation of the Company by Focal Point Securities, LLC, and documents filed with the Bankruptcy Court. The information contained in this Disclosure Statement is provided by the Plan Proponents. The Plan Proponents represent that everything stated in the Disclosure Statement is true to the best of the Plan Proponents' knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

## II.

## BACKGROUND

### A. Description and History of the Debtors' Businesses

CVI and its twenty-one (21) subsidiaries (the "*Subsidiaries*", together with CVI, the "*Company*") are a premiere boutique gym company operating "DavidBartonGyms," stylish, upscale fitness clubs in four metropolitan areas in the United States. The first David Barton Gym was opened in 1992. The Company primarily targets individuals in the 18-40 year age range. As of the Petition Date, the Company operated six fitness clubs in the following locations: (a) three fitness clubs in New York, New York; (b) one fitness club in Chicago, Illinois; (c) one fitness club in Miami Beach, Florida; and (d) one fitness club in Bellevue,

Washington.  Collectively, the clubs serve approximately 13,500 members (the "***Club Members***").

The majority of the Company's revenues derive from the commercial operation of the fitness centers.  The Company's model is differentiated from other commercial fitness centers by its focus on personal training.  As a result, the revenue collected per member is higher, on average, than competing fitness centers.

The Company's consolidated net revenue for the twelve months ending December 31, 2010, was approximately $28.3 million.  The Company has three principal sources of revenue:

- *Membership Services Revenue*.  The Company's primary source of revenue is payments for membership services provided at each of its fitness clubs (the "***Membership Services Revenue***").  Membership Services Revenue includes amounts paid by Club Members in the form of membership fees and dues, as well as revenue generated from initiation fees.  Membership services revenue comprised 51.7% of the Company's revenue for the twelve months ending December 31, 2010.  Total Membership Services Revenue for the twelve months ending December 31, 2010 was approximately $14.6 million, a 13.2% increase from approximately $12.9 million for the twelve months ending December 31, 2009.  The increase in Member Services Revenue was primarily due to the opening of New York and Bellevue fitness centers in the second half of 2009.

- *Personal Training Revenue*.  The second major source of revenue for the Company is payments received for personal training services provided at each of the fitness clubs (the "***Personal Training Revenue***").  Personal Training Revenue includes amounts paid by Club Members who receive personal training sessions.  Personal Training Revenue comprised approximately 43.8% of the Company's revenue for the twelve months ending December 31, 2010.  Total Personal Training Revenue for the twelve months ending December 31, 2010 was approximately $12.4 million, representing a 22% increase from approximately $10.2 million for the twelve months ending December 31, 2009.  The increase in Personal Training Revenue was primarily due to the opening of New York and Bellevue fitness centers in the second half of 2009.

- *Sale of Products and Other Service Revenue*.  The Company also generates revenue through the sale of products at its fitness center retail stores, including branded and third-party nutrition products, juice bar nutrition drinks and fitness-related convenience products, such as clothing.  The Company also offers spa services at one of its locations.  Revenue from sale of products and other services comprised 4.5% of the Company's revenue for the twelve months ending December 31, 2010.  Revenue from sale of products and other services for the twelve months ending December 31, 2010 was approximately $1.3 million, representing a 62.5% increase from approximately $0.8 million for the twelve months ending December 31, 2009.

Although the Company formally consists of a parent company and subsidiaries, the Company has historically been, and presently continues to be, effectively operated as a single enterprise and creditors have traditionally treated the Company as a single enterprise. The Company's audited financial statements are prepared on a consolidated basis. CVI and the Subsidiaries have common management. While substantially all of the Subsidiaries maintain separate collection accounts, funds deposited into the collection accounts are swept daily into a CVI account and all disbursements are made from a CVI disbursement account.

### B. Debtors' Capital Structure and Significant Claims

#### 1. Bank of America

Pursuant to that certain Promissory Note (the "***BofA Note***"), dated June 29, 2004, as amended, between CVI, as borrower, and Bank of America, N.A. ("***BofA***"), as lender, as amended from time to time, and that certain Loan Agreement (the "***BofA Loan Agreement***"), dated as of August 4, 2009, between CVI and BofA, as amended from time to time, BofA agreed to make loans to CVI (the "***BofA Loans***"). BofA also has outstanding a $1.5 million letter of credit for the account of Debtors (all amounts owing thereunder, together with all amounts owing under the BofA Note and the BofA Loan Agreement, the "***BofA Obligations***"). As of the Petition Date, the BofA Obligations were in the approximate amount of $11,115,000.

To induce BofA to extend the BofA Loans and as security for the repayment of all amounts due under the BofA Obligations, (i) pursuant to that certain Pledge Agreement (the "***BofA Pledge Agreement***"), dated June 29, 2004, between BofA and CVI, CVI granted to BofA a lien and security interest (the "***BofA Liens***") in substantially all of its assets, as more fully described in the BofA Pledge Agreement, and (ii) John D. Howard ("***JDH***") issued a Continuing and Unconditional Guaranty, dated June 29, 2004, and a Continuing and Unconditional Guaranty, dated March 27, 2009 (together, the "***JDH Guaranty***"), guaranteeing all amounts owed under the BofA Note.

The Debtors acknowledged the validity of the BofA Obligations and BofA Liens in the DIP/Cash Collateral Order. Under the DIP/Cash Collateral Order, the deadline for any third party to commence an action challenging the validity of the BofA Obligations or BofA Liens was June 26, 2011, and no action was commenced by that date.

#### 2. LBN Holding LLC

Pursuant to agreements entered into between the Debtors and LBN Holding LLC (as successor in interest to JDH) from time to time (collectively, the "***LBN Agreements***"), LBN has loaned amounts to or for the benefit of the Debtors from time to time. Included among the LBN Agreement is a Reimbursement Agreement between JDH and the Debtors dated June 27, 2004, which provides that if JDH is obliged to make any payment under the JDH Guaranty, the Debtors must reimburse LBN. The amounts owed by the Debtors to LBN under the LBN Agreements are referred to as the "***LBN Obligations***". The LBN Obligations are subordinated to the BofA Obligations pursuant to that certain Subordination Agreement, dated on or about March 5, 2009. As of the Petition Date, the outstanding noncontingent LBN Obligations were

in an amount not less than $22,418,294.61, and the outstanding contingent LBN Obligations were in an amount not less than $13,202,431.16.

The LBN Obligations are secured by a lien on and security interest in substantially all of the assets of Debtors and by a pledge of the equity interests in all or substantially all of the Debtors (the "***LBN Liens***").

The Debtors acknowledged the validity of the LBN Obligations and LBN Liens in the DIP/Cash Collateral Order.  Under the DIP/Cash Collateral Order, the deadline for any third party to commence an action challenging the validity of the LBN Obligations or LBN Liens was June 27, 2011, which deadline was extended solely with respect to the Creditors' Committee to July 29, 2011, and no action was commenced by that date.

### 3. Praesidian

Pursuant to security and note purchase agreements executed in 2005, 2006, 2007, 2008 and 2009 (the "***Praesidian Agreements***"), CVI executed a series of promissory notes in favor of Praesidian Capital Investors, LP, Praesidian II SPV 1 LP, and Praesidian II SPV 2, LP (collectively, "***Praesidian***"). The amounts owed by the Debtors to Praesidian under the Praesidian Agreements are referred to as the "***Praesidian Obligations***".  The Praesidian Obligations are subordinated to the BofA Obligations pursuant to that certain Subordination Agreement, dated on or about March 5, 2009.  As of the Petition Date, the outstanding Praesidian Obligations were in the approximate amount of $30,626,715.70.

The Praesidian Obligations are guaranteed by each of the Subsidiaries and are secured by a lien on and security interest in substantially all of the assets of the Debtors (the "***Praesidian Liens***").

The Debtors acknowledged the validity of the Praesidian Obligations and Praesidian Liens in the DIP/Cash Collateral Order.  Under the DIP/Cash Collateral Order, the deadline for any third party to commence an action challenging the validity of the Praesidian Obligations or Praesidian Liens was June 27, 2011, which deadline was extended solely with respect to the Creditors' Committee to July 29, 2011, and no action was commenced by that date.

### 4. Capital Leases

The Debtors lease various equipment under capital leases that expire over a two year period from the Petition Date.  As of the Petition Date, the Company was liable for approximately $860,000 in debt relating to the equipment leases.

### 5. Unsecured Debt

As of the Petition Date, the Debtors' consolidated unsecured debt, consisting primarily of landlords, trade vendors and professionals, was approximately $6.1 million.  As set forth below, that amount was substantially reduced during the Chapter 11 Cases.

### 6. Berkowitz Claims

In 2005, the Debtors hired Mark Berkowitz ("***Berkowitz***") to serve as the Debtors' Chief Financial Officer. The Debtors terminated Berkowitz as CFO in 2007. In 2008, Berkowitz commenced litigation against CVI, David Barton and JDH in the Supreme Court of the State of New York, County of New York, captioned *Mark Berkowitz v. Club Ventures Investments LLC d/b/a David Barton Gym, David Barton and John Howard*, Index No. 602824/07, arising from his termination. JDH was previously dismissed from the action. Berkowitz asserts approximately $500,000 in wage benefit claims, and approximately $3,000,000 in damages arising from or related to his alleged entitlement to Class B Interests in CVI.

### C. Principals/Affiliates of Debtors' Businesses

CVI owns 100% of the membership or shareholder interest in each of the Subsidiaries. CVI has five classes of membership interests: Class A, Class B, Class C, Series A Preferred, and Series B Preferred. Class A membership units are held by David Barton and LBN. Class B membership units are held by Mark Berkowitz. Class C membership units are held by Elan Ben-Avi. Series A Preferred membership interests are held by LBN. Series B Preferred membership interests are held by TRL Holdings Inc., an affiliated company of Praesidian. In addition, LBN and Praesidian hold warrants to purchase Class A membership units. The respective rights and priorities of the different membership classes regarding distributions are set forth in the CVI Operating Agreement, a copy of which is attached as Exhibit A. The membership interests are nonvoting. Instead, the Operating Agreement provides that CVI will be managed by a Board of Managers consisting of (a) a designee of Praesidian, (b) a designee of David Barton, (c) a designee of JDH, and (d) Elan Ben-Avi. On December 24, 2010, Elan Ben-Avi resigned as a Manager and has not yet been replaced.

### D. Management of the Debtors Before and After the Bankruptcy

#### 1. Prepetition Management of the Debtors

From its formation in 1992 through present, David Barton served as the Company's Chief Executive Officer. Mark Berkowitz served as the Company's Chief Financial Officer from December 2005 through June 2007. From March 2009 through the present, Stephen Schwartz served as CFO. In 2008, the Company hired Elan Ben-Avi as the Chief Operating Officer and he served through December 2010. On or about December 1, 2010, Charles Grieve was hired as a consultant and serves as the Chairman.

#### 2. Management of the Debtors After the Chapter 11 Filing

After the Petition Date, the Debtors have been managed by Charles Grieve as Chairman, David Barton as CEO, and Stephen Schwartz as CFO.

### E. Events Leading to the Chapter 11 Filing

In 2005, the Company had fitness clubs in four locations: (a) two in New York, (b) one in Chicago, and (c) one in Miami Beach, totaling approximately 60,000 square feet of space. In

the following years, the Company decided to embark on an ambitious expansion program. Over the next two years, the Company signed seven new real estate leases representing an additional 198,000 square feet of space. Six of the leases were for new fitness centers and one lease was for the corporate office. The real estate leases for the fitness centers had more square footage than the average size of the Company's then existing facilities and the price per square foot was almost twice what the Company was paying for its then existing fitness centers.

To fund the expansion plan, the Company needed to raise capital to provide for capital expenditures, construction build-outs and working capital. In 2006, the Company hired Berkowitz to serve as CFO. Prior to joining the Company, Berkowitz acted as a consultant to the Company. Mr. Berkowitz was responsible for negotiating the leases and the leases were executed prior to having committed funding for these projects. The Company engaged an investment bank, Jefferies Group, Inc. ("**Jefferies Group**"), to represent the Company in its efforts to raise capital from parties other than the current shareholders. Jefferies Group, however, was unable to raise any outside capital.

In 2006 and 2007, the Company received approximately $20 million in funding from LBN and Praesidian. In that period, the Company lost approximately $11 million from operations, spent $6.6 million to fund the building costs for its Miami Beach location and paid off approximately $2.4 million in tax liabilities. The Miami Beach project fell behind schedule and ran over budget.

By 2008, the Company was incurring substantial losses from operations and generating negative cash flow. In 2008, the Company decided to hire an outside restructuring firm, Getzler Henrich & Associates LLC ("**Getzler Henrich**") to assess the financial viability of the Company. Getzler Henrich determined that the primary causes for the Company's poor financial performance was its lack of an experienced management team, lack of internal controls and lack of policies and procedures. In order to address these issues the Company decided to hire a COO. The Company also realized that it was financially necessary to terminate some of the newly signed real estate leases.

Elan Ben-Avi was hired as the COO in 2008. Corporate overhead increased from approximately $3.0 million to approximately $6.0 million annually over the next two year period. In addition, the Company opened three new locations during that period. The Debtors' projections called for significant growth in revenue from the new locations, which would cover the increased costs of overhead. For the period of 2008-2009, the Company's revenue grew less than projected and did not adequately cover expenses incurred over this same period. Also in 2008, the former CFO, Mark Berkowitz, commenced litigation against the Company arising from his termination and claimed $3.5 million in damages.

In 2008, while the Company lost approximately $13 million from operations, it received $17 million in additional financing from BofA, Praesidian, and LBN. The Miami Beach fitness center opened in October 2008, and the Company focused its financial resources on opening two new fitness centers in New York, New York and Bellevue, Washington.

The Company opened the New York fitness center in July 2009 and the Bellevue center in September 2009. That same year the Company had a net loss of $19 million and failed to

comply with the minimum EBITDA and other financial covenants, resulting in a default on the Praesidian Indebtedness. Notwithstanding the default, the Company received an additional $15.7 million in funding from BofA, Praesidian, and LBN.

In 2010, the Company's projections called for an approximately 20% increase in revenue with a similar expense structure as in 2009. The Company, however, fell short of its revenue projections for 2010 and was required to borrow $7.5 million from LBN to continue to operate.

By the fourth quarter of 2010, the Company determined to implement a significant change to its business plan. On or about December 1, 2010, CVI entered into a Management Agreement with Meridian Sports Club California, LLC (collectively with all affiliates, "***Meridian***"). Meridian owns and operates 12 fitness centers in California and Hawaii. Pursuant to the Meridian Management Agreement, Charles Grieve, the principal of Meridian, agreed to serve as the Chairman of CVI. Because of the change of direction, Mr. Ben-Avi, the then existing COO, resigned.

The Meridian Management Agreement contemplates a strategic alliance between the Company and Meridian that will be beneficial to both entities. For example, in the coming months, Meridian will be opening a fitness center in Las Vegas as a David Barton Gym pursuant to a licensing agreement with the Company. A copy of the Meridian Management Agreement is attached as Exhibit B.

After the Meridian Management Agreement was entered into, the Company, under the leadership of Mr. Grieve, prepared a comprehensive plan to implement a restructuring of the Company, with the goal of improving the Debtors' financial position for 2011 and beyond. The comprehensive plan contemplated a financial restructuring of the balance sheet, an operational restructuring of the Company's fitness centers and significant reductions in certain corporate costs. The Company also began introducing new initiatives to enhance revenue and cash flow.

After careful analysis, taking into consideration the existence of pending litigation, the need to modify and/or terminate existing leases, and the need to convert certain existing debt into equity, the Company concluded that its restructuring plan should be implemented through a chapter 11 proceeding and the Chapter 11 Cases were commenced on March 2, 2011.

F.      **Significant Events During the Bankruptcy**

1.      **Bankruptcy Proceedings**

a)      **Administrative Matters**

On March 2, 2011, the Debtors filed emergency motions seeking joint administration of their eighteen cases, which motions were granted by Order entered on March 4, 2011, and an emergency motion seeking approval of limited notice procedures, which motion was granted by Order entered on March 28, 2011.

Throughout these cases, the Debtors materially have complied with, and continue to comply with, all of their duties under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure ("***FRBP***") an all applicable guidelines of the Office of the United States Trustee

"**OUST**"). On March 23, 2011, the Debtors submitted their 15-Day Packages to the OUST, and the Debtors filed their complete Schedules of Assets and Liabilities and Statement of Financial Affairs on April 22, 2011. The Debtors have submitted or will submit prior to confirmation of the Plan all required monthly operating reports to the OUST. In addition, the Debtors have tendered all quarterly fees due and owing to the OUST.

### b) Appointment of Creditors' Committee

On March 18, 2011, the OUST appointed the Creditors' Committee. The members of the Creditors' Committee appointed were (1) The Bravern, LLC, (2) RCK, LLC d/b/a Good Air Commercial & Service Division, and (3) Polar Air Conditioning, Inc. The Creditors' Committee selected Klestadt & Winters, LLP, to serve as its counsel, and FTI Consulting, Inc., to serve as its financial advisor.

The Bravern, LLC is the landlord of the Debtors' facility in Bellevue, Washington. As set forth below, the Debtors reached agreement with The Bravern, LLC concerning the assumption of the lease and treatment of the cure claim, which agreement was approved by the Bankruptcy Court. Consequently, The Bravern, LLC resigned from the Creditors' Committee after approval of the lease assumption agreement and payment of the cure claim.

### c) Debtor in Possession Financing and Cash Collateral Motion

On March 2, 2011, the Debtors filed an emergency motion seeking authority to (1) utilize the cash held by their Estates and generated in the ordinary course of business, which cash may be considered "cash collateral" under the Bankruptcy Code, and (2) borrow up to $800,000 from LBN on a junior secured superpriority basis pursuant to section 364(c) and (d) of the Bankruptcy Code. After a hearing on March 3, 2011, the Bankruptcy Court entered an Interim Order on March 4, 2011, authorizing the Debtors to use cash collateral and borrow up to $200,000, and scheduled a continued hearing for March 24, 2011. After a hearing on March 24, 2011, the Bankruptcy Court entered a Second Interim Order on March 28, 2011, authorizing the Debtors to use cash collateral and borrow up to $400,000, and scheduled a continued hearing for April 27, 2011. After hearings on April 27, 2011, and June 1, 2011, the Bankruptcy Court entered a Final Order on June 1, 2011 (the "**DIP/Cash Collateral Order**"), authorizing the Debtors to use cash collateral and borrow up to $800,000.

### d) Motion to Pay Prepetition Employee Wages and Benefits

On March 2, 2011, the Debtors filed an emergency motion seeking authority to pay the administrative expenses and prepetition priority claims for wages, salaries, commissions and other compensation to their employees, and to honor and pay all employee benefits in accordance with the Debtors' prepetition employee benefit programs and policies. After a hearing on March 3, 2011, the Bankruptcy Court entered an Order on March 4, 2011, granting the motion.

### e) Motion for Order Authorizing (1) Continued Use of Existing Cash Management System, (2) Maintenance of Prepetition Bank Accounts, and (3) Continued Use of Existing Forms

On March 2, 2011, the Debtors filed an emergency motion seeking authority to (1) continue to use their prepetition cash management system, (2) designate, maintain and continue to use all of their existing bank accounts in the names and account numbers existing immediately prior to the commencement of the Chapter 11 Cases, (3) deposit funds in and withdraw funds from such accounts by check, wire transfer, direct electronic debit or credit, interbank transfer, or other customary manner, (4) treat their prepetition accounts for all purposes as debtor in possession accounts, and (5) continue to use correspondence and business forms existing immediately prior to the commencement of the Chapter 11 Cases without reference to their status as debtors in possession. After a hearing on March 3, 2011, the Bankruptcy Court entered an Interim Order on March 4, 2011 granting the motion. After a hearing on March 24, 2011, the Bankruptcy Court entered a Final Order on March 28, 2011 granting the motion.

### f) Motion Regarding Adequate Assurance of Utilities

On March 2, 2011, the Debtors filed an emergency motion seeking an order from the Bankruptcy Court authorizing the Debtors to provide adequate assurance, in the form of cash deposits, to the various utility companies providing service to the Debtors, and determining that the proposed deposits are adequate assurance of payment. After a hearing on March 24, 2011, the Bankruptcy Court entered an Order on March 28, 2011, granting the motion.

### g) Motion Regarding Customer-Related Programs and Practices

On March 2, 2011, the Debtors filed an emergency motion seeking authority from the Bankruptcy Court to perform their prepetition obligations related to various programs and practices currently in place with its customers (the "***Customer Programs***") and to continue, renew, replace, implement new, and/or terminate such of the Customer Programs as the Debtors deem appropriate, in the ordinary course of business. After a hearing on March 3, 2011, the Bankruptcy Court entered an Order, on March 4, 2011, granting the motion.

### h) Motion to Extend Time to Assume or Reject Non-Residential Real Property Leases

On May 17, 2011, the Debtors filed a motion for an extension of time to assume or reject non-residential real property leases. After a hearing on June 1, 2011, the Bankruptcy Court entered an Order on June 1, 2011, extending the time to assume or reject non-residential real property leases to September 28, 2011.

### i) Motion to Assume Certain Fitness Center Leases

The Debtors filed several motions for authority to assume various modified fitness center lease agreements. On April 27, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 600 West Chicago Avenue,

Chicago, Illinois.  On May 25, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at The Shops at The Bravern, Bellevue, Washington.  On June 1, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 2301-2399 Collins Avenue, Miami Beach, Florida.  On July 18, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 30 East 85th Street, New York,  New York.

### j)       Prepetition Payment of Priority Tax Claim

The Company historically did not pay sales tax on Membership Services Revenue generated in Florida.  However, in 2009 the Company reexamined whether sales tax was in fact owed on Membership Services Revenue in Florida.  In the summer of 2009, the State of Florida announced a sales tax amnesty program, which permitted companies to pay past due and owing sales tax without any penalties and minimal interest.   The Company determined to take advantage of the amnesty program and self-reported to the State of Florida a past due sales tax amount of approximately $225,000.  The Company agreed to a payment plan of approximately $20,000 per month.  As of the Petition Date, approximately $60,000 remained outstanding.  The Debtors, without any intention of violating the requirements of the Bankruptcy Code, and concerned that the State of Florida may have had the right to seek additional penalties and interest if the remaining monthly payments were not timely made, made postpetition payments pursuant to the amnesty agreement in March, April, and May 2011.  Upon realization that the payments were in technical violation of the Bankruptcy Code, the Debtors made the decision not to either request retroactive approval or to avoid the payments, but instead to disclose the payments in this Disclosure Statement and not take any further action.  The Debtors made this decision because under the Plan the State of Florida would have been entitled to the payments in any event on the Effective Date of the Plan.

### k)       Bar Dates for Claims

On April 13, 2011, the Debtors filed a motion requesting that the Bankruptcy Court establish a bar date for the filing of claims.  After a hearing on April 27, 2011, the Bankruptcy Court entered an Order on April 27, 2011, establishing June 15, 2011 as the deadline for filing proofs of claim against the Debtors' Estates, with certain specified exceptions.  On May 4, 2011, the Debtors prepared and served a notice of the claims bar date to all known creditors and parties on their Master Mailing Lists.

### l)       Objections to Claims

No objections to Claims have been filed by the Debtors, but the Debtors reserve their right to object to all Claims before and after Confirmation of the Plan.  The Debtors preserve their right to object to any Claims on any available grounds, including any claims, counterclaims, defenses, right to setoff, or other basis, in favor of any Debtor as against any claimant.  A list of the General Unsecured Claims against the Debtors is attached as Exhibit C. Included in Exhibit C is a list of the General Unsecured Claims against the Debtors to which the Debtors' anticipate filing objections.

**m)  Professionals**

The Bankruptcy Court has approved the employment of the following professionals:

| Name | Date Bankruptcy Court Approved Employment |
|---|---|
| Peitzman, Weg & Kempinsky LLP<br>2029 Century Park East, Suite 3100<br>Los Angeles, CA 90067<br><br>*Co-Bankruptcy Counsel to the Debtors* | April 26, 2011 |
| Golenbock Eiseman Assor Bell & Peskoe LLP<br>437 Madison Avenue<br>New York, New York 10022<br><br>*Co-Bankruptcy Counsel to the Debtors* | April 26, 2011 |
| Klestadt & Winters, LLP<br>570 Seventh Avenue, 17th Floor<br>New York, NY 10018<br><br>*Counsel to the Creditors' Committee* | April 21, 2011 |
| FocalPoint Securities, LLC<br>11150 Santa Monica Blvd., Suite 1550<br>Los Angeles, CA 90025<br><br>*Financial Advisors to the Debtors* | April 27, 2011 |
| FTI Consulting, Inc.<br>3 Times Square, 9th Floor<br>New York, NY 10036<br><br>*Financial Advisors to the Creditors' Committee* | June 6, 2011 |

**n)  Pending Adversary Proceedings**

Aside from the motions and proceedings related to the Plan and Disclosure Statement, there are no significant adversary proceedings or motions pending in the Bankruptcy Court.

**2.  Other Legal Proceedings**

In addition to the proceedings discussed above the Debtors have been or currently are involved in the following nonbankruptcy legal proceedings:

a)  <u>Cooke/Rodino</u>.  On or about January 11, 2011, Deborah R. Cooke and Christina M. Rodino (the "***Former Employees***") filed a complaint against DB 85

Gym Corp., CV II Gym, LLC, and CV VI, LLC in the District Court for the Southern District of New York alleging claims based upon sexual orientation discrimination and gender discrimination (the "***Employment Litigation***").  On April 6, 2011, the Former Employees filed a motion for relief from stay to pursue the Employment Litigation.  After a hearing on April 27, 2011, the Bankruptcy Court entered an Order on May 10, 2011, denying the motion with leave to renew in July 2011.  On July 19, 2011, the Former Employees renewed their motion for relief from to pursue the Employment Litigation and the Debtors timely objected to such renewed motion.  A hearing is scheduled for August 3, 2011 at 11:00 a.m.

        b)      <u>Berkowitz</u>.  On or about November 30, 2007, Mark Berkowitz, the Debtors' former Chief Financial Officer, filed an amended complaint against CVI, David Barton, and JDH in the New York State Supreme Court alleging an interest in and claims against CVI for approximately $3.5 million (the "***Berkowitz Litigation***").  JDH was subsequently dismissed from the Berkowitz Litigation.  On May 13, 2011, Berkowitz filed a motion for relief from stay to pursue the Berkowitz Litigation.  After a hearing on June 1, 2011, the Bankruptcy Court entered an Order on June 14, 2011, denying the motion.

        c)      <u>Two Trees Management</u>.  On or about February 17, 2011, Two Trees Management filed a complaint against Club Ventures VI, LLC in the Civil Court of the City of New York alleging a claim for unpaid rent at the Debtors' corporate office located at 50 West 23rd Street, New York.  The litigation is currently stayed.

        d)      <u>Raphael Moeller</u>.  On January 11, 2010, Raphael Moeller filed a complaint against DB 85 Gym Corp. in the Supreme Court of the State of New York alleging a claim for disability.  The litigation is currently stayed.

### 3.      Actual and Projected Recovery of Preferential or Fraudulent Transfers

Except as otherwise provided in the Plan, all of the Debtors' rights, title, and interest in any litigation claims or actions arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law (the "***Avoidance Actions***"), whether (a) alleged, (b) pending, or (c) that may be alleged in a future complaint, are preserved by the Plan.  The Debtors currently have no intention of prosecuting any Avoidance Actions, but reserve the right to prosecute all Avoidance Actions.

### 4.      Procedures Implemented to Resolve Financial Problems

Since entering into the Meridian Management Agreement in December 2010, the Debtors have implemented a comprehensive operational restructuring, including consolidating operations, reducing staff, eliminating expenses, and undertaking other cost-savings measures.  Compared to expenses made in 2010, the Debtors estimate that the restructuring has resulted in a reduction of approximately $3,125,000 in expenses through May 31, 2011, and will ultimately result in an additional $3,000,000 reduction through December 31, 2011.

During the Chapter 11 Cases, the Debtors successfully renegotiated several of their real property leases, which made continued operations at the locations feasible.  In summary:

a)  The Shops at The Bravern, Bellevue, Washington.  The landlord waived over $1.5 million in arrearages and agreed to a reduction in monthly rent resulting in a savings of approximately $1.3 million in 2011 alone.

b)  600 West Chicago Avenue, Chicago, Illinois.  The landlord waived four months rent resulting in a savings of approximately $300,000.

c)  2301-2399 Collins Avenue, Miami Beach, Florida.  The landlord waived approximately $1.6 million in arrearages, agreed the remaining arrearage of approximately $800,000 could be paid over 96 months, and significantly reduced the monthly rent for the remainder of the term.

d)  30 East 85th Street, New York, New York.  The landlord agreed to reduce monthly rent by $10,000 per month for a two year period beginning April 2011 (with a corresponding two year increase beginning in 2018).

Finally, pursuant to the Plan, the Debtors will be deleveraging their balance sheet by restructuring the outstanding amounts owed to LBN and Praesidian.  As a result, after the Effective Date, the Debtors will have a markedly lower debt service obligation going forward.

### 5.  Current and Historical Financial Conditions

The liquidation value of the Debtors' assets is summarized on Exhibit D.  The summary of the Debtors' assets set forth on Exhibit D has not been audited.

The Debtors' audited financial statements for the year ending December 31, 2009, are attached as Exhibit E.  The Debtors' financial statements for the year ending December 31, 2010, and the month of May 2011, are attached hereto as Exhibits F and G, respectively; however, these statements have not been audited.

### III.

### SUMMARY OF THE PLAN OF REORGANIZATION

### A.  Joint Consolidated Plan

This Plan is a single consolidated plan of reorganization for the jointly administered Chapter 11 Cases.  Solely for the purposes of voting, confirmation, and making distributions to the holders of Allowed General Unsecured Claims: (a) all General Unsecured Claims against the Debtors are placed in a single Class for the purpose of voting on the Plan, and (b) any General Unsecured Claims against multiple Debtors based upon one underlying obligation, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall be treated as a single Claim.  Such treatment of General Unsecured Claims for Plan purposes shall not affect, without limitation: (a) the legal and corporate structure of the Reorganized Debtors, (b)

any obligations under any leases or contracts assumed in this Plan or otherwise after the Petition Date, or (c) the obligation of each Reorganized Debtor to pay all U.S. Trustee Fees on all disbursements as required by the Bankruptcy Code and Guidelines of the OUST.

The Debtors believe a single consolidated plan of reorganization is appropriate and in the best interests of all creditors. As set forth above, the Debtors have historically been, and presently continue to be, effectively operated as a single enterprise and creditors have traditionally treated the Debtors as a single enterprise. While each of the Debtors maintains separate books and records and the Debtors can trace funds into and out of each of the Debtors, in many cases it is very difficult for the Debtors to identify the specific Debtor which is liable on a Claim. For example, it was not unusual for a creditor to supply goods or services to a specific fitness center, but to bill "Club Ventures" or "DavidBartonGym." While such bill would be paid from a CVI account, the liability for the bill arguably belonged to the specific Debtor that owned the applicable fitness center. If the Debtors were required to review each Claim to determine which Debtor was liable for the Claim and which Debtor was not liable for the Claim (and then resolve any disputes as to the determination of which Debtor is liable), the costs to the Estates would far outweigh any benefit to the Estates and Holders of the Claims, especially in view of the proposed distribution to Holders of General Unsecured Claims under the Plan.

Furthermore, because both LBN and Praesidian have security interests in the assets of each of the Debtors and no Debtor has any unencumbered assets that could be used to make a distribution to Holders of General Unsecured Claims in an amount greater than proposed under the Plan, no Holder of a General Unsecured Claim will be prejudiced by the consolidation of all General Unsecured Claims into a single Class.

Under these circumstances, the Bankruptcy Court has the authority to confirm a single consolidated plan of reorganization. *See, e.g., United Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988). The test for consolidation, as formulated by the Second Circuit, considers "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit … or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id*. at 518. The Debtors satisfy both of the tests set forth by the Second Circuit.

### B. What Creditors and Interest Holders Will Receive Under the Proposed Plan

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code. The Plan states whether each Class of Claims or Interests is Impaired or Unimpaired. The Plan provides the treatment each Class will receive under the Plan.

### C. Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment as provided in the Bankruptcy Code. As such, the

Plan Proponents have *not* placed the following claims in a class.

### 1. Statutory Fees

On the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, including, without limitation, any U.S. Trustee Fees and any applicable interest thereon incurred pursuant to 28 U.S.C. § 1930(a)(6), as determined by the Bankruptcy Court at the Confirmation Hearing, to the extent not previously paid by the Debtors, shall be paid in Cash in full. The Reorganized Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date. Following Confirmation, the Reorganized Debtors will file with the Bankruptcy Court and serve on the United States Trustee quarterly financial reports regarding all income and disbursements, including all Plan payments, for each quarter (or portion thereof) that the Chapter 11 Cases remain open.

### 2. Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8). Section 1129(a)(9)(C) of the Bankruptcy Code requires that, except as otherwise agreed to by the parties, each holder of an Allowed Priority Tax Claim receive Cash equal to the total unpaid portion of such Allowed Priority Tax Claim, calculated as of the Effective Date of the Plan, paid over a period not exceeding five (5) years after the Petition Date.

On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing.

The following chart lists the Debtors' section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| New York State Department of Taxation | Estimated amount owed as of Effective Date is $28,864.10 | Paid in full on the Effective Date to the extent Allowed |

### 3. Administrative Claims, Including Professional Administrative Claims

Administrative expenses are Claims for costs or expenses of administering the Debtors' Chapter 11 Cases that are Allowed Claims under Bankruptcy Code section 507(a)(2). The Bankruptcy Code requires that, on the Effective Date of the Plan, all Allowed Administrative Claims be paid Cash equal to the total allowed amount of such Administrative Claim, unless a particular claimant agrees to a different treatment.

On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors or the Reorganized Debtors.

The following chart lists the Debtors' section 507(a)(2) Administrative Claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | Estimated amount owed as of Effective Date is $0 | Paid in full on the Effective Date to the extent Allowed |
| Office of the U.S. Trustee Fees | Estimated amount owed as of Effective Date is $18,000 | Paid in full on the Effective Date to the extent Allowed |
| Peitzman, Weg & Kempinsky LLP<br><br>Co-Bankruptcy Counsel for the Debtors | Estimated amount owed as of Effective Date is $300,000 | $200,000 paid on the Effective Date to the extent Allowed<br><br>$100,000 paid in two monthly installments thereafter to the extent Allowed |

| Name | Amount Owed | Treatment |
|---|---|---|
| Golenbock Eiseman Assor Bell & Peskoe LLP<br><br>Co-Bankruptcy Counsel for the Debtors | Estimated amount owed as of Effective Date is $25,000 | Paid in full on the Effective Date to the extent Allowed |
| FocalPoint Securities, LLC<br><br>Financial Advisors to the Debtors | Estimated amount owed as of Effective Date is $20,000 | Paid in full on the Effective Date to the extent Allowed |
| Klestadt & Winters, LLP<br><br>Bankruptcy Counsel for the Creditors' Committee | Estimated amount owed as of Effective Date is $75,000 | Paid in full on the Effective Date to the extent Allowed |
| FTI Consulting, Inc.<br><br>Financial Advisors to the Creditors' Committee | Estimated amount owed as of Effective Date is $75,000 | Paid in full on the Effective Date to the extent Allowed |
| BofA DIP Facility Claim | Estimated amount owed as of Effective Date is $100,000 | Paid in full on the Effective Date to the extent Allowed |
| LBN DIP Facility Claim | Estimated amount owed as of Effective Date is $1,550,000[1] | $200,000 paid on the Effective Date to the extent Allowed<br><br>$200,000 paid in four monthly installments thereafter to the extent Allowed<br><br>Remainder extinguished in exchange for: (1) the LBN Notes and Reimbursement Obligation, |

---

[1] On or about July 6, 2011, LBN advanced to the Debtors $350,000, which the Debtors required to satisfy their ongoing operating expenses, including amounts owed as a result of the Debtors assumption of the modified lease of real property located in Bellevue, Washington. The $350,000 resulted in an overadvance under the DIP Facility. However, LBN and the Debtors believe that the loan was made in the ordinary course of the Debtors' business pursuant to section 364(a) of the Bankruptcy Code and is entitled to administrative expense treatment under section 503(b)(1) of the Bankruptcy Code and, therefore, the overadvance is included in LBN's administrative expense claim. LBN reserves the right to seek *nunc pro tunc* an increase in the amount of the DIP Facility to include the $350,000 sum. Under the structure of the Plan, an increase in the DIP Facility by such amount would have no impact on the consummation of the Plan, including the distribution to creditors and the Debtors' post-Effective Date operations.

| Name | Amount Owed | Treatment |
|---|---|---|
| | | and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement |
| Praesidian DIP Facility Claim | Estimated amount owed as of Effective Date is $250,000 | $125,000 paid on the Effective Date to the extent Allowed<br><br>$125,000 paid in four monthly installments thereafter to the extent Allowed |
| Section 503(b)(9) Claims | Estimated amount owed as of Effective Date is $40,000 | Paid in full on the Effective Date to the extent Allowed |
| TOTAL | $2,453,000 | |

The Bankruptcy Court must approve all Professional Fee Claims listed in this chart for those Professionals employed by the Debtors or the Creditors' Committee. The Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application. Only the amount of fees allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

As indicated above, the Debtors will need to pay approximately $878,000 worth of Allowed Administrative Claims on the Effective Date of the Plan (or when the Claim becomes Allowed). As indicated elsewhere in this Disclosure Statement, the Debtors will have sufficient Cash on hand on the Effective Date of the Plan to make all payments required under the Plan to be paid on the Effective Date. The primary source of this Cash will be from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) the Exit Facility.

### 4. Deadlines For Filing Administrative Claims

#### a) Pre-Effective Date Claims and Expenses

Other than Holders of (a) Administrative Claims for U.S. Trustee Fees, (b) Professional Fee Claims, (c) Administrative Claims that were Allowed on or before the Effective Date, (d) Administrative Claims incurred and payable in the ordinary course of the Debtors' business, (e) DIP Facility Claims, and (f) Administrative Claims held by current officers, directors, managers or employees for indemnification, contribution, or advancement of expenses pursuant to (1) an operating agreement or similar organizational document, or (2) agreement approved by the Bankruptcy Court, all Holders of Administrative Claims shall file with the Bankruptcy Court and serve on the Reorganized Debtors proof of any unpaid Administrative Claim on or before the 30th day following the Effective Date. Such proof

must include all supporting documentation for such Administrative Claim.  **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED**.

### b)      Postpetition Tax Claims

All requests for payment of Claims by a governmental unit for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date otherwise has been established previously, must be Filed on or before the later of: (i) sixty (60) days following Filing of the notice of the Effective Date; and (ii) ninety (90) days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental unit.  **FAILURE TO FILE AND SERVE SUCH POSTPETITION TAX CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE POSTPETITION TAX CLAIM BEING FOREVER BARRED AND DISCHARGED**.

### c)      Professional Fees

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall file with the Bankruptcy Court and serve on the Reorganized Debtors an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the 60th day following the Effective Date.  **FAILURE TO FILE AND SERVE SUCH PROFESSIONAL FEE CLAIMS TIMELY AND PROPERLY SHALL RESULT IN THE PROFESSIONAL FEE CLAIM BEING FOREVER BARRED AND DISCHARGED**.  Without limiting the foregoing, the Reorganized Debtors may pay the charges incurred by the Reorganized Debtors on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

### D.      Classified Claims and Interests

Claims and Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as described below.  The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases.  Solely for the purposes of voting, confirmation, and making distributions to the holders of Allowed General Unsecured Claims: (a) all General Unsecured Claims against the Debtors are placed in a single Class for the purpose of voting on the Plan, and (b) any General Unsecured Claims against multiple Debtors based upon one underlying obligation, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall be treated as a single Claim.  Such treatment of General Unsecured Claims for Plan purposes shall not affect, without limitation: (a) the legal and corporate structure of the Reorganized Debtors, (b) any obligations under any leases or contracts assumed in this Plan or otherwise after the Petition Date, or (c) the obligation of each

Reorganized Debtor to pay all U.S. Trustee Fees on all disbursements as required by the Bankruptcy Code and Guidelines of the OUST.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
|---|---|
| Class 1 - Non-Tax Priority Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – BofA Secured Claim | Impaired – Entitled to vote |
| Class 3 – LBN Secured Claim | Impaired – Entitled to vote |
| Class 4 – Praesidian Secured Claim | Impaired – Entitled to vote |
| Class 5 – Other Secured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 6 – Member Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 7 – Convenience Claims | Impaired – Entitled to vote |
| Class 8 – General Unsecured Claims | Impaired – Entitled to vote |
| Class 9 – Insured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 10 – Subordinated Claims | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 11 – Interests in Subsidiary Debtors | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 12 – Series B Preferred Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 13 – Series A Preferred Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 14 – Class C Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
|---|---|
| Class 15 – Class B Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 16 – Class A Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |

### 1.      Classes of Priority Unsecured Claims

Certain Non-Tax Priority Claims that are referred to in Bankruptcy Code sections 507(a)(1), (4), (5), (6), and (7) are required to be placed in Classes.  Non-Tax Priority Claims include (i) claims for certain accrued employee compensation; (ii) claims for contributions to employee benefit plans; and (iii) claims for certain deposits made in connection with the purchase, lease or rental of certain property or the purchase of certain services.

All Non-Tax Priority Claims are placed in Class 1.  Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

Class 1 is an Unimpaired Class, and the Holders of  Non-Tax Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Non-Tax Priority Claims are not entitled to vote to accept or reject this Plan.

### 2.      Classes of Secured Claims

Secured Claims are Claims secured by liens on property of an Estate.  The following are the Classes containing the Debtors' Secured Claims and their treatment under the Plan:

### a)      BofA Secured Claim

The BofA Secured Claim is placed in Class 2.  The BofA Secured Claim is the Claim asserted by BofA against CVI in the approximate amount of $11,115,000 and secured by substantially all of the assets of CVI.

On the Effective Date, or as soon thereafter as is reasonably practicable, the BofA Secured Claim shall be Reinstated; *provided, however*, that notwithstanding anything to the contrary in the BofA Documentation, the date by which CVI is required to repay all outstanding principal, interest and other charges outstanding shall be extended to September 15, 2012, and BofA shall have no right to declare a default and exercise rights and remedies

based upon CVI's failure to repay all outstanding principal, interest and other charges outstanding prior to September 15, 2012, provided that CVI timely makes monthly interest payments as required under the BofA Documentation and does not otherwise default under the BofA Documentation.

Class 2 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, the Holder of the BofA Secured Claim is entitled to vote to accept or reject this Plan.

### b) LBN Secured Claim

The LBN Secured Claim is placed in Class 3. The LBN Secured Claim is the collective contingent and noncontingent Claims against the Debtors asserted by LBN in the noncontingent amount of not less than $22,418,294.61, and the contingent amount of not less than $13,202,431.16, secured by substantially all of the assets of the Debtors.

On the Effective Date, or as soon thereafter as is reasonably practicable, the Holder of the LBN Secured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, the LBN Secured Claim: (1) the LBN Notes and Reimbursement Obligation, and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement. The terms and conditions of the LBN Notes and Reimbursement Obligation are governed by the Securities Purchase Agreement. A copy of the Securities Purchase Agreement is attached as Exhibit H.

Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, the Holder of the LBN Secured Claim is entitled to vote to accept or reject this Plan.

### c) Praesidian Secured Claim

The Praesidian Secured Claim is placed in Class 4. The Praesidian Secured Claim is the collective Claims asserted by Praesidian against the Debtors in the approximate amount of $30,626,715 and secured by substantially all of the assets of the Debtors.

On the Effective Date, or as soon thereafter as is reasonably practicable, the Holders of the Praesidian Secured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, the Praesidian Secured Claim: (1) the Praesidian Notes, and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement. The terms and conditions of the Praesidian Notes are governed by the Securities Purchase Agreement. A copy of the Securities Purchase Agreement is attached as Exhibit H.

Class 4 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, the Holders of the Praesidian Secured Claim are entitled to vote to accept or reject this Plan.

### d) Other Secured Claims

All Other Secured Claims against any of the Debtors are placed in Class 5. On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors, be entitled to the treatment set forth below in option A, B, C, or D. The Debtors and the Reorganized Debtors specifically reserve

the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A: Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated. The failure of the Debtors to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court in accordance with Article X of the Plan) when and if such Claim is sought to be enforced. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option B: Allowed Other Secured Claims with respect to which the applicable Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option C: Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D: Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the applicable Debtor or Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Debtors shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the Debtors elect another option in writing and filed not later than five (5) days prior to the Confirmation Hearing.

Class 5 is an Unimpaired Class, and the Holders of Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan.

### 3. Classes of Unsecured Claims

Unsecured Claims are Claims that are not secured by liens on property of an Estate and not entitled to priority under section 507(a) of the Bankruptcy Code. Unsecured Claims include all executory contract and lease rejection damage Claims under section 502(g) of the Bankruptcy Code, and all Claims under section 502(h) of the Bankruptcy Code arising from the recovery of property under sections 522, 550, or 553 of the Bankruptcy Code. The following are the Classes containing the Debtors' Unsecured Claims and their treatment under the Plan:

#### a) Member Claims

All Member Claims against any of the Debtors are placed in Class 6. A Member Claim is a Claim against a Debtor based upon a contract with the Debtor for use of and access to the Debtor's fitness centers for personal or group training.

On the Effective Date, Holders of Member Claims shall have such Claims Reinstated.

Class 6 is an Unimpaired Class, and the Holders of Member Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Member Claims are not entitled to vote to accept or reject this Plan.

#### b) Convenience Claims

All Convenience Claims against any of the Debtors are placed in Class 7. A Convenience Claim is a Claim against a Debtor that is for $250 or less or the Holder of a Claim for more than $250 that elects to reduce its Claim to $250. The Debtors estimate that, with the Convenience Claim amount set at $250, more than 73% of the Holders of Allowed Unsecured Claims against the Debtors in these Chapter 11 Cases may be in Class 7 or elect to be in Class 7, which will (1) provide a significant administrative benefit to the Estates, and (2) provide an increased distribution to the overwhelming number of unsecured creditors while liquidating and limiting the aggregate amount of cash necessary to satisfy Allowed General Unsecured Claims under the Plan, which is of critical importance to both the Debtors and the provider of the Exit Financing.

Holders of Convenience Claims shall be paid in Cash, in full, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Convenience Claim becomes an Allowed Convenience Claim, (c) the date on which such Convenience Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors. No interest will be paid on Allowed Convenience Claims.

Class 7 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of a Convenience Claim is entitled to vote to accept or reject this Plan.

### c)    General Unsecured Claims

All General Unsecured Claims against any of the Debtors, including the Berkowitz Wage Claim, are placed in Class 8.  A General Unsecured Claim is a Claim against a Debtor that is not an Administrative Claim, BofA Secured Claim, Convenience Claim, Insured Claim, LBN Secured Claim, Member Claim, Non-Tax Priority Claim, Other Secured Claim, Praesidian Secured Claim, or Priority Tax Claim.

On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between the Debtors or Reorganized Debtors and the Holder of such General Unsecured Claim, or, in each case, as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim shall receive a Cash payment equal to its Pro Rata share of the General Unsecured Claim Distribution Amount, in full and final satisfaction of such Claim.

The General Unsecured Claim Distribution Amount is $150,000 minus the amount of Cash necessary to satisfy all Allowed Convenience Claims.  As set forth in the List of Claims attached as Exhibit C, the Debtors estimate that the aggregate Allowed Amount of General Unsecured Claims is approximately $2,800,000, so the Pro Rata return to Holders of Allowed General Secured Claims from the General Unsecured Claim Distribution Amount is approximately 5.3%.  Based upon the estimate of a 5.3% distribution, the Debtors estimate Allowed General Unsecured Claims in the approximate amount of $260,000 will either be Convenience Claims in Class 7 or the Holders of such Claims will elect to be in Class 7, and the Holders of Allowed Convenience Claims in Class 7 will receive approximately $42,000 in the aggregate, which will reduce the General Unsecured Claim Distribution Amount to $108,000.  Therefore, the Debtors project that the Pro Rata distribution to Holders of Allowed General Unsecured Claims in Class 8 is approximately 4.25%.

Class 8 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

### d)    Insured Claims

All Insured Claims against any of the Debtors are placed in Class 9.  An Insured Claim is a Claim against a Debtor that is covered by insurance or an indemnity policy, agreement, bond or right maintained by or for the benefit of such Debtor, but only to the extent of coverage or liability under the insurance or indemnity policy, agreement, bond or right.

On the Effective Date, all Insured Claims shall be Reinstated.

Class 9 is an Unimpaired Class, and the Holders of Insured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Insured Claims are not entitled to vote to accept or reject this Plan.

### e) Subordinated Claims

All Subordinated Claims, including the Berkowitz Membership Claim, are placed in Class 10. A Subordinated Claim is a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

Holders of Subordinated Claims shall not receive or retain any Cash or other property under the Plan on account of the Subordinated Claims.

Class 10 is Impaired, and the Holders of Subordinated Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.

### 4. Classes of Interests

Interests are the legal, equitable, contractual (including any contractual right to acquire equity in a Debtor contingent upon future events, such as an initial public offering) and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor, including membership interests in limited liability companies regardless of whether such membership interests have any voting rights under the applicable operating agreement. The following are the Classes containing the Debtors' Interests and their treatment under the Plan:

### a) Interests in the Subsidiary Debtors

All Interests in the Subsidiary Debtors are placed in Class 11.

Holders of Interests in the Subsidiary Debtors shall have such Interests Reinstated on the Effective Date.

Class 11 is an Unimpaired Class, and the Holders of Interests in the Subsidiary Debtors are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Interests in the Subsidiary Debtors are not entitled to vote to accept or reject this Plan.

### b) Series B Preferred Interests in CVI

All Series B Preferred Interests in CVI are placed in Class 12.

All Series B Preferred Interests shall be cancelled and Holders of Series B Preferred Interests shall not receive or retain any Cash or other property under the Plan on account of the Series B Preferred Interests.

Class 12 is Impaired, and the Holders of Series B Preferred Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Series B Preferred Interests are not entitled to vote to accept or reject this Plan.

### c) Series A Preferred Interests in CVI

All Series A Preferred Interests in CVI are placed in Class 13.

All Series A Preferred Interests shall be cancelled and Holders of Series A Preferred Interests shall not receive or retain any Cash or other property under the Plan on account of the Series A Preferred Interests.

Class 13 is Impaired, and the Holders of Series A Preferred Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Series A Preferred Interests are not entitled to vote to accept or reject this Plan.

### d) Class C Interests in CVI

All Class C Interests in CVI are placed in Class 14.

All Class C Interests shall be cancelled and Holders of Class C Interests shall not receive or retain any Cash or other property under the Plan on account of the Class C Interests.

Class 14 is Impaired, and the Holders of Class C Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class C Interests are not entitled to vote to accept or reject this Plan.

### e) Class B Interests in CVI

All Class B Interests in CVI are placed in Class 15.

All Class B Interests shall be cancelled and Holders of Class B Interests shall not receive or retain any Cash or other property under the Plan on account of the Class B Interests.

Class 15 is Impaired, and the Holders of Class B Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class B Interests are not entitled to vote to accept or reject this Plan.

### f) Class A Interests in CVI

All Class A Interests are placed in Class 16.

All Class A Interests in CVI shall be cancelled and Holders of Class A Interests shall not receive or retain any Cash or other property under the Plan on account of the Class A Interests.

Class 16 is Impaired, and the Holders of Class A Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class A Interests are not entitled to vote to accept or reject this Plan.

### 5. Intercompany Claims

On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any affiliate of one of the Debtors that is not itself a Debtor shall, at the election of Reorganized CVI, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

### 6. Alternative Treatment

Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors or, after the Effective Date, the Reorganized Debtors, may agree in writing; *provided, however*, that in the event that the Debtors agree prior to the Effective Date that a Holder of an Allowed Claim or Interest shall receive a more favorable distribution or treatment than that to which it is entitled under this Plan, the Debtors must provide notice of and an opportunity to object to such alternative treatment to interested parties.

### 7. Special Provision Regarding Unimpaired Classes of Claims

Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

### E. Means of Performing the Plan

### 1. Continued Legal Existence and Revesting of Assets

Except as otherwise provided in the Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a limited liability company, corporation, or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement, and other organizational documents in effect as of the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. In accordance with Article 9.2 of the Plan, and except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising each Estate (including Retained Actions) shall revest in the applicable Reorganized Debtor.

### 2. Sources of Cash for Distribution

All Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) the Exit Facility, which is a financing facility to be provided to the Reorganized Debtors on the Effective Date by LBN. The terms and conditions of the Exit

Facility are presently being negotiated and a final agreement will be set forth in a plan supplement filed with the Bankruptcy Court no later than five (5) days prior to the hearing on confirmation of the Plan.  The Confirmation Order shall constitute an Order approving the terms and conditions of the Exit Facility.  If the Court refuses to approve the final terms of the Exit Facility, the Plan in its present form will not be feasible and will not be confirmed.

### 3. Amended CVI Operating Agreement

On the Effective Date, the Amended CVI Operating Agreement will become effective. A copy of the Amended CVI Operating Agreement is attached as Exhibit I.  As set forth in the Amended CVI Operating Agreement, the Holders of New Membership Interests include LBN, Praesidian, and members of the Debtors' management.

### 4. Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of membership units in Reorganized CVI shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

### 5. Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by, or required of, any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

### 6. Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of the Plan.

### 7. Effectuating Documents; Further Transactions

Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record all contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

### 8.    Exemption From Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 9.    Further Authorization

The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

### 10.    Dissolution of Creditors' Committee

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims, and (ii) any appeals of the Confirmation Order.

### 11.    Officers and Directors of Reorganized Debtors

On the Effective Date: (a) the officers for each of the Reorganized Debtors shall be: (i) Charles Grieve, Chief Executive Officer, and (ii) David Barton, President; (b) the managers of Reorganized CVI shall be David Barton, Jason Drattell, Charles Grieve, and JDH, (c) the manager of the Reorganized Subsidiary Debtors other than DB 85 Gym Corp. shall be Charles Grieve, and (d) the directors of Reorganized DB 85 Gym Corp. shall be David Barton, Jason Drattell, Charles Grieve, and JDH.  On the Effective Date, such officers, directors or managers, as applicable, of the Reorganized Debtors will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors, and their compensation for such services shall be in whole or in part as agreed to in the Amended CVI Operating Agreement, a copy of which is

attached as Exhibit I.  Without limitation, the compensation of Charles Grieve shall be pursuant to the terms of the Meridian Management Agreement, which will be assumed under the Plan as amended by the Amended CVI Operating Agreement.  A copy of the Meridian Management Agreement is attached as Exhibit B.

### F.       Provisions Governing Distributions

#### 1.       Allowed Claims and Interests

The Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

#### 2.       Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions to Holders of Allowed Claims will be made by mail as follows:

a)       If the Holder filed a proof of claim, distributions will be sent to the address, if any, set forth on the proof of claim;

b)       If the Holder, after filing a proof of claim, delivered or delivers to the Debtors a written notice of address change, distributions will be sent to the address set forth in the written notice and not the address set forth on the proof of claim;

c)       If no proof of claim was filed or if the filed proof of claim does not set forth a legible and complete address and if the Debtors have not received a written notice of address change, distributions will be sent to the address set forth in the Debtors' schedules of assets and liabilities (the "**Schedules**") or

d)       If no proof of claim was filed or if the proof of claim does not set forth a legible, complete address; the Debtors have not received a written notice of address change; and the Schedules do not set forth a complete address, then the distribution will be deemed to be an "Undeliverable Distribution" as defined below.

#### 3.       Undeliverable Distributions

If a distribution is made and returned to the Reorganized Debtors marked as undeliverable for any reason, the distribution shall be deemed an "***Undeliverable Distribution***."  If a distribution to a Holder is returned to the Reorganized Debtors as an Undeliverable Distribution or is deemed to be an Undeliverable Distribution, the Reorganized Debtors shall make no further distribution to the Holder  unless and until the Reorganized

Debtors are timely notified by such Holder, in writing, of the Holder's current address. Any Holder who is otherwise entitled to an Undeliverable Distribution and who does not, within 60 days after the attempted delivery thereof (the "*60-Day Period*"), provide the Reorganized Debtors with written notice asserting its claim in that Undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to or interest in that Undeliverable Distribution and will be forever barred from receiving that Undeliverable Distribution from the Reorganized Debtors. Any Undeliverable Distributions that are not claimed prior to the expiration of the 60-Day Period shall revert back to the Reorganized Debtors free and clear of all claims of the Holder and all other Holders of Allowed Claims. The Reorganized Debtors shall not have any obligation to attempt to locate any Holder whose distribution is undeliverable.

### 4.      Interest and Penalties on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims and Non-Tax Priority Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

### 5.      Means of Cash Payment

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor. Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 6.      Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

### 7.      Setoffs

The Reorganized Debtors may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder. The Debtors or the Reorganized Debtors shall provide notice of any proposed setoff to the Holder of such Claim at least five (5) days prior to effectuating

such setoff.

### G. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

#### 1. Authority and Deadline

The Reorganized Debtors shall have the sole right to file objections to all Disputed Claims. Any objections to Disputed Claims shall be served and filed in the Bankruptcy Court on or before sixty (60) days after the Effective Date; *provided, however,* with respect to any Unimpaired Claim, in the event such Claim is not an Allowed Claim as of the Effective Date, the Holder of such Claim or the Reorganized Debtors may commence at any time an action or proceeding to determine the amount and validity of such Claim in the Bankruptcy Court or any venue in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

#### 2. Creation of Reserves for Disputed Claim

The Reorganized Debtors shall (i) establish and maintain a reserve for Disputed Claims, (ii) establish and maintain a reserve for unclaimed distributions, and (iii) establish any other reserves or accounts it deems necessary or appropriate. All cash held in the reserves shall be invested only in investments permitted under the Bankruptcy Code and maintained in accounts held at authorized bank depositories for the Southern District of New York.

#### 3. Estimation of Claims

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection and make distributions under the Plan with respect to other Allowed Claims in the same class after making an appropriate reserve based on the estimated amount of such Disputed or contingent Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

#### 4. Distributions Relating to Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall distribute to the Holder of such Claim such Cash as the Holder is entitled to under the Plan, which distribution shall occur as soon as practicable after the date that the order or judgment allowing any Disputed Claim becomes a Final Order. To the extent that all or a portion of a Disputed Claim is Disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed.

### 5. Disallowed Claims

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code and shall continue to be Disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

### H. Risk Factors

The Plan provides that (1) on the Effective Date the Debtors will make distributions to holders of Allowed Administrative Claims and Allowed General Unsecured Claims, and (2) thereafter in the following months and years will make interest and principal payments to BofA, LBN, and Praesidian in accordance with the terms of their operative loan agreements. Therefore, the primary risks under the Plan are the possibility that the Debtors will not have sufficient Cash on hand to make the distributions required on the Effective Date, and the Reorganized Debtors will in the future be unable to generate sufficient revenue to make the required payments to BofA, LBN, Praesidian, and other post-Confirmation creditors.

Because LBN has committed to funding the Exit Facility, the Debtors are confident of the Reorganized Debtors' ability to make all required Plan payments required on the Effective Date. However, if for any reason the Exit Facility is not funded or the Bankruptcy Court refused to approve the Exit Facility, the Debtors will not have the ability to make the required Effective-Date Plan payments and the Plan will not be feasible.

With respect to post-Confirmation payments, the Debtors are confident of the Reorganized Debtors' ability to operate profitably and make all such post-Confirmation payments. Attached as Exhibit M is a cash-flow projection through October 2012 that demonstrates the Reorganized Debtors' will be able to make all requirement Plan payments to BofA, LBN, and Praesidian, and other post-Confirmation creditors.

### I. Other Provisions of the Plan

#### 1. Assumption/Rejection of Executory Contracts and Unexpired Leases

A list of the Debtors' Executory Contracts and Unexpired Leases, together with the cure amount for each Executory Contract and Unexpired Lease, is attached as Exhibit K. Exhibit K-1 identifies Executory Contracts and Unexpired Leases to be assumed and Exhibit K-2 identifies Executory Contracts and Unexpired Leases to be rejected. Exhibit K is subject to modification at any time before the Effective Date.

Each Executory Contract and Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

a) has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

b) has been rejected by the Debtors by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order); or

c) is the subject of a motion to reject filed by the Debtors under section 365 of the Bankruptcy Code pending as of the Effective Date.

An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "***Assumed Contract***."  An Executory Contract that is rejected or subject to a motion to reject as described above shall be referred to as a "***Rejected Contract***."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtors and their Estates and that each Assumed Contract is assumed as of the Effective Date, and (iii) the requirements for assumption (or rejection, as the case may be) of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be enforceable.  All cure payments under any Assumed Contract will be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute; *provided, however*, if an objection to the Debtors' proposed cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in their sole discretion, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

Unless otherwise provided by an order of the Bankruptcy Court, any Claim arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under the Plan no later than sixty (60) days after the later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Debtors' and Reorganized Debtors' right to object thereto.  In the event of such objection, the Debtors shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

All of the Debtors' existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in any Rejected Contract), including all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date ("***Benefit Plans***") will be deemed to be, and will be

treated as though they are, executory contracts that are assumed under Section 7.1 of the Plan, and the Debtors' and Reorganized Debtors' obligations and rights under such programs, plans, agreements, and arrangements will survive confirmation of the Plan, subject to the terms and conditions of such Benefit Plans.

Any employment agreements designated for rejection in writing by the Debtors and filed with the Bankruptcy Court prior to the Confirmation Date shall be deemed rejected as of the Effective Date. Any Claims arising from the rejection of any employment agreements shall be governed by the deadlines set forth in Section 7.1 of the Plan. Any such Claims will be classified as Class 8 General Unsecured Claims and will be capped in accordance with section 502(b)(7) of the Bankruptcy Code.

## 2. Changes in Rates Subject to Regulatory Commission Approval

The Debtors are not subject to governmental regulatory commission approval of any rates.

## 3. Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a) resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b) decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

(c) decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving objections to Claims filed after the Effective Date;

(d) enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(e) resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents;

(f)        modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(g)        hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(h)        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(i)        adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

(j)        recover all assets of the Debtors and property of the Estates, wherever located;

(k)        hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

(l)        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(m)        hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)        determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(o)        enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(p)     hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(q)     enter an order closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Section 10.1 of the Plan, the retention of jurisdiction provisions of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## J.     Tax Consequences of the Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The disclosure of possible tax consequences, attached as Exhibit L, is intended solely for the purpose of alerting readers about possible tax issues the Plan may present.  The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

## IV.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible.  These requirements are not the only requirements for confirmation.

## A.     Who May Vote or Object

### 1.     Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained

below not everyone is entitled to vote to accept or reject the Plan.

### 2. Who May Vote to Accept/Reject the Plan

A Creditor or Interest holder has a right to vote for or against the Plan if that Creditor or Interest holder has a Claim that is both (1) Allowed or allowed for voting purposes, and (2) classified in an Impaired Class.

#### a) What Is an Allowed Claim/Interest

As noted above, a Creditor or Interest holder must first have an <u>Allowed Claim or Interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the Claim. When an objection to a Claim or Interest is filed, the Creditor or Interest holder holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

With certain limited exceptions, THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE CHAPTER 11 CASES WAS JUNE 15, 2011. A Creditor or Interest holder may have an Allowed Claim or Interest even if a proof of claim or interest was not timely filed. A Claim is deemed Allowed if (1) it is scheduled on any Debtors' schedules of assets and liabilities and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim. An Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Interest. Consult Exhibit C to see how the Plan Proponents have characterized your Claim or Interest.

#### b) What Is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is <u>Impaired</u> under the Plan. A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class. For example, a Class comprised of General Unsecured Claims is Impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

In this case, the Plan Proponents believe that Classes 2, 3, 4, 7, and 8 are Impaired and that holders of Claims in each of these Classes, therefore, are entitled to vote to accept or reject the Plan. The Plan Proponents believe that Classes 10, 12, 13, 14, 15, and 16 also are impaired and deemed to reject the Plan. The Plan Proponents believe that Classes 1, 5, 6, 9, and 11 are unimpaired and that holders of Claims in each of these Classes, therefore, do not have the right to vote to accept or reject the Plan. Parties who dispute the Plan Proponents' characterization of their Claim or Interest as being Impaired or unimpaired may file an objection to the Plan contending that the Plan Proponents have incorrectly characterized the Class.

### 3. Who is <u>Not</u> Entitled to Vote

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been Disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

Bankruptcy Code sections 507(a)(2), (a)(3), and (a)(8); and (4) Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any value under the Plan do not vote because such Classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4. Who Can Vote in More Than One Class

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the Secured Claim and another ballot for the Unsecured Claim.

### 5. Votes Necessary to Confirm the Plan

If Impaired Classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at least one Impaired Class has accepted the Plan without counting the votes of any insiders within that Class, and (2) all Impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in Section 7.

### 6. Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims that actually voted, voted in favor of the Plan. A Class of Interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the Interest holders of such Class that actually voted, voted to accept the Plan.

### 7. Treatment of Nonaccepting Classes

As noted above, even if all Impaired Classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner required by the Bankruptcy Code. The process by which nonaccepting Classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims or Interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 8. Request for Confirmation Despite Nonacceptance by Impaired Class(es)

In this case, the Plan Proponents believe that Classes 2, 3, 4, 7, and 8 are Impaired and

that holders of Claims in each of these Classes, therefore, are entitled to vote to accept or reject the Plan. The Plan Proponents believe that Classes 10, 12, 13, 14, 15, and 16 also are impaired and deemed to reject the Plan. The Plan Proponents believe that Classes 1, 5, 6, 9, and 11 are unimpaired

The Plan Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on Impaired Classes 10, 12, 13, 14, 15, and 16, and also on Classes 2, 3, 4, 7, and 8 if any of these Classes do not vote to accept the Plan. In addition, if the Bankruptcy Court determines that any Class identified by the Debtors as Unimpaired is Impaired and that Class does not vote to accept the Plan, the Debtors will ask the Bankruptcy Court to confirm the Plan by cramdown on that Class.

### B. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a Claimant or Interest holder is in an Impaired Class and that Claimant or Interest holder does not vote to accept the Plan, then that Claimant or Interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all Creditors and Interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation. The Plan Proponents maintain that this requirement is met here because (1) substantially all of the Debtors' assets are encumbered by security interests held by BofA, LBN, and Praesidian, and (2) the liquidation value of the Debtors' assets is less than the Allowed Amount of the Allowed Secured Claims of BofA, LBN and Praesidian. Therefore, in the event of a liquidation, unsecured creditors would receive nothing from the liquidation of the Debtors' assets. For these reasons, the Plan Proponents conclude that the Plan provides fair and equitable treatment of all Classes of Creditors and the greatest feasible recovery to all Creditors.

Attached as Exhibit D is a liquidation analysis that demonstrates that Creditors and Interest holders will receive at least as much under the Plan as such Creditors and Interest holders would receive a chapter 7 liquidation of the Debtors.

### C. Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means

that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims that are entitled to distribution under the Plan. The Plan Proponents maintain that this aspect of feasibility is satisfied because, to the extent the Debtors do not have sufficient Cash on hand to make the distributions under the Plan, additional funds will be available under the Exit Facility on or prior to the Effective Date.

The second aspect considers whether there will be sufficient funds to make all the Plan payments required after the Effective Date, which include interest and principal payments to BofA, LBN, and Praesidian. The Plan Proponents are confident of the Reorganized Debtors ability to operate profitably and to make all such post-Confirmation payments. Attached as Exhibit J is a cash flow projection through October 2012 that demonstrates the Reorganized Debtors will be able to make all requirement Plan payments to BofA, LBN, Praesidian, and other post-Confirmation creditors after the Effective Date.

## V.

## CONDITION TO CONFIRMATION OF THE PLAN

### A. Condition To Entry of the Confirmation Order

The following are conditions precedent to the Confirmation, each of which must be satisfied, or waived in writing, by the Debtors, LBN, and Praesidian in accordance with the terms hereof:

1. The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall have been filed in form and substance acceptable to the Debtors, LBN, and Praesidian.

2. The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, LBN and Praesidian.

### B. Conditions To Effective Date.

The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors, LBN and Praesidian in accordance with the terms hereof:

1. The Confirmation Order, in form and substance satisfactory to the Debtors, LBN, and Praesidian, shall be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtors and Reorganized Debtors are

authorized without further board or shareholder approval or consent to take all actions necessary to enter into all agreements or documents created in connection with this Plan. Without limiting the foregoing, the chairman of the board of directors, president, chief executive officer, chief financial officer or any other appropriate officer of the Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

2.      All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

3.      All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

4.      The Debtors shall have sufficient Cash, whether on hand or from funds advanced under the Exit Facility to make all required payments to be made on the Effective Date.

5.      The Effective Date shall have occurred on or prior to October 31, 2011.

## C.      Waiver of Condition

The Debtors, LBN, and Praesidian may jointly waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors, LBN, and Praesidian.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.


# VI.

# EFFECT OF CONFIRMATION OF PLAN

## A.      Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

## B.      Revesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property

comprising the Estates (including Retained Actions) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders except as otherwise set forth in the Plan. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### C. Releases by the Debtors, their Estates and the Reorganized Debtors

**As of the Effective Date, for good and valuable consideration, including service in facilitating the expeditious implementation of the restructuring and reorganization contemplated by the Plan, the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (a) Praesidian, (b) LBN, (c) JDH, and (d) the present directors, officers, managers, employees or legal advisors of (a) through (c) (in their capacity as such) (other than the rights under this Plan and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby, and any claims based thereon), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise.**

### D. Discharge of the Debtors

Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan; *provided, however*, the Debtors' obligations to provide adequate protection to LBN, Praesidian and BofA pursuant to paragraph 14 of the DIP/Cash Collateral Order and to reimburse and pay the legal fees and expenses of LBN, Praesidian and BofA pursuant to paragraphs 2 and 14 of the DIP/Cash Collateral Order and sections 2(e), 6(g), 7(b)(v) and 12(j) of the credit agreement approved by such order, to the extent such fees and expenses have not been previously paid or are paid on the Effective Date, shall not be discharged or released.

As of the Effective Date, except as provided in the Plan or the Confirmation Order, all

Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtors or any Interest in the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

### E. Injunction

**Except as provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under Article IX of the Plan, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

### F. Exculpation and Limitation of Liability

Under the Plan, none of (a) the Debtors, (b) any affiliate of the Debtors, (c) the Creditors' Committee and its members (in their capacity as such), (d), the Restructuring Professionals, (e) Praesidian, (f) LBN, (g) JDH, and (h) the present directors, officers, managers, employees or legal advisors of (a) through (g) (in their capacity as such), shall have or incur any liability to any Person or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross

negligence, criminal conduct, or willful misconduct, including the willful misappropriation of confidential information; *provided*, *however*, that the foregoing exculpation and limitation of liability shall apply only to acts and omissions that occur prior to the Effective Date, except with respect to those specific Plan administrative matters identified therein; and *provided further, however,* that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under the Plan and the contracts, instruments, releases, and other agreements or documents delivered thereunder or contemplated thereby. Without limiting the generality of the foregoing, the Debtors, the Reorganized Debtors, LBN, Praesidian, JDH, the Creditors' Committee, and any of such parties' directors, managers, officers, or members, shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of the Plan, no Person, no Person's agents, directors, managers, officers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members and no Person's successors or assigns shall have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud or willful misconduct, including the willful misappropriation of confidential information.

Notwithstanding any other provision of the Plan, nothing in the Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Exculpated Parties, nor shall anything in the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Exculpated Parties referred to herein for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority, against the Exculpated Parties referred to herein.

Notwithstanding any other provision of the Plan, nothing in the Plan shall limit the liability of the Professionals of the Debtors or the Reorganized Debtors to their respective clients, including pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

### G.    Term of Bankruptcy Injunction or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained

in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

### H.  Post-Effective Date Retention of Professionals

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

### I.  Effect of Release, Discharge and Injunction on Unimpaired Claims

Nothing in the Plan, including the release, discharge, injunction and exculpatory provisions set forth in the Plan, shall prevent any Holder of an Unimpaired Claim from pursuing (i) the Allowance of such Unimpaired Claim, or (ii) payment of such Unimpaired Claim from the Reorganized Debtors.

### J.  Amendment Or Modification Of This Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of Praesidian and LBN, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors; provided, however, that, in the event a material modification to the Plan is proposed after the Effective Date, the Reorganized Debtors shall provide notice and an opportunity to object to all interested parties.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### K.  Post-Confirmation Status Report

Subject to any requirements set forth in the Postconfirmation Order and section 1106(a)(7) of the Bankruptcy Code, the Reorganized Debtors shall file, within 45 days after the date of the Postconfirmation Order, a status report detailing the actions taken by the Debtors and the Reorganized Debtors and the progress made toward the consummation of this Plan.  Reports shall be filed thereafter every January 15, April 15, July 15, and October 15 until a final decree has been entered or until conversion or dismissal, whichever is earlier.

### B.  Post-Confirmation Conversion/Dismissal

A Creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Cases under Bankruptcy Code section 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Cases converted to chapter 7 after the Plan is confirmed, all property that had been property of the chapter 11 Estates, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property only to the extent

that relief from stay was not previously granted by the Bankruptcy Court during these Chapter 11 Cases.

## L.    Final Decree and Closing The Chapter 11 Cases

Within 14 days following the distribution of any deposit required by the Plan or, if no deposit was required, upon the payment of the first distribution required by the Plan, the Reorganized Debtors shall file a closing report in accordance with Local Bankruptcy Rule 3022-1 and an application for a final decree.

Dated:  August __ , 2011                **"PLAN PROPONENTS"**

Debtors and Debtors in Possession:
Club Ventures Investments LLC
Club Ventures II, LLC
CV 2, LLC
CV II Gym, LLC
Club Ventures III, L.L.C.
CV 3, LLC
CV III Gym, LLC
Club Ventures IV, LLC
CV 4 Leasing, LLC
CV IV Gym, LLC
Club Ventures VI, LLC
CV VI, LLC
CV VII Gym, LLC
Club Ventures VIII, LLC
CV VIII Gym, LLC
Club Ventures X, LLC
CV X Gym, LLC
DB 85 Gym Corp.


_____
By:  Charles Grieve
Their: Chairman


Submitted By:

PEITZMAN, WEG & KEMPINSKY LLP

By: ___/s/ David B. Shemano_____
        David B. Shemano, Esq.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

and

Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

Counsel for Debtors and Debtors-in-Possession