# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLUB VENTURES INVESTMENTS LLC, *et al.*,[1] | ) | Case No. 11-10891 (ALG) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

---

### DISCLOSURE STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

David B. Shemano, Esq.
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

Counsel for Debtors and Debtors-in-Possession

Dated: Los Angeles, California
        August 12, 2011

---

[1] Jointly Administered with Case Nos.: 11-10892; 11-10894; 11-10893; 11-10896; 11-10895; 11-10897; 11-10900; 11-10898; 11-10899; 11-10901; 11-10902; 11-10903; 11-10905; 11-10904; 11-10906; 11-10907; 11-10908.

EXHIBIT 1
Page 3

# TABLE OF CONTENTS

*Page No.*

**I. INTRODUCTION** ........................................................................................................ 2

  *A.*   *Purpose of This Document* .................................................................................. 3

    1.   **WHO CAN VOTE OR OBJECT** .................................................... 4

    2.   **WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION** ................................. 4

    3.   **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY** .......................................................................... 4

    4.   **WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN.** ................................. 4

    5.   **WHAT IS THE EFFECT OF CONFIRMATION, AND** ................... 4

    6.   **WHETHER THIS PLAN IS FEASIBLE** ................................... 4

  *B.*   *Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing* ................... 4

    1.   Time and Place of the Confirmation Hearing ................................. 4

    2.   Deadline For Voting For or Against the Plan ................................. 5

    3.   Deadline For Objecting to the Confirmation of the Plan ...................... 5

    4.   Identity of Person to Contact for More Information Regarding the Plan ............. 5

  *C.*   *Disclaimer* ................................................................................................ 5

**II. BACKGROUND** ...................................................................................................... 6

  *A.*   *Description and History of the Debtors' Businesses* ........................................... 6

  *B.*   *Debtors' Capital Structure and Significant Claims* ........................................... 7

    1.   Bank of America ................................................................ 7

    2.   LBN Holding LLC ............................................................. 8

    3.   Praesidian ...................................................................... 8

    4.   Capital Leases ................................................................. 9

    5.   Unsecured Debt ............................................................... 9

    6.   Berkowitz Claims ............................................................. 9

  *C.*   *Principals/Affiliates of Debtors' Businesses* .................................................. 9

  *D.*   *Management of the Debtors Before and After the Bankruptcy* ............................. 9

    1.   Prepetition Management of the Debtors ..................................... 9

    2.   Management of the Debtors After The Chapter 11 Filing ...................... 10

  *E.*   *Events Leading to Chapter 11 Filing* ......................................................... 10

  *F.*   *Significant Events During the Bankruptcy* ................................................... 12

    1.   Bankruptcy Proceedings ..................................................... 12

      a. Administrative Matters ................................................... 12

      b. Appointment of Creditors' Committee ................................... 12

      c. Debtor in Possession Financing and Cash Collateral Motion .............. 12

      d. Motion to Pay Prepetition Employee Wages and Benefits .................. 13

      e. Motion for Order Authorizing (1) Continued Use of Existing Cash Management System, (2) Maintenance of Prepetition Bank Accounts, and (3) Continued Use of Existing Forms ...................................................... 13

      f. Motion Regarding Adequate Assurance of Utilities ....................... 13

      g. Motion Regarding Customer-Related Programs and Practices ............. 14

      h. Motion to Extend Time to Assume or Reject Non-Residential Real Property

i

EXHIBIT 1
Page 4

Leases ................................................................................................................ 14
i. Motion to Assume Certain Fitness Center Leases ....................................... 14
j. Prepetition Payment of Priority Tax Claim .............................................. 14
k. Bar Dates for Claims ............................................................................. 15
l. Objections to Claims .............................................................................. 15
m. Professionals ........................................................................................ 15
n. Pending Adversary Proceedings ............................................................. 16
2.    Other Legal Proceedings ............................................................................... 16
a. Cooke/Rodino ...................................................................................... 16
b. Berkowitz ............................................................................................. 16
c. Two Trees Management ......................................................................... 17
d. Raphael Moeller .................................................................................. 17
3.    Actual and Projected Recovery of Preferential or Fraudulent Transfers ...................... 17
4.    Procedures Implemented to Resolve Financial Problems ................................... 17
a. The Shops at The Braverns, Bellevue, Washington ................................. 17
b. 600 West Chicago Avenue, Chicago, Illinois ......................................... 17
c. 2301-2399 Collins Avenue, Miami Beach, Florida ................................. 17
d. 30 East 85th Street, New York, New York ............................................. 17
5.    Current and Historical Financial Conditions ................................................... 18
III.  SUMMARY OF THE PLAN OF REORGANIZATION ............................................. 18
A.   *Joint Consolidated Plan* ................................................................................. 18
B.   *What Creditors and Interest Holders Will Receive Under The Proposed Plan* ............ 19
C.   *Unclassified Claims* ...................................................................................... 19
1.    Statutory Fees ................................................................................................ 19
2.    Priority Tax Claims ........................................................................................ 19
3.    Administrative Claims, Including Professional Administrative Claims ...................... 20
4.    Deadlines For Filing Administrative Claims ...................................................... 23
a. Pre-Effective Date Claims and Expenses ................................................. 23
b. Professional Fees .................................................................................. 23
D.   *Classified Claims and Interests* ...................................................................... 23
1.    Classes of Priority Unsecured Claims ............................................................. 25
2.    Classes of Secured Claims ............................................................................. 25
a. BofA Secured Claim .............................................................................. 25
b. LBN Secured Claim ............................................................................... 26
c. Praesidian Secured Claim ..................................................................... 26
d. Other Secured Claims ........................................................................... 26
3.    Classes of Unsecured Claims ......................................................................... 28
a. Member Claims ..................................................................................... 28
b. Convenience Claims .............................................................................. 28
c. General Unsecured Claims ..................................................................... 29
d. Insured Claims ..................................................................................... 29
e. Subordinated Claims ............................................................................. 30
4.    Class of Interest ............................................................................................ 30
a. Interests in the Subsidiary Debtors ........................................................ 30
b. Series B Preferred Interests in CVI ........................................................ 30
c. Series A Preferred Interests in CVI ........................................................ 31

EXHIBIT 1
Page 5

        d. Class C. Interests in CVI ....................................................................... 31

        e. Class B Interests in CVI ....................................................................... 31

        f. Class A Interests in CVI ....................................................................... 31

    5.     Intercompany Claims ................................................................................... 32

    6.     Special Provision Regarding Unimpaired Classes of Claims ...................... 32

**E.   *Means of Performing the Plan*** ............................................................... 32

    1.     Continued Legal Existence and Revesting of Assets ................................... 32

    2.     Sources of Cash for Distribution ................................................................. 32

    3.     Amended CVI Operating Agreement. ......................................................... 32

    4.     Section 1145 Exemptions. ........................................................................... 33

    5.     Corporate Action. ....................................................................................... 33

    6.     Preservation of Causes of Action ................................................................ 33

    7.     Effectuating Documents; Further Transactions. .......................................... 33

    8.     Exemption From Certain Transfer Taxes and Recording Fees ..................... 33

    9.     Further Authorization. ................................................................................. 34

    10.   Dissolution of Creditors' Committee. ......................................................... 34

    11.   Officers and Directors of Reorganized Debtors .......................................... 34

**F.   *ProvisionsGoverning Distributions*** .................................................... 35

    1.     Allowed Claims and Interests ..................................................................... 35

    2.     Distributions for Claims Allowed as of the Effective Date ......................... 35

    3.     Undeliverable Distributions. ....................................................................... 35

    4.     Interest and Penalties on Claims. ................................................................ 36

    5.     Means on Cash Payment. ............................................................................ 36

    6.     Withholding and Reporting Requirements. ................................................. 36

    7.     Setoffs. ........................................................................................................ 36

**G.  *Procedures for Resolving Disputed, Contingent, and Unliquidated Claims*** ................ 37

    1.     Authority and Deadline ............................................................................... 37

    2.     Creation of Reserves for Disputed Claim ................................................... 37

    3.     Estimation of Claims. .................................................................................. 37

    4.     Distribution Related to Disputed Claims. .................................................... 37

    5.     Disallowed Claims. ..................................................................................... 38

**H.  *Risk Factors*** ......................................................................................... 38

**I.   *Other Provisions of the Plan*** ............................................................... 38

    1.     Assumption/Rejection of Executory Contracts and Unexpired Leases ....... 38

    2.     Changes in Rates Subject to Regulatory Commission Approval .................. 40

    3.     Retention of Jurisdiction. ............................................................................ 40

**J.    *Tax Consequences of Plan*** ................................................................... 42

**IV. CONFIRMATION REQUIREMENTS AND PROCEDURES** ....................................... 42

**A.  *Who May Vote or Object*** ...................................................................... 42

    1.     Who May Object to Confirmation of the Plan ............................................ 42

    2.     Who May Vote to Accept/Reject the Plan .................................................. 43

        a. What Is an Allowed Claim/Interest ...................................................... 43

        b. What Is an Impaired Claim/Interest ..................................................... 43

    3.     Who is <u>Not</u> Entitled to Vote ....................................................................... 43

    4.     Who Can Vote in More Than One Class ..................................................... 44

    5.     Votes Necessary to Confirm the Plan .......................................................... 44

EXHIBIT 1
Page 6

    6.    Votes Necessary for a Class to Accept the Plan ................................................ 44

    7.    Treatment of Nonaccepting Classes ................................................................. 44

    8.    Request for Confirmation Despite Nonacceptance by Impaired Class(es) .......... 44

**B.**    ***Liquidation Analysis*** ..................................................................................... 45

**C.**    ***Feasibility*** .................................................................................................... 45

**V.  CONDITION TO CONFIRMATION OF THE PLAN** ........................................... 46

**A.**    ***Condition to Entry of the Confirmation Order*** ............................................. 46

**B.**    ***Conditions to Effective Date*** ....................................................................... 46

**C.**    ***Waiver of Condition*** ................................................................................... 47

**VI.  EFFECT OF CONFIRMATION OF PLAN** .......................................................... 47

**A.**    ***Binding Effect*** ............................................................................................. 47

**B.**    ***Revesting of Assets*** ..................................................................................... 48

**C.**    ***Releases by the Debtors, their Estates and the Reorganized Debtors*** ........... 48

**D.**    ***Discharge of the Debtors*** ............................................................................ 48

**E.**    ***Injunction*** ................................................................................................... 49

**F.**    ***Exculpation and Limitation of Liability*** ...................................................... 49

**G.**    ***Term of Bankruptcy Injunction or Stays*** .................................................... 50

**H.**    ***Post-Effective Date Retention of Professionals*** ........................................... 51

**I.**    ***Effect of Release, Discharge and Injunction on Unimpaired Claims*** ........... 51

**J.**    ***Amendment Or Modification of This Plan*** ................................................... 51

**K.**    ***Post-Confirmation Status Report*** ............................................................... 51

**L.**    ***Post-Confirmation Conversion/Dismissal*** ................................................... 51

**M.**    ***Final Decree and Closing The Chapter 11 Cases*** ....................................... 52

EXHIBIT A - CVI OPERATING AGREEMENT
EXHIBIT B - MERIDIAN MANAGEMENT AGREEMENT
EXHIBIT C - LIST OF CLAIMS
EXHIBIT D - LIQUIDATION ANALYSIS.
EXHIBIT E - FINANCIAL STATEMENT ENDING DECEMBER 31, 2009
EXHIBIT F - FINANCIAL STATEMENT ENDING DECEMBER 31, 2010
EXHIBIT G - FINANCIAL STATEMENT FOR MAY 2011
EXHIBIT H - SECURITIES PURCHASE AGREEMENT
EXHIBIT I - AMENDED CVI OPERATING AGREEMENT.
EXHIBIT J - CASH FLOW PROJECTION THROUGH OCTOBER 2012
EXHIBIT K - LIST OF EXECUTORY CONTRACTS
EXHIBIT L - TAX CONSEQUENCES

EXHIBIT 1
Page 7

# I.

# <u>INTRODUCTION</u>

Club Ventures Investments LLC ("***CVI***") and certain of its subsidiaries, Club Ventures II, LLC, CV 2, LLC, CV II Gym, LLC, Club Ventures III, L.L.C., CV 3, LLC, CV III Gym, LLC, Club Ventures IV, LLC, CV 4 Leasing, LLC, CV IV Gym, LLC, Club Ventures VI, LLC, CV VI, LLC, CV VII Gym, LLC, Club Ventures VIII, LLC, CV VIII GYM, LLC, Club Ventures X, LLC, CV X Gym, LLC, and DB 85 Gym Corp. (collectively, the "***Debtors***"), are debtors and debtors in possession in jointly-administered chapter 11 bankruptcy cases (the "***Chapter 11 Cases***").  The Debtors commenced voluntary bankruptcy cases by filing chapter 11 petitions under the United States Bankruptcy Code ("***Bankruptcy Code***"), 11 U.S.C. § 101 *et. seq.*, on March 2, 2011 (the "***Petition Date***").  The Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") authorized the joint administration of the Debtors' cases by Order entered on March 4, 2011.

Chapter 11 allows the Debtors, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization.  The plan may provide for the Debtors to reorganize by continuing to operate, to liquidate by selling assets of the estates, or a combination of both.  The Debtors (collectively, the "***Plan Proponents***") are the parties proposing the consolidated chapter 11 plan (the "***Plan***") sent to you in the same envelope as this document.  THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.  The Disclosure Statement has been approved by the Bankruptcy Court, and is provided to help you understand the Plan.  Any capitalized terms used in this Disclosure Statement and not defined shall have the meaning ascribed in the Plan.

The Plan is a reorganizing Plan.  In other words, subject to the provisions of the Plan, the Debtors will emerge from bankruptcy as an operating entity and continue to operate their business.  The Debtors will make payments to creditors from Cash on hand, Cash generated from the operation of the business, and the Exit Facility, which is described herein.  The Effective Date of the proposed Plan is expected to be on or about September 30, 2011.  The Plan was the product of extensive negotiations with, and is fully supported by, the Debtors' Official Committee of Unsecured Creditors (the "***Creditors' Committee***") and the Debtors' secured creditors.

The Plan classifies all claims against and interests in the Debtors into 16 Classes according to the type and status of such Claims and Interests.  The following table provides a brief overview of the Classes and their entitlement to vote on the Plan.  Detailed information regarding the Claims and Interests in each Class and their treatment under the Plan is set forth in Article III below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Non-Tax Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Bank of America Secured Claim | Impaired | Entitled to Vote |

2

EXHIBIT 1
Page 8

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 3 | LBN Holding LLC Secured Claim | Impaired | Entitled to Vote |
| 4 | Praesidian Secured Claim | Impaired | Entitled to Vote |
| 5 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 6 | Member Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Insured Claims | Unimpaired | Deemed to Accept |
| 10 | Subordinated Claims | Impaired | Deemed to Reject |
| 11 | Interests in Subsidiary Debtors | Unimpaired | Deemed to Accept |
| 12 | Series B Preferred Interests in CVI | Impaired | Deemed to Reject |
| 13 | Series A Preferred Interests in CVI | Impaired | Deemed to Reject |
| 14 | Class C Interests in CVI | Impaired | Deemed to Reject |
| 15 | Class B Interests in CVI | Impaired | Deemed to Reject |
| 16 | Class A Interests in CVI | Impaired | Deemed to Reject |

As described in Article III.A, below, the Plan is a single plan of reorganization for the Debtors' jointly administered chapter 11 cases.  Solely for the purposes of voting, confirmation and making distributions to the holders of allowed general unsecured claims: (a) all general unsecured claims against the Debtors are placed in a single class for the purpose of voting on the Plan, and (b) any general unsecured claims against multiple Debtors based upon one underlying obligation, including claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall be treated as a single claim.  Such treatment of general unsecured claims for plan purposes shall not affect, without limitation: (x) the legal and corporate structure of the Reorganized Debtors, (y) any obligations under any leases or contracts assumed in the Plan or otherwise after the commencement of these cases, or (z) the obligation of each Reorganized Debtor to pay all U.S. Trustee fees on all disbursements as required by the Bankruptcy Code and Guidelines of the U.S. Trustee.

## A.  Purpose of This Document

This Disclosure Statement summarizes what is in the Plan, and tells you certain

EXHIBIT 1
Page 9

information relating to the Plan and the process the Bankruptcy Court follows in determining whether to confirm the Plan.

## READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

**1.      WHO CAN VOTE OR OBJECT,**

**2.      WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,**

**3.      THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,**

**4.      WHAT THINGS THE BANKRUPTCY COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**5.      WHAT IS THE EFFECT OF CONFIRMATION, AND**

**6.      WHETHER THIS PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan.

### B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CASES.

### 1.  Time and Place of the Confirmation Hearing

The hearing where the Bankruptcy Court will determine whether or not to confirm the Plan will take place on September 23, 2011, at 10:00 a.m., in Courtroom 617, U.S. Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.

EXHIBIT 1
Page 10

### 2.    Deadline for Voting For or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: Kathryn F. Russo, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067.

Your ballot must be received on or before September 12, 2011 or it will not be counted.

### 3.    Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Bankruptcy Court and served upon: (1) counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: David B. Shemano, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067; (2) counsel for the Creditors' Committee, Klestadt & Winters, LLP, Attention: Tracy L. Klestadt, Esq., 570 Seventh Avenue, 17th Floor, New York, NY 10018; (3) counsel for LBN, Moses & Singer LLP, Attention: Howard R. Herman, Esq., Alan E. Gamza, Esq. and Kent C. Kolbig, Esq., The Chrysler Building, 405 Lexington Avenue, New York, New York 10174; (4) counsel for Praesidian, Morrison Cohen LLP, Attention: Stephen Budow, Esq., and Joe Moldovan, Esq., 909 Third Avenue, New York, New York 10022; and (5) the Office of the United States Trustee for the Southern District of New York, attention: Nazar Khodorovsky, Esq., 33 Whitehall Street, 21st Floor, New York, New York 10004, by September 12, 2011.

### 4.    Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Plan Proponents, Peitzman, Weg & Kempinsky LLP, attention: Kathryn F. Russo, Esq., 2029 Century Park East, Suite 3100, Los Angeles, CA 90067, krusso@pwkllp.com.

### C.    Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtors' books and records, financial statements, valuation of the Company by Focal Point Securities, LLC, and documents filed with the Bankruptcy Court. The information contained in this Disclosure Statement is provided by the Plan Proponents. The Plan Proponents represent that everything stated in the Disclosure Statement is true to the best of the Plan Proponents' knowledge. The Bankruptcy Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

EXHIBIT 1
Page 11

## II.

## BACKGROUND

### A.  Description and History of the Debtors' Businesses

CVI and its twenty-one (21) subsidiaries (the "*Subsidiaries*", together with CVI, the "*Company*") are a premiere boutique gym company operating "DavidBartonGyms," stylish, upscale fitness clubs in four metropolitan areas in the United States.  The first David Barton Gym was opened in 1992.  The Company primarily targets individuals in the 18-40 year age range.  As of the Petition Date, the Company operated six fitness clubs in the following locations: (a) three fitness clubs in New York, New York; (b) one fitness club in Chicago, Illinois; (c) one fitness club in Miami Beach, Florida; and (d) one fitness club in Bellevue, Washington.  Collectively, the clubs serve approximately 13,500 members (the "*Club Members*").

The majority of the Company's revenues derive from the commercial operation of the fitness centers.  The Company's model is differentiated from other commercial fitness centers by its focus on personal training.  As a result, the revenue collected per member is higher, on average, than competing fitness centers.

The Company's consolidated net revenue for the twelve months ending December 31, 2010, was approximately $28.3 million.  The Company has three principal sources of revenue:

> •  *Membership Services Revenue*.  The Company's primary source of revenue is payments for membership services provided at each of its fitness clubs (the "*Membership Services Revenue*").  Membership Services Revenue includes amounts paid by Club Members in the form of membership fees and dues, as well as revenue generated from initiation fees.  Membership services revenue comprised 51.7% of the Company's revenue for the twelve months ending December 31, 2010.  Total Membership Services Revenue for the twelve months ending December 31, 2010 was approximately $14.6 million, a 13.2% increase from approximately $12.9 million for the twelve months ending December 31, 2009.  The increase in Member Services Revenue was primarily due to the opening of New York and Bellevue fitness centers in the second half of 2009.

> •  *Personal Training Revenue*.  The second major source of revenue for the Company is payments received for personal training services provided at each of the fitness clubs (the "*Personal Training Revenue*").  Personal Training Revenue includes amounts paid by Club Members who receive personal training sessions.  Personal Training Revenue comprised approximately 43.8% of the Company's revenue for the twelve months ending December 31, 2010.  Total Personal Training Revenue for the twelve months ending December 31, 2010 was approximately $12.4 million, representing a 22% increase from approximately $10.2 million for the twelve months ending December 31, 2009.  The increase in Personal Training Revenue was primarily

6

EXHIBIT 1
Page 12

due to the opening of New York and Bellevue fitness centers in the second half of 2009.

- *Sale of Products and Other Service Revenue*.  The Company also generates revenue through the sale of products at its fitness center retail stores, including branded and third-party nutrition products, juice bar nutrition drinks and fitness-related convenience products, such as clothing.  The Company also offers spa services at one of its locations.  Revenue from sale of products and other services comprised 4.5% of the Company's revenue for the twelve months ending December 31, 2010.  Revenue from sale of products and other services for the twelve months ending December 31, 2010 was approximately $1.3 million, representing a 62.5% increase from approximately $0.8 million for the twelve months ending December 31, 2009.

Although the Company formally consists of a parent company and subsidiaries, the Company has historically been, and presently continues to be, effectively operated as a single enterprise and creditors have traditionally treated the Company as a single enterprise.  The Company's audited financial statements are prepared on a consolidated basis.  CVI and the Subsidiaries have common management.  While substantially all of the Subsidiaries maintain separate collection accounts, funds deposited into the collection accounts are swept daily into a CVI account and all disbursements are made from a CVI disbursement account.

### B.  Debtors' Capital Structure and Significant Claims

#### 1.  Bank of America

Pursuant to that certain Promissory Note (the "***BofA Note***"), dated June 29, 2004, as amended, between CVI, as borrower, and Bank of America, N.A. ("***BofA***"), as lender, as amended from time to time, and that certain Loan Agreement (the "***BofA Loan Agreement***"), dated as of August 4, 2009, between CVI and BofA, as amended from time to time, BofA agreed to make loans to CVI (the "***BofA Loans***").  BofA also has outstanding a $1.5 million letter of credit for the account of Debtors (all amounts owing thereunder, together with all amounts owing under the BofA Note and the BofA Loan Agreement, the "***BofA Obligations***").  As of the Petition Date, the BofA Obligations were in the approximate amount of $11,115,000.

To induce BofA to extend the BofA Loans and as security for the repayment of all amounts due under the BofA Obligations, (i) pursuant to that certain Pledge Agreement (the "***BofA Pledge Agreement***"), dated June 29, 2004, between BofA and CVI, CVI granted to BofA a lien and security interest (the "***BofA Liens***") in substantially all of its assets, as more fully described in the BofA Pledge Agreement, and (ii) John D. Howard ("***JDH***") issued a Continuing and Unconditional Guaranty, dated June 29, 2004, and a Continuing and Unconditional Guaranty, dated March 27, 2009 (together, the "***JDH Guaranty***"), guaranteeing all amounts owed under the BofA Note.

The Debtors acknowledged the validity of the BofA Obligations and BofA Liens in the DIP/Cash Collateral Order.  Under the DIP/Cash Collateral Order, the deadline for any third

party to commence an action challenging the validity of the BofA Obligations or BofA Liens was June 26, 2011, and no action was commenced by that date.

## 2. LBN Holding LLC

Pursuant to agreements entered into between the Debtors and LBN Holding LLC ("LBN," as successor in interest to JDH) from time to time (collectively, the "**LBN Agreements**"), LBN has loaned amounts to or for the benefit of the Debtors from time to time. Included among the LBN Agreement is a Reimbursement Agreement between JDH and the Debtors dated June 27, 2004, which provides that if JDH is obliged to make any payment under the JDH Guaranty, the Debtors must reimburse LBN. The amounts owed by the Debtors to LBN under the LBN Agreements are referred to as the "**LBN Obligations**". The LBN Obligations are subordinated to the BofA Obligations pursuant to that certain Subordination Agreement, dated on or about March 5, 2009. As of the Petition Date, the outstanding noncontingent LBN Obligations were in an amount not less than $22,418,294.61, and the outstanding contingent LBN Obligations were in an amount not less than $13,202,431.16.

The LBN Obligations are secured by a lien on and security interest in substantially all of the assets of Debtors and by a pledge of the equity interests in all or substantially all of the Debtors (the "**LBN Liens**").

The Debtors acknowledged the validity of the LBN Obligations and LBN Liens in the DIP/Cash Collateral Order. Under the DIP/Cash Collateral Order, the deadline for any third party to commence an action challenging the validity of the LBN Obligations or LBN Liens was June 27, 2011, which deadline was extended solely with respect to the Creditors' Committee to July 29, 2011, and no action was commenced by that date.

## 3. Praesidian

Pursuant to security and note purchase agreements executed in 2005, 2006, 2007, 2008 and 2009 (the "**Praesidian Agreements**"), CVI executed a series of promissory notes in favor of Praesidian Capital Investors, LP, Praesidian II SPV 1 LP, and Praesidian II SPV 2, LP (collectively, "**Praesidian**"). The amounts owed by the Debtors to Praesidian under the Praesidian Agreements are referred to as the "**Praesidian Obligations**". The Praesidian Obligations are subordinated to the BofA Obligations pursuant to that certain Subordination Agreement, dated on or about March 5, 2009. As of the Petition Date, the outstanding Praesidian Obligations were in the approximate amount of $30,626,715.70.

The Praesidian Obligations are guaranteed by each of the Subsidiaries and are secured by a lien on and security interest in substantially all of the assets of the Debtors (the "**Praesidian Liens**").

The Debtors acknowledged the validity of the Praesidian Obligations and Praesidian Liens in the DIP/Cash Collateral Order. Under the DIP/Cash Collateral Order, the deadline for any third party to commence an action challenging the validity of the Praesidian Obligations or Praesidian Liens was June 27, 2011, which deadline was extended solely with

EXHIBIT 1
Page 14

respect to the Creditors' Committee to July 29, 2011, and no action was commenced by that date.

### 4. Capital Leases

The Debtors lease various equipment under capital leases that expire over a two year period from the Petition Date. As of the Petition Date, the Company was liable for approximately $860,000 in debt relating to the equipment leases.

### 5. Unsecured Debt

As of the Petition Date, the Debtors' consolidated unsecured debt, consisting primarily of landlords, trade vendors and professionals, was approximately $6.1 million. As set forth below, that amount was substantially reduced during the Chapter 11 Cases.

### 6. Berkowitz Claims

In 2005, the Debtors hired Mark Berkowitz ("**Berkowitz**") to serve as the Debtors' Chief Financial Officer. The Debtors terminated Berkowitz as CFO in 2007. In 2008, Berkowitz commenced litigation against CVI, David Barton and JDH in the Supreme Court of the State of New York, County of New York, captioned *Mark Berkowitz v. Club Ventures Investments LLC d/b/a David Barton Gym, David Barton and John Howard*, Index No. 602824/07, arising from his termination. JDH was previously dismissed from the action. Berkowitz asserts approximately $500,000 in wage benefit claims, and approximately $3,000,000 in damages arising from or related to his alleged entitlement to Class B Interests in CVI.

## C. Principals/Affiliates of Debtors' Businesses

CVI owns 100% of the membership or shareholder interest in each of the Subsidiaries. CVI has five classes of membership interests: Class A, Class B, Class C, Series A Preferred, and Series B Preferred. Class A membership units are held by David Barton and LBN. Class B membership units are held by Mark Berkowitz. Class C membership units are held by Elan Ben-Avi. Series A Preferred membership interests are held by LBN. Series B Preferred membership interests are held by TRL Holdings Inc., an affiliated company of Praesidian. In addition, LBN and Praesidian hold warrants to purchase Class A membership units. The respective rights and priorities of the different membership classes regarding distributions are set forth in the CVI Operating Agreement, a copy of which is attached as Exhibit A. The membership interests are nonvoting. Instead, the Operating Agreement provides that CVI will be managed by a Board of Managers consisting of (a) a designee of Praesidian, (b) a designee of David Barton, (c) a designee of JDH, and (d) Elan Ben-Avi. On December 24, 2010, Elan Ben-Avi resigned as a Manager and has not yet been replaced.

## D. Management of the Debtors Before and After the Bankruptcy

### 1. Prepetition Management of the Debtors

From its formation in 1992 through present, David Barton served as the Company's

EXHIBIT 1
Page 15

Chief Executive Officer.  Mark Berkowitz served as the Company's Chief Financial Officer from December 2005 through June 2007.  From March 2009 through August 12, 2011, Stephen Schwartz served as CFO.  In 2008, the Company hired Elan Ben-Avi as the Chief Operating Officer and he served through December 2010.  On or about December 1, 2010, Charles Grieve was hired as a consultant and serves as the Chairman.

### 2.  Management of the Debtors After the Chapter 11 Filing

After the Petition Date, the Debtors have been managed by Charles Grieve as Chairman, David Barton as CEO, and Stephen Schwartz as CFO (until his resignation effective August 12, 2011).

### E.  Events Leading to the Chapter 11 Filing

In 2005, the Company had fitness clubs in four locations: (a) two in New York, (b) one in Chicago, and (c) one in Miami Beach, totaling approximately 60,000 square feet of space.  In the following years, the Company decided to embark on an ambitious expansion program.  Over the next two years, the Company signed seven new real estate leases representing an additional 198,000 square feet of space.  Six of the leases were for new fitness centers and one lease was for the corporate office.  The real estate leases for the fitness centers had more square footage than the average size of the Company's then existing facilities and the price per square foot was almost twice what the Company was paying for its then existing fitness centers.

To fund the expansion plan, the Company needed to raise capital to provide for capital expenditures, construction build-outs and working capital.  In 2006, the Company hired Berkowitz to serve as CFO.  Prior to joining the Company, Berkowitz acted as a consultant to the Company.  Mr. Berkowitz was responsible for negotiating the leases and the leases were executed prior to having committed funding for these projects.  The Company engaged an investment bank, Jefferies Group, Inc. ("***Jefferies Group***"), to represent the Company in its efforts to raise capital from parties other than the current shareholders.  Jefferies Group, however, was unable to raise any outside capital.

In 2006 and 2007, the Company received approximately $20 million in funding from LBN and Praesidian.  In that period, the Company lost approximately $11 million from operations, spent $6.6 million to fund the building costs for its Miami Beach location and paid off approximately $2.4 million in tax liabilities.  The Miami Beach project fell behind schedule and ran over budget.

By 2008, the Company was incurring substantial losses from operations and generating negative cash flow.  In 2008, the Company decided to hire an outside restructuring firm, Getzler Henrich & Associates LLC ("***Getzler Henrich***") to assess the financial viability of the Company.  Getzler Henrich determined that the primary causes for the Company's poor financial performance was its lack of an experienced management team, lack of internal controls and lack of policies and procedures.  In order to address these issues the Company decided to hire a COO.  The Company also realized that it was financially necessary to terminate some of the newly signed real estate leases.

Elan Ben-Avi was hired as the COO in 2008.  Corporate overhead increased from

EXHIBIT 1
Page 16

approximately $3.0 million to approximately $6.0 million annually over the next two year period. In addition, the Company opened three new locations during that period. The Debtors' projections called for significant growth in revenue from the new locations, which would cover the increased costs of overhead. For the period of 2008-2009, the Company's revenue grew less than projected and did not adequately cover expenses incurred over this same period. Also in 2008, the former CFO, Mark Berkowitz, commenced litigation against the Company arising from his termination and claimed $3.5 million in damages.

In 2008, while the Company lost approximately $13 million from operations, it received $17 million in additional financing from BofA, Praesidian, and LBN. The Miami Beach fitness center opened in October 2008, and the Company focused its financial resources on opening two new fitness centers in New York, New York and Bellevue, Washington.

The Company opened the New York fitness center in July 2009 and the Bellevue center in September 2009. That same year the Company had a net loss of $19 million and failed to comply with the minimum EBITDA and other financial covenants, resulting in a default on the Praesidian Indebtedness. Notwithstanding the default, the Company received an additional $15.7 million in funding from BofA, Praesidian, and LBN.

In 2010, the Company's projections called for an approximately 20% increase in revenue with a similar expense structure as in 2009. The Company, however, fell short of its revenue projections for 2010 and was required to borrow $7.5 million from LBN to continue to operate.

By the fourth quarter of 2010, the Company determined to implement a significant change to its business plan. On or about December 1, 2010, CVI entered into a Management Agreement with Meridian Sports Club California, LLC (collectively with all affiliates, "*Meridian*"). Meridian owns and operates 12 fitness centers in California and Hawaii. Pursuant to the Meridian Management Agreement, Charles Grieve, the principal of Meridian, agreed to serve as the Chairman of CVI. Because of the change of direction, Mr. Ben-Avi, the then existing COO, resigned.

The Meridian Management Agreement contemplates a strategic alliance between the Company and Meridian that will be beneficial to both entities. For example, in the coming months, Meridian will be opening a fitness center in Las Vegas as a David Barton Gym pursuant to a licensing agreement with the Company. A copy of the Meridian Management Agreement is attached as Exhibit B.

After the Meridian Management Agreement was entered into, the Company, under the leadership of Mr. Grieve, prepared a comprehensive plan to implement a restructuring of the Company, with the goal of improving the Debtors' financial position for 2011 and beyond. The comprehensive plan contemplated a financial restructuring of the balance sheet, an operational restructuring of the Company's fitness centers and significant reductions in certain corporate costs. The Company also began introducing new initiatives to enhance revenue and cash flow.

After careful analysis, taking into consideration the existence of pending litigation, the need to modify and/or terminate existing leases, and the need to convert certain existing debt into equity, the Company concluded that its restructuring plan should be implemented through a

EXHIBIT 1
Page 17

chapter 11 proceeding and the Chapter 11 Cases were commenced on March 2, 2011.

### F.  Significant Events During the Bankruptcy

#### 1.  Bankruptcy Proceedings

##### a)  Administrative Matters

On March 2, 2011, the Debtors filed emergency motions seeking joint administration of their eighteen cases, which motions were granted by Order entered on March 4, 2011, and an emergency motion seeking approval of limited notice procedures, which motion was granted by Order entered on March 28, 2011.

Throughout these cases, the Debtors materially have complied with, and continue to comply with, all of their duties under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure ("*FRBP*") an all applicable guidelines of the Office of the United States Trustee "*OUST*").  On March 23, 2011, the Debtors submitted their 15-Day Packages to the OUST, and the Debtors filed their complete Schedules of Assets and Liabilities and Statement of Financial Affairs on April 22, 2011.  The Debtors have submitted or will submit prior to confirmation of the Plan all required monthly operating reports to the OUST.  In addition, the Debtors have tendered all quarterly fees due and owing to the OUST.

##### b)  Appointment of Creditors' Committee

On March 18, 2011, the OUST appointed the Creditors' Committee.  The members of the Creditors' Committee appointed were (1) The Bravern, LLC, (2) RCK, LLC d/b/a Good Air Commercial & Service Division, and (3) Polar Air Conditioning, Inc.  The Creditors' Committee selected Klestadt & Winters, LLP, to serve as its counsel, and FTI Consulting, Inc., to serve as its financial advisor.

The Bravern, LLC is the landlord of the Debtors' facility in Bellevue, Washington.  As set forth below, the Debtors reached agreement with The Bravern, LLC concerning the assumption of the lease and treatment of the cure claim, which agreement was approved by the Bankruptcy Court.  Consequently, The Bravern, LLC resigned from the Creditors' Committee after approval of the lease assumption agreement and payment of the cure claim.

##### c)  Debtor in Possession Financing and Cash Collateral Motion

On March 2, 2011, the Debtors filed an emergency motion seeking authority to (1) utilize the cash held by their Estates and generated in the ordinary course of business, which cash may be considered "cash collateral" under the Bankruptcy Code, and (2) borrow up to $800,000 from LBN on a junior secured superpriority basis pursuant to section 364(c) and (d) of the Bankruptcy Code.  After a hearing on March 3, 2011, the Bankruptcy Court entered an Interim Order on March 4, 2011, authorizing the Debtors to use cash collateral and borrow up to $200,000, and scheduled a continued hearing for March 24, 2011.  After a hearing on March 24, 2011, the Bankruptcy Court entered a Second Interim Order on March 28, 2011, authorizing the Debtors to use cash collateral and borrow up to $400,000, and scheduled a continued hearing for April 27, 2011.  After hearings on April 27, 2011, and June 1, 2011, the Bankruptcy Court

EXHIBIT 1
Page 18

entered a Final Order on June 1, 2011 (the "***DIP/Cash Collateral Order***"), authorizing the Debtors to use cash collateral and borrow up to $800,000.

On August 15, 2011, the Debtors will present the Bankruptcy Court with an Order supplementing the DIP/Cash Collateral Order and authorizing an amendment (the "***Amendment***") to the underlying credit agreement governing the DIP Facility to increase the maximum borrowing amount by an additional $700,000 (the "***Additional Funds***") to $1,500,000 so that the Debtors have access to sufficient funds to cover operating expenses through the Effective Date of the Plan.  Due to the Debtors' immediate need for cash, and in anticipation of such an Order, LBN has advanced to the Debtors $550,000 of the Additional Funds, resulting in $150,000 of the Additional Funds remaining unadvanced and available to the Debtors in the event the Debtors require use of such funds prior to the Effective Date of the Plan.  The Amendment will have no effect on the treatment of LBN under the Plan or on the distributions to unsecured creditors thereunder.  The only effect of the Amendment is that funds advanced in excess of the first $350,000 of the Additional Funds will accelerate the timing of certain advances that were to be made under the Exit Facility and, therefore, correspondingly reduce the amount available under the Exit Facility.

### d)  Motion to Pay Prepetition Employee Wages and Benefits

On March 2, 2011, the Debtors filed an emergency motion seeking authority to pay the administrative expenses and prepetition priority claims for wages, salaries, commissions and other compensation to their employees, and to honor and pay all employee benefits in accordance with the Debtors' prepetition employee benefit programs and policies.  After a hearing on March 3, 2011, the Bankruptcy Court entered an Order on March 4, 2011, granting the motion.

### e)  Motion for Order Authorizing (1) Continued Use of Existing Cash Management System, (2) Maintenance of Prepetition Bank Accounts, and (3) Continued Use of Existing Forms

On March 2, 2011, the Debtors filed an emergency motion seeking authority to (1) continue to use their prepetition cash management system, (2) designate, maintain and continue to use all of their existing bank accounts in the names and account numbers existing immediately prior to the commencement of the Chapter 11 Cases, (3) deposit funds in and withdraw funds from such accounts by check, wire transfer, direct electronic debit or credit, interbank transfer, or other customary manner, (4) treat their prepetition accounts for all purposes as debtor in possession accounts, and (5) continue to use correspondence and business forms existing immediately prior to the commencement of the Chapter 11 Cases without reference to their status as debtors in possession.  After a hearing on March 3, 2011, the Bankruptcy Court entered an Interim Order on March 4, 2011 granting the motion.  After a hearing on March 24, 2011, the Bankruptcy Court entered a Final Order on March 28, 2011 granting the motion.

### f)  Motion Regarding Adequate Assurance of Utilities

On March 2, 2011, the Debtors filed an emergency motion seeking an order from the

EXHIBIT 1
Page 19

Bankruptcy Court authorizing the Debtors to provide adequate assurance, in the form of cash deposits, to the various utility companies providing service to the Debtors, and determining that the proposed deposits are adequate assurance of payment.  After a hearing on March 24, 2011, the Bankruptcy Court entered an Order on March 28, 2011, granting the motion.

### g)  Motion Regarding Customer-Related Programs and Practices

On March 2, 2011, the Debtors filed an emergency motion seeking authority from the Bankruptcy Court to perform their prepetition obligations related to various programs and practices currently in place with its customers (the "***Customer Programs***") and to continue, renew, replace, implement new, and/or terminate such of the Customer Programs as the Debtors deem appropriate, in the ordinary course of business.  After a hearing on March 3, 2011, the Bankruptcy Court entered an Order, on March 4, 2011, granting the motion.

### h)  Motion to Extend Time to Assume or Reject Non-Residential Real Property Leases

On May 17, 2011, the Debtors filed a motion for an extension of time to assume or reject non-residential real property leases.  After a hearing on June 1, 2011, the Bankruptcy Court entered an Order on June 1, 2011, extending the time to assume or reject non-residential real property leases to September 28, 2011.

### i)  Motion to Assume Certain Fitness Center Leases

The Debtors filed several motions for authority to assume various modified fitness center lease agreements.  On April 27, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 600 West Chicago Avenue, Chicago, Illinois.  On May 25, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at The Shops at The Bravern, Bellevue, Washington.  On June 1, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 2301-2399 Collins Avenue, Miami Beach, Florida.  On July 18, 2011, the Bankruptcy Court entered an Order authorizing the Debtors to assume the modified lease of real property located at 30 East 85th Street, New York,  New York.

### j)  Prepetition Payment of Priority Tax Claim

The Company historically did not pay sales tax on Membership Services Revenue generated in Florida.  However, in 2009 the Company reexamined whether sales tax was in fact owed on Membership Services Revenue in Florida.  In the summer of 2009, the State of Florida announced a sales tax amnesty program, which permitted companies to pay past due and owing sales tax without any penalties and minimal interest.  The Company determined to take advantage of the amnesty program and self-reported to the State of Florida a past due sales tax amount of approximately $225,000.  The Company agreed to a payment plan of approximately $20,000 per month.  As of the Petition Date, approximately $60,000 remained outstanding.  The Debtors, without any intention of violating the requirements of the Bankruptcy Code, and concerned that the State of Florida may have had the right to seek additional penalties and interest if the remaining monthly payments were not timely made, made postpetition payments

EXHIBIT 1
Page 20

pursuant to the amnesty agreement in March, April, and May 2011.  Upon realization that the payments were in technical violation of the Bankruptcy Code, the Debtors made the decision not to either request retroactive approval or to avoid the payments, but instead to disclose the payments in this Disclosure Statement and not take any further action.  The Debtors made this decision because under the Plan the State of Florida would have been entitled to the payments in any event on the Effective Date of the Plan.

### k)  Bar Dates for Claims

On April 13, 2011, the Debtors filed a motion requesting that the Bankruptcy Court establish a bar date for the filing of claims.  After a hearing on April 27, 2011, the Bankruptcy Court entered an Order on April 27, 2011, establishing June 15, 2011 as the deadline for filing proofs of claim against the Debtors' Estates, with certain specified exceptions.  On May 4, 2011, the Debtors prepared and served a notice of the claims bar date to all known creditors and parties on their Master Mailing Lists.

### l)  Objections to Claims

No objections to Claims have been filed by the Debtors, but the Debtors reserve their right to object to all Claims before and after Confirmation of the Plan.  The Debtors preserve their right to object to any Claims on any available grounds, including any claims, counterclaims, defenses, right to setoff, or other basis, in favor of any Debtor as against any claimant.  A list of the General Unsecured Claims against the Debtors is attached as Exhibit C.  Included in Exhibit C is a list of the General Unsecured Claims against the Debtors to which the Debtors' anticipate filing objections.

### m) Professionals

The Bankruptcy Court has approved the employment of the following professionals:

| Name | Date Bankruptcy Court Approved Employment |
|---|---|
| Peitzman, Weg & Kempinsky LLP<br>2029 Century Park East, Suite 3100<br>Los Angeles, CA 90067<br><br>*Co-Bankruptcy Counsel to the Debtors* | April 26, 2011 |
| Golenbock Eiseman Assor Bell & Peskoe LLP<br>437 Madison Avenue<br>New York, New York 10022<br><br>*Co-Bankruptcy Counsel to the Debtors* | April 26, 2011 |

EXHIBIT 1
Page 21

| | |
|---|---|
| Klestadt & Winters, LLP<br>570 Seventh Avenue, 17th Floor<br>New York, NY 10018<br><br>*Counsel to the Creditors' Committee* | April 21, 2011 |
| FocalPoint Securities, LLC<br>11150 Santa Monica Blvd., Suite 1550<br>Los Angeles, CA 90025<br><br>*Financial Advisors to the Debtors* | April 27, 2011 |
| FTI Consulting, Inc.<br>3 Times Square, 9th Floor<br>New York, NY 10036<br><br>*Financial Advisors to the Creditors' Committee* | June 6, 2011 |

**n)  Pending Adversary Proceedings**

Aside from the motions and proceedings related to the Plan and Disclosure Statement, there are no significant adversary proceedings or motions pending in the Bankruptcy Court.

**2.  Other Legal Proceedings**

In addition to the proceedings discussed above the Debtors have been or currently are involved in the following nonbankruptcy legal proceedings:

a)  <u>Cooke/Rodino</u>**.**  On or about January 11, 2011, Deborah R. Cooke and Christina M. Rodino (the "***Former Employees***") filed a complaint against DB 85 Gym Corp., CV II Gym, LLC, and CV VI, LLC in the District Court for the Southern District of New York alleging claims based upon sexual orientation discrimination and gender discrimination (the "***Employment Litigation***").  On April 6, 2011, the Former Employees filed a motion for relief from stay to pursue the Employment Litigation.  After a hearing on April 27, 2011, the Bankruptcy Court entered an Order on May 10, 2011, denying the motion with leave to renew in July 2011.  On July 19, 2011, the Former Employees renewed their motion for relief from to pursue the Employment Litigation and the Debtors timely objected to such renewed motion.  After a hearing on August 3, 2011, the Bankruptcy Court entered an Order on August 3, 2011, granting the Former Employees relief from the stay to resume prosecution of the Employment Litigation on the Effective Date of the Plan.

b)  <u>Berkowitz</u>.  On or about November 30, 2007, Mark Berkowitz, the Debtors' former Chief Financial Officer, filed an amended complaint against CVI, David Barton, and JDH in the New York State Supreme Court alleging an interest in and claims against CVI for approximately $3.5 million (the "***Berkowitz Litigation***").  JDH was subsequently dismissed from the Berkowitz Litigation.  On May 13, 2011, Berkowitz filed a motion for relief from stay to pursue the Berkowitz Litigation.  After a hearing on June 1,

16

EXHIBIT 1<br>Page 22

2011, the Bankruptcy Court entered an Order on June 14, 2011, denying the motion.

        c)  <u>Two Trees Management</u>.  On or about February 17, 2011, Two Trees Management filed a complaint against Club Ventures VI, LLC in the Civil Court of the City of New York alleging a claim for unpaid rent at the Debtors' corporate office located at 50 West 23rd Street, New York.  The litigation is currently stayed.

        d)  <u>Raphael Moeller</u>.  On January 11, 2010, Raphael Moeller filed a complaint against DB 85 Gym Corp. in the Supreme Court of the State of New York alleging a claim for disability.  The litigation is currently stayed.

### 3.  Actual and Projected Recovery of Preferential or Fraudulent Transfers

Except as otherwise provided in the Plan, all of the Debtors' rights, title, and interest in any litigation claims or actions arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law (the "***Avoidance Actions***"), whether (a) alleged, (b) pending, or (c) that may be alleged in a future complaint, are preserved by the Plan.  The Debtors currently have no intention of prosecuting any Avoidance Actions, but reserve the right to prosecute all Avoidance Actions.

### 4.  Procedures Implemented to Resolve Financial Problems

Since entering into the Meridian Management Agreement in December 2010, the Debtors have implemented a comprehensive operational restructuring, including consolidating operations, reducing staff, eliminating expenses, and undertaking other cost-savings measures. Compared to expenses made in 2010, the Debtors estimate that the restructuring has resulted in a reduction of approximately $3,125,000 in expenses through May 31, 2011, and will ultimately result in an additional $3,000,000 reduction through December 31, 2011.

During the Chapter 11 Cases, the Debtors successfully renegotiated several of their real property leases, which made continued operations at the locations feasible.  In summary:

        a)  <u>The Shops at The Bravern, Bellevue, Washington</u>.  The landlord waived over $1.5 million in arrearages and agreed to a reduction in monthly rent resulting in a savings of approximately $1.3 million in 2011 alone.

        b)  <u>600 West Chicago Avenue, Chicago, Illinois</u>.  The landlord waived four months rent resulting in a savings of approximately $300,000.

        c)  <u>2301-2399 Collins Avenue, Miami Beach, Florida</u>.  The landlord waived approximately $1.6 million in arrearages, agreed the remaining arrearage of approximately $800,000 could be paid over 96 months, and significantly reduced the monthly rent for the remainder of the term.

        d)  <u>30 East 85th Street, New York, New York</u>.  The landlord agreed to reduce monthly rent by $10,000 per month for a two year period beginning April 2011 (with a corresponding two year increase beginning in 2018).

17

EXHIBIT 1
Page 23

Finally, pursuant to the Plan, the Debtors will be deleveraging their balance sheet by restructuring the outstanding amounts owed to LBN and Praesidian.  As a result, after the Effective Date, the Debtors will have a markedly lower debt service obligation going forward.

### 5.  Current and Historical Financial Conditions

The liquidation value of the Debtors' assets is summarized on Exhibit D.  The summary of the Debtors' assets set forth on Exhibit D has not been audited.

The Debtors' audited financial statements for the year ending December 31, 2009, are attached as Exhibit E.  The Debtors' financial statements for the year ending December 31, 2010, and the month of May 2011, are attached hereto as Exhibits F and G, respectively; however, these statements have not been audited.

### III.

## SUMMARY OF THE PLAN OF REORGANIZATION

### A.  Joint Consolidated Plan

The Plan is a single consolidated plan of reorganization for the jointly administered Chapter 11 Cases.  Solely for the purposes of voting, confirmation, and making distributions to the holders of Allowed General Unsecured Claims: (a) all General Unsecured Claims against the Debtors are placed in a single Class for the purpose of voting on the Plan, and (b) any General Unsecured Claims against multiple Debtors based upon one underlying obligation, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall be treated as a single Claim.  Such treatment of General Unsecured Claims for Plan purposes shall not affect, without limitation: (x) the legal and corporate structure of the Reorganized Debtors, (y) any obligations under any leases or contracts assumed in the Plan or otherwise after the Petition Date, or (z) the obligation of each Reorganized Debtor to pay all U.S. Trustee Fees on all disbursements as required by the Bankruptcy Code and Guidelines of the OUST.

The Debtors believe a single consolidated plan of reorganization is appropriate and in the best interests of all creditors.  As set forth above, the Debtors have historically been, and presently continue to be, effectively operated as a single enterprise and creditors have traditionally treated the Debtors as a single enterprise.  While each of the Debtors maintains separate books and records and the Debtors can trace funds into and out of each of the Debtors, in many cases it is very difficult for the Debtors to identify the specific Debtor which is liable on a Claim.  For example, it was not unusual for a creditor to supply goods or services to a specific fitness center, but to bill "Club Ventures" or "DavidBartonGym."  While such bill would be paid from a CVI account, the liability for the bill arguably belonged to the specific Debtor that owned the applicable fitness center.  If the Debtors were required to review each Claim to determine which Debtor was liable for the Claim and which Debtor was not liable for the Claim (and then resolve any disputes as to the determination of which Debtor is liable), the

18

EXHIBIT 1
Page 24

costs to the Estates would far outweigh any benefit to the Estates and Holders of the Claims, especially in view of the proposed distribution to Holders of General Unsecured Claims under the Plan.

Furthermore, because both LBN and Praesidian have security interests in the assets of each of the Debtors and no Debtor has any unencumbered assets that could be used to make a distribution to Holders of General Unsecured Claims in an amount greater than proposed under the Plan, no Holder of a General Unsecured Claim will be prejudiced by the consolidation of all General Unsecured Claims into a single Class.

Under these circumstances, the Bankruptcy Court has the authority to confirm a single consolidated plan of reorganization.  *See, e.g., United Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988). The test for consolidation, as formulated by the Second Circuit, considers "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit … or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Id*. at 518.  The Debtors satisfy both of the tests set forth by the Second Circuit.

### B.  What Creditors and Interest Holders Will Receive Under the Proposed Plan

As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code. The Plan states whether each Class of Claims or Interests is Impaired or Unimpaired.  The Plan provides the treatment each Class will receive under the Plan.

### C.  Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment as provided in the Bankruptcy Code.  As such, the Plan Proponents have ***not*** placed the following claims in a class.

#### 1.  Statutory Fees

On the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, including, without limitation, any U.S. Trustee Fees and any applicable interest thereon incurred pursuant to 28 U.S.C. § 1930(a)(6), as determined by the Bankruptcy Court at the Confirmation Hearing, to the extent not previously paid by the Debtors, shall be paid in Cash in full.  The Reorganized Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date.  Following Confirmation, the Reorganized Debtors will file with the Bankruptcy Court and serve on the United States Trustee quarterly financial reports regarding all income and disbursements, including all Plan payments, for each quarter (or portion thereof) that the Chapter 11 Cases remain open.

#### 2.  Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8).  Section 1129(a)(9)(C) of the Bankruptcy

Code requires that, except as otherwise agreed to by the parties, each holder of an Allowed Priority Tax Claim receive Cash equal to the total unpaid portion of such Allowed Priority Tax Claim, calculated as of the Effective Date of the Plan, paid over a period not exceeding five (5) years after the Petition Date.

On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing.

The following chart lists the Debtors' section 507(a)(8) Priority Tax Claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| New York State Department of Taxation | Estimated amount owed as of Effective Date is $28,864.10 | Paid in full on the Effective Date to the extent Allowed |

### 3.    Administrative Claims, Including Professional Administrative Claims

Administrative expenses are Claims for costs or expenses of administering the Debtors' Chapter 11 Cases that are Allowed Claims under Bankruptcy Code section 507(a)(2). The Bankruptcy Code requires that, on the Effective Date of the Plan, all Allowed Administrative Claims be paid Cash equal to the total allowed amount of such Administrative Claim, unless a particular claimant agrees to a different treatment.

On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors or the Reorganized Debtors.

The following chart lists the Debtors' section 507(a)(2) Administrative Claims and

EXHIBIT 1
Page 26

their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | Estimated amount owed as of Effective Date is $0 | Paid in full on the Effective Date to the extent Allowed |
| Office of the U.S. Trustee Fees | Estimated amount owed as of Effective Date is $18,000 | Paid in full on the Effective Date to the extent Allowed |
| Peitzman, Weg & Kempinsky LLP<br><br>Co-Bankruptcy Counsel for the Debtors | Estimated amount owed as of Effective Date is $300,000 | $200,000 paid on the Effective Date to the extent Allowed<br><br>$100,000 paid in two monthly installments thereafter to the extent Allowed |
| Golenbock Eiseman Assor Bell & Peskoe LLP<br><br>Co-Bankruptcy Counsel for the Debtors | Estimated amount owed as of Effective Date is $25,000 | Paid in full on the Effective Date to the extent Allowed |
| FocalPoint Securities, LLC<br><br>Financial Advisors to the Debtors | Estimated amount owed as of Effective Date is $20,000 | Paid in full on the Effective Date to the extent Allowed |
| Klestadt & Winters, LLP<br><br>Bankruptcy Counsel for the Creditors' Committee | Estimated amount owed as of Effective Date is $75,000 | Paid in full on the Effective Date to the extent Allowed |
| FTI Consulting, Inc.<br><br>Financial Advisors to the Creditors' Committee | Estimated amount owed as of Effective Date is $75,000 | Paid in full on the Effective Date to the extent Allowed |
| BofA DIP Facility Claim | Estimated amount owed as of Effective Date is $100,000 | Paid in full on the Effective Date to the extent Allowed |

EXHIBIT 1
Page 27

| Name | Amount Owed | Treatment |
|------|-------------|-----------|
| LBN DIP Facility Claim | Estimated amount owed as of Effective Date is $1,750,000[1] | $200,000 paid on the Effective Date to the extent Allowed<br><br>$200,000 paid in four monthly installments thereafter to the extent Allowed<br><br>Remainder extinguished in exchange for: (1) the LBN Notes and Reimbursement Obligation, and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement |
| Praesidian DIP Facility Claim | Estimated amount owed as of Effective Date is $250,000 | $125,000 paid on the Effective Date to the extent Allowed<br><br>$125,000 paid in four monthly installments thereafter to the extent Allowed |
| Section 503(b)(9) Claims | Estimated amount owed as of Effective Date is $40,000 | Paid in full on the Effective Date to the extent Allowed |
| TOTAL | $2,453,000 | |

　　　　The Bankruptcy Court must approve all Professional Fee Claims listed in this chart for those Professionals employed by the Debtors or the Creditors' Committee.  The Professional in question must file and serve a properly noticed fee application and the Bankruptcy Court must rule on the application.  Only the amount of fees allowed by the Bankruptcy Court will be owed and required to be paid under the Plan.

　　　　As indicated above, the Debtors will need to pay approximately $878,000 worth of Allowed Administrative Claims on the Effective Date of the Plan (or when the Claim becomes Allowed).  As indicated elsewhere in this Disclosure Statement, the Debtors will have sufficient Cash on hand on the Effective Date of the Plan to make all payments required under the Plan to be paid on the Effective Date.  The primary source of this Cash will be from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) the Exit Facility.

---

[1] The LBN DIP Facility Claim could increase by up to an additional $150,000 if LBN advances the full amount of the Additional Funds.

22

EXHIBIT 1
Page 28

### 4.   Deadlines For Filing Administrative Claims

#### a)   Pre-Effective Date Claims and Expenses

By separate Order, the Bankruptcy Court has established the following deadline for filing Administrative Claims:  Other than Holders of (a) Administrative Claims for U.S. Trustee Fees, (b) Professional Fee Claims, (c) Administrative Claims that were Allowed on or before the Effective Date, (d) Administrative Claims incurred and payable in the ordinary course of the Debtors' business, (e) DIP Facility Claims, and (f) Administrative Claims held by current officers, directors, managers or employees for indemnification, contribution, or advancement of expenses pursuant to (1) an operating agreement or similar organizational document, or (2) agreement approved by the Bankruptcy Court, all Holders of Administrative Claims shall file with the Bankruptcy Court and serve on the Reorganized Debtors proof of any unpaid Administrative Claim on or before the 30th day following the Effective Date. Such proof must include all supporting documentation for such Administrative Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISCHARGED**.

#### b)   Professional Fees

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall file with the Bankruptcy Court and serve on the Reorganized Debtors an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the 60th day following the Effective Date.  **FAILURE TO FILE AND SERVE SUCH PROFESSIONAL FEE CLAIMS TIMELY AND PROPERLY SHALL RESULT IN THE PROFESSIONAL FEE CLAIM BEING FOREVER BARRED AND DISCHARGED**.  Without limiting the foregoing, the Reorganized Debtors may pay the charges incurred by the Reorganized Debtors on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

### D.   Classified Claims and Interests

Claims and Interests are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as described below.  The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases.  Solely for the purposes of voting, confirmation, and making distributions to the holders of Allowed General Unsecured Claims: (a) all General Unsecured Claims against the Debtors are placed in a single Class for the purpose of voting on the Plan, and (b) any General Unsecured Claims against multiple Debtors based upon one underlying obligation, including Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall be treated as a single Claim.  Such treatment of General Unsecured Claims for Plan purposes shall not affect, without limitation: (a) the legal and corporate structure of the Reorganized Debtors, (b) any obligations under any leases or contracts assumed in this Plan or otherwise after the Petition Date, or (c) the obligation of each

23

EXHIBIT 1
Page 29

Reorganized Debtor to pay all U.S. Trustee Fees on all disbursements as required by the
Bankruptcy Code and Guidelines of the OUST.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or
Interest falls within the description of that Class and is classified in other Classes to the extent
that any portion of the Claim or Interest falls within the description of such other Classes.  A
Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to
the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim
has not been paid, released, or otherwise settled prior to the Effective Date.

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
|---|---|
| Class 1 - Non-Tax Priority Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – BofA Secured Claim | Impaired – Entitled to vote |
| Class 3 – LBN Secured Claim | Impaired – Entitled to vote |
| Class 4 – Praesidian Secured Claim | Impaired – Entitled to vote |
| Class 5 – Other Secured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 6 – Member Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 7 – Convenience Claims | Impaired – Entitled to vote |
| Class 8 – General Unsecured Claims | Impaired – Entitled to vote |
| Class 9 – Insured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 10 – Subordinated Claims | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 11 – Interests in Subsidiary Debtors | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 12 – Series B Preferred Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 13 – Series A Preferred Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 14 – Class C Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |

24

EXHIBIT 1
Page 30

| Class | Impaired/Unimpaired; Entitlement To Vote |
|---|---|
| Class 15 – Class B Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |
| Class 16 – Class A Interests in CVI | Impaired – Deemed to have rejected this Plan and not entitled to vote |

### 1. Classes of Priority Unsecured Claims

Certain Non-Tax Priority Claims that are referred to in Bankruptcy Code sections 507(a)(1), (4), (5), (6), and (7) are required to be placed in Classes. Non-Tax Priority Claims include (i) claims for certain accrued employee compensation; (ii) claims for contributions to employee benefit plans; and (iii) claims for certain deposits made in connection with the purchase, lease or rental of certain property or the purchase of certain services.

All Non-Tax Priority Claims are placed in Class 1. Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

Class 1 is an Unimpaired Class, and the Holders of Non-Tax Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Non-Tax Priority Claims are not entitled to vote to accept or reject this Plan.

### 2. Classes of Secured Claims

Secured Claims are Claims secured by liens on property of an Estate. The following are the Classes containing the Debtors' Secured Claims and their treatment under the Plan:

#### a) BofA Secured Claim

The BofA Secured Claim is placed in Class 2. The BofA Secured Claim is the Claim asserted by BofA against CVI in the approximate amount of $11,115,000 and secured by substantially all of the assets of CVI.

On the Effective Date, or as soon thereafter as is reasonably practicable, the BofA Secured Claim shall be Reinstated; *provided, however*, that notwithstanding anything to the contrary in the BofA Documentation, the date by which CVI is required to repay all outstanding principal, interest and other charges outstanding shall be extended to September 15, 2012, and BofA shall have no right to declare a default and exercise rights and remedies

25

EXHIBIT 1
Page 31

based upon CVI's failure to repay all outstanding principal, interest and other charges outstanding prior to September 15, 2012, provided that CVI timely makes monthly interest payments as required under the BofA Documentation and does not otherwise default under the BofA Documentation.

Class 2 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holder of the BofA Secured Claim is entitled to vote to accept or reject this Plan.

### b)  LBN Secured Claim

The LBN Secured Claim is placed in Class 3.  The LBN Secured Claim is the collective contingent and noncontingent Claims against the Debtors asserted by LBN in the noncontingent amount of not less than $22,418,294.61, and the contingent amount of not less than $13,202,431.16, secured by substantially all of the assets of the Debtors.

On the Effective Date, or as soon thereafter as is reasonably practicable, the Holder of the LBN Secured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, the LBN Secured Claim: (1) the LBN Notes and Reimbursement Obligation, and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement.  The terms and conditions of the LBN Notes and Reimbursement Obligation are governed by the Securities Purchase Agreement.  A copy of the Securities Purchase Agreement is attached as Exhibit H.

Class 3 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holder of the LBN Secured Claim is entitled to vote to accept or reject this Plan.

### c)  Praesidian Secured Claim

The Praesidian Secured Claim is placed in Class 4.  The Praesidian Secured Claim is the collective Claims asserted by Praesidian against the Debtors in the approximate amount of $30,626,715 and secured by substantially all of the assets of the Debtors.

On the Effective Date, or as soon thereafter as is reasonably practicable, the Holders of the Praesidian Secured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, the Praesidian Secured Claim: (1) the Praesidian Notes, and (2) New Membership Interests as set forth in the Amended CVI Operating Agreement. The terms and conditions of the Praesidian Notes are governed by the Securities Purchase Agreement.  A copy of the Securities Purchase Agreement is attached as Exhibit H.

Class 4 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holders of the Praesidian Secured Claim are entitled to vote to accept or reject this Plan.

### d)  Other Secured Claims

All Other Secured Claims against any of the Debtors are placed in Class 5.  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim shall, at the option of the Debtors, be entitled to the treatment set forth below in option A, B, C, or D.  The Debtors and the Reorganized Debtors specifically reserve

EXHIBIT 1
Page 32

the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated.  The failure of the Debtors to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.  Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option B:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option C:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the applicable Debtor or Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Debtors shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the Debtors elect another option in writing and filed not later than five (5) days prior to the Confirmation Hearing.

Class 5 is an Unimpaired Class, and the Holders of Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan.

EXHIBIT 1
Page 33

### 3.  Classes of Unsecured Claims

Unsecured Claims are Claims that are not secured by liens on property of an Estate and not entitled to priority under section 507(a) of the Bankruptcy Code.  Unsecured Claims include all executory contract and lease rejection damage Claims under section 502(g) of the Bankruptcy Code, and all Claims under section 502(h) of the Bankruptcy Code arising from the recovery of property under sections 522, 550, or 553 of the Bankruptcy Code.  The following are the Classes containing the Debtors' Unsecured Claims and their treatment under the Plan:

### a)  Member Claims

All Member Claims against any of the Debtors are placed in Class 6.  A Member Claim is a Claim against a Debtor based upon a contract with the Debtor for use of and access to the Debtor's fitness centers for personal or group training.

On the Effective Date, Holders of Member Claims shall have such Claims Reinstated.

Class 6 is an Unimpaired Class, and the Holders of Member Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Member Claims are not entitled to vote to accept or reject this Plan.

### b)  Convenience Claims

All Convenience Claims against any of the Debtors are placed in Class 7.  A Convenience Claim is a Claim against a Debtor that is for $250 or less or the Holder of a Claim for more than $250 that elects to reduce its Claim to $250.  The Debtors estimate that, with the Convenience Claim amount set at $250, more than 73% of the Holders of Allowed Unsecured Claims against the Debtors in these Chapter 11 Cases may be in Class 7 or elect to be in Class 7, which will (1) provide a significant administrative benefit to the Estates, and (2) provide an increased distribution to the overwhelming number of unsecured creditors while liquidating and limiting the aggregate amount of cash necessary to satisfy Allowed General Unsecured Claims under the Plan, which is of critical importance to both the Debtors and the provider of the Exit Financing.

Holders of Convenience Claims shall be paid in Cash, in full, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Convenience Claim becomes an Allowed Convenience Claim, (c) the date on which such Convenience Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.  No interest will be paid on Allowed Convenience Claims.

Class 7 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, each Holder of a Convenience Claim is entitled to vote to accept or reject this Plan.

28

EXHIBIT 1
Page 34

### c)    General Unsecured Claims

All General Unsecured Claims against any of the Debtors, including the Berkowitz Wage Claim, are placed in Class 8.  A General Unsecured Claim is a Claim against a Debtor that is not an Administrative Claim, BofA Secured Claim, Convenience Claim, Insured Claim, LBN Secured Claim, Member Claim, Non-Tax Priority Claim, Other Secured Claim, Praesidian Secured Claim, or Priority Tax Claim.

On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between the Debtors or Reorganized Debtors and the Holder of such General Unsecured Claim, or, in each case, as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim shall receive a Cash payment equal to its Pro Rata share of the General Unsecured Claim Distribution Amount, in full and final satisfaction of such Claim.

The General Unsecured Claim Distribution Amount is $150,000 minus the amount of Cash necessary to satisfy all Allowed Convenience Claims.  As set forth in the List of Claims attached as Exhibit C, the Debtors estimate that the aggregate Allowed Amount of General Unsecured Claims is approximately $2,800,000, so the Pro Rata return to Holders of Allowed General Secured Claims from the General Unsecured Claim Distribution Amount is approximately 5.3%.  Based upon the estimate of a 5.3% distribution, the Debtors estimate Allowed General Unsecured Claims in the approximate amount of $260,000 will either be Convenience Claims in Class 7 or the Holders of such Claims will elect to be in Class 7, and the Holders of Allowed Convenience Claims in Class 7 will receive approximately $42,000 in the aggregate, which will reduce the General Unsecured Claim Distribution Amount to $108,000.  Therefore, the Debtors project that the Pro Rata distribution to Holders of Allowed General Unsecured Claims in Class 8 is approximately 4.25%.

Class 8 is Impaired.  Pursuant to section 1126 of the Bankruptcy Code, the Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

### d)    Insured Claims

All Insured Claims against any of the Debtors are placed in Class 9.  An Insured Claim is a Claim against a Debtor that is covered by insurance or an indemnity policy, agreement, bond or right maintained by or for the benefit of such Debtor, but only to the extent of coverage or liability under the insurance or indemnity policy, agreement, bond or right.

On the Effective Date, all Insured Claims shall be Reinstated.

Class 9 is an Unimpaired Class, and the Holders of Insured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Insured Claims are not entitled to vote to accept or reject this Plan.

EXHIBIT 1
Page 35

### e)  Subordinated Claims

All Subordinated Claims, including the Berkowitz Membership Claim, are placed in Class 10.  A Subordinated Claim is a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

Holders of Subordinated Claims shall not receive or retain any Cash or other property under the Plan on account of the Subordinated Claims.

Class 10 is Impaired, and the Holders of Subordinated Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.

### 4.  Classes of Interests

Interests are the legal, equitable, contractual (including any contractual right to acquire equity in a Debtor contingent upon future events, such as an initial public offering) and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor, including membership interests in limited liability companies regardless of whether such membership interests have any voting rights under the applicable operating agreement.  The following are the Classes containing the Debtors' Interests and their treatment under the Plan:

### a)  Interests in the Subsidiary Debtors

All Interests in the Subsidiary Debtors are placed in Class 11.

Holders of Interests in the Subsidiary Debtors shall have such Interests Reinstated on the Effective Date.

Class 11 is an Unimpaired Class, and the Holders of Interests in the Subsidiary Debtors are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Interests in the Subsidiary Debtors are not entitled to vote to accept or reject this Plan.

### b)  Series B Preferred Interests in CVI

All Series B Preferred Interests in CVI are placed in Class 12.

All Series B Preferred Interests shall be cancelled and Holders of Series B Preferred Interests shall not receive or retain any Cash or other property under the Plan on account of the Series B Preferred Interests.

Class 12 is Impaired, and the Holders of Series B Preferred Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Series B Preferred Interests are not entitled to vote to accept or reject this Plan.

30

EXHIBIT 1
Page 36

### c)  Series A Preferred Interests in CVI

All Series A Preferred Interests in CVI are placed in Class 13.

All Series A Preferred Interests shall be cancelled and Holders of Series A Preferred Interests shall not receive or retain any Cash or other property under the Plan on account of the Series A Preferred Interests.

Class 13 is Impaired, and the Holders of Series A Preferred Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Series A Preferred Interests are not entitled to vote to accept or reject this Plan.

### d)  Class C Interests in CVI

All Class C Interests in CVI are placed in Class 14.

All Class C Interests shall be cancelled and Holders of Class C Interests shall not receive or retain any Cash or other property under the Plan on account of the Class C Interests.

Class 14 is Impaired, and the Holders of Class C Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class C Interests are not entitled to vote to accept or reject this Plan.

### e)  Class B Interests in CVI

All Class B Interests in CVI are placed in Class 15.

All Class B Interests shall be cancelled and Holders of Class B Interests shall not receive or retain any Cash or other property under the Plan on account of the Class B Interests.

Class 15 is Impaired, and the Holders of Class B Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class B Interests are not entitled to vote to accept or reject this Plan.

### f)  Class A Interests in CVI

All Class A Interests are placed in Class 16.

All Class A Interests in CVI shall be cancelled and Holders of Class A Interests shall not receive or retain any Cash or other property under the Plan on account of the Class A Interests.

Class 16 is Impaired, and the Holders of Class A Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the Holders of Class A Interests are not entitled to vote to accept or reject this Plan.

EXHIBIT 1
Page 37

### 5.  Intercompany Claims

On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any affiliate of one of the Debtors that is not itself a Debtor shall, at the election of Reorganized CVI, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

### 6.  Special Provision Regarding Unimpaired Classes of Claims

Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

### E.  Means of Performing the Plan

### 1.  Continued Legal Existence and Revesting of Assets

Except as otherwise provided in the Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a limited liability company, corporation, or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement, and other organizational documents in effect as of the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  In accordance with Article 9.2 of the Plan, and except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising each Estate (including Retained Actions) shall revest in the applicable Reorganized Debtor.

### 2.  Sources of Cash for Distribution

All Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) the Exit Facility, which is a financing facility to be provided to the Reorganized Debtors on the Effective Date by LBN.  The terms and conditions of the Exit Facility are presently being negotiated and a final agreement will be set forth in a plan supplement filed with the Bankruptcy Court no later than five (5) days prior to the hearing on confirmation of the Plan.  The Confirmation Order shall constitute an Order approving the terms and conditions of the Exit Facility.  If the Court refuses to approve the final terms of the Exit Facility, the Plan in its present form will not be feasible and will not be confirmed.

### 3.  Amended CVI Operating Agreement

On the Effective Date, the Amended CVI Operating Agreement will become effective.

32

EXHIBIT 1
Page 38

A copy of the Amended CVI Operating Agreement is attached as Exhibit I.  As set forth in the Amended CVI Operating Agreement, the Holders of New Membership Interests include LBN, Praesidian, and members of the Debtors' management.

### 4.  Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of membership units in Reorganized CVI shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

### 5.  Corporate Action

Each of the matters provided for under the Plan involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by, or required of, any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

### 6.  Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of the Plan.

### 7.  Effectuating Documents; Further Transactions

Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record all contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

### 8.  Exemption From Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a

EXHIBIT 1
Page 39

Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 9.  Further Authorization

The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

### 10. Dissolution of Creditors' Committee

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims, and (ii) any appeals of the Confirmation Order.

### 11. Officers and Directors of Reorganized Debtors

On the Effective Date: (a) the officers for each of the Reorganized Debtors shall be: (i) Charles Grieve, Chief Executive Officer, and (ii) David Barton, President; (b) the managers of Reorganized CVI shall be David Barton, Jason Drattell, Charles Grieve, and JDH, (c) the manager of the Reorganized Subsidiary Debtors other than DB 85 Gym Corp. shall be Charles Grieve, and (d) the directors of Reorganized DB 85 Gym Corp. shall be David Barton, Jason Drattell, Charles Grieve, and JDH.  On the Effective Date, such officers, directors or managers, as applicable, of the Reorganized Debtors will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors, and their compensation for such services shall be in whole or in part as agreed to in the Amended CVI Operating Agreement, a copy of which is attached as Exhibit I.  Without limitation, the compensation of Charles Grieve shall be pursuant to the terms of the Meridian Management Agreement, which will be assumed under the Plan as amended by the Amended CVI Operating Agreement.  A copy of the Meridian Management Agreement is attached as Exhibit B.

EXHIBIT 1
Page 40

### F.  Provisions Governing Distributions

#### 1.  Allowed Claims and Interests

The Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

#### 2.  Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions to Holders of Allowed Claims will be made by mail as follows:

a)  If the Holder filed a proof of claim, distributions will be sent to the address, if any, set forth on the proof of claim;

b)  If the Holder, after filing a proof of claim, delivered or delivers to the Debtors a written notice of address change, distributions will be sent to the address set forth in the written notice and not the address set forth on the proof of claim;

c)  If no proof of claim was filed or if the filed proof of claim does not set forth a legible and complete address and if the Debtors have not received a written notice of address change, distributions will be sent to the address set forth in the Debtors' schedules of assets and liabilities (the "**Schedules**") or

d)  If no proof of claim was filed or if the proof of claim does not set forth a legible, complete address; the Debtors have not received a written notice of address change; and the Schedules do not set forth a complete address, then the distribution will be deemed to be an "Undeliverable Distribution" as defined below.

#### 3.  Undeliverable Distributions

If a distribution is made and returned to the Reorganized Debtors marked as undeliverable for any reason, the distribution shall be deemed an "***Undeliverable Distribution***." If a distribution to a Holder is returned to the Reorganized Debtors as an Undeliverable Distribution or is deemed to be an Undeliverable Distribution, the Reorganized Debtors shall make no further distribution to the Holder  unless and until the Reorganized Debtors are timely notified by such Holder, in writing, of the Holder's current address.  Any Holder who is otherwise entitled to an Undeliverable Distribution and who does not, within 60 days after the attempted delivery thereof (the "***60-Day Period***"), provide the Reorganized Debtors with written notice asserting its claim in that Undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to or interest in that Undeliverable

EXHIBIT 1
Page 41

Distribution and will be forever barred from receiving that Undeliverable Distribution from the Reorganized Debtors.  Any Undeliverable Distributions that are not claimed prior to the expiration of the 60-Day Period shall revert back to the Reorganized Debtors free and clear of all claims of the Holder and all other Holders of Allowed Claims.  The Reorganized Debtors shall not have any obligation to attempt to locate any Holder whose distribution is undeliverable.

### 4.  Interest and Penalties on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims and Non-Tax Priority Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

### 5.  Means of Cash Payment

Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor.  Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 6.  Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

### 7.  Setoffs

The Reorganized Debtors may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.  The Debtors or the Reorganized Debtors shall provide notice of any proposed setoff to the Holder of such Claim at least five (5) days prior to effectuating such setoff.

EXHIBIT 1
Page 42

### G.  Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

#### 1.  Authority and Deadline

The Reorganized Debtors shall have the sole right to file objections to all Disputed Claims.  Any objections to Disputed Claims shall be served and filed in the Bankruptcy Court on or before sixty (60) days after the Effective Date; *provided, however,* with respect to any Unimpaired Claim, in the event such Claim is not an Allowed Claim as of the Effective Date, the Holder of such Claim or the Reorganized Debtors may commence at any time an action or proceeding to determine the amount and validity of such Claim in the Bankruptcy Court or any venue in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

#### 2.  Creation of Reserves for Disputed Claim

The Reorganized Debtors shall (i) establish and maintain a reserve for Disputed Claims, (ii) establish and maintain a reserve for unclaimed distributions, and (iii) establish any other reserves or accounts it deems necessary or appropriate.  All cash held in the reserves shall be invested only in investments permitted under the Bankruptcy Code and maintained in accounts held at authorized bank depositories for the Southern District of New York.

#### 3.  Estimation of Claims

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection and make distributions under the Plan with respect to other Allowed Claims in the same class after making an appropriate reserve based on the estimated amount of such Disputed or contingent Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

#### 4.  Distributions Relating to Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtors shall distribute to the Holder of such Claim such Cash as the Holder is entitled to under the Plan, which distribution shall occur as soon as practicable after the date that the order or judgment allowing any Disputed Claim becomes a Final Order.  To the extent that all or a portion of a Disputed Claim is Disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is Disallowed.

EXHIBIT 1
Page 43

### 5. Disallowed Claims

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code and shall continue to be Disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

### H. Risk Factors

The Plan provides that (1) on the Effective Date the Debtors will make distributions to holders of Allowed Administrative Claims and Allowed General Unsecured Claims, and (2) thereafter in the following months and years will make interest and principal payments to BofA, LBN, and Praesidian in accordance with the terms of their operative loan agreements. Therefore, the primary risks under the Plan are the possibility that the Debtors will not have sufficient Cash on hand to make the distributions required on the Effective Date, and the Reorganized Debtors will in the future be unable to generate sufficient revenue to make the required payments to BofA, LBN, Praesidian, and other post-Confirmation creditors.

Because LBN has committed to funding the Exit Facility, the Debtors are confident of the Reorganized Debtors' ability to make all required Plan payments required on the Effective Date. However, if for any reason the Exit Facility is not funded or the Bankruptcy Court refused to approve the Exit Facility, the Debtors will not have the ability to make the required Effective-Date Plan payments and the Plan will not be feasible.

With respect to post-Confirmation payments, the Debtors are confident of the Reorganized Debtors' ability to operate profitably and make all such post-Confirmation payments. Attached as Exhibit M is a cash-flow projection through October 2012 that demonstrates the Reorganized Debtors' will be able to make all requirement Plan payments to BofA, LBN, and Praesidian, and other post-Confirmation creditors.

### I. Other Provisions of the Plan

### 1. Assumption/Rejection of Executory Contracts and Unexpired Leases

A list of the Debtors' Executory Contracts and Unexpired Leases, together with the cure amount for each Executory Contract and Unexpired Lease, is attached as Exhibit K. Exhibit K-1 identifies Executory Contracts and Unexpired Leases to be assumed and Exhibit K-2 identifies Executory Contracts and Unexpired Leases to be rejected. Exhibit K is subject to modification at any time before the Confirmation Date.

Each Executory Contract and Unexpired Lease on Exhibit K-1 shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

38

EXHIBIT 1
Page 44

a) has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

b) has been rejected by the Debtors by order of the Bankruptcy Court in effect as of the Confirmation Date (which order may be the Confirmation Order); or

c) is the subject of a motion to reject filed by the Debtors under section 365 of the Bankruptcy Code pending as of the Confirmation Date.

An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "***Assumed Contract***."  An Executory Contract that is rejected or subject to a motion to reject as described above shall be referred to as a "***Rejected Contract***."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtors and their Estates and that each Assumed Contract is assumed as of the Effective Date, and (iii) the requirements for assumption (or rejection, as the case may be) of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be enforceable.  All cure payments under any Assumed Contract will be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute.

Unless otherwise provided by an order of the Bankruptcy Court, any Claim arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under the Plan no later than sixty (60) days after the later of (1) the Effective Date and (2) the effective date of such rejection, subject to the Debtors' and Reorganized Debtors' right to object thereto.  In the event of such objection, the Debtors shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

All of the Debtors' existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in any Rejected Contract), including all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date ("***Benefit Plans***") will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Section 7.1 of the Plan, and the Debtors' and Reorganized Debtors' obligations and rights under such programs, plans,

39

EXHIBIT 1
Page 45

agreements, and arrangements will survive confirmation of the Plan, subject to the terms and conditions of such Benefit Plans.

Any employment agreements designated for rejection in writing by the Debtors and filed with the Bankruptcy Court prior to the Confirmation Date shall be deemed rejected as of the Effective Date. Any Claims arising from the rejection of any employment agreements shall be governed by the deadlines set forth in Section 7.1 of the Plan. Any such Claims will be classified as Class 8 General Unsecured Claims and will be capped in accordance with section 502(b)(7) of the Bankruptcy Code.

## 2. Changes in Rates Subject to Regulatory Commission Approval

The Debtors are not subject to governmental regulatory commission approval of any rates.

## 3. Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

(c)    decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving objections to Claims filed after the Effective Date;

(d)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(e)    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents;

40

EXHIBIT 1
Page 46

(f)      modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(g)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(h)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(i)      adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

(j)      recover all assets of the Debtors and property of the Estates, wherever located;

(k)      hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtors;

(l)      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(m)      hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n)      determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(o)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

41

EXHIBIT 1
Page 47

(p)      hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(q)      enter an order closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Section 10.1 of the Plan, the retention of jurisdiction provisions of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

### J.  Tax Consequences of the Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The disclosure of possible tax consequences, attached as Exhibit L, is intended solely for the purpose of alerting readers about possible tax issues the Plan may present.  The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

### IV.

### <u>CONFIRMATION REQUIREMENTS AND PROCEDURES</u>

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Bankruptcy Court can confirm a plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible.  These requirements are <u>not</u> the only requirements for confirmation.

### A.  Who May Vote or Object

### 1.  Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained

EXHIBIT 1
Page 48

below not everyone is entitled to vote to accept or reject the Plan.

## 2.   Who May Vote to Accept/Reject the Plan

A Creditor or Interest holder has a right to vote for or against the Plan if that Creditor or Interest holder has a Claim that is both (1) Allowed or allowed for voting purposes, and (2) classified in an Impaired Class.

### a)   What Is an Allowed Claim/Interest

As noted above, a Creditor or Interest holder must first have an <u>Allowed Claim or Interest</u> to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the Claim.  When an objection to a Claim or Interest is filed, the Creditor or Interest holder holding the Claim or Interest cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

With certain limited exceptions, THE BAR DATE FOR FILING A PROOF OF CLAIM IN THE CHAPTER 11 CASES WAS JUNE 15, 2011.  A Creditor or Interest holder may have an Allowed Claim or Interest even if a proof of claim or interest was not timely filed.  A Claim is deemed Allowed if (1) it is scheduled on any Debtors' schedules of assets and liabilities and such Claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the Claim.  An Interest is deemed Allowed if it is scheduled and no party in interest has objected to the Interest.  Consult Exhibit C to see how the Plan Proponents have characterized your Claim or Interest.

### b)   What Is an Impaired Claim/Interest

As noted above, an Allowed Claim or Interest only has the right to vote if it is in a Class that is <u>Impaired</u> under the Plan.  A Class is Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.  For example, a Class comprised of General Unsecured Claims is Impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

In this case, the Plan Proponents believe that Classes 2, 3, 4, 7, and 8 are Impaired and that holders of Claims in each of these Classes, therefore, are entitled to vote to accept or reject the Plan.  The Plan Proponents believe that Classes 10, 12, 13, 14, 15, and 16 also are impaired and deemed to reject the Plan.  The Plan Proponents believe that Classes 1, 5, 6, 9, and 11 are unimpaired and that holders of Claims in each of these Classes, therefore, do not have the right to vote to accept or reject the Plan.  Parties who dispute the Plan Proponents' characterization of their Claim or Interest as being Impaired or unimpaired may file an objection to the Plan contending that the Plan Proponents have incorrectly characterized the Class.

## 3.   Who is <u>Not</u> Entitled to Vote

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been Disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to

43

EXHIBIT 1
Page 49

Bankruptcy Code sections 507(a)(2), (a)(3), and (a)(8); and (4) Claims in Classes that do not
receive or retain any value under the Plan.  Claims in unimpaired Classes are not entitled to
vote because such Classes are deemed to have accepted the Plan.  Claims entitled to priority
pursuant to Bankruptcy Code sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote
because such Claims are not placed in Classes and they are required to receive certain
treatment specified by the Bankruptcy Code.  Claims in Classes that do not receive or retain
any value under the Plan do not vote because such Classes are deemed to have rejected the
Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY
STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.  Who Can Vote in More Than One Class

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an
Unsecured Claim is entitled to accept or reject the Plan in both capacities by casting one ballot
for the Secured Claim and another ballot for the Unsecured Claim.

### 5.  Votes Necessary to Confirm the Plan

If Impaired Classes exist, the Bankruptcy Court cannot confirm the Plan unless (1) at
least one Impaired Class has accepted the Plan without counting the votes of any insiders
within that Class, and (2) all Impaired Classes have voted to accept the Plan, unless the Plan is
eligible to be confirmed by "cramdown" on non-accepting Classes, as discussed later in
Section 7.

### 6.  Votes Necessary for a Class to Accept the Plan

A Class of Claims is considered to have accepted the Plan when more than one-half
(1/2) in number and at least two-thirds (2/3) in dollar amount of the Claims that actually voted,
voted in favor of the Plan.  A Class of Interests is considered to have accepted the Plan when
at least two-thirds (2/3) in amount of the Interest holders of such Class that actually voted,
voted to accept the Plan.

### 7.  Treatment of Nonaccepting Classes

As noted above, even if <u>all</u> Impaired Classes do not accept the proposed Plan, the
Bankruptcy Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in
the manner required by the Bankruptcy Code.  The process by which nonaccepting Classes are
forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The
Bankruptcy Code allows the Plan to be "crammed down" on nonaccepting Classes of Claims
or Interests if it meets all consensual requirements except the voting requirements of
1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward
each Impaired Class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b)
and applicable case law.

### 8.  Request for Confirmation Despite Nonacceptance by Impaired Class(es)

In this case, the Plan Proponents believe that Classes 2, 3, 4, 7, and 8 are Impaired and

EXHIBIT 1
Page 50

that holders of Claims in each of these Classes, therefore, are entitled to vote to accept or reject the Plan. The Plan Proponents believe that Classes 10, 12, 13, 14, 15, and 16 also are impaired and deemed to reject the Plan. The Plan Proponents believe that Classes 1, 5, 6, 9, and 11 are unimpaired

The Plan Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on Impaired Classes 10, 12, 13, 14, 15, and 16, and also on Classes 2, 3, 4, 7, and 8 if any of these Classes do not vote to accept the Plan. In addition, if the Bankruptcy Court determines that any Class identified by the Debtors as Unimpaired is Impaired and that Class does not vote to accept the Plan, the Debtors will ask the Bankruptcy Court to confirm the Plan by cramdown on that Class.

## B. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a Claimant or Interest holder is in an Impaired Class and that Claimant or Interest holder does not vote to accept the Plan, then that Claimant or Interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Bankruptcy Court to be able to confirm the Plan, the Bankruptcy Court must find that all Creditors and Interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation. The Plan Proponents maintain that this requirement is met here because (1) substantially all of the Debtors' assets are encumbered by security interests held by BofA, LBN, and Praesidian, and (2) the liquidation value of the Debtors' assets is less than the Allowed Amount of the Allowed Secured Claims of BofA, LBN and Praesidian. Therefore, in the event of a liquidation, unsecured creditors would receive nothing from the liquidation of the Debtors' assets. For these reasons, the Plan Proponents conclude that the Plan provides fair and equitable treatment of all Classes of Creditors and the greatest feasible recovery to all Creditors.

Attached as Exhibit D is a liquidation analysis that demonstrates that Creditors and Interest holders will receive at least as much under the Plan as such Creditors and Interest holders would receive a chapter 7 liquidation of the Debtors.

## C. Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means

EXHIBIT 1
Page 51

that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether the Debtors will have enough Cash on hand on the Effective Date of the Plan to pay all the Claims that are entitled to distribution under the Plan.  The Plan Proponents maintain that this aspect of feasibility is satisfied because, to the extent the Debtors do not have sufficient Cash on hand to make the distributions under the Plan, additional funds will be available under the Exit Facility on or prior to the Effective Date.

The second aspect considers whether there will be sufficient funds to make all the Plan payments required after the Effective Date, which include interest and principal payments to BofA, LBN, and Praesidian.  The Plan Proponents are confident of the Reorganized Debtors ability to operate profitably and to make all such post-Confirmation payments.  Attached as Exhibit J is a cash flow projection through October 2012 that demonstrates the Reorganized Debtors will be able to make all requirement Plan payments to BofA, LBN, Praesidian, and other post-Confirmation creditors after the Effective Date.

## V.

## <u>CONDITION TO CONFIRMATION OF THE PLAN</u>

### A.  Condition To Entry of the Confirmation Order

The following are conditions precedent to the Confirmation, each of which must be satisfied, or waived in writing, by the Debtors, LBN, and Praesidian in accordance with the terms hereof:

**1.** The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall have been filed in form and substance acceptable to the Debtors, LBN, and Praesidian.

**2.** The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, LBN and Praesidian.

### B.  Conditions To Effective Date.

The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors, LBN and Praesidian in accordance with the terms hereof:

46

EXHIBIT 1
Page 52

**1.** The Confirmation Order, in form and substance satisfactory to the Debtors, LBN, and Praesidian, shall be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtors and Reorganized Debtors are authorized without further board or shareholder approval or consent to take all actions necessary to enter into all agreements or documents created in connection with this Plan. Without limiting the foregoing, the chairman of the board of directors, president, chief executive officer, chief financial officer or any other appropriate officer of the Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**2.** All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

**3.** All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

**4.** The Debtors shall have sufficient Cash, whether on hand or from funds advanced under the Exit Facility to make all required payments to be made on the Effective Date.

**5.** The Effective Date shall have occurred on or prior to October 31, 2011.

### C.  Waiver of Condition

The Debtors, LBN, and Praesidian may jointly waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors, LBN, and Praesidian.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.


## VI.

## EFFECT OF CONFIRMATION OF PLAN

### A.  Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

EXHIBIT 1
Page 53

### B.  Revesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Retained Actions) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders except as otherwise set forth in the Plan.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### C.  Releases by the Debtors, their Estates and the Reorganized Debtors

**As of the Effective Date, for good and valuable consideration, including service in facilitating the expeditious implementation of the restructuring and reorganization contemplated by the Plan, the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (a) Praesidian, (b) LBN, (c) JDH, and (d) the present directors, officers, managers, employees or legal advisors of (a) through (c) (in their capacity as such) (other than the rights under this Plan and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby, and any claims based thereon), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise.**

### D.  Discharge of the Debtors

Except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan; *provided, however*, the Debtors' obligations to provide adequate protection to LBN, Praesidian and BofA pursuant to paragraph 14 of the DIP/Cash Collateral Order and to reimburse and pay the legal fees and expenses of LBN, Praesidian and BofA pursuant to paragraphs 2 and 14 of the DIP/Cash Collateral Order and sections 2(e), 6(g), 7(b)(v) and 12(j) of the credit agreement approved by such order, to the extent such fees and expenses have not been

48

EXHIBIT 1
Page 54

previously paid or are paid on the Effective Date, shall not be discharged or released.

As of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtors or any Interest in the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

### E.  Injunction

**Except as provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under Article IX of the Plan, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest:  (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

### F.  Exculpation and Limitation of Liability

Under the Plan, none of (a) the Debtors, (b) any affiliate of the Debtors, (c) the Creditors' Committee and its members (in their capacity as such), (d), the Restructuring Professionals, (e) Praesidian, (f) LBN, (g) JDH, and (h) the present directors, officers, managers, employees or legal advisors of (a) through (g) (in their capacity as such), shall have or incur any liability to any Person or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or

EXHIBIT 1
Page 55

implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the
Plan, the consummation of the Plan, or the administration of the Plan or the property to be
distributed under the Plan, except for acts or omissions that are the result of fraud, gross
negligence, criminal conduct, or willful misconduct, including the willful misappropriation of
confidential information; *provided*, *however*, that the foregoing exculpation and limitation of
liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or
causes of action arising from or related to the rights and obligations under the Plan and the
contracts, instruments, releases, and other agreements or documents delivered thereunder or
contemplated thereby.  Without limiting the generality of the foregoing, the Debtors, the
Reorganized Debtors, LBN, Praesidian, JDH, the Creditors' Committee, and any of such
parties' directors, managers, officers, or members, shall be entitled to reasonably rely upon the
advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of the Plan, no Person, no Person's agents,
directors, managers, officers, employees, representatives, advisors, attorneys, affiliates,
shareholders, or members and no Person's successors or assigns shall have any right of action
against any of the Exculpated Parties for any act or omission in connection with, relating to, or
arising out of, the Chapter 11 Cases, the Disclosure Statement, the formulation, negotiation, or
implementation of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the
Plan, the consummation of the Plan, or the administration of the Plan or the property to be
distributed under the Plan, except for acts or omissions that are the result of fraud or willful
misconduct, including the willful misappropriation of confidential information.

Notwithstanding any other provision of the Plan, nothing in the Plan shall effect a
release of any claim by the United States Government or any of its agencies or any state and
local authority whatsoever, including, without limitation, any claim arising under the Internal
Revenue Code, the environmental laws, or any criminal laws of the United States or any state
and local authority against the Exculpated Parties, nor shall anything in the Plan enjoin the
United States or any state or local authority from bringing any claim, suit, action or other
proceedings against the Exculpated Parties referred to herein for any liability whatever,
including without limitation, any claim, suit or action arising under the Internal Revenue
Code, the environmental laws, or any criminal laws of the United States or any state or local
authority, nor shall anything in the Plan exculpate any party from any liability to the United
States Government or any of its agencies or any state and local authority whatsoever,
including liabilities arising under the Internal Revenue Code, the environmental laws, or any
criminal laws of the United States or any state and local authority, against the Exculpated
Parties referred to herein.

Notwithstanding any other provision of the Plan, nothing in the Plan shall limit the
liability of the Professionals of the Debtors or the Reorganized Debtors to their respective
clients, including pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

## G.  Term of Bankruptcy Injunction or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays
provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or
otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained

EXHIBIT 1
Page 56

in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

### H.  Post-Effective Date Retention of Professionals

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

### I.  Effect of Release, Discharge and Injunction on Unimpaired Claims

Nothing in the Plan, including the release, discharge, injunction and exculpatory provisions set forth in the Plan, shall prevent any Holder of an Unimpaired Claim from pursuing (i) the Allowance of such Unimpaired Claim, or (ii) payment of such Unimpaired Claim from the Reorganized Debtors.

### J.  Amendment Or Modification Of This Plan

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of Praesidian and LBN, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors; provided, however, that, in the event a material modification to the Plan is proposed after the Effective Date, the Reorganized Debtors shall provide notice and an opportunity to object to all interested parties.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

### K.  Post-Confirmation Status Report

Subject to any requirements set forth in the Postconfirmation Order and section 1106(a)(7) of the Bankruptcy Code, the Reorganized Debtors shall file, within 45 days after the date of the Postconfirmation Order, a status report detailing the actions taken by the Debtors and the Reorganized Debtors and the progress made toward the consummation of this Plan.  Reports shall be filed thereafter every January 15, April 15, July 15, and October 15 until a final decree has been entered or until conversion or dismissal, whichever is earlier.

### L.  Post-Confirmation Conversion/Dismissal

A Creditor or party in interest may bring a motion to convert or dismiss the Chapter 11 Cases under Bankruptcy Code section 1112(b) after the Plan is confirmed if there is a default in performing the Plan.  If the Bankruptcy Court orders the Chapter 11 Cases converted to chapter 7 after the Plan is confirmed, all property that had been property of the chapter 11 Estates, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estates, and the automatic stay will be reimposed upon the revested property only to the extent

51

EXHIBIT 1
Page 57

that relief from stay was not previously granted by the Bankruptcy Court during these Chapter 11 Cases.

### M. Final Decree and Closing The Chapter 11 Cases

As soon as practicable after the Estates are fully administered, the Reorganized Debtors shall seek a decree closing the Chapter 11 Cases.  The Estates shall be administered fully, as provided in Bankruptcy Code section 350 and Bankruptcy Rule 3022, notwithstanding any continuing jurisdiction of the Bankruptcy Court and whether or not the Reorganized Debtors have made all distributions to the holders of Allowed Claims as provided under the Plan.

Dated:  August 12, 2011                     **"PLAN PROPONENTS"**

Debtors and Debtors in Possession:
Club Ventures Investments LLC
Club Ventures II, LLC
CV 2, LLC
CV II Gym, LLC
Club Ventures III, L.L.C.
CV 3, LLC
CV III Gym, LLC
Club Ventures IV, LLC
CV 4 Leasing, LLC
CV IV Gym, LLC
Club Ventures VI, LLC
CV VI, LLC
CV VII Gym, LLC
Club Ventures VIII, LLC
CV VIII Gym, LLC
Club Ventures X, LLC
CV X Gym, LLC
DB 85 Gym Corp.


_____/s/ Charles Grieve_____
By:  Charles Grieve
Their: Chairman

Submitted By:

PEITZMAN, WEG & KEMPINSKY LLP

By: ___/s/ David B. Shemano_____
        David B. Shemano, Esq.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

EXHIBIT 1
Page 58

and

Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

Counsel for Debtors and Debtors-in-Possession

53

EXHIBIT 1
Page 59

# EXHIBIT A

EXHIBIT 1
Page 60

### Club Ventures Investments LLC

A Delaware Limited Liability Company

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Effective as of March 24, 2009

THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION AND QUALIFICATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

#1632013 v6\019346\0019

EXHIBIT 1
Page 61

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## CLUB VENTURES INVESTMENTS LLC

This Amended and Restated Limited Liability Company Agreement is made and is to be effective as of March 24, 2009, by and among CLUB VENTURES INVESTMENTS LLC, a Delaware limited liability company (the "**Company**"), JOHN HOWARD ("**Howard**"), DAVID BARTON ("**Barton**"), and PRAESIDIAN CAPITAL INVESTORS, L.P., a Delaware limited partnership, PRAESIDIAN II SPV 1, L.P., a Delaware limited partnership, and PRAESIDIAN II SPV 2, L.P., a Delaware limited partnership (collectively, the "**Praesidian Group**").

WHEREAS, Howard and Barton are parties to that certain Amended and Restated Limited Liability Company Agreement, dated June 17, 2004, by and among, Barton and Howard, (as heretofore amended, restated, supplemented, or amended and restated, including, without limitation, to add the Praesidian Group as a party, and including as amended and restated on February 12, 2009, the "**Original LLC Agreement**"); and

WHEREAS, Howard, Barton and the Praesidian Group wish to amend and restate the Original LLC Agreement in the manner set forth herein, to among other things, implement a new governance structure and set forth the grant of certain equity interests not contained in the Original LLC Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Howard, Barton and the Praesidian Group hereby amend and restate in its entirety the Original LLC Agreement, as amended, and adopt the following as the limited liability company agreement of the Company:

## ARTICLE I

## Definitions

The defined terms used in this Agreement shall, unless any term is elsewhere defined in this Agreement or the context otherwise requires, have the meanings specified in this Article I.

"**2009 Praesidian Agreement**" shall mean that certain Note Purchase Agreement, dated as of March 5, 2009, by and between the Company, its subsidiaries, and the Praesidian SPVs.

"**Act**" shall mean the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

#1632013 v6 \019346 \0019

EXHIBIT 1
Page 62

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(*d*)(4), 1.7041-1(b)(2)(ii)(*d*)(5), and 1.704-1(b)(2)(ii)(*d*)(6).

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"**Affiliate**" of any Person shall mean any Person that, directly or indirectly, is in control of, is controlled by, or is under common control with such Person. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" and under "common control with") shall mean the power, direct or indirect, (x) to vote a majority of the equity interests having ordinary voting power for the election of directors of a Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of a Person whether by ownership of equity interests, contract or otherwise.

"**Agreement**" shall mean this Amended and Restated Limited Liability Company Agreement of Club Ventures Investments LLC, as amended, modified, supplemented or restated from time to time.

"**Berkowitz**" means Mark Berkowitz.

"**Book Item**" shall have the meaning set forth in Section 5.3(c) hereof.

"**Capital Contribution**" means the aggregate amount of money and property contributed by a Member to the capital of the Company. For the avoidance of doubt, the value of any services provided or to be provided by any Member to the Company shall not constitute a Capital Contribution. The value of any property contributed shall be valued at its fair market value, as reasonably determined by the Board of Managers.

"**Capital Proceeds**" shall mean the cash proceeds received by the Company upon the occurrence of (i) the sale of all or substantially all of the Company's assets other than in the ordinary course of business, (ii) the dissolution and liquidation of the Company, or (iii) the sale of all the equity interests in the Company or the merger or consolidation of the Company by the Company to or with any Person where the proceeds of such sale, merger or consolidation are paid to the Company.

2

EXHIBIT 1
Page 63

"**Cause**" means the death or Disability of Barton, commission by Barton of any act of fraud, theft or embezzlement involving the Company, the conviction of, or plea of no-contest by Barton to, any felony, gross misconduct or malfeasance by Barton, or material breach by Barton of this Agreement or any Howard Reimbursement Document, which breach is not cured within thirty (30) days following receipt of written notice to Barton of such breach specifying in detail the nature of such breach; provided, that if such breach is not willful, and Barton is exercising good faith efforts to cure such breach, such time period shall be extended to ninety (90) days.

"**Certificate of Formation**" shall mean the Company's Certificate of Formation, as filed with the Secretary of State of Delaware, as it may be amended, supplemented or restated from time to time.

"**Change in Control**" shall have the meaning set forth in Section 3.l(c)(iii) hereof.

"**Class B Grant Date**" shall have the meaning set forth in Section 3.1(b)(i) hereof.

"**Class A Membership Units**" shall mean the Membership Interests of the Company represented by the units designated as Class A Membership Units in Section 3.l(a) hereof, issued to and held in such amounts as set forth on <u>Schedule A</u> hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Class B Membership Units**" mean the Membership Interests of the Company represented by the units designated as Class B Membership Units in Section 3.1 (a) hereof, issued to and held in such amounts as set forth on <u>Schedule B</u> hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Class C Grant Date**" shall mean, with respect to a holder of Class C Membership Units, the date such Class C Membership Units were issued to such holder as specified opposite such holder's name on <u>Schedule C</u>.

"**Class C Hurdle Amount**" shall mean, with respect to a holder of Class C Membership Units, the amount set forth opposite such holder's name on <u>Schedule C</u> hereto.

"**Class C Membership Units**" shall mean the Time-Vest Class C Units and the Incentive Class C Units, collectively.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

"**Combined Percentage Interest**" means, with respect to a Member holding Series B Preferred Membership Units and/or Common Membership Units, at any time and from time to time the fraction (converted into a percent), the numerator of which is the number of Series B Preferred Membership Units and Common Membership Units owned by such Member

3

EXHIBIT 1
Page 64

and the denominator of which is the aggregate number of Series B Preferred Membership Units and Common Membership Units owned by all Members.

"**Common Membership Units**" shall mean the Class A Membership Units, the Class B Membership Units and the Class C Membership Units.

"**Common Percentage**" means the fraction (converted into a percent), the numerator of which is the aggregate number of Common Membership Units owned by all Members and the denominator of which is the aggregate number of Series B Preferred Membership Units and Common Units owned by all Members.

"**Consent" (including the correlative term "Consented")** shall mean the affirmative majority vote of Members holding the issued and outstanding Common Membership Units and Series B Preferred Membership Units with each such Member entitled to one vote for each Common Membership Unit and Series B Preferred Membership Unit that it owns; provided that (i) until the Praesidian Termination Date, Consent shall also require the affirmative vote of the Praesidian Group as to votes on the matters set forth in Sections 3.1(e)(iv), 3.4, 5.1(c) and 7.1(a) hereof, and (ii) until the Howard Termination Date, Consent shall also require the affirmative vote of Howard.

"**Co-Sale Securities**" shall have the meaning set forth in Section 6.4 hereof.

"**Covered Person**" shall have the meaning set forth in Section 10.2(c) hereof.

"**DB85**" means **DB 85 Gym Corp.**, a New York corporation.

"**Disability**" means, with respect to a person, an illness or incapacity of such person of such character and severity so as to prevent such person from performing his duties for the Company substantially in the manner theretofore performed by such person which continues for a period of one hundred eighty (180) business days in any twelve-month period.

"**Employment Agreement**" shall mean, with respect to any employee Member, the employment agreement between the Company and such Member.

"**Enterprise Value**" shall have the meaning set forth in Section 3.1(c)(iii) hereof.

"**Excluded Acts of a Member/Manager**" shall have the meaning set forth in Section 10.1 hereof.

"**Howard Guaranteed Indebtedness**" means indebtedness of the Company or DB85 or any Affiliate of either, the payment of which is guaranteed by Howard under a guaranty subject to the Reimbursement Agreement.

"**Howard Reimbursement Documents**" means the Reimbursement Agreement and the "Loan Documents" as defined therein.

4

EXHIBIT 1
Page 65

"**Howard Subscription Agreement**" shall mean that certain Commitment and Subscription Agreement, dated as of March 5, 2009, by and between the Company and Howard.

"**Howard Termination Date**" means the date upon which (i) all of the Series A Preferred Membership Units have been redeemed, (ii) Howard shall have been paid all amounts, if any, paid by him in respect of Howard Guaranteed Indebtedness, the Howard Guaranteed Indebtedness shall have been paid in full and the Howard Reimbursement Documents shall have been terminated and no further amounts are outstanding thereunder and all other outstanding loans by Howard to the Company or any Affiliate thereof shall have been paid in full, and (iii) at least 80% of the Class A Membership Units held by Howard (including such Units for which Warrants held by Howard may be exercised) have been Transferred to one or more Persons that are not Affiliates and are not Persons described in Section 6.1(b) hereof.

"**Hurdle Amount**" shall have the meaning set forth in Section 3.1(b)(ii) hereof.

"**Incentive Class C Unit**" shall mean the Membership Interests of the Company represented by the units designated as Incentive Class C Unit in Section 3.1(c)(i), issued to and held in such amounts as set forth on Schedule C hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Meeting**" shall have the meaning set forth in Section 3.7 hereof.

"**Member**" means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any Person who has ceased to be a Member of the Company after the date of this Agreement.

"**Membership Interest**" means the interest of a Member in the Company, including rights to distributions (liquidating or otherwise), allocations, information, all other rights, benefits and privileges enjoyed by that Member (under the Act, the Certificate of Formation, this Agreement, or otherwise) in its capacity as a Member, and all obligations, duties, and liabilities imposed on that Member (under the Act, the Certificate of Formation, this Agreement, or otherwise) in its capacity as a Member; provided, however, that such term shall not include any management rights held by a Member solely in his, her or its capacity as Manager.

"**Membership Units**" means the Class A Membership Units, the Class B Membership Units, the Class C Membership Units, the Series A Preferred Membership Units and the Series B Preferred Membership Units held by each Member representing such Member's interest in the income, gains, losses, deductions and expenses of the Company as set forth respectively on Schedule A, Schedule B, Schedule C, Schedule D, and Schedule E hereto.

"**Percentage Interest**" means, with respect to a Member holding (i) Series B Preferred Membership Units, at any time and from time to time the fraction (converted into a percent), the numerator of which is the number of Series B Preferred Membership Units owned by such Member and the denominator of which is the aggregate number of Series B Preferred

EXHIBIT 1
Page 66

Membership Units owned by all Members and (ii) Common Membership Units, at any time and from time to time, the fraction (expressed as a percent), the numerator of which is the number of Common Membership Units owned by such Member and the denominator of which is the aggregate number of Common Membership Units owned by all Members.

"**Permitted Acts of a Member/Manger**" shall have the meaning set forth in Section 10.1 hereof.

"**Person**" shall mean any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust or other entity.

"**Praesidian**" shall mean Praesidian Capital Investors, L.P.

"**Praesidian Agreements**" shall mean any and all securities purchase agreements or note purchase agreements entered into between the Company and any member of the Praesidian Group, as amended from time to time, including the 2009 Praesidian Agreement, and all agreements, documents and other instruments executed in connection therewith.

"**Praesidian SPVs**" shall mean collectively Praesidian II SPV 1, L.P. and Praesidian II SPV 2, L.P.

"**Praesidian Termination Date**" means the date upon which all indebtedness of the Company and its Affiliates owed to the Praesidian Group, including, without limitation, indebtedness under the Praesidian Agreements, has been paid in full and at least 80% of the aggregate number of Series B Preferred Membership Units and Warrants held by the members of the Praesidian Group have been Transferred to one or more Persons other than Persons described in Section 6.1(e) hereof.

"**Preferred Percentage**" means the fraction (converted into a percent), the numerator of which is the aggregate number of Series B Preferred Membership Units owned by all Members and the denominator of which is the aggregate number of Series B Preferred Membership Units and Common Units owned by all Members.

"**Proposed Rules**" shall have the meaning set forth in Section 3.1(d)(ii) hereof.

"**Redemption Amount**" shall have the meaning set forth in Section 3.1(e)(iv) hereof.

"**Regulations**" shall mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including the corresponding provisions of any succeeding regulations).

"**Reimbursement Agreement**" means the Reimbursement Agreement made as of June 29, 2004 by and among Howard, the Company, DB85 and Barton.

"**Safe Harbor Election**" shall have the meaning set forth in Section 3.1(d)(ii) hereof.

EXHIBIT 1
Page 67

"**Sale Notice**" shall have the meaning set forth in Section 6.5(b) hereof.

"**Sale Price**" shall have the meaning set forth in Section 6.5(a) hereof.

"**Seller**" shall have the meaning set forth in Section 6.4 hereof.

"**Selling Members**" shall have the meaning set forth in Section 6.5(a) hereof.

"**Series A Preferred Membership Units**" shall mean the redeemable, non-convertible, cumulative, preferred Membership Interests of the Company represented by the units designated as Series A Preferred Membership Units in Section 3.1(e) hereof, issued to and held by the Persons and in such amounts as set forth on Schedule D hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Series A Preferred Stated Value**" shall have the meaning set forth in Section 3.1(e)(ii) hereof.

"**Series A Yield**" shall have the meaning set forth in Section 3.1(e)(iii) hereof.

"**Series B Preferred Membership Units**" shall mean the preferred Membership Interests of the Company represented by the units designated as Series B Preferred Units in Section 3.1(f) hereof, issued to and held by the Persons and in such amounts as set forth on Schedule E hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Series B Preferred Stated Value**" shall have the meaning set forth in Section 3.1(f)(ii) hereof.

"**Super-Majority Approval**" shall have the meaning set forth in Section 4.1(c) hereof.

"**Time-Vest Class C Units**" shall mean the Membership Interests of the Company represented by the units designated as Time-Vest Class C Units in Section 3.1(c)(i), issued to and held in such amounts as set forth on Schedule C hereto, as may be amended from time to time in accordance with the terms of this Agreement.

"**Transfer**" shall mean any sale, transfer, gift, assignment, other disposition, pledge or grant of a security interest, by operation of law or otherwise, in or of an interest in the Company or of rights under this Agreement, excluding, however, any grant of a security interest, or a transfer pursuant to any exercise of rights, under the Howard Reimbursement Documents.

"**Transfer Notice**" shall have the meaning set forth in Section 6.4 hereof.

"**TTM 4-Wall EBITDA**" shall mean Four-Wall EBITDA as measured in Exhibit C of the 2009 Praesidian Agreement for any consecutive 12-month period.

EXHIBIT 1
Page 68

"**TTM EBITDA after Corporate**" shall mean TTM 4-Wall EBITDA adjusted by disregarding the last add-back (relating to corporate overhead expenses) to Net Income (as defined in the 2009 Praesidian Agreement) set forth in item 1 of Exhibit C of the 2009 Praesidian Agreement.

"**Warrant**" shall mean and refer to those certain Warrants to purchase Class A Membership Units of the Company, issued to the Warrantholders as set forth on Schedule F hereto, as amended from time to time in accordance with the terms of this Agreement.

"**Warrant Sale Price**" shall have the meaning set forth in Section 6.5(a) hereof.

"**Warrantholder**" shall mean and refer to the holders of the Warrants and their successors and assigns for so long as such persons continue to hold the Warrants, as set forth on Schedule F hereto, as amended from time to time in accordance with the terms of this Agreement.

## ARTICLE II

### Organization

2.1    **Formation.**  The Members confirm the formation of the Company as a limited liability company pursuant to the provisions of the Act and this Agreement.  This Agreement constitutes the operating agreement and sets forth the agreement of the Members as to their relative rights and obligations as well as the manner in which the Members have agreed to operate the Company.  Except as herein otherwise expressly provided, the rights and obligations of the Members shall be as provided in the Act.

2.2    **Name.**  The name of the limited liability company formed hereby is "**Club Ventures Investments LLC**".

2.3    **Purposes.**  The purposes for which the Company is formed is (i) establishing, operating or managing, directly or through wholly-owned subsidiaries, one or more DAVID BARTON GYM facilities and conducting related activities and (ii) to engage in any other lawful activity for which limited liability companies may be formed under the Act, subject to the terms of this Agreement.

2.4    **Principal Office; Registered Agent and Office.**  The location of the principal office of the Company shall be at 50 West 23rd Street, 5th Floor, New York, NY or such other location as the Board of Managers may from time to time designate.  The Company's registered agent and office in Delaware shall be CSC – Wilmington at 2711 Centerville Road, Suite 400, Wilmington, DE 19808, or such other agent and/or office as the Board of Managers may from time to time designate.  The Company may maintain other offices within or outside of Delaware as the Members may determine.

2.5    **Duration.**  The term of the Company shall commence on the date that the Certificate of Formation is filed with the Secretary of State and shall continue in full force and effect unless terminated in accordance with the provisions of this Agreement.

2.6    **No State-Law Partnership**.   The Company is a Delaware limited liability company that will be treated as a partnership only for federal income tax purposes, and if applicable, state tax purposes and no Member shall be deemed to be a partner or joint venturer of any other Member, for any purposes other than federal income tax purposes and, if applicable, state and local tax purposes, and this Agreement shall not be construed to suggest otherwise.  The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III

## Members; Units

3.1    **Membership Units.**  The Membership Interests of the Company shall be designated as and represented by the Class A Membership Units, the Class B Membership Units, the Class C Membership Units, the Series A Preferred Membership Units and the Series B Preferred Membership Units.   No additional class or classes or series of Membership Interests of the Company shall be created, designated or issued except in accordance with the terms of this Agreement.  The total number of Class A Membership Units, Class B Membership Units, Class C Membership Units, Series A Preferred Membership Units and Series B Preferred Membership Units shall be as set forth respectively on Schedules A, B, C, D and E hereto.  All Membership Interests shall have identical rights in all respects as all other Membership Interests in its class except as otherwise specified in this Agreement.  Each Member hereby agrees that his interest in the Company and his Membership Interests shall be personal property for all purposes.

(a)    Class A Membership Units.  Schedule A sets forth the number of Class A Membership Units owned by each of Howard and Barton.

(b)    Class B Membership Units.

(i)    On November 18, 2005 (the "**Class B Grant Date**"), the then Members caused the Company to issue 2.9 Class B Membership Units to Berkowitz. The Class B Membership Units are fully vested.

(ii)    With respect to the Class B Membership Units, Berkowitz is entitled to receive distributions from the Company only if the aggregate distributions by the Company in respect of all Membership Units (excluding distributions under Section 5.4(a)) issued prior to the issuance of such Class B Membership Units exceeds $3,500,000 (the "**Hurdle Amount**").

EXHIBIT 1
Page 70

(c)    Class C Membership Units.

(i)    On the applicable Class C Grant Date, the then Members caused the Company to issue to each person identified on Schedule C the number of Time-Vest Class C Units and Incentive Class C Units set forth opposite such person's name on Schedule C. The Board of Managers may hereafter grant additional Class C Membership Units to employees or consultants of the Company or any of its subsidiaries, and upon any such grant the Chief Executive Officer or Chief Operating Officer shall amend Schedule C to reflect such grant.

(ii)    Except as provided in Sections 3.1(c)(iii), (iv), and (vii) below, a holder of Class C Membership Units shall forfeit such holder's Class C Membership Units (and such Class C Membership Units shall be terminated) to the extent not vested upon the termination of such holder's employment with the Company or any of its subsidiaries for any reason.

(iii)    The right of a holder of Time-Vest Class C Units to such Time-Vest Class C Units shall vest (and no longer be subject to forfeiture as provided in Section 3.1(c)(ii) above) in 36 equal monthly installments beginning on the Class C Grant Date with respect to such Time-Vest Class C Units, such that the Time-Vest Class C Units shall be fully vested on the third anniversary of such Class C Grant Date; provided, that in the event of a Change in Control, or termination of such holder's employment with the Company or any subsidiary of the Company by the Company or such subsidiary without Cause (other than due to death or Disability) or by such holder for Good Reason (as such terms are defined in the Employment Agreement with respect to such holder or if not specified therein, as determined by the Board of Managers), the Time-Vest Class C Units issued to such holder shall vest in full upon such Change in Control, or termination. For purposes of this Agreement, **"Change in Control"** means (i) a sale, merger or similar transaction or series of related transactions involving the Company, as a result of which those persons who held 100% of the voting power of the Company immediately prior to such transaction do not hold (either directly or indirectly) more than 50% of the voting power of the Company (or the surviving or resulting entity thereof) after giving effect to such transaction; or (ii) the sale of all or substantially all of the assets of the Company and its subsidiaries, taken as a whole, in a transaction or series of related transactions.

(iv)    The right of a holder of Incentive Class C Units to such Incentive Class C Unit shall vest (and no longer be subject to forfeiture as provided in Section 3.1(c)(ii) above) as set forth below:

| | |
|---|---|
| As of Class C Grant Date: | 0% of the Incentive Class C Unit |
| As of the date on which TTM 4-Wall EBITDA is $10.5 million: | 40% of the Incentive Class C Units |

EXHIBIT 1
Page 71

As of the date on which TTM EBITDA
after Corporate is $5.0 million:

40% of the Incentive Class C
Units

Upon a Change in Control:

20% of the Incentive Class C Unit

(v)    Any distributions made under Sections 5.4(e) and 5.4(f) hereof that
are made on account of any portion of the Class C Membership Units issued to a
Member pursuant to Section 3.1(c)(i) that have not vested pursuant to this Section
3.1(c) as of the date of such distribution, other than distributions required by
Section 5.4(a) hereof, shall be deposited into an escrow account established by the
Company, which amounts shall be released to such Member as the forfeiture
rights under this Section 3.1(c) lapse. Such escrow amount shall not delay the
taxation of any allocations made to such Members, and amounts shall be released
from the escrow account to pay any and all taxes on the income assessed on the
escrow account. Any amounts remaining in the escrow account in respect of Class
C Membership Units which have been forfeited in accordance with Section 3.1(c)
shall be released from the escrow and returned to the Company.

(vi)    With respect to the Class C Membership Units issued to a Member
pursuant to Section 3.1(c)(i), any distributions from the Company pursuant to
Section 5.4 to the holders of Common Membership Interests which are
attributable to Capital Proceeds (including distributions under Section 7.2(a)(iii)
upon a liquidation) shall be distributable to such holders as follows: (A) first, to
the holders of Common Membership Interests issued prior to the  Class C Grant
Date with respect to such Member, pro rata in proportion to their respective
Percentage Interests, up to an aggregate amount equal to the Class C Hurdle
Amount with respect to such Member, (B) second, one hundred percent (100%) to
such  Member until such Member has received pursuant to this clause (B) an
amount equal to its Percentage Interest of the aggregate amounts distributable
pursuant to clause (A) above and this clause (B), and (C) thereafter, to all holders
of Common Membership Interests, pro rata, in proportion to their Percentage
Interests.  If there is more than one holder of Class C Membership Units at the
time of any distribution is made under Section 5.4, the provisions of clauses (A),
(B) and (C) of this clause (vi) will be reapplied with respect to each such holder in
reverse order of each such holder's Class C Grant Date.

(vii)    Notwithstanding any other provision of this Agreement, but subject
to the next sentence, a holder of Class C Membership Units shall forfeit all vested
and unvested Class C Membership Units (and such Class C Membership Units
shall be terminated) if such holder's employment is terminated by the Company
for Cause (as such term is defined in the Employment Agreement with respect to
such holder or if not specified therein or such Member does not have an
Employment Agreement with the Company, as determined by the Board of
Managers)  or if such holder at any time, whether while employed under his
Employment Agreement or afterwards, shall breach any covenant contained in the
Section of the applicable Employment Agreement captioned "Restrictive

11

EXHIBIT 1
Page 72

Covenants" or similarly captioned. Notwithstanding any other provision of this Agreement, the Board of Managers may by Super-Majority Approval amend Schedule C or authorize separate agreements to (A) provide for vesting, forfeiture, hurdle rate and other terms that are different than those contained in this Agreement with respect to any Class C Membership Units granted after the date of this Agreement and (B) accelerate or waive any vesting, forfeiture or other requirements, or with the consent of the holder of Class C Membership Units so affected, otherwise modify the vesting, forfeiture or other requirements with respect to any outstanding Class C Membership Units.

(d)    Tax Treatment of and Elections with Respect to Issuance of Class B and Class C Membership Units.

(i)    The Company and each Member agree to treat the Class B and Class C Membership Units as "profits interests" within the meaning of Rev. Proc. 93-27,1993-2 C.B. 343. In accordance with Rev. Proc. 2001-43, 2001-2 C.B. 191, the Company shall treat each holder of Class B and Class C Membership Units as the owner of such Units from the date they are granted, and shall file its IRS form 1065, and issue appropriate Schedule K-1's to such holder, allocating to such holder his or her distributive share of all items of income, gain, loss, deduction and credit associated with such Class B and Class C Membership Units as if such units were fully vested. Each Member agrees to take into account such distributive share in computing his or her Federal income tax liability for the entire period during which he or she holds the Class B or Class C Membership Units. Subject to a "determination" (as such term is defined in Code Section 1313(a)) to the contrary, the Company and each Member agree not to claim a deduction (as wages, compensation or otherwise) for the fair market value of such Class B and Class C Membership Units issued to a Member, either at the time of grant of such Class B and Class C Membership Units or at the time such Class B and Class C Membership Units become substantially vested. The undertakings contained in this Section 3.1(d)(i) shall be construed in accordance with Section 4 of Rev. Proc. 2001-43. The provisions of this Section 3.1(d)(i) shall apply regardless of whether or not the holder of Class B and Class C Membership Units files an election pursuant to Section 83(b) of the Code.

(ii)    The Board of Managers is hereby authorized and directed to cause the Company to make an election to value any Class B and Class C Membership Units issued by the Company at liquidation value (the "**Safe Harbor Election**"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(1) and IRS Notice 2005-43 (collectively, the "**Proposed Rules**"). The Board of Managers shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

EXHIBIT 1
Page 73

(iii)    Any such Safe Harbor Election shall be binding on the Company and on all of its Members with respect to all Transfers of Class B and Class C Membership Units thereafter made by the Company, except for any such Transfers made after revocation of such Safe Harbor Election. A Safe Harbor Election once made may be revoked by the Board of Managers as permitted by the Proposed Rules or any applicable rule.

(iv)    Each Member (including any person to whom Class B and Class C Membership Units are Transferred in connection with the performance of services), by signing this Agreement or by accepting such Transfer, hereby agrees to comply with all requirements of the Safe Harbor Election with respect to all Class B and Class C Membership Units transferred while the Safe Harbor Election remains effective.

(v)    The Board of Managers shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to Transfers of Class B and Class C Membership Units covered by such Safe Harbor Election.

(vi)    Notwithstanding anything to the contrary contained herein, the Board of Managers is hereby authorized and empowered, without further vote or action of the Members, to amend this Agreement as necessary to comply with the Proposed Rules or any rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member. Any undertakings by the Members necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and to the extent so reflected shall be binding on each Member, respectively.

(vii)    Each Member agrees to cooperate with the Board of Managers to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the Board of Managers.

(viii)    No Transfer of any interest in the Company by a Member shall be effective unless prior to such Transfer the Transferee of such interest shall have agreed in writing to be bound by the provisions of this Section 3.1(d), in form satisfactory to the Board of Managers.

(ix)    Costs and expenses incurred by the Board of Managers in making and preserving (or if revoked, revoking) the Safe Harbor Election shall be paid by the Company.

EXHIBIT 1
Page 74

(e)   Series A Preferred Membership Units.

(i)   The Company has issued Series A Preferred Membership Units to Howard in such amounts and on the dates of issuance set forth on Schedule D hereto and with a Series A Preferred Stated Value as of the date hereof as set forth on Schedule D. For the avoidance of doubt, effective as of the issuance of additional Series A Preferred Membership Units in accordance with the terms of the Howard Subscription Agreement, Schedule D will be amended by the Chief Executive Officer or the Chief Operating Officer to reflect the issuance of such additional Series A Preferred Membership Units.

(ii)   The "Series A Preferred Stated Value" of each Series A Preferred Membership Unit shall equal the sum of (a) with respect to Series A Preferred Membership Units outstanding as of the date hereof, the Series A Preferred Stated Value set forth on Schedule D, or, with respect to Series A Preferred Membership Units issued on or after the date hereof, $100,000, in each case as reduced from time to time as a result of distributions pursuant to Section 5.4(d) hereof, and (b) any amount added to the Series A Preferred Stated Value pursuant to Section 3.1(e)(iii) below. For the avoidance of doubt, in the event that Howard has received amounts on account of a Series A Preferred Membership Unit as a result of distributions under Section 5.4(d) equal to the Series A Preferred Stated Value in full, such Series A Preferred Membership Unit shall be deemed to be fully and finally redeemed effective as of the date on which Howard has received such Series A Preferred Stated Value and Schedule D will be amended by the Chief Executive Officer or the Chief Operating Officer to reflect such redemption.

(iii)   The Series A Preferred Stated Value of each Series A Preferred Membership Unit shall be increased at the rate per unit (as a percentage of the Series A Preferred Stated Value per unit) of 15% per annum (the "Series A Yield"). Such Series A Yield shall be calculated on the basis of a 360-day year, shall accrue daily commencing on the date hereof, except that the Series A Yield shall accrue from the date of issuance with respect to Series A Preferred Membership Units issued on or after the date hereof, and shall compound on December 31 of each year, commencing December 31, 2008, whether or not earned or declared and whether or not there are profits, surplus or other funds of the Company available.

(iv)   Notwithstanding anything to the contrary in Section 4.1 hereof, the Series A Preferred Membership Units may be redeemed by the Company at any time, at the Series A Preferred Stated Value as of such date plus accrued Series A Yield since the December 31st immediately preceding such date per each Series A Preferred Membership Unit (the "Redemption Amount"), subject to the Consent of the Members with holders of the Series A Preferred Membership Units in their capacity as a holder of any Units, recusing themselves from any such vote or consent as a Member or otherwise.

(v)    Notwithstanding anything to the contrary set forth in this Agreement: (A) until the Series A Preferred Membership Units have been fully and finally redeemed and the entire Redemption Amount has been paid to the holders thereof, the Company shall not, except as provided in Sections 5.4(a), 5.4(d) and 7.2 hereof, directly or indirectly, pay (or set aside any funds to pay) any distribution to the holders of any other class of Membership Units of the Company, redeem (or set aside any funds to redeem) in whole or in part any class, of Membership Units of the Company; and (B) upon liquidation or dissolution of the Company, before any amount shall be paid to (or set aside for) any holder of any other class of Membership Units of the Company (other than the Series B Preferred Membership Units), the holders of the Series A Preferred Membership Units shall be paid the full Redemption Amount of the Series A Preferred Membership Units.

(vi)    Without the consent of holders of the Series A Preferred Membership Units, no Membership Interests will be issued on a parity with or senior to the rights of the Series A Preferred Membership Units with respect to distributions or liquidation, and no additional Series A Preferred Membership Units will be issued.

(vii)    Except as may be required by law, no holder of Series A Preferred Membership Units shall be entitled to any notice of any meeting or to vote with respect to any matter presented to Members for their action or consideration.

(viii)    If not previously redeemed, upon the payment in full of (A) all indebtedness of the Company and its Affiliates owed to the Praesidian Group, including, without limitation, indebtedness under the Praesidian Agreements, (B) all Howard Guaranteed Indebtedness, and (C) the Series B Preferred Stated Value to the holders of the Series B Preferred Membership Units on each of the Series B Preferred Membership Units (whether pursuant to Section 5.4(c) or otherwise), at the option of Howard upon no less than ten (10) days prior written notice to the Company, the Series A Preferred Membership Units must be redeemed for the Redemption Amount.

(f)    Series B Preferred Membership Units.

(i)    The Company has issued Series B Preferred Membership Units to such Persons and in such amounts set forth on Schedule E hereto.

(ii)    The "Series B Preferred Stated Value" of each Series B Preferred Membership Unit shall equal $73,615.15.

(iii)    Unless consented to by the holders of the Series B Preferred Membership Units, no Membership Interests will be issued on a parity with or senior to the rights of the Series B Preferred Membership Units with respect to

EXHIBIT 1
Page 76

distributions or liquidation, and no additional Series B Preferred Membership Units will be issued.

(iv)    Without the consent of the members of the Praesidian Group, except as provided in Sections 3.1(e)(viii), 5.4 and 7.2, no distribution or redemptions of any Units shall be made.

3.2    **Issuance of Units.** The Membership Units issued hereunder shall not be certificated. Each Member's Membership Interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company, shall be represented by the class of Membership Units owned by such Member, subject to all of the provisions hereof. The ownership of Membership Units shall entitle each Member to allocations of profit and loss and other items and distributions of cash and other property as set forth in Article V hereof. Each Common Membership Unit and Series B Preferred Membership Unit shall entitle the Member owning such Membership Unit to one vote on any matter voted on or consented to by Members as provided in this Agreement or as required by applicable law. Each Member has made such Member's Capital Contribution set forth opposite his, her or its name, as the case may be, on Schedule D or Schedule E hereto, and each Member is deemed to own the number of Membership Units set forth opposite his, her or its name on Schedule A, Schedule B, Schedule C or Schedule D hereto, as the case may be.

3.3    **Members.** The names, residences, business or mailing addresses and the Membership Units of the Members are set forth in Schedule A, Schedule B, Schedule C and Schedule D hereto, as amended from time to time in accordance with the terms of this Agreement.

3.4    **Loans.** No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law, by this Agreement, the 2009 Praesidian Agreement, the Howard Subscription Agreement or such other agreements as may be entered into by such Member and the Company in the future. Any Member may, with the approval of the Board of Managers (or, if such Member is a Manager, consent of a majority of the other members of the Board of Managers), make loans to the Company, and any loan by a Member to the Company shall not be considered to be a Capital Contribution. The Members hereby ratify, confirm, approve and consent to the Reimbursement Agreement, the other Howard Reimbursement Documents, the Howard Subscription Agreement and the Praesidian Agreements.

3.5    **Liability of Members.**

(a)    Except as otherwise required by applicable law or as explicitly set forth in this Agreement, no Member shall have any personal liability whatever in his, her or its capacity as a Member, whether to the Company, to any of the Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the

EXHIBIT 1
Page 77

Company and therefore, a Member shall be liable only to make his, her or its Capital Contribution to the Company.

(b)    In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to Article V hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or distribution of any such property to a Member shall be deemed to be a compromise within the meaning of the Act, and the Member receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of any Manager or any other Member.

3.6    **Lack of Authority**. No Member, in his capacity as a Member, has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures on behalf of the Company.

3.7    **Meetings of Members**. Any Manager or any Member or Members owning Common Membership Units or Series B Preferred Membership Units holding an aggregate of at least fifteen percent (15%) of either the Common Membership Units or Series B Preferred Membership Units, respectively, may request that a meeting (a "**Meeting**") be held at any time at the office of the Company for any purpose deemed by them to require action by the Members. At any Meeting, any action taken shall be by Consent of the Members.

3.8    **Action by Consent; Telephone Meetings**. Notwithstanding any provision contained in this ARTICLE III, any meeting of the Members may be held by means of a conference telephone call, and any Member shall be entitled to participate in any meeting by conference telephone call upon request. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if a written consent thereto is signed by Members holding at least the number of Common Membership Units and Series B Preferred Membership Units necessary to authorize such action and filed with the records of the meetings of the Members. Such consent shall be treated as a vote of the Members for all purposes. The Chief Executive Officer or the Chief Operating Officer will give prompt notice of any action taken without a meeting by less than unanimous written consent to those Members holding Common Membership Units and Series B Preferred Membership Units who have not consented, but the failure to give such notice shall not affect in any manner the validity or effectiveness of the consent given.

3.9    **Outside Activities**. Except as may be provided otherwise in a separate agreement, subject to Section 4.1(c)(xiv) below, each Member, in his capacity as such, may at any time and from time to time engage in and own interests in other business ventures of any and every type and description, independently or with others with no obligation to offer to the Company or any other Member or Officer the right to participate therein. Neither the

EXHIBIT 1
Page 78

Company nor any Member or Officer of the Company shall have any rights by virtue of this Agreement or the limited liability company relationship created hereby in any such business interests or activities of any such Persons.

## ARTICLE IV

## Board of Managers; Officers

4.1    **Management of the Company**.

    (a)    General. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of Managers (the "**Board of Managers**" and each member thereof a "**Manager**" and collectively, the "**Managers**"). In addition to the powers and authorities expressly conferred by this Agreement upon the Board of Managers, the Board of Managers may exercise all such powers of the Company and do all such lawful acts and things as are provided by the Act.

    (b)    Number and Qualifications. The number of Managers composing the Board of Managers of the Company shall be four (4). A Manager of the Company need not be a resident of the State of Delaware and need not be a Member of the Company. The Board of Managers shall consist of the following persons: (i) until the Praesidian Termination Date, a designee of the Praesidian Group (together with any successor Manager appointed in accordance with the terms of this Agreement, the "**Praesidian Designee**"), who shall be Jason Drattell initially; (ii) until such time as Barton shall no longer own at least 33% of the number of Membership Units that he owns as of March 24, 2009 (the "**Barton Termination Date**"), a designee of Barton (together with any successor Manager appointed in accordance with the terms of this Agreement, the "**Barton Designee**"), who shall be Barton initially; (iii) until the Howard Termination Date, a designee of Howard (together with any successor Manager appointed in accordance with the terms of this Agreement, the "**Howard Designee**"), who shall be Howard initially; and (iv) until his employment with the Company is terminated, Elan Ben-Avi ("**Ben-Avi**").

    (c)    Actions Requiring Super-Majority Approval of the Board of Managers. Notwithstanding the foregoing, the Company shall not take the following actions without the consent of at least 51% of all of the Managers, which consent must include the Praesidian Designee and the Howard Designee (a "**Super-Majority Approval**"):

        (i)    incur, guaranty or be responsible for any indebtedness for borrowed money, other than the Howard Guaranteed Indebtedness, the Praesidian Agreements or in connection with the Howard Reimbursement Documents;

        (ii)    grant any lien or encumbrance on any of the assets of the Company other than in connection with the Howard Guaranteed Indebtedness or the Praesidian Agreements;

(iii) enter into, amend or become liable under any employment or consulting agreement or arrangement providing for payment of in excess of $200,000 per year, or not terminable at will by the Company upon payment of less than $100,000, in each case unless provided for in a line-item included in a budget approved as provided below;

(iv) enter into any lease for real property;

(v) make any capital or other expenditures, or commit to make any capital or other expenditures, in excess of $75,000 in the aggregate per year unless provided for in a line-item included in a budget approved as provided below, such amount to be calculated net of proceeds of capital asset sales not included in such budget;

(vi) acquire any other Person, whether by asset acquisition, merger, or otherwise;

(vii) except as provided for in a line-item included in a budget approved as provided below, dispose of assets in excess of $75,000 in the aggregate in any fiscal year, other than the disposition of equipment the proceeds of which are promptly used to acquire replacement equipment;

(viii)    entering into any material transaction other than in the ordinary course of business or other than as provided for in a line-item included in a budget approved as provided below;

(ix) enter into any transaction with the Managing Member or any Affiliate thereof (other than transactions between the Company and the direct or indirect wholly-owned subsidiaries or among such subsidiaries), or pay any amount to or for the benefit of Barton except as provided for in a line-item included in a budget approved as provided below, and except for a management agreement or license agreement with Barton or an Affiliate of Barton;

(x) take any action (or omit to take any action) which act or omission would violate any of the provisions of the Howard Reimbursement Documents or the Praesidian Agreements;

(xi) except as contemplated by the 2009 Praesidian Agreement or the Howard Subscription Agreement, issue any additional Membership Units or consent to the Transfer of any Membership Units, other than such issuances as already have been consented to pursuant to Section 3.1 of this Agreement;

(xii) form any direct or indirect subsidiary, or make or maintain an investment in a any entity, which is not directly or indirectly wholly owned by the Company;

(xiii)    cause or permit any direct or indirect subsidiary of the Company to take any act which, if taken by the Company, would violate this Agreement or any of the Howard Reimbursement Documents or the Praesidian Agreement; or

19

EXHIBIT 1
Page 80

(xiv) open or operate, or participate in the opening or operation of, a new facility and by signing below Barton agrees that until the Praesidian Termination Date and the Howard Termination Date, he will not, directly or indirectly, through the Company or any of its subsidiaries or otherwise, open or operate, or participate in the opening or operation of, a new facility without consent of Howard and the Praesidian Group.

4.2    **Vacancy**.  Any vacancy occurring for any reason in the number of Managers shall be filled by the election of a new Manager by Consent of the Members; provided, however, that: (i) until the Praesidian Termination Date, a vacancy created by the removal, resignation or other departure of a Praesidian Designee may only be filled by a nominee of the Praesidian Group; (ii) until the Barton Termination Date, a vacancy created by the removal, resignation or other departure of a Barton Designee may only be filled by a nominee of Barton; and (iii) until the Howard Termination Date, a vacancy created by the removal, resignation or other departure of a Howard Designee may only be filled by a nominee of Howard.  A Manager elected to fill a vacancy shall be elected for the unexpired term of the predecessor in office.

4.3    **Removal**.  No Praesidian Designee, Barton Designee or Howard Designee may be removed except: (i) by the person who has the right to designate such Manager to the Board of Managers pursuant to Section 4.1(b), or (ii) by the Board of Managers if the conditions specified in Section 4.1(b) entitling each such person to designate a person for or to fill a Board seat, as the case may be, are not then satisfied.

4.4    **Notice of Meetings; Place of Meetings**.  Meetings of the Board of Managers may be called by the Chief Executive Officer, the Chief Operating Officer or by any two Managers upon at least two business days notice delivered to each Manager, which may be delivered personally or by e-mail, telecopy or express delivery, and such time period shall in each case be measured from the time notice is received by the recipient.  The notice of each such meeting shall specify the purpose or purposes for which it is called, and no action may be taken with respect to other matters at any such meeting except with the unanimous consent of all Managers in attendance at such meeting at which a quorum is present (as determined in accordance with Section 4.6 hereof).  All meetings of the Board of Managers of the Company may be held either within or without the State of Delaware as shall from time to time be determined by the Board of Managers. Persons who are not Managers may attend any meeting of the Board of Managers if approved by at least 51% of the Managers.

4.5    **Meetings of Board of Managers**.  The Company shall hold quarterly meetings of the Board of Managers on the first day of every calendar quarter (the "**Quarterly Meeting**") unless otherwise determined by the Board and may hold special meetings called in the manner described in Section 4.4.  Other than with respect to Quarterly Meetings, the Company shall give each member of the Board of Managers written notice at least two business days in advance of all meetings of the Board, in the manner described in Section 4.4

20

EXHIBIT 1
Page 81

4.6    **Quorum**.

(a)    Subject to the following provisions of this <u>Section 4.6</u>, at any meeting of the Board of Managers, the presence of at least 3 of the Managers, shall be necessary to constitute a quorum for the transaction of business.

(b)    The act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Board of Managers, except as otherwise provided by law, the Certificate of Formation or this Agreement. If a quorum shall not be present at any meeting of the Board of Managers, the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

4.7    **Attendance and Waiver of Notice**. Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

4.8    **[Intentionally Omitted]**.

4.9    **Actions by Consent; Telephone Meetings**. Notwithstanding any provision contained in this <u>ARTICLE IV</u>, all actions of the Board of Managers provided for herein may be taken by written consent without a meeting, or any meeting thereof may be held by means of a conference telephone call, and any Manager shall be entitled to participate in any meeting by conference telephone call upon request. Any such action which may be taken by the Board of Managers without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by at least such number of Managers as would be necessary to take such action at a meeting at which all the Managers were present and voted. Prompt notice of the taking of any action by the Managers without a meeting by less than unanimous written consent shall be given to those Managers who did not consent in writing to the action, but the failure to give such notice shall not affect in any manner the validity of the consent given.

4.10    **Budget**. The Chief Executive Officer and Chief Operating Officer shall propose a budget for such fiscal year to the Board of Managers. If such budget is approved by the Super-Majority Approval of the Board of Managers (the "**Budget Approval**"), it shall be the budget for such fiscal year. If such Budget Approval is not obtained, the budget for the prior fiscal year shall continue to be the budget for the Company. In the event that all of the Series A Preferred Membership Units and the Series B Preferred Membership Units have been redeemed or otherwise paid in full, the budget shall require the approval of the Board of Managers.

4.11    **Duties and Obligations of the Managers**. The Board of Managers shall take all commercially reasonable actions which may be necessary or appropriate for the continuation of the Company's valid existence as a limited liability company under the laws of the State of Delaware and of each other jurisdiction in which the existence of the Company or qualification to do business is necessary to protect the limited liability of the Members and to enable the

21

EXHIBIT 1
Page 82

Company to conduct the business in which it is engaged. The Board of Managers and officers of the Company shall have a fiduciary duty of loyalty and care similar to that of directors and officers of business corporations organized under the General Corporation Law of the State of Delaware.

4.12    **Officers**.

(a)    The Board of Managers may designate one or more persons to fill one or more officer positions of the Company. Such officers may include Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, Vice President, Controller, Treasurer, Assistant Treasurer, Secretary and Assistant Secretary or such other officer positions as the Board of Managers may determine from time to time. No officer need be a resident of the State of Delaware. The Board of Managers may assign titles to particular officers. Each officer will hold office until his or her successor shall be duly designated and shall qualify to hold such office, or until his or her death or until he shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company may be fixed from time to time by the Board of Managers. Unless the Board of Managers specify otherwise, the assignment of such title shall constitute the delegation to such officer of the authority and duties set forth below and those that are normally associated with that office:

(i)    *Chief Executive Officer*. The Chief Executive Officer will be primarily responsible for developing and coordinating the sales, marketing and branding efforts of the Company ("**Sales and Marketing**") as well as designing new clubs ("**Club Design**"). The CEO will manage the day-to-day Sales and Marketing efforts and will discuss major business decisions with the Chief Operating Officer. Such significant decisions include the hiring and firing of employees, compensation agreements, goal setting, pricing and promotional arrangements. The CEO will confer with the Chief Operating Officer regarding Club Design decisions prior to committing the Company's resources. The Chief Executive Officer and Chief Operating Officer should discuss and agree to significant commitments and/or expenditures (for example, any contractual arrangements, and/or disbursements in excess of $15,000 individually or in the aggregate). The Chief Executive Officer shall be Barton. The Chief Executive Officer may be removed (i) for Cause, by Members holding a majority of the Class A Membership Units, and (ii) without Cause, by Members holding 90% of the aggregate number of issued and outstanding Common Membership Units and Series B Preferred Membership Units held by all Members other than the Chief Executive Officer, any Affiliate of the Chief Executive Officer or any transferee of the Chief Executive Officer contemplated by Section 6.1(b).

(ii)    *Chief Operating Officer*. The Chief Operating Officer will be generally responsible for all daily business decisions of the Company

EXHIBIT 1
Page 83

including but not limited to pricing, compensation (other than that of the Chief Executive Officer), expenditures, decisions to hire and fire employees (other than the Chief Executive Officer), retain professionals, enter into contracts and agreements and/or commit company resources. With the exception of the Sales and Marketing departments, the Company's management and division heads will report to the Chief Operating Officer. The division heads of the Sales and Marketing departments will report to the Chief Executive Officer, however, they will be accountable to the Chief Operating Officer in all matters including performance and compliance with Company's rules and procedures. Until the termination of his employment with the Company pursuant to his employment agreement with the Company, the Chief Operating Officer shall be Ben-Avi.

(b)    In the event of any disputes between the Chief Executive Officer and Chief Operating Officer as to business decisions to be made by one or both of them on behalf of the Company, if they are unable to resolve the dispute, the dispute shall be submitted to the Board of Managers for resolution in such manner as the Board of Managers deems advisable in its discretion.

(c)    Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Company. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Subject to Section 4.12(a)(i), any officer may be removed as such, either with or without cause, by the Board of Managers; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the officer so removed. Designation of an officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

(d)    Each officer shall devote such time, effort, and skill to the Company's business affairs as he or she deems necessary and proper for the Company's welfare and success, but subject to any more specific direction from the Board of Managers or a more senior executive officer from time to time.

## ARTICLE V

### Capital Accounts; Allocations; Distributions

5.1    **Capital and Capital Accounts**.

(a)    No Member shall be entitled to withdraw any part of such Member's capital account balance or to receive any distribution from the Company, except as expressly provided in this Agreement. No Member shall be entitled to demand or receive any property from the Company other than cash as expressly provided herein.

EXHIBIT 1
Page 84

(b)    No Member shall be required to make any additional capital contributions to the Company. No Member shall be paid interest on any contribution of capital to the Company. Except as otherwise agreed in writing, no Member shall be required to make loans in any amount to the Company. The terms and conditions of any such loans shall be evidences by appropriate loan documentation.

(c)    Subject to Section 4.1, any Member may provide the funds reasonably necessary for the Company to operate on a term or revolving loan basis with all outstanding balances to earn interest at the then Prime Rate as published by Citibank, N.A. or such other rate as may be agreed by the Board of Managers; provided, that if such loan is to be made by a Manager, the Chief Executive Officer or the Chief Operating Officer, or an Affiliate thereof, such rate shall be Consented to by the Members.

5.2    **Capital Accounts.**    A capital account shall be established for each Member and determined, maintained and adjusted in accordance with the Code and the Regulations. Any questions concerning a Member's capital account shall be resolved by applying principles consistent with this Agreement and the Code and Regulations in order to ensure that all allocations to the Members will have substantial economic effect or will otherwise be respected for federal income tax purposes. No Member shall be required to contribute capital to restore a negative balance in such Member's capital account, including, for the avoidance of doubt, Regulations sections 1.704-1(b)(2)(iv)(d), (f) and (g).

5.3    **Allocations.**

(a)    Book Allocations. The items of income, gain, loss or deduction of the Company (determined in accordance with Code Section 703(a) and Regulation Section 1.704-1(b)(2)(iv)) for a fiscal year or other period shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 5.4(c) – (f) hereof if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their adjusted tax bases for federal income tax purposes, adjusted as provided in sections 1.704-1(b)(2)(iv)(d), 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) of the Regulations, all Company liabilities were satisfied (limited in the case of each nonrecourse liability (as such term is defined in Regulations Section 1.752-1(a)(2)) to the fair market value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 5.4(c) – (f) to the Members immediately after making such allocations, minus (ii) such Member's share of any "partnership minimum gain" (as such term is defined in Regulations Section 1.704-2(b)(2)) and "partner nonrecourse debt minimum gain" (as such term is defined in Regulations Section 1.704-2(i)(2)), in each case, computed immediately prior to the hypothetical sale of the Company's assets.

(b)    Loss Limitation. Notwithstanding anything to the contrary in Section 5.3(a), the amount of items of Company expense and loss allocated pursuant

EXHIBIT 1
Page 85

to Section 5.3(a) to any Member shall not exceed the maximum amount of such items that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year, unless each Member would have an Adjusted Capital Account Deficit. All such items in excess of the limitation set forth in this Section 5.3(b) shall be allocated first, to Members who would not have an Adjusted Capital Account Deficit, pro rata, in proportion to their Capital Account balances, adjusted as provided in clauses (i) and (ii) of the definition of Adjusted Capital Account Deficit, until no Member would be entitled to any further allocation, and thereafter, to all Members, pro rata, in proportion to their Aggregate Percentage Interests. For purposes of this Section 5.3, the term "Aggregate Percentage Interests" means, with respect to any Member, at any time and from time to time, (i) with respect to the Series B Preferred Membership Units owned by such Member, the product of the applicable Percentage Interest multiplied by the Preferred Percentage and (ii) with respect to the Common Membership Units owned by such Member, the product of the applicable Percentage Interest multiplied by the Common Percentage.

(c)  Tax Allocations. Each item of income, gain, loss, deduction or credit for federal income tax purposes that corresponds to an item of income, gain, loss or expense that is allocated pursuant to Section 5.3(a) or Section 5.3(b) (a "**Book Item**") shall be allocated among the Members in the same proportion as the corresponding Book Item is allocated among them pursuant to Section 5.3(a) or Section 5.3(b) hereof. Notwithstanding anything in the preceding sentence to the contrary, in the event any property of the Company is credited to the Capital Account of a Member at a value other than its tax basis (whether as a result of a contribution of such property or a revaluation of such property pursuant to Regulation Section 1.704-1(b)(2)(iv)(f)), then allocations of taxable income, gain, loss and deductions with respect to such property shall be made in a manner which will comply with Section 704(b) and Section 704(c) of the Code and the Regulations thereunder.

(d)  Special Allocations. Notwithstanding Sections 5.3(a) and (b) hereof, appropriate adjustments shall be made to the allocations to the extent required to comply with the "qualified income offset," "minimum gain charge back," "partner nonrecourse debt minimum gain chargeback," "nonrecourse deductions" (which shall be allocated among the Members in proportion to their Aggregate Percentage Interests) and "partner nonrecourse deductions" rules of the Treasury Regulations promulgated pursuant to Section 704(c) of the Code. To the extent permitted by such Treasury Regulations, the allocations in such year and subsequent years shall be further adjusted so that the cumulative effect of all the allocations shall be the same as if all such allocations were made pursuant to the allocation provisions hereof without regard to this Section 5.3(d).

5.4  **Distributions Generally.** At the time determined by the Barton Designee or, if a Barton Designee is not then serving on the Board of Managers by a majority of Managers then serving on the Board of Managers, but at least quarterly during each fiscal year, the Board of Managers shall cause the Company to distribute any cash held by it which is not

EXHIBIT 1
Page 86

reasonably necessary for the then current operations of the Company (including repayment of any current indebtedness of the Company), in the following manner:

(a)    First, and by April 1st of 2005 and of each year thereafter, to each Member an amount equal to the product of (i) the maximum combined marginal federal, state and local tax rate payable by an individual resident of New York City (taking into account the character of the income earned and any lower marginal tax rates applicable to such income) multiplied by (ii) such Member's allocable share of the Company's taxable income for the prior calendar year, if any, as disclosed on the Company's filing with the Internal Revenue Service for such prior year, to the extent such income exceeds (x) such Member's allocable share of cumulative losses of the Company less (y) such Member's allocable share of the Company's cumulative taxable income from calendar years preceding such calendar year; any amounts distributed to a Member pursuant to this Section 5.4(a) shall be treated as an advance of the next distribution payable to such Member pursuant to Sections 5.4(c)-(f) below and shall reduce such distributions; in addition, to the extent income is allocated to the Warrantholders, a similarly calculated distribution shall be made to the Warrantholders;

(b)    Next, to the extent not already retained by operation of the lead-in paragraph to this Section 5.4, to a reserve for operating capital sufficient, in such amount as determined by the Super-Majority Approval of the Board of Managers, as is necessary to fund the next season's financial commitments;

(c)    Next, one hundred percent (100%) to the holders of the Series B Preferred Membership Units in proportion to and to the extent of the Series B Preferred Stated Value with respect to the then outstanding Series B Preferred Membership Units held by each such holder;

(d)    Next, one hundred percent (100%) to the holders of the Series A Preferred Membership Units in proportion to and to the extent of the Series A Preferred Stated Value with respect to the then outstanding Series A Preferred Membership Units held by each such holder;

(e)    Next, one hundred percent (100%) to the holders of Common Membership Units, pro rata in proportion to their Percentage Interests, until such holders have received pursuant to this clause (e) an amount equal to the Common Percentage of the aggregate amounts distributed pursuant to clause (c) above and this clause (e); and

(f)    Lastly, to the holders of the Series B Preferred Membership Units and Common Membership Units on a pro rata basis in proportion to their Combined Percentage Interests; *provided, however,* that anything in this Section 5.4 to the contrary notwithstanding:

EXHIBIT 1
Page 87

(A)    holders of any Class B Membership Units with applicable Hurdle Amounts will not be entitled to receive any distributions pursuant to this Section 5.4(f) and Section 5.4(e) above unless and until the aggregate distributions by the Company in respect of all Common Membership Units pursuant to this Section 5.4 (other than distributions in respect of Class B Membership Units with higher Hurdle Amounts) exceeds the Hurdle Amount applicable to such Class B Membership Units; and

(B)    with respect to any distributions pursuant to this Section 5.4(f) and Section 5.4(e) above that are on account of any portion of the Class C Membership Units that have not vested pursuant to Section 3.1(c) hereof as of the date of such distribution, such distributions shall instead be deposited into an escrow account established by the Company, which amounts shall be released to such holder as the forfeiture rights under Section 3.1(c) hereof lapse;

(C)    each holder of Class C Membership Units with applicable Class C Hurdle Amounts shall be entitled to distributions pursuant to this Section 5.4(f) and Section 5.4(e) above as follows: any such distribution to the holders of Common Membership Interests which are attributable to Capital Proceeds (including distributions under Section 7.2(a)(iii) upon a liquidation) shall be distributable to such holders (x) first, to the holders of Common Membership Interests issued prior to the Class C Grant Date with respect to such holder of Class C Membership Units, pro rata in proportion to their respective Percentage Interests, up to an aggregate amount equal to the Class C Hurdle Amount with respect to such holder, (y) second, one hundred percent (100%) to such holder of Class C Membership Units until such holder has received pursuant to this clause (y) an amount equal to its Percentage Interest of the aggregate amounts distributable pursuant to clause (x) above and this clause (y), and (z) thereafter, to all holders of Common Membership Interests (including such holder of Class C Membership Units), pro rata, in proportion to their Percentage Interests;

(D)    if there is more than one holder of Class C Membership Units at the time a distribution is made under Section 5.4, clause (C) above will be reapplied with respect to each such holder in reverse order of each such holder's Class C Grant Date; and

(E)    notice of such intended distribution shall be given to all Warrantholders at least five (5) days prior to such distribution.

Notwithstanding the foregoing, from and after the Howard Termination Date and the Praesidian Termination Date, the Chief Executive Officer shall have sole discretion as to whether or not to make any distributions pursuant to Sections 5.4(c) through (f), but shall not have discretion to alter the priorities set forth in Section 5.4.

EXHIBIT 1
Page 88

# ARTICLE VI

## Transfers of Membership Interests

6.1    **Transfer Restrictions**.

(a)    A Member may not Transfer all or any of such Member's Membership Units, without the prior written consent of Barton, Howard and the Praesidian Group. Any Transfer of any Membership Interest in violation of this Article VI shall be null and void and of no effect for any purpose, and no transferee or assignee shall be admitted as a Member hereunder without the prior written consent of the Chief Executive Officer. In the event a Member desires to Transfer for consideration any or all of such Member's Membership Units and such Member receives a *bona fide* written offer for the purchase of such Member's Membership Units, then such Member shall deliver written notice of such offer (which notice shall specify in reasonable detail the material terms of the offer to purchase such Membership Units) to the other Members and each of the other Members shall have a right of first refusal to purchase the Membership Units proposed to be Transferred by another Member on the same terms as set forth in the *bona fide* written offer, which right may be exercised by such non-transferring Members on a pro rata basis in accordance with their relative ownership of Membership Units. Such right shall be exercisable for a period of thirty (30) days from the date the Member proposing such Transfer delivers written notice to the non-transferring Members.

(b)    Notwithstanding the foregoing, a Member shall have the right to Transfer, for estate planning purposes, all or any of such Member's Membership Units to members of such Member's immediate family or to a trust or trusts for the benefit of such Member or members of such Member's immediate family; provided, however, that in no event shall the Member making such Transfer transfer any voting rights with respect to the Membership Units so transferred without the prior written consent of the other Members.

(c)    Notwithstanding the foregoing, upon (x) the death or Disability of Barton, (y) if for a period greater than forty-five (45) days Barton has not devoted commercially reasonable time and efforts to the affairs of the Company, DB85 and their wholly-owned subsidiaries other than as a result of a physical or mental incapacity which has not yet resulted in a Disability of Barton, or (z) the occurrence of a Trigger Event (as defined in the Reimbursement Agreement), Howard shall have the right, subject to the consent of the Praesidian Group if any such sale as hereinafter described does not result in the payment in full of (A) all indebtedness of the Company and its Affiliates owed to the Praesidian Group, including, without limitation, indebtedness under the Praesidian Agreements, and (B) the Series B Preferred Stated Value to the holders of the Series B Preferred Membership Units, to arrange for a sale of all or substantially all of the Membership Units (including the Warrants and the Membership Units issuable upon exercise of the Warrants) in the Company or any or all of the assets of the Company or any subsidiary to an

EXHIBIT 1
Page 89

unaffiliated third party on an arms-length basis, and Barton and or his legal representative hereby consent to any such transaction.

(d)    Notwithstanding the foregoing, no Member may Transfer any Class C Membership Units held by such Member which are subject to vesting in accordance with Section 3.1(c) hereof.

(e)    Notwithstanding the foregoing, a Transfer of any Membership Interest by any of the Praesidian Group to any of its Affiliates shall not be deemed a Transfer for purposes of Section 6.1(a); provided, however, that such Affiliate recipient of any Membership Interest shall be admitted as a Member hereunder only in accordance with Section 6.2 hereof.

6.2    **Rights of Assignee**.    Subject to Section 6.2(c) below, no assignee or transferee shall automatically become a substituted Member or have any of the rights of the Member who made the transfer or assignment, except that a permitted assignee or a transferee shall be entitled to receive the share of profits and losses of the Company, the return of capital contributions and any other payments to which such Member would have been entitled.  A permitted assignee or transferee of a Member's Membership Interest, or any portion thereof, shall be admitted to the Company as a Member in the place and stead of, or together with, as the case may be, the Member who has assigned or transferred all or part of his Membership Interest upon satisfaction of all of the following conditions:

(a)    A duly executed and acknowledged written instrument of assignment must be filed with the Company setting forth the intention of the assignor that the assignee become a Member in his place or together with the Member, as the case may be.

(b)    The assignor and the assignee must execute and deliver such other instruments as the Chief Executive Officer or the Chief Operating Officer may reasonably deem necessary or desirable to effect such admission, including the written acceptance and adoption by the assignee of the provisions of this Agreement.

(c)    Each Warrantholder shall be deemed a Member immediately upon exercise of his or its Warrant in accordance with its terms, without any further action on the part of the Company, the Members or such Warrantholder.

After all of the foregoing conditions have been fulfilled and the assignee has been admitted to the Company as a Member, the Chief Executive Officer and the other Members shall amend this Agreement and any Schedules hereto to reflect the assignee's admission to the Company as a Member.

6.3    **Intentionally Deleted.**

6.4    **Right of Co-Sale**.    In the event that any Member or a Warrantholder (a "**Seller**") proposes to sell, assign, transfer or otherwise convey Membership Units or securities convertible into, exchangeable for or exercisable for Membership Units other than

EXHIBIT 1
Page 90

in accordance with Section 6.1(b), (c) or (e) or, in the case of a Warrantholder other than to its Affiliates, ("**Co-Sale Securities**"), then such Seller shall offer in writing to each other Member and Warrantholder the right to participate in such sale at the same price and on the same terms and conditions available to such Seller (the "**Transfer Notice**"), except that each of the Warrantholders, solely in its capacity as a Warrantholder, will only be required to indemnify the bona fide, third party purchaser against breaches of representations and warranties up to a dollar amount not to exceed its consideration received. Such Transfer Notice shall include (i) a description of the Co-Sale Securities to be transferred, (ii) the identity of the prospective transferee(s) and (iii) the consideration and the material terms and conditions upon which the proposed transfer is to be made. The Transfer Notice shall certify that the Seller has received a firm offer from the prospective transferee(s) and in good faith believes a binding agreement for the transfer is obtainable on the terms set forth in the Transfer Notice. The Transfer Notice shall also include a copy of any written proposal, term sheet or letter of intent or other agreement relating to the proposed transfer. Upon written notice to the Seller within fifteen (15) days of receipt by any Member or Warrantholder of notification from such Seller of the proposed sale, any Member or Warrantholder may sell that number of Co-Sale Securities equal to the total number of Co-Sale Securities to be sold in the transaction, multiplied by a fraction, the numerator of which is the number of shares of Co-Sale Securities held by such person and the denominator of which is the number of Co-Sale Securities held by all Members and Warrantholders, to the extent such persons elect to participate, plus the Seller. In the event that a Seller proposes to sell, transfer or otherwise convey Co-Sale Securities for which a Member or Warrantholder either does not own or cannot convert its Membership Units into such Co-Sale Securities, such Member or Warrantholder shall be entitled to participate in the proposed transaction set forth in the Transfer Notice with its Membership Units not constituting Co-Sale Securities on a pro rata basis and on such terms and conditions as appropriately adjusted to give effect to the differences in the preferences and other economic terms of the Membership Units, as determined by the Consent of the Members with the Member or Warrantholder proposing to sell Membership Units not constituting Co-Sale Securities, recusing themselves from such Consent.

6.5    **Right of Bring-Along**.

(a)    Subject to (i) the payment of the Redemption Amount to the holders of the Series A Preferred Membership Units and (ii) the payment of the Series B Preferred Stated Value to holders of the Series B Preferred Membership Units, if Members holding 90% of the aggregate number of outstanding Common Membership Units and Series B Preferred Membership Units (the "**Selling Members**"), propose to sell, transfer, assign or otherwise dispose of all (but not less than all) of the Common Membership Interests and Series B Preferred Membership Units owned by them to a bona fide, third-party purchaser, other than any transfers by such Members to their respective Affiliates, spouses, children, parents or siblings, then, notwithstanding anything herein to the contrary, the Selling Members may require (a) each of the Warrantholders to sell, transfer, assign or dispose of his or its Warrant or the Common Membership Units issued thereunder to such bona fide, third-party

EXHIBIT 1
Page 91

purchaser for an amount (the "**Warrant Sale Price**") equal to the greater of (i) the Repurchase Price (as defined in the Warrant) and payable as provided in the Warrant and (ii) the same consideration per Common Membership Unit (on an "as if exercised" basis), and otherwise on the same terms and conditions upon which the Members effect the disposition of their Common Membership Units and (b) the Members other than the Selling Members to sell, transfer, assign or dispose of their Membership Units to such bona fide, third-party purchaser for an amount (the "**Sale Price**") equal to the same consideration per Membership Unit and otherwise on the same terms and conditions upon which the Selling Members effect the disposition of their Membership Units.

(b)    In the event that the Selling Members desire to exercise their rights pursuant to Section 6.5(a) hereof, the Selling Members shall deliver to the other Members and the Warrantholders written notice ("**Sale Notice**") setting forth the consideration per Common Membership Unit and Series B Preferred Membership Unit to be paid by such bona fide, third-party purchaser and the other terms and conditions of such disposition. In the event the Selling Members exercise their rights under Section 6.5(a) hereof, the other Members and the Warrantholders shall be required to make to a bona fide, third-party purchaser such representations and warranties with respect to the Warrants or the Membership Units as are set forth in Section 6.5(d) hereof; provided that the other Members and the Warrantholders will only be required to indemnify the bona fide, third-party purchaser against breaches of such representations and warranties up to an aggregate dollar amount not to exceed its consideration received.

(c)    Upon the consummation of the disposition of Membership Units pursuant to this Section 6.5, the Selling Members shall cause the bona fide, third-party purchaser to remit to (a) each of the Warrantholders the Warrant Sale Price for his or its Warrant and (b) the other Members the Sale Price.

(d)    All sales of Membership Units to be made pursuant to this Section 6.5 shall be subject to the following terms:

(i)    the Warrantholders and the members of the Praesidian Group shall not be required to make any representations or warranties to any Person in connection with such sale, except as to (A) good title to the Warrants or the Membership Units being sold and (B) the absence of encumbrances with respect to the Warrants or the Membership Units being sold; and

(ii)    the Warrantholders shall not be required to provide any indemnities in connection with such sale except for breach by it of the representations and warranties specifically required by the terms of this Section 6.5.

31

EXHIBIT 1
Page 92

## ARTICLE VII

### Dissolution and Liquidation

7.1    **Dissolution**.

(a)    The Company shall dissolve, without further action of the Members, upon, but not before, the first to occur of the following:  (i) the consent of the Members holding at least 90% of the aggregate number of outstanding Common Membership Units and Series B Preferred Membership Units; (ii) the disposition of all or substantially all of the assets of the Company; (iii) the failure of the Members to Consent to a budget for two consecutive years in accordance with Section 4.10 hereof and (iv) any other event, which, under the Act, would cause the dissolution of a limited liability company unless, within 180 days after such event, the Members Consent to continue the Company.

(b)    Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Members and the Board of Managers shall proceed with reasonable promptness to liquidate the business of the Company.

(c)    During the period of the winding up of the affairs of the Company, the rights and obligations of the Members and the Board of Managers shall continue.

7.2    **Liquidation**.

(a)    The Company shall terminate after its affairs have been wound up and its assets fully distributed in liquidation as follows:

(i)    First, to the payment of all debts and liabilities of the Company, including, without limitation, debts and liabilities under the Praesidian Agreements, the Howard Reimbursement Documents, and all other indebtedness owed to or guaranteed by Howard, subject to the terms of any applicable subordination agreement, and the expenses of liquidation;

(ii)    Next, to the setting up of any reserves which the Board of Managers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(iii)    Thereafter, to the Members, in accordance with Section 5.4 of this Agreement.

(b)    No Member shall have any right to demand property other than cash upon dissolution and termination of the Company.

7.3    **Cancellation of Certificate of Formation of the Company.**    Upon the completion of the liquidation of the Company's property, the Members shall cause the

EXHIBIT 1
Page 93

cancellation of the Certificate of Formation and shall take such other actions as necessary for the dissolution and termination of the Company.

## ARTICLE VIII

## Company Property

8.1    **Company Property.** The Company's property shall consist of all its assets and funds. Title to the Company's property may be taken and held in the name of the Company or in such other name or names as shall be agreed upon by the unanimous written consent of all of the Members; provided, however, that if title is held other than in the name of the Company, the Person or Persons who hold title shall certify by instrument duly executed and acknowledged, in form for recording or filing, that title is held as nominee and/or trustee for the benefit of the Company pursuant to the terms of this Agreement and an executed copy of such instrument shall be delivered to each Member. All property now or hereafter owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property.

8.2    **Prohibition Against Partition.** Each Member hereby permanently waives and relinquishes any and all rights it may have to cause all or any part of the Company's property to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members.

8.3    **Ownership of Intellectual Property.** The Company, for itself and all the Members acknowledges that it licenses or may acquire a license to use the name "DAVID BARTON GYM" and related intellectual property from the owner thereof and that all the intellectual property rights licensed to or used by the Company and employed within or applied to its products are owned by the Company and not by any Member.

## ARTICLE IX

## Records and Accounting; Fiscal Affairs

9.1    **Fiscal Year.** The Company's fiscal year shall be the calendar year.

9.2    **Bank Accounts.** All of the Company's funds shall be deposited in such bank or accounts as shall be designated by the Chief Executive Officer. All withdrawals from any such bank accounts shall be made by the authorized agent or agents of the Company.

9.3    **Books and Records.** The Company shall maintain full and accurate books and records, in accordance with the Company's accounting policies consistently applied, at the principal place of business of the Company or such other place as the Members so agree, showing all receipts and expenditures, assets and liabilities, all adjustments to each Member's capital account, consistent with this Agreement, including without limitation, Article V herein, and such other records necessary for recording the Company's business and affairs, including those sufficient to record the allocations and distributions provided for in

33

EXHIBIT 1
Page 94

this Agreement. The books and records shall, upon reasonable notice to the Company, be open for inspection and copying by any Member or such Member's duly authorized representatives during regular business hours at such principal place of business. Any expense for any inspection or copying shall be borne by the Member causing such inspection or copying to be conducted. Any information obtained by a Member with respect to the affairs of the Company shall, except as may be required by law, be kept strictly confidential. The Members, by Consent, shall designate the accountant/tax preparer who shall act for the Company. Barton shall be the tax matters partner.

9.4    **Annual Reports**. The Company shall provide to the Members annual financial statements prepared on a compilation basis by the outside accountant for the Company within one hundred fifty (150) days after the close of each calendar year.

### ARTICLE X

### Liability, Exculpation and Indemnification

10.1    **Liability of a Member or a Manager for Acts and Omissions**. Neither a Member nor a Manager shall be liable or accountable in damages or otherwise to the Company or the other Members or Managers for any failure to take any action or the taking of any action within the scope of authority conferred on it by this Agreement, made in good faith and not constituting gross negligence or willful misconduct ("**Permitted Acts of a Member/ Manager** "). Neither a Member nor a Manager shall be liable to the Members or other Managers because any taxing authorities disallow or adjust any deductions or credits in the Company's income tax returns or for the return of all or any portion of the capital contributions of the Members. A Member or Manager, respectively, shall be liable, responsible, accountable in damages to the Company and the Members (including any non-culpable Managers) for any acts performed by such Member or Manager arising out of or resulting from the fraud or criminal action of such Person or the failure of such Person to comply in any material respect with any covenant herein or its gross negligence or willful misconduct ("**Excluded Acts of a Member/Manager**"). Nothing in this paragraph shall be deemed to make any Member or the Manager liable, responsible or accountable to persons other than the Company, the Members or the Managers.

10.2    **Indemnification**.

(a)    The Company, its receiver, or its trustee shall indemnify, save harmless, and pay all judgments, penalties, fines, expenses and claims (including, without limitation, third party claims) against a Covered Person  relating to any liability or damage incurred by reason of any Permitted Acts of a Member/Manager and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person including, without limitation, attorneys' fees and reasonable disbursements incurred by such Covered Person in connection with the defense of any action based on any such act or omissions, which attorneys' fees and reasonable disbursements shall be paid as incurred. Notwithstanding the foregoing, any indemnity under this Section 10.2 shall be provided out of and to the extent of

34

EXHIBIT 1
Page 95

Company assets only, and no Member shall have any personal liability on account thereof including, without limitation, the obligation to loan or advance any funds to the Company.

(b)   In the event of any action by a Member against a Covered Person, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of such Covered Person, including attorneys' fees and reasonable disbursements, incurred in the defense of such action; provided, however, that the Covered Person shall repay such expenses to the Company if the Covered Person is not successful in its defense of a Company derivative suit or if such Covered Person is determined not to be entitled to indemnification hereunder.

(c)   For purposes of this Section 10.2, a "**Covered Person**" shall include: (a) each Member, their Affiliates, and their respective directors, shareholders, partners, members, managers, employees or officers, as applicable; (b) the Managers; and (c) except as limited below, the officers of the Company.

(d)   Notwithstanding the provisions of Section 10.1, Section 10.2(a), Section 10.2(b), and Section 10.2(c) above, no Member or Manager shall be indemnified from any liability for gross negligence, willful misconduct, fraud or criminal action, and, in the case of a Manager, any liability arising from or relating to any Excluded Acts of a Member/Manager.

(e)   The Company shall not be liable under this Section 10.2. for the settlement of any claim, demand, action, suit or proceeding effected without its written consent.   The Company shall not effect any settlement of any pending or threatened claim, demand, action, suit or proceeding in respect of which any Covered Person is seeking indemnification hereunder without the prior written consent of such Covered Person, unless such settlement includes an unconditional release of such Covered Person from all liability and claims that are the subject matter of such claim.

(f)   The provisions of this Article X shall survive even if a Person has ceased to serve in the capacity which initially entitled such Person to indemnification hereunder.   The rights granted pursuant to this Article X shall be contract rights, and no amendment, modification or termination of this Article X or this Agreement shall have the effect of limiting or denying such rights with respect to actions taken or claims or proceedings arising prior to any such amendment, modification or termination.   The rights granted under this Article X shall not be exclusive of any other right which a Person may have at law or otherwise.

(g)   Anything contained herein to the contrary notwithstanding, in the event that a Member, Manager or officer of the Company shall have a separate indemnification agreement with the Company pursuant to an employment agreement or other agreement, and the terms of that indemnification agreement specify that such indemnity shall apply in lieu of the provisions of this Section 10.2, the terms of such indemnity shall apply in lieu of the provisions of this Section 10.2.

EXHIBIT 1
Page 96

10.3    **No Effect on Praesidian Group Relationships**.    The Company and each Member acknowledge and agree that, notwithstanding anything in this Agreement to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any member of the Praesidian Group or any of its Affiliates in its or their capacity as a lender or as agent for lenders to the Company or any of its subsidiaries pursuant to any agreement under which the Company or any of its subsidiaries has borrowed or hereafter may borrow money, including, without limitation, the Praesidian Agreements. Without limiting the generality of the foregoing, except as otherwise required by applicable law, each member of the Praesidian Group and its Affiliates, in exercising its or their rights as a lender, including making its decision on whether to foreclose on any collateral security, exercise any put right in respect of the Warrants, or exercise any other remedies, will have no duty to consider (x) its or any of its Affiliates' status as a Member, or (y) the interests of the Company or its subsidiaries or (z) any duty it may have to the Company, any of its subsidiaries or any other Member.    No consent, approval, vote or other action taken or required to be taken by the Praesidian Group or any of their Affiliates in such capacity shall in any way impact, affect or alter any of their respective rights and remedies as a lender or agent for lenders.

## ARTICLE XI

### Miscellaneous

11.1    **Notice**.    All notices, requests, demands and other communications hereunder shall be made in writing and shall be deemed to have been given (a) upon delivery, if delivered by hand, (b) upon receipt, if delivered by facsimile transmission to the fax number of the receiving party listed below, if receipt is confirmed electronically or by the addressee by return fax, (c) three days after being mailed first class, certified mail, return receipt requested, postage and registry fees prepaid, to the address set forth below, or (d) one business day after being delivered to a reputable overnight courier service, prepaid, marked for next day delivery, to the addresses set forth below.    The address of the Company is set forth in Section 2.4 hereof.    Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed.

To Barton at:          50 West 23rd Street
                       5th Floor
                       New York, NY 10010
                       Fax: (212) 524-2512

With a copy to:        Brian A. Haskel, Esq.
                       Tannenbaum Helpern Syracuse & Hirschtritt LLP
                       900 Third Avenue
                       New York, NY 10022
                       Fax: 212-371-1084

EXHIBIT 1
Page 97

| To Howard at: | John D. Howard<br>80 Irving Place<br>New York, NY  10003 |
| --- | --- |
| With a copy to: | Howard R. Herman, Esq.<br>Moses & Singer LLP<br>405 Lexington Avenue<br>New York, NY 10174<br>Fax: 212-554-7700 |
| If to any member of<br>the Praesidian Group: | Praesidian Capital Investors, L.P.<br>419 Park Avenue South<br>New York, NY 10016<br>Fax: (212) 520-2601<br>Attention: Jason D. Drattell |
| With a copy to: | Morrison Cohen LLP<br>909 Third Avenue<br>New York, NY 10022<br>Fax: (212) 735-8708<br>Attention: Stephen I. Budow, Esq. |
| To Ben-Avi at: | Elan Ben-Avi<br>500 East 77th Street<br>Apt. 1615<br>New York, NY 10162 |

11.2    **Severability**.  The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

11.3    **Interpretation**.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware applicable to agreements made and performed wholly therein for all purposes. The captions of sections of this Agreement have been inserted as a matter of convenience only and shall not control or affect the meaning or construction of any of the terms or provisions hereof.

11.4    **Entire Agreement**.  All understandings and agreements heretofore made among the Members, with respect to the subject matter hereof, are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof.    There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the Members, other than as set forth in this Agreement and the Certificate of Formation.  All prior agreements among the Members are superseded by this Agreement, which integrates all promises, agreements,

EXHIBIT 1
Page 98

conditions, and understandings among the Members with respect to the Company and its property.

11.5    **Counterparts; Effective Date**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any Member to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. This Agreement is dated and shall be effective among the Members as of the date first above written.

11.6    **Binding Effect**. This Agreement shall be binding upon, and shall inure to the benefit of, the Members and their respective successors, heirs, executors, administrators, legal representatives, and permitted assigns.

11.7    **Further Assurances**. Each Member shall execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and take all such further action as may be required by law or deemed by the Members or the Board of Managers to be necessary or useful in furtherance of the Company's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

11.8    **Waiver**. No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by such other Member of its obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligation of such other Member hereunder. Failure on the part of a Member to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure or default continues, shall not constitute a waiver by such member of its rights hereunder.

11.9    **Additional Remedies**. The rights and remedies of the Members shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any Member aggrieved as against the other Members, for breach or threatened breach of any provision hereof, it being the intention of this section to make clear the agreement of the Members that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

11.10    **Confidentiality**.

(a)    Confidential and Proprietary Information.    No Member or permitted assignee or transferee will, at any time, whether during or after the time that he or she is a Member or permitted assignee or transferee, disclose or improperly use any Confidential Information of the Company for any reason whatsoever. "**Confidential Information**" shall mean, without limitation, all research, essential ideas and principles of the Company, procedures or techniques of the Company, software, databases, trade secrets,

38

EXHIBIT 1
Page 99

sales and marketing information, operations material and memoranda, client lists and information, portfolio, business plans, or financial information concerning or relating to the business, employees, and affairs of the Company and/or any of their Affiliates, and contact persons and other information maintained by the Company and/or its Affiliates, obtained by or furnished, disclosed or disseminated to the Members or permitted assignee or transferee. "**Confidential Information**" shall not include any of the foregoing to the extent the same can be shown by written documentation by the Members or permitted assignee or transferee to be lawfully available to the public through no breach of this Operating Agreement. No Member or permitted assignee or transferee shall remove, or cause to be removed, without the Company's prior written consent, any Confidential Information of the Company or of its Affiliates for purposes other than for use in connection with the authorized work for the Company or any of its Affiliates. Notwithstanding anything in this Agreement to the contrary, each Member shall, in any event, have the right to deliver copies of any such information, and to disclose any such information, to:

(i)    its Affiliates, lenders, funding or financing sources (or its affiliates' or lenders' funding or financing sources), directors, officers, trustees, partners, members, managers, employees, agents, attorneys, equity owners, professional consultants, portfolio management services and rating agencies;

(ii)    any other Member;

(iii)    any federal or state regulatory authority or examiner, or any insurance industry association, regulating or having jurisdiction over such Member;

(iv)    subject to an agreement containing provisions substantially the same as those of this Section 11.10(a), any assignee or transferee of, or any prospective assignee or transferee of, any of its rights or obligations under this Agreement, other than competitors, or the Affiliates of competitors, of the Company and its Subsidiaries; and

(v)    any other Person to which such delivery or disclosure may be necessary or appropriate (A) in compliance with any applicable law, rule, regulation or order, (B) in response to any subpoena or other legal process or informal investigative demand, (C) in connection with any litigation to which such Member is a party, or (D) in connection with the exercise or enforcement, or potential exercise or enforcement, of any of the rights and/or remedies of the Members under this Agreement.

(b)    Non-Disparagement. No Member or permitted assignee or transferee will, at any time, whether during or after the time that he or she is a Member or Assignee, publish or otherwise transmit any disparaging or defamatory statements, whether written or oral, regarding the Company, or any of its Affiliates, employees, products, operations, procedures, policies or services, except to the extent required by law, and then only after

39

EXHIBIT 1
Page 100

consultation with the Company to the extent possible, or to enforce the terms of this Agreement. This Section 11.10(b) in no way restricts or prevents a Member from providing truthful testimony concerning the Company as required by court order or other legal process.

11.11  **No Reliance by Third Parties**. The provisions of this Agreement are not for the benefit of any creditor or other Person other than a Member or, to the extent expressly provided herein, the Warrantholders to whom any losses, debts, claims, expenses or encumbrances are owed by, or who otherwise has any claim against, the Company or any Member.

11.12  **Amendment of the Agreement and the Certificate of Formation**. Neither this Agreement nor the Certificate of Formation may be amended other than pursuant to a written agreement executed by Members holding at least 80% of the Common Membership Units, 80% of the Series A Preferred Membership Units, and 80% of the Series B Preferred Membership Units; provided, however, that any amendment to Sections 6.2(c), 6.4 and 6.5 of this Agreement or any amendment to the Certificate of Formation or this Agreement which would have an adverse impact on a Warrantholder shall require the prior written consent of such Warrantholder.

11.13  **Construction**. Any reference to any gender, masculine, feminine or neuter, shall be deemed to include all genders, masculine, feminine and neuter, unless the context otherwise requires. The singular shall include the plural, and the plural the singular, as the context may require. The word "including" means in all instances "including, but not limited to." The words "hereof," "herein," "hereto," "hereby," "hereunder" and other words of similar import refer to this Agreement as a whole, including all schedules and exhibits.

(Signature Page follows.)

EXHIBIT 1
Page 101

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

### Counterpart Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Limited Liability Company Agreement to be duly executed by as of the day and year first above-written.

| COMPANY: | MEMBERS: |
|---|---|
| CLUB VENTURES INVESTMENTS LLC<br><br>By: _____<br>Name: David Barton<br>Title:   Chief Executive Officer | JOHN HOWARD<br><br><br>_____<br>DAVID BARTON<br><br>_____<br>ELAN BEN-AVI<br><br>PRAESIDIAN II SPV 1, L.P.<br><br>By: Praesidian II SPV1 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title:<br><br><br>PRAESIDIAN II SPV 2, L.P.<br><br>By: Praesidian II SPV2 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title: |

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT]

EXHIBIT 1
Page 102

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

Counterpart Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Limited Liability Company Agreement to be duly executed by as of the day and year first above-written.

| COMPANY: | MEMBERS: |
|---|---|
| **CLUB VENTURES INVESTMENTS LLC**<br><br>By: _____<br>Name: David Barton<br>Title:   Chief Executive Officer | _____<br>JOHN HOWARD<br><br><br>_____<br>DAVID BARTON<br><br><br>_____<br>ELAN BEN-AVI<br><br>**PRAESIDIAN II SPV 1, L.P.**<br><br>By: Praesidian II SPV1 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title:<br><br><br>**PRAESIDIAN II SPV 2, L.P.**<br><br>By: Praesidian II SPV2 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title: |

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT]

EXHIBIT 1
Page 103

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

Counterpart Signature Page

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Limited Liability Company Agreement to be duly executed by as of the day and year first above-written.

| COMPANY: | MEMBERS: |
|---|---|
| **CLUB VENTURES INVESTMENTS LLC**<br><br>By: _____<br>Name: David Barton<br>Title:   Chief Executive Officer | <br>_____<br>JOHN HOWARD<br><br><br>_____<br>DAVID BARTON<br><br><br>_____<br>ELAN BEN-AVI<br><br>**PRAESIDIAN II SPV 1, L.P.**<br><br>**By: Praesidian II SPV1 GP, Inc., its General Partner**<br><br>By: _____<br>Name:<br>Title:<br><br><br>**PRAESIDIAN II SPV 2, L.P.**<br><br>**By: Praesidian II SPV2 GP, Inc., its General Partner**<br><br>By: _____<br>Name:<br>Title: |

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT]

#1632013

EXHIBIT 1
Page 104

| WARRANTHOLDERS: | |
|---|---|
| **PRAESIDIAN CAPITAL INVESTORS, L.P.**<br><br>**By: Praesidian Capital, LLC, its General Partner**<br><br>By: _____<br>Name:<br>Title: | **PRAESIDIAN II SPV 1, L.P.**<br><br>**By: Praesidian II SPV1 GP, Inc., its General Partner**<br><br>By: _____<br>Name:<br>Title: |
| **PRAESIDIAN II SPV 2, L.P.**<br><br>**By: Praesidian II SPV2 GP, Inc., its General Partner**<br><br>By: _____<br>Name:<br>Title: | _____<br>JOHN HOWARD |

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT]

EXHIBIT 1
Page 105

**WARRANTHOLDERS:**

| | |
|---|---|
| **PRAESIDIAN CAPITAL INVESTORS, L.P.**<br><br>By: Praesidian Capital, LLC, its General Partner<br><br>By: _____<br>Name:<br>Title: | **PRAESIDIAN II SPV 1, L.P.**<br><br>By: Praesidian II SPV1 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title: |
| **PRAESIDIAN II SPV 2, L.P.**<br><br>By: Praesidian II SPV2 GP, Inc., its General Partner<br><br>By: _____<br>Name:<br>Title: | JOHN HOWARD |

[SIGNATURE PAGE TO AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT]

EXHIBIT 1
Page 106

## Schedule A

Class A Members

| Name and Address | Class A Membership Units |
|---|---|
| David Barton<br>50 West 23rd Street<br>5th Floor<br>New York, NY  10010 | 49 |
| John Howard<br>80 Irving Place<br>New York, NY  10003 | 51 |

## Schedule B

Class B Members

Name and Address                    Issued Class B Membership Units

                                          2.9

Mark Berkowitz
235 West 56th Street, Apt. 24D
New York, NY 10019

#1632013 v6 \019346 \0019

EXHIBIT 1
Page 108

### Schedule C

Class C Members

| Name and Address | Class C Grant Date | Time-Vest Class C Units | Incentive Class C Units | Class C Hurdle Amount |
|---|---|---|---|---|
| Elan Ben-Avi 500 East 77th Street Apt. 1615 New York, NY 10162 | 3/24/09 | 7.4995 | 3.7498 | * |

* To be determined by resolution of the Board of Managers. Upon such determination, the Chief Executive Officer shall notify Elan Ben-Avi of such amount and shall amend this Schedule C to reflect such Hurdle Amount.

## Schedule D

### Series A Preferred Membership Unit Holders

| Name and Address | Issued Series A Preferred Membership Units | Capital Contribution ($) | Issuance Date | Series A Preferred Stated Value as of 3/24/09* ($) |
|---|---|---|---|---|
| John Howard 80 Irving Place New York, NY 10003 | 13.000 | 1,300,000 | 5/31/07 | 1,667,400.46 |
| | 2.500 | 250,000 | 9/19/07 | 299,134.84 |
| | 2.500 | 250,000 | 10/10/07 | 295,063.66 |
| | 2.500 | 250,000 | 11/6/07 | 289,829.28 |
| | 2.500 | 250,000 | 12/3/07 | 284,594.91 |
| | 2.500 | 250,000 | 12/26/07 | 280,136.00 |
| | 5.350 | 535,000 | 1/31/08 | 586,270.83 |
| | 6.500 | 650,000 | 3/6/08 | 696,944.44 |
| | 2.000 | 200,000 | 4/24/08 | 207,500.00 |
| | 2.500 | 250,000 | 5/16/08 | 255,555.56 |
| | 2.500 | 250,000 | 5/27/08 | 253,645.83 |
| | 2.500 | 250,000 | 6/17/08 | 250,000.00 |
| | 3.500 | 350,000 | 6/24/08 | 350,000.00 |
| | 2.500 | 250,000 | 7/11/08 | 250,000.00 |
| | 1.500 | 150,000 | 7/17/08 | 150,000.00 |
| | 2.125 | 212,500 | 8/04/08 | 212,500.00 |
| | 0.626 | 62,600 | 9/2/08 | 62,600.00 |
| | 2.125 | 212,500 | 9/15/08 | 212,500.00 |
| | 5.000 | 500,000 | 9/30/08 | 500,000.00 |
| | 1.500 | 150,000 | 11/25/08 | 150,000.00 |
| | 8.375 | 837,500 | 12/24/08 | 837,500.00 |
| | 0.249 | 24,900 | 2/18/09 | 24,900 |
| | 10.000 | 1,000,000 | 3/05/09 | 1,000,000.00 |
| | **Total: 84.350** | $8,435,000 | | $9,662,426.42 |

\* Does not reflect accruals since 6/17/08 or compounding which shall occur on December 31 of each year.

#3632013 v6 \019346 \0019

EXHIBIT 1
Page 110

## Schedule E

### Series B Preferred Membership Unit Holders

| Name and Address | Issued Series B Preferred Membership Units | Capital Contribution ($) | Issuance Date |
|---|---|---|---|
| Praesidian II SPV 1, L.P. 419 Park Avenue South New York, NY 10016 | 1.21457751677 1.70040852348 1.21457751677 0.72874651006 2.06478177851 0.60801750490 2.06478177851 2.18623953019 1.21457751677 2.91498604025 8.13766936237 0.24218675642 | 89,411.30 125,175.82 89,411.30 53,646.78 151,999.21 44,759.30 151,999.21 160,940.34 89,411.30 214,587.12 599,055.71 17,828.61 | 6/17/08 6/25/08 7/11/08 7/24/08 8/06/08 9/03/08 9/16/08 10/24/08 10/31/08 11/25/08 12/24/08 2/18/09 |
| **Subtotal:** | 24.29155033500 | 1,788,226.00 | |
| Praesidian II SPV 2, L.P. 419 Park Avenue South New York, NY 10016 | 0.1438360823 0.20137405152 0.14383860823 0.08630316494 0.24452563399 0.07200560728 0.24452563399 0.25890949481 0.14383860823 0.34521265975 0.96371867513 0.02868394483 | 10,588.70 14,824.18 10,588.70 6,353.22 18,000.79 5,300.70 18,000.79 19,059.66 10,588.70 25,412.88 70,944.29 2,111.39 | 6/17/08 6/25/08 7/11/08 7/24/08 8/06/08 9/03/08 9/16/08 10/24/08 10/31/08 11/25/08 12/24/08 2/18/09 |
| **Subtotal:** | 2.87677216500 | 211,774.00 | |
| **Total for Praesidian II SPV 1, L.P. and Praesidian II SPV 1, L.P.:** | 27.168322500 | 2,000,000.00 | |

EXHIBIT 1
Page 111

## Schedule F

### Warrants and Warrant Holders

Warrants:

| | |
|---|---|
| Praesidian Capital Investors, LP | Warrants initially exercisable for 6.07659 Class A Membership Units |
| John Howard | Warrants initially exercisable for 1.1206 Class A Membership Units |
| Praesidian II SPV 1, L.P. | Warrants initially exercisable for 1.2370 Class A Membership Units |
| Praesidian II SPV 2, L.P. | Warrants initially exercisable for 0.2391 Class A Membership Units |

# EXHIBIT B

EXHIBIT 1
Page 113

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") effective as of December 1, 2010 (the "Effective Date"), is entered into by and between Club Ventures Investments LLC, a Delaware limited liability company, d/b/a David Barton Gyms (the "Company"), and Meridian Sports Club California, LLC, a California limited liability company (the "Manager").

## W I T N E S S E T H

WHEREAS, the Company, through its subsidiaries, owns six (6) health clubs, of which three (3) are located in New York City and the other three (3) are located in Miami Beach, Florida, Chicago, Illinois and Bellevue, Washington (the "Existing Company Clubs"), which Existing Company Clubs are operated as premier boutique health clubs focused on personal training and operated under the name David Barton Gyms (the "David Barton Style").

WHEREAS, Manager is in the business of owning and managing health clubs (the "Meridian Clubs") and the Company wishes to hire Manager to manage the Existing Company Clubs and Manager wishes to accept such engagement, on the terms and conditions provided herein; and

WHEREAS, the Company and the Manager also wish to confirm their agreement with respect to opening future health clubs and converting certain of Manager's Meridian Clubs to clubs that use the David Barton Style.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Engagement.    The Company hereby engages Manager and Manager hereby accepts such engagement as the sole and exclusive Manager of all of the Existing Company Clubs. Manager shall have authority over all aspects of the day-to-day operations of the business of the Existing Company Clubs, subject at all times to the direction of the Board of Managers of the Company.    Manager covenants that Charles H. Grieve, II ("Grieve") will be actively involved on the engagement and the Company acknowledges that same will be on a non-exclusive basis. Grieve shall hold the title "Chairman" of the Company. Manager covenants and agrees that it will use its best efforts to improve the results of operations of the Company and will perform its services hereunder in a prudent and diligent manner.

2.    Term. The term of this Agreement shall commence effective as of the date of this Agreement and shall remain in full force and effect for six (6) years (the "Initial Term") with the option of the Company to renew the Agreement year to year upon six (6) months' written notice prior to expiration of the Initial Term. Manager may give six (6) months' written notice prior to expiration of the Initial Term that it does not wish to have this Agreement renewed for an additional period.  As used herein, "Term" shall include the Initial Term and any extension

#2722766 v1 \019346 \0052

1

EXHIBIT 1
Page 114

thereof. The Term shall be subject to earlier termination by either party at any time upon 6 months' prior written notice.

3. Consideration.

3.1 As compensation for the management services to be performed hereunder, (x) during the Term of this Agreement the Company shall pay Manager (i) a monthly management fee equal to the greater of $50,000 per month or 2% of the preceding month's gross revenues of the Company from the Existing Company Clubs, plus (ii) an annual amount equal to 10% of the Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") in excess of One Million Dollars ($1,000,000) of the Existing Company Clubs, which annual payment shall be paid within 60 days of receipt of the Company's certified public accountant prepared annual year-end financial statements, plus (y) Manager shall receive, or shall cause its designee, which may be Grieve, to receive an interest (the "Liquidity Event Interest") in the Company representing the right to receive 10% of the amount received by the Company or its members, net of related costs and expenses, in excess of $16,750,000, as the result of a "Liquidity Event".

3.2 In determining EBITDA for purposes of Section 3.1(x)(ii), the monthly amounts paid under the preceding clause (x)(i) shall be expensed and any amounts received by the Company under Sections 4, 5, and 6 shall be excluded.

3.3 For the purposes hereof, "Liquidity Event" means (i) the occurrence of a Change of Control, (ii) the sale or other disposition of all or substantially all of the assets of the Company, (iii) the liquidation, dissolution or winding up of the Company, (iv) the combination or merger of the Company, with another entity, as a result of which (A) any person or group, other than the existing equity members of the Company, becomes the beneficial owner of 50% or more of the then outstanding equity interests of the combined entity or (B) the directors of the Company constitute less than a majority of the Board of Directors or Managers, as applicable, of the combined entity. For the purposes hereof, "Change of Control" means the occurrence of any event (whether in one or more transactions) pursuant to which the existing equity members of the Company shall cease to own, beneficially and of record, on a fully-diluted basis, at least fifty-one percent (51%) of the equity interests of the Company having ordinary voting power for the election of directors (or persons performing similar functions).

4. Conversion of Manager Clubs.

4.1 Manager shall retain One Hundred (100%) Percent of all rights, title and interest in Manager's existing locations, including health clubs doing business as Meridian's Bodies in Motion, Meridian Sports Clubs, and the Honolulu Club (collectively the "Manager Clubs"), including any future expansion or new locations for Manager Clubs, except for Manager Clubs converted to David Barton Style clubs as provided in Sections 4.2 and 5.

4.2 At Manager's sole and absolute discretion, subject to the consent of Company, Manager may convert any of its existing Manager Clubs to David Barton Style clubs

and Manager shall pay to Company 20% of the amount by which the gross profit of such converted Manager Club ("Converted Club") exceeds the gross profit of such Manager Club as of the Effective Date, determined in each case on a four-wall club level basis, before allocation of corporate overhead. Such payments shall be made on a monthly basis during the Term.

5.    <u>Las Vegas Club</u>.  Manager is presently developing and constructing a new health club at Tivoli Village at Queensridge, Las Vegas, Nevada (the "Las Vegas Club"), anticipated to open in 2011 as a David Barton Style club. During the Term, Manager shall pay to Company an annual amount equal to ten (10%) percent of the four-wall club level EBITDA for the Las Vegas Club, before allocation of corporate overhead, reduced, however, by any increase in Manager's corporate and administrative expense related to operating the Las Vegas Club, which payment shall be paid on a quarterly basis.

6.    <u>Expansion of David Barton Style Clubs</u>.  Manager and Company agree to pursue jointly commercially reasonable opportunities to open new health clubs under the David Barton Style, the income and expenses of which shall be borne equally by Company and Manager (each, a "Shared Club"). Manager shall have the first right to participate in such new health clubs on such Shared Club Basis. If Manager declines to so participate, then Company may open such new health club without Manager and Grieve shall serve as the Chief Executive Officer of such new health club.

7.    <u>Relationship of the Parties; Limitations</u>.

7.1    <u>Independent Contractor</u>.    The Company and the Manager, hereby acknowledge that Manager is being engaged by the Company as the sole and exclusive Manager of the Existing Company Clubs under the terms and conditions set forth in this Agreement. The Company and the Manager agree and acknowledge that the relationship between the Company and Manager arising and resulting from this Agreement is that of an independent contractor. Manager shall be solely obligated and responsible for paying and discharging any and all taxes of any kind or nature whatsoever arising from, and for filing any and all returns and reports with the appropriate authorities in connection with any amounts received from the Company under this Agreement.

7.2    <u>Limitations on Manager's Authority</u>. Notwithstanding any other provision in this Agreement to the contrary, Manager shall not, without the prior written approval of Company:

(a)    pledge the credit of Company;

(b)    borrow money or execute any promissory note or mortgage, deed of trust, security agreement or other encumbrance in the name of or on behalf of Company;

(c)    convey or otherwise transfer, pledge or encumber any asset of Company, except for the sale or disposal of inventory or equipment in the ordinary course of business;

(d) institute or defend lawsuits or other legal proceedings on behalf of Company;

(e) release, compromise or settle any claim against Company; or

(f) make any structural alterations to any Existing Company Club.

Subject to the foregoing, Manager shall be entitled to perform all actions necessary in the ordinary course of business to operate the Existing Company Clubs, and any applicable Shared Clubs in the future.

8. Representations, Warranties and Covenants of the Company. The Company hereby represents, warrants and covenants to Manager as follows:

8.1 Organization. The Company is duly organized, validly existing and are in good standing under the laws of the State of Delaware, and the Company is duly registered or qualified to do business, and are in good standing, in each jurisdiction in which the nature of its business or properties requires such registration or qualification, except where the failure to so register or qualify would not have a material adverse effect on the Company.

8.2 Authority. The Company has full power, authority and capacity to execute and deliver, and to perform its duties and obligations under this Agreement. This Agreement is legal, valid and binding obligation of the Company and is enforceable against the Company in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies, including specific performance, may be subject to the discretion of the court before which any proceeding may be brought.

8.3 No Conflicts; Consents. The execution, delivery and performance of this Agreement will not (i) violate or conflict with any provision of the organizational documents of the Company as amended; (ii) violate or conflict with any constitution, statute, regulation, rule, injunction, judgment, order, permit, decree, ruling, charge, or other restriction of any government, governmental agency, court or arbitrator to which the Company or their assets are subject; or (iii) require the Company to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency, creditor or other third party except for any of the foregoing in connection with liquor licenses for the Company, which, the Company acknowledge shall be their responsibility.

8.4 Financial Information. The Company shall make available to Manager such financial information as it shall reasonably request with respect to all amounts payable to Manager under this Agreement.

8.5 Insurance. The Company shall maintain directors' and officers' insurance, liability insurance and workers' compensation insurance that provide coverage for Manager or Grieve, as applicable, to the extent such insurance is available on commercially reasonable

4

EXHIBIT 1
Page 117

terms. The Company also shall maintain such insurance as is required by the landlords of the Existing Company Clubs.

9.    Representations, Warranties and Covenants of Manager.    Manager hereby represents and warrants to the Company and Praesidian as follows:

9.1    Organization.  The Manager is duly organized, validly existing and are in good standing under the laws of the State of California, and the Manager is duly registered or qualified to do business, and are in good standing, in each jurisdiction in which the nature of its business or properties requires such registration or qualification, except where the failure to so register or qualify would not have a material adverse effect on the Manager.

9.2    Authority.  Manager has full power and authority to execute and deliver, and to perform its duties and obligations under this Agreement. This Agreement is a legal, valid and binding obligation of Manager and is enforceable against Manager in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies, including specific performance, may be subject to the discretion of the court before which any proceeding may be brought.

9.3    No Conflicts; Consents.  The execution, delivery and performance of this Agreement will not (i) violate or conflict with any provision of the organizational documents of Manager, as amended; (ii) violate or conflict with any constitution, statute, regulation, rule, injunction, judgment, order, permit, decree, ruling, charge, or other restriction of any government, governmental agency, court or arbitrator to which Manager or any of its assets are subject; or (iii) require Manager to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency, creditor or other third party.

9.4    Financial Information.  Manager shall make available to Company such financial information as it shall reasonably request with respect to all amounts payable to Company under this Agreement.

9.5    Intellectual Property Rights.  Manager shall not take any action, either during or after the Term, which is detrimental to the David Barton Style or the intellectual property rights of Company.  This provision shall survive any termination or expiration of the Agreement.

10.    Termination.  This Agreement shall terminate upon the occurrence of the events in Section 10.1 or 10.2, as follows:

10.1    Misrepresentation or Breach.  Either party may terminate this Agreement if (i) any representation, warranty or covenant made by the other party under this Agreement, or any agreement, document, certificate or instrument executed in connection with this Agreement shall be false, misleading or incorrect in any material respect; or (ii) the other party breaches

materially any covenant or agreement in this Agreement and fails to cure such breach within thirty (30) days after receiving written notice of such breach; or

10.2    Liquidity Event.  The Company may terminate this Agreement upon the Occurrence of a Liquidity Event.

10.3    Effect of Termination.  Upon termination or expiration of this Agreement, except as provided in Section 10.4, no party hereto shall have any further rights, liability or obligation hereunder except that (i) the foregoing shall not relieve a party from damages caused by its misrepresentation or breach as provided in Section 10.1, (ii) if this Agreement is terminated by Company for any reason other than as provided in Section 10.1 and other than due to a Liquidity Event, then the Company shall pay the Manager a termination fee equal to $450,000 payable in 3 equal quarterly payments.  Upon termination or expiration of this Agreement for any reason, Manager shall cease to use the David Barton Style and any trademarks, service marks or other intellectual property rights of Company, at all Converted Clubs, the Las Vegas Club and all Shared Clubs, except that the foregoing shall not apply to Converted Clubs so long as Manager continues to pay the amount required by Section 4.2 for each such Converted Club and continues to comply with Section 9.5.  If this Agreement is terminated by Company pursuant to Section 10.1 or if this Agreement is terminated by Manager during the first 3 years of the Term for any reason other than pursuant to Section 10.1, then the Liquidity Event Interest shall be terminated.

10.4    Transition.  In the event that this Agreement is terminated or expires, Manager shall cooperate with Company and use its reasonable and good faith efforts to transition the management services to Company or a management company selected by Company.  This provision shall survive termination, not to exceed 180 days.

11.    Indemnification by Company.  The Company hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge and release Manager, its affiliates, its members, partners, directors, managers, officers, employees, agents, attorneys, successors and permitted assigns from and against any and all payments, charges, judgments, assessments, liabilities, obligations, claims, demands, actions, losses, damages, penalties, interest or fines and any and all costs and expenses paid or incurred, including attorneys' fees, costs, fees of experts, and any legal or other expenses reasonably incurred in connection therewith (collectively, the "Liabilities"), arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of the Company contained in this Agreement; and (ii) any failure of the Company to perform or observe any term, condition or covenant contained in this Agreement on its part to be performed.  The indemnification obligations under this Section 11 shall survive the termination of this Agreement for a period of three (3) years.

12.    Indemnification by Manager.  Manager hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Company and its respective members, managers, officers, employees, agents, heirs, legal representatives, successors and assigns from and against any and all Liabilities arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of Manager

#2722766 v1 \019346 \0052

6

EXHIBIT 1
Page 119

contained in this Agreement; (ii) any failure of Manager to perform or observe any term, condition or covenant contained in this Agreement on its part to be performed. The indemnification obligations under this Section 12 shall survive the termination of this Agreement for a period of three (3) years.

13.    Entire Agreement; Amendment. This Agreement constitutes the entire agreement of the Company and Manager with respect to the subject matter hereof and supersedes all prior agreements and understandings, either oral or written, between or among the Company and Manager with respect to the subject matter hereof. This Agreement may be amended or modified only by a written instrument signed by the Company and Manager.

14.    Headings. The headings used in this Agreement are for ease in reference only and are not intended to affect the interpretation of this Agreement in any way.

15.    Binding Effect. This Agreement shall inure to the benefit of, and shall be binding upon, the Company, Manager and their respective successors and permitted assigns.

16.    Assignment. No party hereto may assign any of its respective rights, or delegate any of its respective duties or obligations, under this Agreement without the prior written consent of the other party hereto, which consent may be withheld, conditioned or delayed at the discretion of the other parties hereto.

17.    Notices. Any notices or communications required or permitted to be given by this Agreement must be (i) given in writing, and (ii) be personally delivered or mailed by prepaid mail or overnight courier, or by facsimile transmission delivered or transmitted to the party to whom such notice or communication is directed, to the address of such party as follows:

　　　　　　　　To Company:

　　　　　　　　　　　　Club Venture Investments LLC
　　　　　　　　　　　　50 West 23rd Street
　　　　　　　　　　　　New York, NY  10010
　　　　　　　　　　　　Attention:    Stephen Schwartz
　　　　　　　　　　　　Facsimile:    (212) 524-2512

　　　　　　　　With a copy to:

　　　　　　　　　　　　Attention:
　　　　　　　　　　　　Facsimile:

　　　　　　　　To Manager:

　　　　　　　　　　　　Charles H. Grieve II
　　　　　　　　　　　　Managing Member
　　　　　　　　　　　　Meridian Sports Clubs California, LLC

#2722766 v1 \019346 \0052

7

EXHIBIT 1
Page 120

1001 Fourth Street
San Rafael, CA  94901
Facsimile:      (415) 459-5584

With a copy to:

Leonard A. Rifkind, Esq.
Rifkind Law Group
100 Drake's Landing Road, Suite 260
Greenbrae, CA  94904
Facsimile:      (415) 785-7976

Any such notice or communication shall be deemed to have been given on (i) the day such notice or communication is personally delivered, (ii) three (3) days after such notice or communication is mailed by prepaid certified or registered mail, (iii) one (1) working day after such notice or communication sent by overnight courier, or (iv) on the day such notice or communication is faxed and the sender has received a confirmation of such fax.  Any party may, for purposes of this Agreement, change its address, fax number, or the person to whom a notice or other communication is marked to the attention of, by giving notice of such change to the other parties pursuant hereto.

18.    Multiple Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

19.    Prevailing Party.  In the event that any party brings any suit, action or proceeding against the other party (is) for any reason arising from or related to this Agreement, then the prevailing party(is) shall be entitled to recover from the non-prevailing party(is) any and all costs and expenses, including reasonable attorney fees and expert fees, arising from or related to the suit, action or proceeding.

20.    Severability.  If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to the invalid, illegal, void or unenforceable provision while still remaining valid and enforceable and the remaining terms or provisions contained herein shall not be affected thereby.

21.    Construction.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted by the Company and Manager, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

22.    Waiver.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy created hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  No waiver

#2722766 v1 \019346 \0052

8

EXHIBIT 1
Page 121

by any party to any breach of, or default in, any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition hereof. The terms and provisions of this Agreement, whether individually or in their entirety, may only be waived in writing and signed by the party(ies) against whom or which the enforcement of such waiver is sought. No right, remedy or election given by any term of this Agreement or made by any party shall be deemed exclusive, but shall be cumulative with all other rights, remedies and elections available at law or in equity. The Company and Manager acknowledge that the rights created hereby are unique and recognize and affirm that in the event of a breach of this Agreement irreparable harm would be caused money damages may be inadequate and an aggrieved party may have no adequate remedy at law. Accordingly, the Company and Manager agree that any party shall have the right, in addition to any other rights and remedies existing in its favor at law or in equity, to enforce such party's rights and the obligations of the other party(ies) not only by an action or actions for damages but also by an action or actions for specific performance, injunctive and/or other equitable relief.

23.    Plural. Words used in this Agreement in the singular, where the context so permits, shall be deemed to include the plural and vice versa. Words used in the masculine or the feminine, where the context so permits, shall be deemed to mean the other and vice versa.

24.    Governing Law; Venue; Jurisdiction. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. The Company and Manager agree that any dispute arising out of this Agreement shall be decided by either the federal or state courts in New York County, New York.

**CLUB VENTURES INVESTMENTS, LLC**

By: _____

Name: _____

Title: _____

**MERIDIAN SPORTS CLUBS CALIFORNIA, LLC**

By: _____

Name: Charles H. Grieve II Title: Manager