Jonathan L. Flaxer, Esq.
GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
437 Madison Avenue
New York, New York 10022
(212) 907-7300

David B. Shemano, Esq.
PEITZMAN WEG LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

Counsel for the Reorganized Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| CLUB VENTURES INVESTMENTS LLC, *et al.*,[1] ) | |
| ) | Case No. 11-10891 (ALG) |
| Debtors. ) | |
| ) | Jointly Administered |

**REORGANIZED DEBTORS' MOTION FOR ORDERS (1) GRANTING
SUMMARY ADJUDICATION THAT MARK BERKOWITZ IS A
CREDITOR OF THE DEBTORS, AND (2) ESTABLISHING A DISPUTED
CLAIM RESERVE AMOUNT FOR THE CLAIM FILED BY MARK BERKOWITZ**

Club Ventures Investments LLC ("**Club Ventures**") and certain of its subsidiaries in the

above-captioned jointly administered cases (collectively, the "**Reorganized Debtors**") hereby

move (the "**Motion**") for Orders (1) granting summary adjudication that Mark Berkowitz

("**Berkowitz**") is a creditor of the Debtor, and (2) establishing a disputed claim reserve for Claim

No. 64 filed by Berkowitz (the "**Berkowitz Claim**") for the purpose of making a distribution to

Berkowitz pursuant to the Reorganized Debtors' Second Amended Joint Plan Of Reorganization

---

[1] Jointly Administered with Case Nos.: 11-10892; 11-10894; 11-10893; 11-10896; 11-10895; 11-10897; 11-10900;
11-10898; 11-10899; 11-10901; 11-10902; 11-10903; 11-10905; 11-10904; 11-10906; 11-10907; 11-10908.

1

[Docket No. 168] (the "**Plan**"). In support of this Motion, attached is the Declaration of David Shemano (the "**Shemano Declaration**").

## I.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter relates to the estimation of a claim filed against Club Ventures' bankruptcy estate and, accordingly, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 502(b), 502(c), 1141, and 1142 of title 11 of the United States Code (the "**Bankruptcy Code**") and section 6.8 of the Reorganized Debtors' Plan.

## II.

## GENERAL BACKGROUND

2.     On March 2, 2011 (the "**Petition Date**"), the Reorganized Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of the Bankruptcy Code. On March 4, 2011, the Bankruptcy Court entered its Orders jointly administering the Debtors' Chapter 11 Cases. Prior to emergence from chapter 11, the Reorganized Debtors were authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors was appointed on March 18, 2011.

3.     On April 27, 2011, the Bankruptcy Court entered an order establishing June 15, 2011 as the last day for all persons and entities, except governmental unites, to file proof of claim arising before the Petition Date against the Debtors (the "**General Bar Date**"). On or about May 4, 2011, the Debtors provided notice of the General Bar Date by mailing a notice approved by the Bankruptcy Court, together with a proof of claim form, upon the mailing matrix.

1547130.1

4.      On September 20, 2011, the Reorganized Debtors filed their Plan. On September 23, 2011, the Bankruptcy Court entered its Order Confirming the Reorganized Debtors' Plan [Docket No. 180] (the "**Confirmation Order**"). On November 23, 2011 (the "**Effective Date**"), the Plan became effective in accordance with its terms.

5.      Following the Effective Date, the Reorganized Debtors made distributions as contemplated under the Plan to Holders of Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, and Allowed Convenience Claims in an amount equal to such Holder's Allowed Claim. Distributions of the Allowed Convenience Claims in the total amount of $6,398.57 were made from the $150,000 General Unsecured Claim Distribution Amount.

6.      Pursuant to the Plan, Holders of Allowed General Unsecured Claims are placed in Class 8 and will share a *pro rata* distribution of the remaining $143,601.45 General Unsecured Claim Distribution Amount. Not including the disputed Berkowitz Claim, the Reorganized Debtors estimate the *pro rata* distribution to Holders of Allowed General Unsecured Claims will be approximately 5.5%. Because of the size of the disputed Berkowitz Claim, the Reorganized Debtors are precluded from distributing funds to general unsecured creditors until the Berkowitz Claim is resolved or a reasonable disputed claim reserve is established.

7.      Pursuant to the Plan, all Subordinated Claims are placed in Class 10 and are subject to subordination under section 510(b) of the Bankruptcy Code. Holders of Subordinated Claims shall not receive or retain any cash or other property under the Plan on account of the Subordinated Claims.

### III.

### THE BERKOWITZ CLAIM

8.      On or about November 30, 2007, Mark Berkowitz ("**Berkowitz**"), the Debtors' former Chief Financial Officer ("**CFO**"), filed an amended complaint (the "**Complaint**") against Club Ventures, David Barton, and John D. Howard in the New York State Supreme Court alleging an interest in and claims against Club Ventures (the "**Berkowitz Litigation**"). Specifically, Berkowitz asserted a claim against Club Ventures for wages and bonuses under his

3

"Employment Agreement" as defined in the underlying complaint filed in the Berkowitz

Litigation, and an interest or claim against Club Ventures arising from or related to his alleged

entitlement to Class B membership interests in Club Ventures.  A copy of the Complaint is

attached as Exhibit 1 to the Shemano Declaration.

9.    On May 13, 2011, Berkowitz filed a motion for relief from stay to pursue the

Berkowitz Litigation [Docket No. 81] (the "**Relief from Stay Motion**").[1]  After a hearing on

June 1, 2011, the Bankruptcy Court entered an Order on June 14, 2011, denying the motion

[Docket No. 102].

10.    On June 15, 2011, Berkowitz filed a proof of claim, designated by the Bankruptcy

Court as Claim No. 64, and referred to herein as the "**Berkowitz Claim**," asserting an unsecured

claim for $10,149,530.87, of which Berkowitz asserts $11,725.00 is entitled to priority status

under Bankruptcy Code section 507(a)(4).  The Berkowitz Claim is divided into a "principal

amount" of $7,915,845.20, and an "interest expense" of $2,233,685.67.  The stated bases for the

Berkowitz Claim are "wages, services, litigation."  Berkowitz did not attach any documentation

in support of the Berkowitz Claim, but simply attached a one-page summary of categories of

documentation he alleges supports the claim.  Berkowitz provides no breakdown of the bases for

his $10.1 million claim and does not indicate how the documents listed in the summary give rise

to the claim.

11.    On September 12, 2011, the Reorganized Debtors filed their motion (the

"**Original Motion**") for an order disallowing, subordinating, and reclassifying the Berkowitz

Claim {Docket No. 161], which Original Motion was supported by the Declaration of David

Barton [Docket No. 162] (the "**Barton Declaration**").  A true and correct copy of the Berkowitz

Claim is attached as Exhibit A to the Barton Declaration.

12.    On or about December 8, 2011, Berkowitz filed an opposition to the Original

Motion, which included a "Cross-Motion for an Order Permitting Withdrawal of Claim No. 64

Because No Debtor is a Party to [Berkowitz's] Underlying Litigation" [Docket No. 212] (the

---

[1] The Reorganized Debtors request that the Bankruptcy Court take judicial notice of all
referenced pleadings filed on the Court's docket pursuant to Federal Rule of Evidence 201.

4

"**Original Cross-Motion**"). The purported basis for the Original Cross-Motion was Berkowitz's belated discovery that he was not a creditor of the Debtors. Instead, Berkowitz alleged that he had discovered that he was the creditor of a different entity named "Club Ventures Investments, LLC."

13.     On December 15, 2011, in response to the Original Cross-Motion, the Reorganized Debtors filed their consent to the Original Cross-Motion and to Berkowitz's request to withdraw the Berkowitz Claim [Docket No. 213].

14.     The Reorganized Debtors and Berkowitz were unable to agree on a form of order resolving the Original Motion and Original Cross-Motion. On January 24, 2012, at the direction of the Bankruptcy Court, the Reorganized Debtors filed their Motion And Memorandum Of Law For Summary Judgment Granting The Cross-Motion Of Mark Berkowitz To Withdraw His Claim No. 64 [Docket No. 219] (the "**Summary Judgment Motion**"). On February 28, 2012, Berkowitz filed an opposition to the Summary Judgment Motion, which included a cross-motion for summary judgment (the "**Second Berkowitz Cross-Motion**") [Docket No. 223]. The Second Berkowitz Cross-Motion contains extensive argument and purported evidence supporting Berkowitz's theory that there are two different "Club Ventures" entities.

15.     A hearing was held on March 6, 2012. On March 30, 2012, the Court issued a Memorandum Of Decision And Order denying the Summary Judgment Motion [Docket No. 230]. Instead, the Court modified the injunctions under the Plan to allow Berkowitz to go forward with his state court litigation to determine the issue of whether two separate "Club Ventures" entities exist, one the Reorganized Debtor and the other a non-debtor entity with the same name. If two separate entities are found by the state court to exist, Berkowitz will have the right to pursue his claim against the non-debtor entity, but the Berkowitz Claim against the Reorganized Debtor will be expunged. If, on the other hand, the state court finds that there is only one "Club Ventures" entity (*i.e.*, the Reorganized Debtor), Berkowitz will have the right to pursue the Berkowitz Claim in this Chapter 11 Case.

1547130.1

16.     In the Memorandum of Decision, the Court further held that "if the Debtors conclude that the length of time needed to obtain a State Court determination is unfairly prejudicing other creditors by delaying a distribution to them or by requiring the instant chapter 11 cases to remain open, the Debtor may seek to advance determination of its objections and/or move to estimate Berkowitz's claim pursuant to section 502(c) of the Bankruptcy Code."

## VI.

## THE UNDISPUTED FACTS CONCERNING THE ALLEGED EXISTENCE OF TWO SEPARATE ENTITIES KNOWN AS CLUB VENTURES INVESTMENTS, LLC.

17.     The Second Berkowitz Cross-Motion makes the very convoluted, if not facially incoherent, argument that there are two entities known as "Club Ventures Investments, LLC," one of which is a debtor in this case and one which is not, and that Berkowitz is only a creditor of the entity that is a not a debtor in this case.

18.     Berkowitz's entire case is built around his argument that the Debtor is not the entity in which Berkowitz was granted a membership interest.  He argues that what he characterizes as the "Real CVI" was formed in 2004 by John Howard and David Barton when they signed the original Operating Agreement for Club Ventures Investments LLC and then validly amended in 2005 to include Berkowitz as the holder of a membership interest.  (Second Berkowitz Cross-Motion, p. 6[2]).  He then argues that what he characterizes as the "Impostor CVI" was formed in 2008 when Howard, Barton and Praesidian Capital ("Praesidian") wrote a different and new LLC operating agreement contract to which they, but not Berkowitz, became parties. (Second Berkowitz Cross-Motion, p. 7).  Berkowitz asserts that the "Real CVI" is the entity he is suing in state court and is a "different legal person" than the "Impostor CVI," which he alleges is the debtor in this bankruptcy case.  (Second Berkowitz Cross-Motion, p. 11).

19.     Berkowitz does not appear to deny that all of the assets of the CVI that existed prior to 2008 are property of the CVI entity that is the debtor in this case (the "**Debtor CVI**") and the Debtor CVI confirmed plan is effective and binding, but he apparently believes he may

---

[2] The page numbers referenced are the ECF page numbers at the top of the pages.

have some derivative rights against third parties, such as John Howard, David Barton and Praesidian Capital, if the "Real CVI" is a separate entity from the Debtor CVI.[3]

20.    While it is easy enough for Berkowitz to allege a convoluted theory, establishing that his theory has any factual or legal basis is an entirely different matter.  Berkowitz's theory is easily tested by a review of the underlying operative documents and public records, and those documents and records show that Berkowitz's theory has absolutely no factual or legal support.

Certificate of Formation

21.    CVI was formed in 2004 as a Delaware limited liability company.  A copy of the certificate of formation filed in 2004 is attached as Exhibit 2 to the Shemano Declaration. Pursuant to section 18-02 of the Delaware Corporations Code, the name of a limited liability company as set forth in its certificate of formation "[m]ust be such as to distinguish it upon the records in the office of the Secretary of State" from the name of any other entity qualified to do business in Delaware, unless the other entity provides its written consent.  Therefore, as a matter of Delaware law, there cannot be two different Delaware limited liability companies each having the same name in their respective filed certificates of formation (unless written consent is provided).  Berkowitz has never alleged that "Impostor CVI" filed a certificate of formation identifying its name as "Club Ventures Investments," nor has Berkowitz ever alleged that Impostor CVI filed a certificate of formation using any other name.  As set forth in the Shemano Declaration, the Reorganized Debtors have searched the records of the Delaware Secretary of State, which search revealed that there is only one certificate of formation on file with the Delaware Secretary State for an entity called "Club Ventures Investments," and that certificate of formation was filed in 2004.

---

[3] As Berkowitz's claims against John Howard in the Berkowitz Litigation were previously dismissed, it is unclear on what basis Berkowitz believes he could assert any new claims against Howard.

Tax Identification Number

22.    As set forth in the Shemano Declaration, the tax identification number assigned to
CVI in 2004 was 20-1250014, that number was used on each and every tax return filed by CVI
from 2004 through 2012, and is the number on Debtor CVI's petition page.

Operating Agreements

23.    As set forth above, Berkowitz argues that there was one CVI entity until 2008,
when a new operating agreement was entered into without Berkowitz's consent.  According to
Berkowitz, because he did not consent to the new operating agreement, the new operating
agreement created a separate entity from the preexisting CVI, of which Berkowitz remained the
holder of a membership interest and creditor.

24.    While the operating agreement amendments and restatements speak for
themselves, the following is a chronological summary of the multiple post-2004 amendments
and restatements so that the Court can have some context for the changes and why Berkowitz's
attempt to characterize one of those multiple amendments and restatements as the genesis of a
"different and new" entity is simply wrong.  Attached as Exhibit 3 to the Shemano Declaration is
a more comprehensive identification of each of the changes to the various amendments and
restatements (the "**Documentary Supplement**"), and each of the amendments and restatements
is attached as an exhibit to the Documentary Supplement.

The Original Operating Agreement

25.    Club Ventures Investments LLC ("**CVI**") was formed as a Delaware limited
liability company in 2004.  The members of CVI entered into an operating agreement entitled
"Limited Liability Company Agreement of Club Ventures Investments LLC, made as of June 11
2004 (the "**Original Operating Agreement**").  The signatories to the Original Operating
Agreement were Howard and Barton, who, between them, were issued all of CVI's 100
"Membership Units." (Documentary Supplement, Ex. A).  Pursuant to Section 11.12 of the
Original Operating Agreement, the Original Operating Agreement could be amended at any time

8

by a writing executed by "Members holding at least 80% of the Membership Units."
(Documentary Supplement, Ex A, p. 18).

### The Amendments To The Operating Agreement

26.      After 2004, Section 11.12 was invoked twelve times to amend the operating

agreement (as amended, from time to time, hereinafter referred to as the "**Operating**

**Agreement**").   Virtually all of the amendments coincided with a new investment in CVI, either

by Howard or by one or more Praesidian entities, with one of the amendments, the Second,

coinciding with the employment by CVI of Berkowitz.

27.      The first amendment, styled simply "Amendment to the Limited Liability

Company Agreement and Joinder Agreement" (the "**First Amendment**"), made as of August 26,

2005, dealt primarily with the issuance to Praesidian of a "warrant" for 2,041 Membership Units.

The preamble of the First Amendment referred to Section 11.12 and recited that Howard and

Barton as the "Amending Members" were holders of 100% of the Membership Units.

(Documentary Supplement, Ex. B).

28.      As noted above, the Second Amendment, made as of November 8, 2005,

coincided with the employment by CVI of Berkowitz and the conditional issuance of 2.9 "Class

B Membership Units" to him in connection with that employment.   The 100 Membership Units

previously issued to Howard and Barton were re-denominated "Class A Membership Units"

pursuant to this amendment.   The Second Amendment was signed by Howard and Barton as

"Amending Members," Praesidian as "Warrantholder," and Berkowitz as "Executive."   Like the

First Amendment, the Second Amendment referred to Section 11.12 and recited that Howard and

Barton as the "Amending Members" were holders of 100% of the Membership Units.

(Documentary Supplement, Ex. C).

29.      The Third Amendment, made as of May 30, 2007, the Fourth Amendment, made

as of September 19, 2007, the Fifth Amendment, made as of January 31, 2008, the Sixth

Amendment, made as of March 5, 2008, the Seventh Amendment, made as of April 23, 2008, the

Eighth Amendment, made as of May 16, 2008, and the Ninth Amendment, made as of May 23,

9

2008, all coincided with additional investments by Howard and the issuance to Howard of "Series A Preferred Membership Units" in return for those investments. The signatories to the Third Amendment were, like the signatories to the Second Amendment, Barton and Howard as "Amending Members," Praesidian as "Warrantholder," and Berkowitz as "Executive." With respect to the Fourth through Ninth Amendments, the signatories were Howard and Barton as "Amending Members" and Praesidian as "Warrantholder." Berkowitz was not a signatory to the Fourth through Ninth Amendments. As with the prior amendments, each of the Third through Ninth referred to Section 11.12, but, unlike the prior amendments (which had referred to the fact that the Amending Members held 100% of the Membership Units), these amendments stated merely that the signatories to the amendment held more than 80% of the Membership Units, which was consistent with the provision of the Original Operating Agreement that provided that only 80% of the membership units were required to amend the Original Operating Agreement. (Documentary Supplement, Exhibits D through J).

30.     In addition to accommodating the Class B Membership Units and the Series A Preferred Membership Units, a number of the first nine amendments made other changes to the Operating Agreement so that, by the time the Ninth Amendment was signed, in order to figure out what the Operating Agreement actually said, a reader had to refer to ten different documents—the Original Operating Agreement and each of the nine subsequent amendments.

<u>The Amended and Restated Agreement</u>

31.     Figuring out what the Operating Agreement at that point provided must, therefore, have been a cumbersome process. Presumably for this reason, when the Operating Agreement was amended again, this time to accommodate an additional investment by, and the issuance of a new "Series B Preferred Membership Units" to, Praesidian, it was decided that the new amendments required to accommodate the Series B Preferred Membership Units should be consolidated into one document with all the changes wrought by the prior nine amendments. And so was created the "Amended and Restated Limited Liability Company Agreement,"

1547130.1

effective as of June 17, 2008 (the "**Amended and Restated Agreement**"). (Documentary Supplement, Ex. K).

32.     The Amended and Restated Agreement is the document that Berkowitz characterizes as something "different and new," and giving birth to "Impostor CVI." But there was nothing nefarious about the First Statement, which was, in fact, simply what its full name implied—additional amendments to the then extant Operating Agreement and a restatement of the Operating Agreement taking into account all of the amendments that had been made by the prior nine amendments, plus the provisions added or modified by the Amended and Restated Agreement.

33.     Other than the incorporation of the cumulative amendments and a few other related provisions, the Amended and Restated Agreement did not significantly change the governance of CVI. The membership interests in CVI included the same old Class A Membership Units (issued to Howard and Barton under the Original Operating Agreement), the same old Class B Membership Units (conditionally issued to Berkowitz under the Second Amendment), and the same old Series A Preferred Membership Units (issued to Howard under the Third through Ninth Amendments, all of which had existed under amendments that predated the Amended and Restated Agreement and, in the case of the Class A and Class B Memberships Units and some of the Series A Membership Units, existed under amendments (the Second and Third) that Berkowitz himself had signed.

34.     The parties did not prepare and file a new "Certificate of Formation" concurrently with the Amended and Restated Agreement. The Amended and Restated Agreement specifically refers to CVI's Certificate of Formation, which is defined as the Certificate of Formation filed with the Delaware Secretary of State. As set forth above, the only Certificate of Formation was filed in 2004, and no new Certificate of Formation was filed in 2008 or any other time. As described in the Documentary Supplement, the Second Restatement and Third Restatement

11

1547130.1

(Exhibits K and M) were made effective as of February 12, 2009 and March 24, 2009, respectively.[4]

## VI.

### THE REORGANIZED DEBTOR ARE ENTITLED TO SUMMARY ADJUDICATION THAT BERKOWITZ HOLDS A CLAIM AGAINST THE DEBTORS

35.    Federal Rule of Civil Procedure 56 and Federal Rules of Bankruptcy Procedure ("FRBP") 7056, made applicable to this contested matter pursuant to FRBP 9014(c), provide that "a party seeking to recover upon a claim, counterclaim, or cross claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof."  Fed.R.Civ.P 56(a).  Summary judgment, "shall be rendered forthwith if the pleadings, . . ., together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(c).

36.    Berkowitz's legal argument that the Amended and Restated Agreement executed in 2008 created a new and distinct entity from the existing CVI is summarized on page 10-11 of the Second Berkowitz Cross-Motion, which argues that, as a matter of law, the amendment and restatement of a limited liability company operating agreement necessarily creates a new and distinct legal entity:

> Despite the clever but misleading labeling scheme aimed at impersonating Real CVI, legal precedent establishes such amendments and restatements as Defendants purport to have made to Real CVI's operating agreement legally can not constitute a valid amendment of Real CVI's Delaware LLC operating agreement contract.

37.    As the Bankruptcy Court is aware, operating agreements are commonly amended and restated, and there can be little doubt that companies and their professionals would be very

---

[4] The Reorganized Debtors have not as yet been able to locate executed versions of the Amended and Restated Agreement nor the Third Restatement and thus neither Exhibits K nor M of the Documentary Supplement are executed.  The version of the Amended and Restated Agreement annexed to the Documentary Supplement is the same as the one attached to Berkowitz's Declaration filed on February 28, 2012 (Dkt. 223), Exhibit 15.

12

surprised to discover that each amendment or restatement created a new legal entity. Employees would suddenly need to have tax withholdings made by some new entity, and leases and other agreements which prohibit assignment or use of assets by anyone other than the contracting party, would suddenly be violated. Therefore, if Berkowitz is correct that an amendment of restatement of an operating agreement creates a new legal entity, corporate law will be revolutionized.

### The Legal Status Of A Delaware Limited Liability Company Is Defined By The Certificate Of Formation, Not The Operating Agreement.

38.    The crux of Berkowitz's argument is that the legal status of a Delaware limited liability company is defined by the entity's operating agreement, so if the operating agreement is changed, a new entity, by definition, is created. (Second Berkowitz Cross-Motion, pp. 10-11).

39.    The argument that the legal status of Delaware LLC is defined by the operating agreement is simply wrong. The legal formation of a Delaware limited liability company is governed by section 18-201 of the Delaware Corporations Code, which provides that the legal entity is formed by the filing of a certificate of formation:

> (a) In order to form a limited liability company, 1 or more authorized persons must execute a certificate of formation. The certificate of formation shall be filed in the office of the Secretary of State and set forth:
>
> (1) The name of the limited liability company;
>
> (2) The address of the registered office and the name and address of the registered agent for service of process required to be maintained by § 18-104 of this title; and
>
> (3) Any other matters the members determine to include therein.
>
> (b) **A limited liability company is formed at the time of the filing of the initial certificate of formation in the office of the Secretary of State** or at any later date or time specified in the certificate of formation if, in either case, there has been substantial compliance with the requirements of this section. A limited liability company formed under this chapter shall be a separate legal entity, the existence of which as a separate legal entity shall continue until cancellation of the limited liability company's certificate of formation.

13

(Emphasis added).

While the statute specifically requires the filing of a certification to create a separate legal entity, there is no requirement that an operating agreement be entered into to form the entity. The preparation of the operating agreement is addressed in Section 18-201(d), which provides that the operating agreement may be entered into before or after the filing of the certificate of formation, and may be made effective as of the date of formation or at any other time as provided for in the agreement:

> (d) A limited liability company agreement shall be entered into or otherwise existing either before, after or at the time of the filing of a certificate of formation and, whether entered into or otherwise existing before, after or at the time of such filing, may be made effective as of the formation of the limited liability company or at such other time or date as provided in or reflected by the limited liability company agreement.

40.    While Section 18-201(d) appears to require that a "limited liability company agreement" eventually be entered into, there is no requirement that the agreement be in writing or include any substantive provision. *See,* Section 18-101 ("limited liability company agreement" broadly defined as "any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business."); Section 18-106 ("A limited liability company shall possess and may exercise all the powers and privileges granted by this chapter or by any other law *or* by its limited liability company agreement, . . .") (emphasis added).

41.    The fact that it is the filed certificate of formation that governs the legal status of the LLC, and not the operating agreement, runs throughout the Delaware Corporations Code. For example, Section 18-1109 governs the revival of an LLC whose certificate had been cancelled as a result of the resignation of the registered agent or nonpayment of taxes. The revival is effectuated by filing new certificate of revival, which is treated as an amendment to the certificate of formation. Pertinently, after the revival, "the limited liability company shall be as exclusively liable for all contracts, acts, matters and things made, done or performed in its name

14

and on its behalf by its members, managers, employees and agents prior to its revival **as if its certificate of formation had at all times remained in full force and effect**." (Emphasis added). The highlighted language makes clear that it is the certificate of formation, and not the operating agreement, that creates the legal entity and empowers the entity to transact business.

> Limited Liability Agreements May Be Amended Without Creating A New Limited Liability Agreement.

42.    Berkowitz's argument that the amendment of an operating agreement creates a new legal entity is contradicted by specific language in the Delaware Corporation Code which specifically contemplates the amendment of both the certification of formation and the operating agreement. *See, e.g.,* Section 18-204 ("Unless otherwise provided in a limited liability company agreement, any person may sign any certificate or amendment thereof or enter into a limited liability company agreement or amendment thereof by an agent, including an attorney-in-fact."); Section 18-206 ("The signed copy of the certificate of formation and of any certificates of amendment, correction, amendment of a certificate with a future effective date or time . . . shall be delivered to the Secretary of State.").

43.    In fact, section 18-206 specifically contemplates that a certificate of formation can be restated to include all amendments, and the restatement relates back to the date of the original certification of formation:

> (a) A limited liability company may, whenever desired, integrate into a single instrument all of the provisions of its certificate of formation which are then in effect and operative as a result of there having theretofore been filed with the Secretary of State 1 or more certificates or other instruments pursuant to any of the sections referred to in this subchapter, and it may at the same time also further amend its certificate of formation by adopting a restated certificate of formation.
>
> . . .
>
> (d) Upon the filing of a restated certificate of formation with the Secretary of State, or upon the future effective date or time of a restated certificate of formation, as provided for therein, the initial certificate of formation, as theretofore amended or supplemented, shall be superseded; thenceforth, the restated certificate of formation, including any further amendment or changes

15

made thereby, shall be the certificate of formation of the limited liability company, but the original effective date of formation shall remain unchanged.

Berkowitz does not, and cannot, explain how a certification of formation can be amended and restated without creating a new legal entity, but any amendment of an operating agreement necessarily creates a new legal entity.[5]

### Amendment Of An Operating Agreement Does Not Create A Separate Entity

44.     As the Court may expect, black-letter law holds that an "amendment" to a contract is exactly what the name implies -- an amendment to the original contract and not the creation of a separate additional contract. If a contract is amended, the original contact and the amendment are treated as a single contract. *See, e.g., International Business Lists, Inc. v. American Tel. & Tel. Co.,* 147 F.3d 636, 641 (7th Cir. 1998) ("A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed."); *Travelers Ins. Co. v. Workmen's Compensation Appeals Bd.,* 68 Cal.2d 7, 434 P.2d 992 (1967) ("[A]n alteration of details of the contract which leaves undisturbed its general purpose constitutes a modification rather than a rescission of the contract [cite omitted]; it does 'not affect the original contract, which still remains in force.'").

45.     The law is no different in Delaware, which follows the black-letter law that contractual modification creates a single modified contract. *See, e.g., Lee Builders, Inc. v. Wells,* 33 Del.Ch. 315, 92 A.2d 710 (Del. Ch. 1952), *rev'd on other grounds,* 99 A.2d 620 (Del. 1953) ("A new contract relating to the subject matter of the former agreement does not destroy the obligation of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intended the new contract to supersede the old contract entirely."); *see also, In re VeraSun Energy Corp.,* 467 B.R. 757 (Bankr. D. Del. 2012) ("it is black letter law that a contract

---

[5] As further evidence that Berkowitz's legal theory is not merely wrong, but incoherent, Berkowitz never argues that the multiple amendments and restatements other than the Amended and Restated Agreement entered into by the majority members created additional "impostor" CVIs. If Berkowitz's legal theory is correct, there are actually around a dozen separate "CVIs" in existence capable of transacting business and being sued.

1547130.1

and any agreement modifying it may be considered together" and that "writings connected by internal references to each other and involving the same subject matter constitute a single contract for the entire transaction.").

### Novation Of An Agreement Does Not Create A Second Agreement.

46.    Contractual amendment or modification is distinguished from "novation," which is the intentional extinguishment of the old contract and replacement of the old contract with a new contract. Under Delaware law, a novation requires four elements: "(1) a valid pre-existing obligation; (2) a valid new contract; (3) extinction of the old contract; and (4) the consent of all parties to the novation transaction." *Aveta Inc. v. Bengoa*, 986 A.2d 1166 (Del.Ch. 2009).

47.    As a practical matter, the distinction only becomes relevant when a clause included in the original contract is omitted from the new document. If the new document is an amendment or modification to the old contract, then the omitted clause would continue to be enforceable. Comparatively, if the new document is a novation, then the omitted clause would not be enforceable. *See, e.g., China Resource Products (U.S.A.) Ltd. v. Fayda Intern., Inc.*, 747 F.Supp. 1101 (D. Del. 1990) (analyzing whether arbitration clause included in the original contract but omitted from new document was enforceable).

48.    Pertinently, regardless of whether a contract is modified or novated, there can only be one contract at any one time. If a contract is modified, the amendment is incorporated into the existing contract, so there is only one contract in existence. If a contract is novated, the old contract is extinguished, so again, there is only one contract in existence.

49.    There is no dispute that the Amended and Restated Agreement was a complete restatement and replacement of the Original Operating Agreement. That is to say, there is no dispute that it was the intent of the parties to the Amended and Restated Agreement to memorialize a new written operating agreement that would remove any need to refer back to the Original Operating Agreement, and reasonable people could disagree concerning whether the Amended and Restated Agreement is a modification or a novation of the Original Operating Agreement. But the fact that the parties intended to restate and replace the ***operating agreement***

does not mean the parties intended to create a new *entity* distinct and separate from the *existing entity*. This is evidenced by the fact that the Amended and Restated Agreement specifically refers to CVI's Certificate of Formation, which is defined as the Certificate of Formation filed with the Delaware Secretary of State. As set forth above, the only Certificate of Formation was filed file in 2004, and no new Certificate of Formation was filed in 2008, nor did the parties cancel the existing Certificate of Formation.

The Case Law Cited By Berkowitz Does Not Support His Argument.

50.    In the face of overwhelming legal authority to the contrary and the complete absence of factual evidence supporting his two-debtor theory, Berkowitz cites the single case of *Abbey v. Fortune Drive Associates, LLC*, 2010 WL 1553616 (Cal. App. 1 Dist. April 20, 2010). The *Abbey* case is very instructive, but in a way that entirely undermines Berkowitz's argument.

51.    In the case, the majority members of a limited liability company wanted to remove a minority member. To effectuate the removal, the majority members approved an amendment to the operating agreement that permitted the majority members to remove and buyout a minority member, and provided for arbitration in the event of any dispute concerning the value of the minority member's interest. The majority members then removed the minority member in accordance with the amendment and served a notice of arbitration with respect to the buyout terms. The issue before the court was whether the arbitration provision was enforceable if the minority member did not execute the amendment. There was no dispute that the majority members had the right under the operating agreement to amend the operating agreement without the consent of the minority member.

52.    The court held that, with respect to the drafting of operating agreements, the Delaware Limited Liability Company Act law affords parties "virtually unfettered discretion to define contractually their business understanding." *Id.* at 8. Once the operating agreement is entered into, however, the operating agreement "becomes a contract, subject to the same general law as every other contract." *Id.* As a practical matter, this means that non-unanimous amendments are subject to various constraints. "Once an operating agreement has been created

18

and executed, the members' expectations constrain the changes that can be made to that agreement without the consent of all members." *Id*. Based upon the facts and circumstances, the court concluded that the arbitration clause was beyond the intent of the parties and, therefore, unenforceable. *Id*. at 9.

53.     The *Abbey* case is instructive, because it concerns an amendment to an operating agreement to which a minority member did not consent, which is the fact pattern at issue. However, Berkowitz misses the point, which is that the court never even implied the amendment created a new operating agreement. Instead, the court determined that the amendment was not enforceable against the minority member. In determining that the unconsented to amendment was unenforceable as opposed to novating the existing agreement and creating a new agreement, the court in *Abbey* was following black-letter law. *See, e.g., Stroud v. Tunzi*, 160 Cal.App.4th 377, 385, 72 Cal.Rptr.3d 756, 762 (2008) ("Appellants' contention fails because they cite no authority that invalid modifications to a contract nullify the contract.").

54.     Therefore, if Berkowitz believes that the Amended and Restated Agreement includes one or more provisions that were beyond the power of the majority members to agree to, his remedy is to seek a determination that such provisions are not enforceable against Berkowitz. There is simply no case law, in Delaware or any other jurisdiction, that suggests that Berkowitz is entitled to a determination that the Amended and Restated Agreement created a new legal entity separate and apart from the entity that existed prior to the Amended and Restated Agreement.

Contrary To Berkowitz's Characterizations, The State Court Has Never Ruled That There Are Two Different Entities As A Consequence Of The Amended and Restated Agreement.

55.     Berkowitz repeatedly refers to purported finding by the State Court that support his allegation that there are two distinct legal entities, going so far as to allege that the State Court ruled that CVI " will not even be allowed to mention the Impostor CVI" at trial. (Second Berkowitz Cross-Motion, p. 9).

1547130.1

56.    As this Court may expect, the State Court has never ruled on or made any finding regarding whether there are two distinct legal entities. Berkowitz cites to two different rulings made to the State Court. First, on August 3, 2009, the State Court considered a CVI motion for summary judgment that Berkowitz did not suffer any damage from the failure of CVI to give Berkowitz 2.9 Class B interests in CVI in 2006 because CVI amended the Operating Agreement in 2009 to give Berkowitz the interests. Berkowitz opposed the motion, arguing that he never received the interests because he was not a party to the 2009 agreement. The State Court denied the motion for summary judgment, but it is evident from the transcript that the State Court denied the motion because of a stated factual dispute concerning whether Berkowitz ever received the interests. The State Court did not discuss, consider, or make any finding concerning the substantive issue, including whether there were two distinct legal entities. (Second Berkowitz Cross-Motion, Exhibit 22, pp. 3-6).

57.    Second, on March 25, 2010, the State Court considered a CVI motion to amend the pleadings to refer to the fact that CVI amended the Operating Agreement in 2009 to give Berkowitz 2.9 Class B interests in CVI. The Defendants made the motion to preserve their right to argue that they mitigated any damage caused by the failure to give Berkowitz the interests in 2006. Berkowitz opposed the motion. The State Court denied the motion, but again, the denial had nothing to do with the substance of the issue, including whether there are two distinct legal entities. Instead, it is evident from the transcript that the State Court viewed the granting of the units in 2009, several years after the commencement of the litigation, as an inadmissible settlement offer. The State Court did not discuss, consider, or make any finding concerning the substantive issue, including whether there were two distinct legal entities. (Second Berkowitz Cross-Motion, Exhibit 19, pp. 3-6).

Conclusion

58.    Berkowitz's argument that there are two CVI entities is based on a legal theory that is refuted by the Delware statutes, black-letter law, and the underlying documents. For the reasons set forth above, the Court should grant summary adjudication that there is only one

20

"CVI" entity, that CVI entity is the entity that filed the chapter 11 petition in this case and confirmed the Plan, and Berkowitz is a creditor of that CVI entity to the extent he has a claim.

## VI.

### BERKOWITZ'S GENERAL UNSECURED CLAIM AGAINST THE DEBTORS SHOULD BE ESTIMATED AT $184,963 FOR PURPOSES OF DISTRIBUTION UNDER THE PLAN

59.     In contemplation that the adjudication of one or more disputed claims may unduly delay the distribution to creditors, section 6.8(c) of the confirmed Plan specifically provides that the Bankruptcy Court shall retain jurisdiction to estimate disputed claims pursuant to section 502(c) of the Bankruptcy Code:

> (c) The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection and make distributions under the Plan with respect to other Allowed Claims in the same class after making an appropriate reserve based on the estimated amount of such Disputed or contingent Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Except as provided herein and in the Agreement, Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

60.     Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure specify procedures for estimation under section 502(c). Bankruptcy courts may employ "whatever method is best suited to the particular contingencies at issue" as long as the procedures adopted are consistent with the objective that "a reorganization must be accomplished quickly and efficiently." *In re Corey*, 892 F.2d 829 (9th Cir. 1989).

21

61.    Given the breadth of their discretion in regard to estimation proceedings, bankruptcy courts have fashioned numerous different hearing procedures for the estimation of claims. For example, some courts have held trials on limited or shortened schedules. *See, e.g., In re Nova Real Estate Investment Trust*, 23 B.R. 62 (Bankr. E.D. Va. 1982) (8 days of testimony permitted). Some courts have combined limited live testimony with deposition transcripts. *See, e.g. In re Thomson McKinnon Securities, Inc.*, 143 B.R. 612 (Bankr. S.D.N.Y. 1982) (each side permitted one live witness plus relevant depositions). Others have simply relied upon a review of pleadings and briefs with limited opportunity for oral argument. *See, e.g., In re Lane*, 68 B.R. 609 (Bankr. D. Hi. 1986).

62.    In conducting an estimation proceeding, the majority view appears to require that the court asses the probability of success on the merits if there were a trial and assign a value based on these probabilities. "A trier of fact first determines which version is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by the probability that it may be sustainable only in part or not at all." *In re Windsor Plumbing Supply Co.,* 170 B.R. 503, 521 (Bankr. E.D.N.Y. 1994). The *Windsor Plumbing* court gave the following example of one possible methodology. Suppose a plaintiff claims it was defrauded out of $1,000. If, in estimation proceedings, the bankruptcy court believed that two out of ten randomly-selected juries might grant the maximum award of $1,000, six of the ten might award just $ 750, one of the ten might award $ 250, one of the ten might award nothing, then $675 is the statistically estimated value of the plaintiff's claim. *Id.* at 521.

63.    Another approach was taken by the court in *In re Lane*, 68 B.R. 609 (Bankr. D. Hi. 1986). That court employed a kind of modified all-or-nothing approach. It analyzed each of the elements of damages sought by the claimants. The creditors claimed that, as a result of the debtor's misrepresentations in connection with the sale of real property, they were entitled to at least $5,000,000 in damages, which included $500,000 down payment, $120,000 in monthly

22

payments, lost benefit of $500,000, damages of $3,000,000 and punitive damages which could easily reach $15,000,000. The debtor argued that $80,000 was sufficient to cover the claim, since the cost of repairs was $159,023 and some of the repairs were caused by the creditor-buyers' failure to maintain the premises. Because it felt that any award of the benefit of the bargain damages ($500,000) was very unlikely, the bankruptcy court concluded that the claim should be estimated at $550,000, which included only the buyer's down payment and subsequent monthly payments. *Id.* at 613.

64.    A somewhat more sophisticated approach was taken by the court in *In re Farley, Inc.*, 146 B.R. 748, 756 (Bankr. N.D. Il. 1992). There the court reviewed the various issues that personal injury claimants would have to address under state law and the relative strength and weakness of the parties' positions on each such issue. Based on this analysis, the court concluded that the claimants had a 25% probability of success at trial. The court then estimated the claims at $1.5 million by taking the stipulated amount of potential damages ($5 million) and multiplying it by the probability (25%).

65.    The approach taken by the *Farley* court is similar to the approach commonly applied by courts to determine the "fair value" of contingent liabilities for purposes of determining whether a debtor was insolvent for fraudulent transfer or preference purposes. The leading case on this point is *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988). In determining whether a transferor that had contingent liabilities was insolvent at the time of the transfer, the Seventh Circuit reasoned that it made no sense to take the contingent liabilities at face value: "By definition, a contingent liability is not certain--and often is highly unlikely--ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real." *Id.* at 199.

66.    As set forth above, whatever the estimated allowed amount of the Berkowitz Claim, that Claim will share a *pro rata* pot of less than $150,000. In view of the relatively nominal amount at stake, the Debtors request that the Court exercise its considerable discretion to adopt an estimation procedure that is simple and quick. The Debtors believe no discovery is

required to conduct the estimation hearing, and that the Court should simply review the respective pleadings and make a determination.

67.    The Debtors' position concerning the merits of the Berkowitz Claim is set forth in the Original Motion and Barton Declaration filed on September 12, 2011, and the Debtors will not repeat those arguments in any detail. In summary:

a)    Berkowitz failed to provide *prima facie* evidence of his claim because of the lack of supporting documentation.

b)    The portion of the Berkowitz Claim arising from or related to his alleged entitlement to Class B membership interests in Club Ventures Investments, LLC, should be subordinated pursuant to section 510(b) of the Bankruptcy Code.

c)    The portion of the Berkowitz Claim asserting a priority wage claim should be disallowed because Berkowitz did not perform services within 180 days of the Petition Date.

d)    Berkowitz did not resign with good reason.

e)    The Debtors' applicable financial statements, signed by Berkowitz, did not disclose any amounts owed to Berkowitz.

f)    Berkowitz is not entitled to a bonus because the Debtors' did not report positive EBITDA.

g)    There was no transaction during Berkowitz's employ that would have triggered a bonus for obtaining equity financing.

68.    Berkowitz responded to the Original Motion in his Original Cross-Motion filed on December 8, 2011, and alleged in response as follows:

a)    Berkowitz is in possession of voluminous documentation evidencing his claims.

b)    Berkowitz does not assert any equity claims against the Debtor, because his equity claims are against "Real CVI" and not "Impostor CVI."

c)    Berkowitz is entitled to a priority claim because his claim is inclusive of a whistleblower retaliation claim.

1547130.1

     d)     Berkowitz did resign for good reason.

     e)     Berkowitz denies signing financial statements that did not disclose any amounts owed to Berkowitz.

     f)     The Debtors' financial statements can be calculated to show positive EBITDA.

     g)     Berkowitz does not assert a claim for a bonus for obtaining equity financing.

69.     The following is an identification of the claim amounts in the Complaint, and then the Reorganized Debtors' proposed estimation amount for distribution purposes:

     a)     <u>$34,453.60 for base compensation and EBITDA bonus in 2005</u>. While the Reorganized Debtors dispute any amounts are owed, the Reorganized Debtors suggest that the entire amount be allowed for estimation purposes.

     b)     <u>$29,388.77 for base compensation  in 2006</u>. While the Reorganized Debtors dispute any amounts are owed, the Reorganized Debtors suggest that the entire amount be allowed for estimation purposes.

     c)     <u>$91,975.59 for EBITDA bonus in 2006</u>. There is absolutely no evidence that the Debtors had positive EBITDA in 2006 that would entitle Berkowitz to a bonus. To the contrary, the Debtors required significant infusions from Howard and Praesidian to operate. Therefore, this claim should be allowed at zero for estimation purposes.

     d)     <u>$17,307.69 for accrued unused vacation time</u>. While the Reorganized Debtors dispute any amounts are owed, the Reorganized Debtors suggest that the entire amount be allowed for estimation purposes.

     e)     <u>$26,426 for unreimbursed expenses</u>. While the Reorganized Debtors dispute any amounts are owed, the Reorganized Debtors suggest that the entire amount be allowed for estimation purposes.

1547130.1

f)      $2,900,000 for the estimated value of the membership interests that were allegedly not provided to Berkowitz.  This claim should be treated as subordinated claim pursuant to section 510(b) of the Bankruptcy Code and allowed at zero for estimation purposes.

g)      $520,000 for equity financing bonus.  In the Original Cross-Motion, Berkowitz stated that he is not asserting this claim against the Debtors, so the claim should be allowed at zero for estimation purposes.

h)      $100,000 for EBITDA bonus in 2007.  There is absolutely no evidence that the Debtors had positive EBIDA in 2007 that would entitle Berkowitz to a bonus.  To the contrary, the Debtors required significant infusions from Howard and Praesidian to operate. Therefore, this claim should be allowed at zero for estimation purposes.

i)      $77,387 for consulting fees.  While the Reorganized Debtors dispute any amounts are owed, the Reorganized Debtors suggest that the entire amount be allowed for estimation purposes.

j)      $3.5 million for retaliation based upon the reporting of financial irregularities.  In order for Berkowitz to have a retaliation claim for $3.5 million, he must demonstrate that (i) the Debtors had financial irregularities, (ii) he was fired for reporting the irregularities, and (iii) the claim amount is a reasonable penalty.  There is absolutely no evidence of any irregularities, no evidence that Berkowitz was terminated as opposed to Berkowitz resigning, and no evidence that Berkowitz was terminated for reporting irregularities. Furthermore, pursuant to section 726(a)(4) of the Bankruptcy Code, penalty claims are subordinated to other general unsecured claims.  Therefore, this claim should be allowed at zero for estimation purposes.

k)      $3.5 million for tortious interference with employment agreement.  The complaint does not describe what additional damages such alleged interference would have created and/or why such damages would not be duplicative of the other asserted damages, including the damages relating to the membership interests.  Therefore, this claim should be allowed at zero for estimation purposes.

1547130.1

l)    Unliquidated claims for indemnity and attorneys' fees. The State Court ruled that Berkowitz is entitled to advancement of expenses incurred in defending any counterclaims asserted in the Berkowitz Litigation. (Second Berkowitz Cross-Motion, Exhibit 21). At the time of the ruling, Berkowitz estimated his fees at $63,304.28. However, the State Court referred the matter to a special referee because there was no evidence that Berkowitz had actually incurred any fees, which would be the case, for example, if Berkowitz was represented on a contingency basis. As the Debtors dismissed all affirmative claims against Berkowitz, and Berkowitz never submitted any evidence that he had actually incurred fees, the claim should be allowed at zero. If the Court is inclined to estimate the claim at more than zero, the claim should be estimated at no more than $63,304.28.

70.    For the reasons set forth above, the Bankruptcy Court should estimate Berkowitz's claim for purposes of establishing a reserve at $184,963.

## V.

## NOTICE

71.    No trustee or examiner has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York, (b) counsel to the Debtors' secured creditors, (c) counsel to the official committee of unsecured creditors, (d) Mark Berkowitz, and (e) parties that have requested special notice. The Debtors respectfully submit that such notice is sufficient and that no further notice is required.

**WHEREFORE**, the Debtors respectfully request entry of an Order granting the Debtors the relief requested herein and such other and further relief as is just.

Dated: New York, New York
    June 27, 2012

**GOLENBOCK EISEMAN ASSOR BELL &
    PESKOE LLP**
437 Madison Avenue
New York, New York 10022
(212) 907-7300


By: /s/ Jonathan L. Flaxer
        Jonathan L. Flaxer

and

David B. Shemano, Esq.
PEITZMAN WEG LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
(310) 552-3100

Counsel for the Reorganized Debtors

1547130.1